Volume I of II (Appx1 – Appx5555)

No. 25-1936

# United States Court of Appeals for the Federal Circuit

NETLIST, INC.,

*Plaintiff-Appellee,*

*v.*

MICRON TECHNOLOGY TEXAS, LLC, MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Eastern District of Texas
No. 2:22-cv-00294-JRG, Hon. Rodney Gilstrap

## NON-CONFIDENTIAL JOINT APPENDIX

| | |
|---|---|
| Jeffrey A. Lamken | E. Joshua Rosenkranz |
| MOLOLAMKEN LLP | ORRICK, HERRINGTON & |
| The Watergate, Suite 500 |   SUTCLIFFE LLP |
| 600 New Hampshire Avenue, NW | 51 West 52nd Street |
| Washington, DC  20037 | New York, NY 10019 |
| (202) 506-2000 | (212) 506-5000 |
| | |
| *Counsel for Appellee* | *Counsel for Appellants* |

# TABLE OF CONTENTS

**Page**

## VOLUME I

*E.D. Tex. No. 2:22-cv-00294-JRG*

Final Judgment,
Dkt. No. 151, filed July 11, 2024 .............................................. Appx1-4

Memorandum Opinion and Order Denying Motion for
Judgment as a Matter of Law for Non-Infringement,
Dkt. No. 190, filed June 11, 2025
**(Filed Under Seal; Contains Confidential
Materials)**
Dkt. No. 194-1 **(Public Version)** ......................................... Appx5-35

Memorandum Opinion and Order Denying Renewed
Motion for Judgment as a Matter of Law of No
Willfulness of the Asserted Patents,
Dkt. No. 191, filed June 11, 2025 ......................................... Appx36-38

Memorandum Opinion and Order Denying Renewed
Motion for Judgment as a Matter of Law on
Damages,
Dkt. No. 192, filed June 11, 2025
**(Filed Under Seal; Contains Confidential
Materials)**
Dkt. No. 195-1 **(Public Version)** ......................................... Appx39-63

Memorandum Opinion and Order Denying Motion for a
New Trial,
Dkt. No. 193, filed June 11, 2025
**(Filed Under Seal; Contains Confidential
Materials)**
Dkt. No. 196-1 **(Public Version)** ......................................... Appx64-90

Docket for Eastern District of Texas
No. 2:22-cv-00294-JRG .................................................. Appx91-116

Complaint,
Dkt. No. 1, filed August 1, 2022 ....................................... Appx117-127

Transcript of March 6, 2024 Pretrial Conference,
Dkt. No. 67, filed March 11, 2024 .............. Appx128, 256-262, 269-271

Transcript of March 7, 2024 Pretrial Conference,
Dkt. No. 68, filed March 11, 2024 ............................ Appx332, 387-390

Order on Pretrial Motions, Motions in Limine, and
Exhibits,
Dkt. No. 73, filed March 14, 2024 ................................... Appx445-455

Exhibit 2 to Micron's Motion to Stay or, Alternatively,
Sever and Stay the Asserted '912 Patent: Final
Written Decision of IPR2022-00615,
Dkt. No. 93-3, filed April 17, 2024 .................................. Appx457-512

Jury Verdict Form,
Dkt. No. 135, filed May 23, 2024 .................................... Appx513-518

Exhibit A to Defendants' Notice of Determinations
Invalidating Patents-in-Suit: Final Written Decision
of IPR2023-00454,
Dkt. No. 155-1, filed August 1, 2024 .............................. Appx520-569

Micron Defendants' Renewed Motion for Judgment as a
Matter of Law on Damages,
Dkt. No. 156, filed August 7, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ............................................................ Appx570, 575-588

Defendants' Rule 59 Motion for a New Trial,
Dkt. No. 158, filed August 7, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ................................................................ Appx593, 608

Micron Defendants' Notice of Appeal,
Dkt. No. 197, filed July 9, 2025 ...................................... Appx615-618

Micron Defendants' Rule 50(b) Motion for Judgment as
a Matter of Law for Non-Infringement Regarding
U.S. Patent Nos. 7,619,912 and 11,093,417,
Dkt. No. 159, filed August 7, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ................................................................. Appx619, 624-625

Exhibit A to Micron Defendants' Motion for Leave to
Supplement Dispositive Motions and Motions to
Strike Based on Deposition Testimony Obtained
After Briefing Closed: Excerpts from February 15,
2024 Deposition of David Kennedy,
Dkt. No. 38-7, filed February 29, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ........................................................................ Appx655-669

Netlist's Opposition to Micron Defendants' Renewed
Motion for Judgment as a Matter of Law on
Damages,
Dkt. No. 174, filed September 19, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ................................................................ Appx695, 699-715

Netlist's Opposition to Micron's Motion for a New Trial,
Dkt. No. 175, filed September 19, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ................................................................ Appx718, 722-736

Netlist's Sur-Reply to Micron Defendants' Renewed
Motion for Judgment as a Matter of Law on
Damages,
Dkt. No. 184, filed October 30, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ........................................................................ Appx739-746

Netlist's Sur-Reply to Micron's Rule 59 Motion for a
New Trial,
Dkt. No. 187, filed October 30, 2024
**(Filed Under Seal; Contains Confidential
Materials)** .............................................................. Appx748, 751-755

***E.D. Tex. No. 2:22-cv-00293-JRG***

Claim Construction Memorandum Opinion and Order,
Dkt. No. 228, filed November 21, 2023 ......................... Appx5001-5037

Exhibit 3 to Samsung's Renewed Motion to Stay
Pending IPR: Institution Decision of IPR2023-
00454,
Dkt. No. 285-3, filed December 18, 2023 ...................... Appx5039-5081

Exhibit 13 to Samsung's Renewed Motion to Stay
Pending IPR: Institution Decision of IPR2022-
00615,
Dkt. No. 285-13, filed December 18, 2023 ................... Appx5083-5142

Micron's Daubert Motion and Motion to Strike Expert
Testimony of Mr. David Kennedy,
Dkt. No. 360, filed January 16, 2024
**(Filed Under Seal; Contains Confidential
Materials)**
Dkt. No. 484 **(Public Version)** .......................... Appx5143, 5153-5157

Exhibit 1 to Micron's Daubert Motion and Motion to
Strike Expert Testimony of Mr. David Kennedy:
November 20, 2023 Expert Report of Mr. David
Kennedy,
Dkt. No. 360-2, filed January 16, 2024
**(Filed Under Seal; Contains Confidential
Materials)** ..................... Appx5167, 5233-5241, 5311-5312, 5417-5418

Exhibit 2 to Micron's Daubert Motion and Motion to Strike Expert Testimony of Mr. David Kennedy: Excerpts from Exhibit E to Opening Expert Report of Dr. William Henry Mangione-Smith, Dkt. No. 360-3, filed January 16, 2024 **(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx5479, 5481-5488

Exhibit 4 to Micron's Daubert Motion and Motion to Strike Expert Testimony of Mr. David Kennedy: Excerpts from October 4, 2023 Expert Report of Mr. David Kennedy, Dkt. No. 360-5, filed January 16, 2024 **(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx5490, 5492-5495

Micron Defendants' Omnibus Motions in Limine, Dkt. No. 613, filed February 20, 2024 **(Filed Under Seal; Contains Confidential Materials)** ....................................................... Appx5497, 5507-5510

Exhibit 9 to Micron Defendants' Omnibus Motions in Limine: Excerpts from Opening Expert Report of Dr. William Henry Mangione-Smith, Dkt. No. 613-10, filed February 20, 2024 **(Filed Under Seal; Contains Confidential Materials)** ................................................... Appx5520, 5523

Exhibit 10 to Micron Defendants' Omnibus Motions in Limine: Excerpts from Opening Expert Report of Dr. William Henry Mangione-Smith, Dkt. No. 613-11, filed February 20, 2024 **(Filed Under Seal; Contains Confidential Materials)** ................................................... Appx5525, 5530

Micron's Reply to Netlist's Opposition to Motion to
Strike Expert Testimony of Mr. David Kennedy,
Dkt. No. 522, filed February 7, 2024
**(Filed Under Seal; Contains Confidential
Materials)**
Dkt. No. 642 **(Public Version)** ......................... Appx5551, 5553-5555

# VOLUME II

## *Trial Exhibits*

JX-1: U.S. Patent No. 11,093,417 (certified copy) ......... Appx10001-10060

JX-2: U.S. Patent No. 7,619,912 (certified copy) ........... Appx10061-10110

JX-3: Provisional Appl. No. 60/645,087 ........................ Appx10111-10118

JX-4: Micron, DDR4 SDRAM RDIMM Core, 288-Pin
DDR4 RDIMM Core Product Description ........................... Appx10119

JX-5: Micron, DDR4 SDRAM LRDIMM Core, 288-Pin
DDR4 LRDIMM Core Product Description ........................ Appx10142

JX-9: "16GB: x4, x8, x16 DDR4 SDRAM," Micron,
Available at (https://www.micron.com/-
/media/client/global/documents/products/datasheet/d
ram/ddr4/16gb_ddr4_sdram.pdf) ...... Appx11525, 11581, 11637, 11640

JX-18: JESD79-4C Jan. 2020.pdf
**(Filed Under Seal; Contains Confidential
Materials)** .......................................................... Appx12202, 12272

JX-20: https://www.micron.com/-
/media/client/global/documents/products/datasheet/d
ram/ddr4/4gb_ddr4_dram_2e0d.pdf ........................ Appx12468, 12564

JX-23: U.S. Patent No. 7,024,518 ("Halbert") ............... Appx12827-12846

JX-27: Micron DDR4 SDRAM RDIMM Addendum,
MTA36ASF8G72PZ – 64GB ......................... Appx12847-12852, 12857

DX-0030: Driver Definition, JESD 82-32A (Aug. 2019) (NL-MS-293_00053562 - NLMS-293_00053761) **(Filed Under Seal; Contains Confidential Materials)** .............................................................. Appx13101, 13135

PX-013: Micron Presentation re DDR4 Module Level Trends and Features (Kinsley) [Smith Depo Ex. 5] .................................................. Appx14436, 14441, 14445

PX-015: HyperCloud Qualification by IBM and HP ................ Appx14467

PX-028: 12/1/2013 Semiconductor Patent License Agreement **(Filed Under Seal; Contains Confidential Materials)** .............................................................. Appx14610-14643

Demonstratives for Micron's Opening Statement........ Appx14720, 14734

Demonstratives for Infringement Analysis of Dr. William Mangione-Smith ..... Appx14747, 14756-14757, 14817, 14835, 14837-14838, 14843, 14862, 14864, 14946-14947

Demonstratives for Direct Testimony of Dr. Harold Stone .......................... Appx14957, 14972, 14974-14975, 14982, 14986

Exhibit 1 to Samsung's Daubert Motion and Motion to Strike Expert Testimony of Dr. William Henry Mangione-Smith: Excerpts from Opening Expert Report of Dr. William Henry Mangione-Smith, Dkt. 350-1, filed January 16, 2024 **(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx15038, 15148-15150

Exhibit 3 to Netlist's Opposition to Micron's Daubert Motion to Strike Expert Testimony of David Kennedy: Exhibit B to Opening Expert Report of Dr. William Henry Mangione-Smith, Dkt. 456-34, filed January 31, 2024 **(Filed Under Seal; Contains Confidential Materials)** .................................................... Appx15159, 15215-15221

***Trial Transcripts***

May 20, 2024 Trial Transcript ............... Appx20001-20004, 20162-20169, 20185-20188, 20197-20221, 20231-20234, 20244-20247, 20311-20314

May 21, 2024 Trial Transcript
**(Filed Under Seal; Contains Confidential Materials)** ........................................ Appx20316-20319, 20330-20348, 20352-20355, 20360-20387, 20394-20401, 20428-20434, 20473-20480, 20489-20494, 20498-20501, 20505-20513, 20529-20536, 20540-20546, 20562-20566, 20570-20573, 20586-20599, 20603-20614, 20619-20622, 20626-20638, 20642-20647

May 22, 2024 Trial Transcript
**(Filed Under Seal; Contains Confidential Materials)** ........................................ Appx20660-20663, 20674-20688, 20692-20694, 20718-20720, 20734-20751, 20757-20759, 20761-20763, 20810-20812, 20826-20828, 20832-20845, 20857-20861, 20926-20928, 20942-20956

May 23, 2024 Trial Transcript ............... Appx20963-20965, 21014-21016, 21077-21110, 21117-21119, 21148-21151, 21158-21161

## **Statement Regarding Confidential Material Omitted**

Pursuant to Federal Circuit Rule 25.1(e)(1)(B) and the Protective Order filed in E.D. Tex. No. No. 2:22-cv-00293-JRG on December 12, 2022, material has been redacted from Appx16, Appx20-23, Appx25-26, Appx29-30, Appx84-85, Appx88-89, Appx575-588, Appx608, Appx624-625, Appx656-669, Appx699-715, Appx722-736, Appx740-745, Appx751-755, Appx5153-5157, Appx5233-5241, Appx5311-5312, Appx5417-5418, Appx5481-5488, Appx5492-5495, Appx5507-5510, Appx5523, Appx5530, Appx5553-5555, Appx12202, Appx12272, Appx13101, Appx13135, Appx14610-14643, Appx15148-15150, Appx15215-15221, Appx20642-20647, Appx20942-20947.  The redacted materials contain the confidential technical and financial information of Micron and Netlist.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

**FINAL JUDGMENT**

A jury trial commenced in this case on May 20, 2024.  On May 23, 2024, the jury returned a unanimous verdict (Dkt. No. 135) finding that Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC (collectively, "Micron") infringed at least one claim of each patent asserted by Netlist, Inc. ("Netlist"), such claims being Claim 16 of U.S. Patent No. 7,619,912 (the "'912 Patent") and Claims 1, 2, 8, 11, 12, 13, and 14 of U.S. Patent No. 11,093,417 (the "'417 Patent") (collectively, the "Asserted Claims"); that such infringement was willful; and that Netlist should recover from Micron $425,000,000.00 for infringement of the '912 Patent and $20,000,000.00 for infringement of the '417 Patent through the date of trial.

In Micron's notices concerning its invalidity and equitable defenses (Dkt. Nos. 106 and 123), Micron has stipulated that it is no longer pursuing any of its previously raised invalidity and equitable defenses. In light of these stipulations and the jury's verdict, the Court finds that a Final Judgment in the case should be and hereby is entered based on the jury's verdict.

Appx1

On May 30, 2024, Netlist filed an opposed Motion Requesting Entry of Final Judgment. (Dkt. No. 142.) Micron opposes the entry of Final Judgment. (Dkt. No. 147.) Micron argues that Netlist's motion is premature and unwarranted because Netlist did not include a proposed form of judgement in a separate document. (*Id.*) Further, Micron notes that the IPR of the '417 Patent is still pending with the PTAB's decision expected in August 2024. (*Id.*) Micron argues that the Court should wait to enter judgment until the PTAB's decision issues so that the "full record" may be presented to the Federal Circuit all at the same time. (*Id.*) Further, Micron argues that Netlist is not entitled to prejudgment interest because Netlist did not propose any form of judgment and because Netlist exhibited undue delay in bringing its infringement suit. (*Id.* at 6-12.) The Court finds that none of these are an appropriate basis to withhold entry of final judgment. The Motion Requesting Entry of Final Judgment (Dkt. No. 142) is **GRANTED** hereby.

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's unanimous verdict, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. Micron has infringed Claim 16 of the '912 Patent;

2. Micron has infringed one or more of Claims 1, 2, 8, 11, 12, 13, and 14 of the '417 Patent;

3. Micron has willfully infringed Claim 16 of the '912 Patent;

4. Micron has willfully infringed one or more of Claims 1, 2, 8, 11, 12, 13, and 14 of the '417 Patent;

5. Netlist is hereby awarded damages from and against Micron and shall accordingly have and recover from Micron the sum of $425,000,000.00 U.S. Dollars in the form of a running royalty for Micron's infringement of the '912 Patent;

Appx2

6. Netlist is hereby awarded damages from and against Micron and shall accordingly have and recover from Micron the sum of $20,000,000.00 U.S. Dollars in the form of a running royalty for Micron's infringement of the '417 Patent;

7. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, Netlist is the prevailing party in this case and shall recover its costs from Micron, and Netlist is directed to file its proposed Bill of Costs;

8. Notwithstanding the jury's finding of willfulness, the Court having considered the totality of the circumstances together with the material benefit of having presided throughout the jury trial and having seen the same evidence and heard the same arguments as the jury, and mindful that enhancement is generally reserved for "egregious cases of culpable behavior,"[1] concludes that enhancement of the compensatory award herein is not warranted under 35 U.S.C. § 284 and consequently, the Court elects not to enhance the damages awarded herein;

9. Pursuant to 35 U.S.C. § 284 and Supreme Court guidance that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award," the Court awards pre-judgment interest applicable to all sums awarded herein, calculated at the 5-year U.S. Treasury Bill rate, compounded quarterly, from the date of infringement through the date of entry of this Judgment;[2] and

10. Pursuant to 28 U.S.C. § 1961, the Court awards post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid.

---

[1] *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016).
[2] *See Nickson Indus., Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 800–801 (Fed. Cir. 1988). The Court finds Micron's arguments against an award of prejudment interest unavailing. (*See* Dkt. No. 147.)

Appx3

Any request for relief pursuant to 35 U.S.C. § 285 must be filed as a subsequent motion herein within 28 days of this Judgment. All other relief requested by either party which is now pending before the Court and not specifically awarded herein is **DENIED**.

**So ORDERED and SIGNED this 10th day of July, 2024.**

_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

Appx4



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | ███████████████ |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Rule 50(b) Motion for Judgment as a Matter of Law for Non-Infringement Regarding U.S. Patent Nos. 7,619,912 and 11,093,417 (the "Motion") filed by Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC. (collectively, "Micron" or "Defendants"). (Dkt. No. 159.) In the Motion, Micron moves for judgment as a matter of law of non-infringement for U.S. Patent Nos. 7,619,912 and 11,093,417 pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. (*Id.* at 1.) For the reasons discussed herein, the Court finds that the Motion should be **DENIED**.

## I.   BACKGROUND

Plaintiff Netlist, Inc. ("Plaintiff" or "Netlist") alleged that Micron infringes claim 16 of U.S. Patent No. 7,619,912 (the "'912 Patent") and claims 1, 2, 8, 11–14 of U.S. Patent No. 11,093,417 (the "'417 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 100; Trial Tr. at 1075:11-15.)   After a trial in this case, the jury returned a unanimous verdict finding that Defendants infringed the Asserted Patents, that Defendants owed a total of $445,000,000 in damages for their infringement, and that Defendants willfully infringed the Asserted Patents. (Dkt. No. 135 at 4-6.) Micron now moves for judgment as a matter of law of non-infringement for the '912 and '417 Patents. (Dkt. No. 159 at 1.)

## II.    LEGAL STANDARD

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig. Div. Inc.*, 442 F.3d 919, 933 (5th Cir. 2006).

## III.    DISCUSSION

In the Motion, Micron moves pursuant to Rule 50(b) of the Federal Rules of Civil Procedure for judgment as a matter of law of non-infringement for the '912 and '417 Patents. (*Id.* at 1.)  The Court begins by addressing the Motion as to the '912 Patent.

### A.    The '912 Patent

Micron contends that it is entitled to judgment as a matter of law of non-infringement as to (1) all accused products on the grounds that Netlist failed to prove that command signals are "transmitted to only one DDR memory device at a time," and as to (2) the accused dual-rank

2

Appx6

RDIMM devices on the grounds that Netlist failed to prove that output signals control more devices and ranks than input signals. (Dkt. No. 159 at 1-2, 11.)

> **1.      Micron's Motion for JMOL on All Accused Products on the Grounds that Netlist Failed to Prove that Command Signals are "Transmitted to Only One DDR Memory Device at a Time"**

In the Motion, Micron asks the Court to grant judgment as a matter of law of non-infringement of the '912 Patent as to all accused products on the grounds that Netlist failed to prove "the command signal is transmitted to only one DDR memory device as a time," as recited by claim 16. (Dkt. No. 159 at 1, 6.)  Micron contends, instead, that the undisputed evidence established that the command signal is <u>not</u> "transmitted to only <u>one</u> DDR memory device at a time" because the command signal is "transmitted to <u>all</u> memory devices" at a time.  (*Id.* at 1, 7) (emphasis added).  As support, Micron points out that Netlist's technical expert, Dr. Mangione-Smith, admitted that the command signals are transmitted "*towards* all DRAM memory devices" at the same time over a shared line (BUS) that connects all DRAMs in a rank. (*Id.* at 2 (citing Trial Tr. at 486:25-488:4) (emphasis added).)

Netlist responds that substantial evidence supports the jury's finding that the "transmitted to only one DDR memory device at a time" limitation is met. (Dkt. No. 173 at 1.)  Netlist first argues that because the Court did not construe "transmitted to," the Court should defer to the "jury's view of the claim element unless that view is contrary to the only reasonable view of the claim element." (*Id.* (citing *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023).) Netlist then argues that Micron's non-infringement argument hinges on the interpretation that "transmit to" means "transmit towards," which Netlist argues that the jury heard and rejected. (*Id.*) Specifically, Netlist points out that Dr. Mangione-Smith distinguished "transmitted to" from "transmitted towards" at trial, stating:

3

Appx7

Q. You don't believe that at the time the DRAM ignores the MRS command, that it's been sent to that DRAM?

A. I don't believe that it's been transmitted to it. It's been transmitted maybe towards it in that direction but not to it.

Q. Okay. So that's a little bit of a difference here.

(*Id.* at 4-5 (citing Trial Tr. at 486:20-25) (emphasis removed).) Consequently, Netlist contends that after Micron "invited the jury to decide whether the plain meaning of 'transmitted to' was 'transmitted towards,' the jury weighed the evidence and rejected" Micron's interpretation. (*Id.* at 5.)

Despite this evidence, Micron contends that Dr. Mangione-Smith interpreted the claim language "transmitted to" to require a transmission *and* receipt of the transmission. (Dkt. No. 159 at 2-3 (citing Trial Tr. at 489:23-25).) Micron argues that this interpretation is improper because (1) it adds limitations, such as "received," beyond the plain claim language "transmitted to," which the specification and claims use separately and distinctly from "transmit," and (2) no explanation was given as to how any intrinsic or extrinsic evidence supports Dr. Mangione-Smith's interpretation. (*Id.* at 8-9; *see also* Dkt. No. 178 at 2-3.) Nevertheless, Micron argues that even under Netlist's improper interpretation, the evidence at trial established that the command signal is transmitted to and received by every DDR memory device in a rank. (*Id.* at 3.)

Netlist responds that it is Micron who has attempted to rewrite the claim limitation by changing "transmitted to" to "transmitted towards." (Dkt. No. 173 at 4.) Notably, Netlist further responds that Micron never objected to Dr. Mangione-Smith's testimony as improper claim construction or as inconsistent with the plain meaning of the claims. (Dkt. No. 185 at 1 (citing Dkt. No. 178 at 2).) Regardless, Netlist argues that Dr. Mangione-Smith did not attempt to write additional limitations into the claims; rather, he applied the plain and ordinary meaning of "transmitted to" in his infringement analysis. (Dkt. No. 173 at 6.) As support, Netlist emphasizes several pieces of evidence showing infringement under the plain and ordinary meaning. (*Id.* at 6.)

4

Appx8

For example, Netlist points out that Dr. Mangione-Smith explained to the jury that it is the per-DRAM addressability ("PDA") mode functionality of the accused products that enables MRS commands to be transmitted to a single DRAM on a rank. (*Id.* at 6 (citing Trial Tr. at 357:20-364:24, 505:22-508:23).) Netlist also points out that it was Micron's corporate representative, Mr. Ross, who testified that PDA mode is "used for accessing -- or addressing only a single DRAM device at a time." (*Id.* at 6 (citing Trial Tr. at 537:20-23).) Moreover, Netlist notes Dr. Mangione Smith testified that even though other DRAMs shared some common signal lines, the MRS command would be transmitted only to the selected DRAM. (*Id.* at 6 (citing Trial Tr. at 508:9-23).) Netlist also points out that only one DRAM will receive the command and do what the command says as a result of this transmission of a command signal to a single DRAM. (*Id.* at 6 (citing Trial Tr. at 360:16-361:21).)

Micron argues, however, that even if the plain meaning of "transmitted to" included "received by," the evidence established that the MRS command is transmitted to and received by "every" DDR memory device. (Dkt. No. 159 at 3; Dkt. No. 178 at 3.) As support, Micron cites Dr. Mangione-Smith's testimony that the MRS commands are transmitted before the DQ0 signals (which put the memory device receivers into standby mode) are transmitted. (*Id.* at 3 (citing Trial Tr. at 440:22-24; 471:21-24; 477:5-7; 508:9-19).) Micron further contends that Dr. Stone explained how the process for exiting PDA mode demonstrates that the memory devices receive commands even while in PDA mode. (*Id.*) Consequently, Micron argues it is unreasonable to assume the accused command signals are not transmitted to and received by each DRAM when the evidence shows that the DQ0 signals, which turn off some DRAMS and activate one of the DRAMs, do not arrive until after the MRS commands have already been sent. (*Id.* at 9-10 (citing Trial Tr. at 675:21-676:16); *see also* Trial Tr. at 508:9-23; Dkt. No. 178 at 3).)

5

Appx9

In response, Netlist cites Dr. Mangione-Smith's testimony that the command signal has not been "transmitted to" any of the DRAMs "until the point in time when the DQ0 signal turns off some DRAMS and activates one." (Dkt. No. 173 at 4 (citing 507:17-508:23; *see also* 362:8-10 ("[JX-9] tells me that the MRS commands are qualified with DQ0. That means if DQ0 is not set low, the DRAM chip is not going to receive and execute that MRS command.").) Netlist argues that this is consistent with the specification's description stating that "[t]his is an embodiment in which only one device does what the command says." (*Id.* at 6-7 (citing Trial Tr. at 725:16-726:8).) Further, Netlist points out that Micron's argument about exiting PDA mode improperly focuses on Step 3 ("Take DRAM out of PDA mode"), instead of Step 2 ("Program the unique DRAM locations by using posted MRS commands, address inputs and DQ[0].") (Dkt. No. 185 at 3.) Ultimately, Netlist contends that substantial evidence supports the jury's finding that PDA mode infringes the "transmitted to" limitation of claim 16. (*Id.*)

After reviewing the evidence, the Court finds that substantial evidence supports the jury's finding that the "transmitted to only one DDR memory device at a time" limitation is met. As a preliminary matter, the Court did not construe that term and therefore defers to the jury's view of the plain and ordinary meaning of the claim element unless that view is contrary to the only reasonable view of the claim element. *See VLSI Tech. LLC*, 87 F.4th 1332 at 1341; *see also Solas OLED Ltd. v. Samsung Display Co.*, No. 2:19-CV-00152-JRG, 2021 WL 4950308, at *11 (E.D. Tex. Oct. 25, 2021) ("The Court initially notes that 'connected' was not construed by the Court and the jury was instructed to apply the plain and ordinary meaning. The Court also finds that Plaintiff presented sufficient evidence on this issue. Mr. Credelle testified that the claim limitation was met."). In this case, Micron's non-infringement argument hinges on the interpretation that "transmit to" requires only being "transmitted towards." (Dkt. No. 159 at 1.) Since the Court does

6

Appx10

not find that "transmitting towards" is the "only reasonable view" of the claim element "transmitting to," the Court defers to the jury's view of the claim. *See VLSI Tech. LLC*, 87 F.4th 1332 at 1341; *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1048 (Fed. Cir. 2016) ("The case went to the jury without a construction of the key 'in files' language, and Avid has not met its burden of showing that it has the only reasonable view of the claim element as long as it is unconstrued.").) Here, after hearing Micron's argument, the jury rejected it.

Moreover, in addition to the testimony already discussed above, the jury heard testimony from several witnesses, including Dr. Mangione-Smith, Mr. Frank Ross, and Dr. Harold Stone, that would allow them to conclude that claim 16 was infringed. Dr. Mangione-Smith, for example, cited a Micron document discussing PDA mode (JX-9) and testified that "a number of reasons" demonstrate that "Micron's devices transmit command signals to only one DDR memory device at a time." (Trial Tr. at 506:1-8.) The jury heard Dr. Mangione-Smith testify that JX-9 states that PDA mode allows Micron's devices to "program devices individually." (*Id.* at 506:8-9.) The jury heard evidence that individual programmability would not have been possible if the MRS command were transmitted to all the devices on a rank as opposed to only one device at a time. (*Id.* at 506:13-16.) The jury also heard evidence from Dr. Mangione-Smith that the "DQ0 [signal] is used to control which individual DRAM the MRS message is transmitted to" such that the command signals are not transmitted to any of the DRAMs until the DQ0 activates one DRAM. (*Id.* at 507:14-21.) The jury could have reasonably found that a command signal is not "transmitted to" a DDR memory device unless "the command signals in PDA mode are addressed to a single DRAM device" and the device receives them.[1] (*Id.* at 507:6-9.)

---

[1] The Court notes that counsel for Micron used an analogy during its cross-examination of Dr. Mangione-Smith that was focused on the claim limitation "transmitted to" as compared with the same limitation when characterized as "transmitted towards." (*See, e.g.,* Trial Tr. at 488:10-490:3.) In that analogy, counsel for Micron asked whether he would have "transmitted [envelopes] to" all twenty people in Dr. Mangione-Smith's neighborhood if counsel had

7

The jury also heard testimony from Micron's own witnesses, Frank Ross, Scott Cyr, and Dr. Stone, that would enable them to conclude this limitation was satisfied. For example, Mr. Ross testified that when a DRAM is not selected, its receiver for the command and address signals are disabled, and that DRAM does not receive any command signal. (Trial Tr. at 529:20-25; *see also* Trial Tr. at 530:13-18 ("Q. And so in the per-device addressability mode, the selected DRAM will receive the command address signal while the ones that's not -- that are not selected will have their receivers in the standby mode and ignore the command address signals. Is that correct? A. That's right.").) Likewise, Dr. Stone admitted that "it's possible in PDA mode to tell one device in a rank and one device only to execute that MRS command." (Trial Tr. at 731:10-12.) Finally, Mr. Cyr, a Micron engineer designated as a 30(b)(6) witness on technical issues, testified that in PDA mode "if the rank activated for the MRS command, if only device has its DQ0 low, that will be the only device to accept the MRS commands." (Dkt. No. 560:10-15.) Based on the testimony from Mr. Ross, Dr. Stone, and Mr. Cyr, the jury could reasonably reject the argument that the command signals are transmitted to all devices and conclude that command signal is selectively transmitted only to specific devices.

Ultimately, the Court finds that substantial evidence supports the jury's finding that the command signals are transmitted to only one DDR memory device at a time. Accordingly, the Court finds that judgment as a matter of law for non-infringement of the '912 Patent is not appropriate under Micron's "transmitted towards" argument.

---

addressed the envelopes and put them in the mail. (*See id.* at 489:18-21.) Dr. Mangione-Smith confirmed that counsel may have transmitted them "towards" everyone in the neighborhood, but he would not have transmitted them "to" everyone in the neighborhood unless the addressees actually receive them. (*See id.* at 489:18-25.) After hearing Micron's analogy, the jury could have concluded, under the plain and ordinary meaning of "transmitted to," that the command signals were transmitted to only one DDR memory device at a time as recited by claim 16.

8

## 2. Micron's Motion for JMOL on the Dual-Rank RDIMM Products on the Grounds that Netlist Failed to Prove Claim 16's Requirement that Output Signals Control More Devices and Ranks Than Input Signals

With respect to only the accused dual-rank RDIMM products, Micron contends it is entitled to judgment as a matter of law of non-infringement of the '912 Patent for a second, independent reason. (Dkt. No. 159 at 11.) Specifically, Micron contends that neither of Netlist's two infringement theories can satisfy claim 16's requirement that input signals controlling a second number of ranks be smaller than the first number of ranks controlled by the output signals. (Dkt. No. 159 at 1, 11; JX-02.45.)

Claim 16 of the '912 Patent recites, *inter alia*:

a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks

(JX-02.45, '912 Patent Claim 16).

Micron claims that Netlist's primary infringement theory for the accused quad-rank devices, which relied on Encoded Quad Chip Select ("QuadCS") mode, fails as to the dual-rank devices because Netlist presented no evidence that the dual-rank devices use the Encoded QuadCS mode and the undisputed evidence demonstrated that the dual-rank devices lack the required connectivity/wires to operate in Encoded QuadCS mode. (*Id.* at 1-2.) Micron also claims that Netlist's alternative infringement theory based on single-rank MRS command mode fails because it relates to LRDIMM products, not RDIMM products, and because it mixes and matches features

9

Appx13

from two distinct modes—i.e., single-rank MRS command mode and PDA mode—that do not work together. (*Id.* at 2.)

Netlist responds that a reasonable jury could find that claim 16's requirement that the RCD provides output signals that control a greater number of memory devices and ranks than input signals is met by the accused dual-rank RDIMMs based on either of its two independent theories presented by Dr. Mangione Smith. (Dkt. No. 173 at 2.)

Regarding its single-rank MRS command theory, Netlist contends that Micron's Motion simply presents waived attorney arguments that are procedurally improper and substantively insufficient to overturn the jury's verdict as attorney arguments are not evidence. (*Id.*) Further, Netlist contends that Dr. Mangione-Smith explained why the limitation was met under the single-rank MRS command theory, and Dr. Stone admitted he did not dispute that theory at trial. (*Id.*) Netlist claims that a reasonable jury, therefore, could conclude that Micron did not dispute the infringement under the single-rank MRS command theory and find infringement accordingly. (*Id.*)

Regarding its Encoded QuadCS mode theory, Netlist contends that Micron not only improperly reurges its failed summary judgment argument, but that a reasonable jury could accept Dr. Mangione-Smith's explanation that the RCD on a dual-rank RDIMM is configured to support the Encoded QuadCS mode because the RCD would not know beforehand which configuration the memory controller will place the memory module in and has to support whatever configuration is set by the memory controller. (*Id.*)

The Court now addresses whether there is substantial evidence to support the jury's infringement verdict under either theory:

### a. The Single-Rank MRS Command Theory

Netlist contends not only that there is substantial evidence that dual-rank RDIMMs infringe based on the single MRS command theory, but that this theory is sufficient for the Court to uphold

10

Appx14

the jury's infringement verdict as to the '912 Patent. (Dkt. No. 173 at 18-19 (citing *Innovation Scis., LLC v. Amazon.com, Inc.*, No. 2021-2111, 2022 WL 2824675, at *2 (Fed. Cir. July 20, 2022), cert. denied, 143 S. Ct. 779 (2023) ("When a jury returns a general verdict for which there are multiple independent factual bases, however, a lack of substantial evidence for some of those bases does not warrant JMOL.") (citing *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 126 (5th Cir. 1992) ("[W]e will not reverse a verdict simply because the jury might have decided on a ground that was supported by insufficient evidence."); *Northpoint Tech., Ltd. v. MDS Am., Inc.*, 413 F.3d 1301, 1311 (Fed. Cir. 2005) ("[E]ven if some of the proposed factual grounds for liability are not legally sufficient to support a verdict, that is not fatal, because the critical question is whether the evidence, taken as a whole, was sufficient to support the jury's verdict." (collecting cases)).)   Netlist contends, in other words, that the Court "must uphold the verdict if substantial evidence supports *any* of the proffered factual bases." *Innovation Scis., LLC*, 2022 WL 2824675, at *2.

Under this first theory, Netlist contends that Dr. Mangione-Smith presented unrebutted evidence that the single-rank MRS commands satisfy the limitation for all accused products. (Dkt. No. 173 at 13.) Specifically, Netlist contends that Dr. Mangione-Smith testified that the single-rank MRS commands for multi-rank settings meet the disputed limitation in all accused products and Micron chose not to cross him on this issue. (*Id.* (citing Trial Tr. at 352:9-17; *see also* 431-504 (cross); 525-527 (re-cross).) Netlist also contends that Micron chose not to have its own expert, Dr. Stone, address this issue. (*Id.* (citing Trial Tr. at  747:13-15 ("Q. You said absolutely nothing about Doctor Mangione-Smith's analysis of a single-rank MRS command capability. Correct? A. That is correct.").)  Netlist contends that given Micron's silence on this theory during trial, the jury could have reasonably found infringement under the uncontested single-rank MRS command theory. (*Id.*)

11

Appx15

CONFIDENTIAL MATERIAL OMITTED

In its Motion, Micron argues that this theory fails because "all the evidence at trial related only to 'LRDIMM applications,' not dual-rank RDIMM applications." (Dkt. No. 159 at 17; *see also id.* at 2 ("Netlist's alternative infringement theory, using a single-rank MRS command mode, relates to LRDIMM products, not RDIMM products.").) Specifically, Micron argues that Dr. Mangione-Smith attempted to prove that Micron's accused products use single-rank MRS mode commands by identifying Table 12 and its footnote from DX-29 at 43. (Dkt. No. 159 at 18.)

While nothing in Table 12 or the footnote limits this to LRDIMM applications, Micron argues that it is applicable only to LRDIMM applications because it is part of a section titled "DQ Bus Termination in LRDIMM application." (*Id.* (citing DX-29 at 41).) Micron further argues that though Dr. Mangione-Smith cites exhibits PX-5a-c as support for his theory, each of these exhibits also identify that they are applicable only in LRDIMM applications. (*Id.* (citing PX-5a.48-50; PX-5b.25-27; PX-5c.31-33).) Furthermore, Micron argues that "single-rank MRS commands are used to configure the BODT setting in *data buffers* found only in LRDIMMs, thus confirming such commands are only applicable to LRDIMM applications." (*Id.* (citing DX-29.41-42) (emphasis original) (footnote omitted); Dkt. No. 178 at 5 ("RDIMMs do not have data buffers.")) Micron claims, therefore, that Dr. Stone did not address this alternative theory because Netlist did not carry its burden in the first instance. (Dkt. No. 159 at 18; Dkt. No. 178 at 5.)

Netlist responds that nothing in the document actually states that the table presented to the jury is applicable only to LRDIMs. (Dkt. No. 173 at 14; Dkt. No. 185 at 5-6.) Netlist further responds that while Micron argues that a "BODT" (i.e., Buffer On-Die Termination) setting relates to data buffers and thus is only configured in LRDIMM products, Table 12 describes how RCD

███████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* at 15) (emphasis original).)

12

Appx16

Micron next argues that the single-rank MRS command mode theory fails because the record establishes that dual-rank RDIMMs are not "reasonably capable" of implementing single-rank MRS commands using the *TGIP* factors. (Dkt. No. 159 at 19.) Specifically, Micron argues that the dual-rank RDIMMs are not reasonably capable of using single-rank MRS commands because (1) the evidence shows that Micron and other industry participants did not intend or anticipate that customers would modify the accused device to operate in an infringing manner, (2) no evidence shows that Micron's RDIMMs were ever designed to be altered or assembled to use single-rank MRS commands, (3) the technical documents only demonstrate that LRDIMM, not RDIMM, products implement single-rank MRS command mode and confirm that RDIMMs would not actually operate or in any way use such commands, and (4) no evidence shows that single-rank MRS commands would serve any purpose in RDIMM applications given those commands configure settings in data buffers found only in LRDIMMs, not RDIMMs. (*Id.*) Consequently, Micron argues that none of the evidence Netlist presented supports that the dual-rank RDIMMs are reasonably capable of using single-rank MRS commands, which Micron claims are used only in LRDIMM applications to configure buffers that RDIMMs do not have. (*Id.* at 20.)

Netlist responds that Micron "failed to present any counter-evidence at trial" and now "resorts to post hoc attorney arguments on theories disclosed for the first time in its motion." (Dkt. No. 173 at 13-14.) Netlist notes, for example, that Dr. Stone's rebuttal report does not contend that the disclosure relied on by Dr. Mangione-Smith applies only to LRDIMMs, and not to RDIMMs. (*Id.* at 14.) Netlist further notes that Dr. Stone did not opine that single-rank MRS commands are used to configure the BODT setting in data buffers found only in LRDIMMs. (*Id.*) In sum, Netlist contends that the jury neither heard nor saw evidence supporting Micron's new interpretation or rebutting Dr. Mangione-Smith's testimony. (*Id.*) Netlist contends, therefore, that

13

Micron is "asking the Court to make a *de novo* assessment of a technical document based on Micron's post-trial attorney argument," which is no substitute for its expert's testimony. (*Id.* (citing e.g., *Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated attorney argument regarding the meaning of technical evidence is no substitute for competent, substantiated expert testimony."); *see also Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1259–60 (Fed. Cir. 2010) ("Becton never argued at trial that Boyce's force displacement test showed that the hinges contributed in any way to the movement of the guard. No witness, either on direct or cross-examination, testified that Boyce's tests reflected any such movement. Unsupported attorney argument, presented for the first time on appeal, is an inadequate substitute for record evidence.").)

Netlist contends, instead, that the jury heard substantial evidence that the single-rank MRS commands meet the limitation at issue in claim 16. (*See* Dkt. No. 173 at 12-18.) Netlist notes that Dr. Mangione-Smith began by explaining what MRS commands are and their general use in the accused products. (*Id.* at 15 (citing Trial Tr. at 348:12-349:23).) Dr. Mangione-Smith then presented an example of using MRS commands to set the DRAM chips' burst lengths to demonstrate infringement. (*Id.* (citing Trial Tr. at 349:24-350:12).) He testified that the input signals of the disputed limitation are met, for example, by the host sending an MRS command to set the burst length of the devices in rank 0. (*Id.* (citing Trial Tr. at 350:13-19).) He further testified that the JEDEC RCD specification and third-party RCD data sheets states that the RCD "assumes that all ranks are configured identically for certain values," which include "Write/Read Pre-amble, Burst length, and Write CRC," and "may monitor DRAM MRS commands for only rank 0." (*Id.* at 16 (citing Trial Tr. at 350:20-351:12; DX-29).) Dr. Mangione-Smith further explained that the "burst length setting for rank 0 is used to control the burst length setting for all of the ranks because

14

Appx18

they have to all be the same. And there's one thing I know for sure is that each DIMM at least has a rank of 0." (*Id.* at 17 (citing Trial Tr. at 352:9-20).) Accordingly, Netlist contends that this demonstrates that Dr. Mangione-Smith's testimony "applies to all DIMMs at issue, and not just the LRDIMMs." (*Id.*) Netlist claims, therefore, that there is substantial evidence that Micron's dual-rank RDIMMs are reasonably capable of implementing single-rank MRS commands, particularly given that "no contrary evidence was presented to the jury." (*Id.*)

In Micron's final argument as to why the single-rank MRS command mode theory fails, Micron contends that Netlist improperly mixes technical features from two distinct modes. (Dkt. Nos. 159 at 20; 178 at 6-7.). Specifically, Micron argues that Dr. Mangione-Smith improperly relied on signals transmitted in the distinct PDA mode for infringement. (*Id.*) Micron contends it was improper to rely on commands from two distinct modes because the limitations require that the claimed "circuit" respond to the claimed command signal and input signal from the same command, and Netlist did not demonstrate whether the two modes can operate concurrently. (*Id.*)

Netlist contends, once again, that Micron made no such assertion at trial and now presents only waived attorney arguments that are procedurally improper. (Dkt. Nos. 173 at 2, 17; 185 at 6.) Netlist also contends that Micron is mistaken because the claim "does not preclude the command signals from being sent to different ranks of DRAM devices at different times." (*Id.* at 17.) Though single-rank MRS commands control all ranks, Netlist contends this does not mean the commands are transmitted to all devices at once. (*Id.*) As an example, Netlist contends that after a particular rank is placed into PDA mode, a MR4 command can selectively set a DRAM. (*Id.* at 18.) Accordingly, Netlist contends that there is sufficient evidence to support the jury's verdict. (*Id.*)

Ultimately, the Court finds that there is substantial evidence that dual-rank RDIMMs infringe based on the single-rank MRS command theory. In addition to the evidence cited above,

15

CONFIDENTIAL MATERIAL OMITTED

the jury heard from Dr. Mangione-Smith that there are "other ways that Micron infringes the claim that don't require it to use encoded quad chip select mode" that are "completely independent from the encoded quad chip select mode." (Trial Tr. at 348:5-10.) The jury heard that Dr. Mangione-Smith referred to this theory as "using a single MRS command to settings for multiple ranks." (Trial Tr. at 348:11.) After jury heard that MRS command stands for "mode register set" and is a command that "gets sent from the memory controller to the RCD and then propagates onward," Dr. Mangione-Smith testified that Micron's documents show that Micron's modules use these commands. (Trial Tr. at 348:12-24.)  He explained that the MRS commands can be used, for example, to set "burst length," which is when individual DRAMS send four or eight chunks of data. (Trial Tr. at 350:1-9.) The jury then heard that a "JEDEC specification," marked as exhibit DX-29, states that the "RCD assumes that all ranks are configured identically with regards to certain values, one of which is burst length" and that Micron "implement[s] this functionality into its products." (Trial Tr. at 351:1-15.) The jury further heard Dr. Mangione-Smith testify that he knows Micron implements this functionality into its "RDIMM products and the LRDIMM products," because exhibits JX 4 and JX 5 state that Micron's devices comply with the JEDEC specification. (Trial Tr. at 351:16-352:17.)  Furthermore, evidence presented to the jury showed that there were no material differences between RDIMMs and LRDIMMs for infringement of claim 16 of the '912 Patent. (*See, e.g.*, Trial Tr. at 331:20-332:14 ("Q. Does Micron sell a variety of different RDIMM products and LRDIMM products? A. Yes. Q. Does your infringement analysis apply equally to all those products? A. Yes. There are no differences among them that affect my opinion."); 333:18-19).)  The jury was also presented with evidence from Table 12 describing how RCD ███████████████████         ███████████████████

████████████████████████████████████████████████████

16

Appx20

CONFIDENTIAL MATERIAL OMITTED

███████████████████████████████████████ ) Having considered the totality of the evidence presented to the jury in this case, the Court rejects Micron's argument that all the evidence at trial related only to LRDIMM applications, not dual-rank RDIMM applications.

The Court also agrees with Netlist that Micron failed to present any counter-evidence at trial and now resorts to post hoc attorney arguments on theories disclosed for the first time in its Motion. Notably, Micron cites to no evidence in the record presented to the jury establishing that the single-rank MRS command applies only to LRDIMMs, and not to RDIMMs.[2] Consequently, the jury neither heard evidence or testimony rebutting Dr. Mangione-Smith's testimony on this theory nor did Micron present this theory to the jury. (*Id.*) The Court will not make a *de novo* assessment now based on Micron's post-trial attorney argument, which is no substitute for the evidence presented to the jury for their consideration at trial. *See Becton, Dickinson & Co.*, 616 F.3d at 1259–60 ("Becton never argued at trial that Boyce's force displacement test showed that the hinges contributed in any way to the movement of the guard. No witness, either on direct or cross-examination, testified that Boyce's tests reflected any such movement. Unsupported attorney argument, presented for the first time on appeal, is an inadequate substitute for record evidence.").)

Accordingly, the Court finds that Netlist's single-rank MRS command theory is sufficient for the Court to uphold the jury's finding of infringement of the accused dual-rank RDIMMs. The Court will, nevertheless, address whether Netlist's encoded QuadCS mode theory is also sufficient to uphold the verdict.

---

[2] Micron claims that Dr. Stone did not discuss whether dual-rank RDIMM products are configured to implement single-rank MRS command mode because Netlist had only presented evidence regarding "LRDIMM (*i.e.,* not RDIMM) products." (Dkt. No. 159 at 6.) While Micron could easily have presented this contention to the jury at least once, Micron points to no such evidence in the record.

17

Appx21

CONFIDENTIAL MATERIAL OMITTED

### b. The Encoded QuadCS Mode Theory

Netlist contends that though substantial evidence supports the jury's finding of infringement of dual-rank RDIMMs based on the single MRS command theory and is sufficient for the Court to uphold the verdict, there is also substantial evidence in the record supporting a finding the accused products are capable of utilizing Encoded QuadCS mode. (Dkt. No. 173 at 18.)

As support, Netlist points to Dr. Mangione-Smith's testimony at trial that Micron's RDIMM and LRDIMM datasheets explain that all RDIMMs and LRDIMMs are capable of using Encoded QuadCS mode:

> Q. And so is it your understanding that Micron and its expert are taking the view that at least some of their memory modules simply cannot use encoded quad chip select mode?
>
> A. Yes, I recall hearing that.
>
> Q. Do you agree with that?
>
> A. No.



18

CONFIDENTIAL MATERIAL OMITTED

(Dkt. No. 173 at 19 (emphasis original) (citing Trial Tr. at 346:14-347:1). Additionally, Netlist notes that, on cross-examination, Dr. Stone confirmed that Micron's datasheet for its RDIMM products discusses ██████████████████████████████████████████████ ██████.[3] (*Id.* at 21 (citing Trial Tr. at 744:14-20 ("Q. Sure. This is Micron's data sheet for its RDIMM products. Correct? A. That's correct. █████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Micron contends that Netlist's expert "blatantly mischaracterizing a clear statement in a document like this is not substantial evidence." (*Id.*)

Netlist also points to Dr. Mangione-Smith testimony at trial where he explained that the dual-rank RDIMMs are capable of using Encoded QuadCS mode because the "module" is controlled by the "memory controller," which is sometimes referred to as the "host," and "if the host tells it to go into encoded quad chip select, it will do it." (Dkt. No. 173 at 20 (citing Trial Tr. at 347:2-14).) He further explained that he was not "aware of any RDIMM or LRDIMM that Micron sells that doesn't have this capability to use encoded quad chip select mode" because "all" the RDIMMs and LRDIMMs "use the same RCD, and so their RCDs can be programmed in exactly that [encoded quad select] mode." (*Id.* (citing Trial Tr. at 347:18-23).) As further support, Netlist notes that Dr. Mangione-Smith discussed testimony from Mr. Cyr to prove his point that "[i]f the host wants the device to go into encoded quad chip select mode, it will do that." (*Id.* (citing Trial Tr. at 347:24-348:4); *see also* Trial Tr. at 558:9-14 ("Q. Are there any RDIMM or LRDIMMs

---

[3] Netlist notes that though the LRDIMMs and RDIMMs use the same RCDs, Micron's Motion does not dispute that its dual-rank LRDIMMs are configured to use the Encoded QuadCS mode. (Dkt. No. 173 at 21.) Micron responds that it does dispute this, but chose to limit the issues raised in post-trial briefing so as to focus the Court's review solely on dual-rank RDIMMs. (Dkt. No. 178 at 9.)

19

that Micron sells that don't have the capability of per-DRAM addressability or quad mode CS if the host instructs them to use it? A. [Mr. Cyr:] Again, we wire the device per the JEDEC specification, and that -- that follows the -- the raw card, and it's – it's up to the host to decide.").[4]

Despite this evidence, Micron argues that the "evidence shows that it is impossible for Micron's dual-rank RDIMMs to use the allegedly infringing encoded quad chip select mode because these modules do not have the necessary wiring." (Dkt. No. 159 at 12.)  Specifically, Micron argues that its "*dual*-rank RDIMMs" do not have the necessary "four wires" used for chip select signals in "encoded *quad* chip select mode," and therefore, it is impossible for the dual-rank RDIMMs to ever implement Encoded QuadCS mode. (*Id.* at 13.)  As support, Micron cites to Dr. Stone's testimony that "[t]he module does not have the connectivity required by this chip to operate" in such a mode because those dual-rank modules "only have two wires" and you cannot use the RCD to operate "four wires when you only have two." (*Id.* (citing Trial Tr. at 794:3-4; 681:7-9).)

Micron further argues that not only are its dual-rank RDIMMs incapable of operating in an Encoded QuadCS mode, but that Netlist also presented no evidence that its dual-rank RDIMMs are reasonably capable based on the *TGIP* factors. (Dkt. No. 159 at 13-14 (citing *INVT SPE LLC v. Int'l Trade Comm'n*, 46 F.4th 1361, 1371–77 (Fed. Cir. 2022) ("[S]ome apparatus claims [] require an infringing device to actually perform and operate according to the functional terms recited in the claims" while "other apparatus claims [] require only capability. . . . Because we require claim limitations to have some teeth and meaning, proof of reasonable capability of performing claimed functions requires, at least as a general matter, proof that an accused product—when put into operation—in fact executes all of the claimed functions at least some of the time or at least once in the

---

[4] Micron argues that Mr. Cyr's testimony regarding the devices being wired per JEDEC specifications actually supports Micron's position that dual-rank modules cannot infringe because they do not have the necessary wires for Encoded QuadCS mode. (Dkt. No. 178 at 9.)

claim-required environment.").) Specifically, Micron argues that (1) there is no evidence that

Micron intended or anticipated that consumers could or would modify the dual-rank RDIMMs to

used encoded quad chip select mode, (2) no evidence shows that its dual-rank RDIMMs were

"designed to be altered or assembled" to use encoded quad chip select mode before operation, (3)

its technical data sheets ███████████████████████████████████████████████

████████████████████████████████████████████ and (4) using Encoded QuadCS

mode cannot serve any functional purpose beyond what was already accomplished by its

configurations using Direct DualCS mode. (Dkt. No. 159 at 14-16.) Consequently, Micron argues

that the Court should conclude that no substantial evidence exists to show that the accused

dual-rank RDIMMs infringe claim 16. (*Id.* at 16.)

In response, Netlist argues that *TGIP* is "off point" because there, the court found no

infringement since the accused product would require actual reprogramming in order to infringe

the claims. (Dkt. No. 173 at 22 (citing *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 573 (E.D.

Tex. 2007) ("The basic question is whether AT&T's computerized system infringes a patent claim

because it is possible that AT&T could reprogram the system in ways that would infringe the

claim.").) Netlist argues that the court expressly distinguished its facts from those in *Intel Corp.*

*v. United States International Trade Commission*, stating that "[t]his is not the same issue as in

*Intel Corp.*, where . . . the accused device was capable of operating in the same mode as the

invention." (Dkt. No. 173 at 22 (citing *TGIP*, 527 F. Supp. 2d at 574) (citing 946 F.2d 821, 832

(Fed. Cir. 1991).) Netlist further contends that substantial evidence at trial supports a finding that

all accused DDR4 DIMMs, including dual-ranked RDIMMs, can be placed into Encoded QuadCS

mode if the host instructs them to do so and without the need for modification. (Dkt. No. 173 at

22.) Netlist contends this is particularly true given that when Micron's own counsel asked its

21

CONFIDENTIAL MATERIAL OMITTED

infringement expert, Dr. Stone, on direct examination whether "the Micron products" are "capable of using [direct quad or encoded quad mode]," Dr. Stone testified equivocally to the jury that "the chip may be able to go into the mode, but I doubt it." (Dkt. No. 185 at 8 (citing Trial Tr. at 793:19-794:4).)

Netlist contends that this is a classic battle-of-the-experts case where the jury, after being presented with both sides, found in favor of Netlist. (*Id.*) Netlist argues that the verdict should not be disturbed because the Court should respect the jury's fact-finding role in battle-of-the-expert scenarios. (*Id.* (citing e.g., *Anascape, Ltd. v. Nintendo of Am., Inc.*, No. 9:06-CV-158, 2008 U.S. Dist. LEXIS 127518, at *8 (E.D. Tex. 2008) ("This case presented the classic 'battle of the experts,' and the jury clearly chose to believe Anascape's infringement expert.")).

The Court finds that there is substantial evidence to support infringement under Netlist's Encoded QuadCS mode theory. In addition to the evidence discussed above, the jury heard Dr. Mangione-Smith testify that ██████████████████████████████████ ████████████████████████ (Trial Tr. at 346:14-347:1.) The jury also heard Dr. Stone admit that ████████████████████████████████████████ ████████████████████████████████. (*Id.* at 744:14-20.) Further, Dr. Mangione-Smith explained that the dual-rank RDIMMs are capable of using Encoded QuadCS mode because the "if the host tells it to go into encoded quad chip select, it will do it." (*Id.* at 347:2-14.) Micron's own expert, Dr. Stone, admitted so during his direct examination when Micron's counsel asked whether Micron's products are capable of using Encoded QuadCS mode. (*Id.* at 793:19-794:4). In that moment, Dr. Stone admitted that "the chip may be able to go into the mode, but I doubt it." (*Id.*)  The jury was entitled to credit Netlist's evidence and apparently did. *See Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 933 (5th Cir. 2006) ("[The Court] must draw all reasonable inferences and resolve all conflicting evidence in favor of [the verdict].").

22

Appx26

In conclusion, the Court finds that the jury could reasonably find infringement of claim 16's limitation requiring that output signals control more devices and ranks than input signals. Accordingly, Micron's request for judgment as a matter of law of non-infringement of the '912 Patent with respect to the accused dual-rank RDIMM products should be denied.

## B.     The '417 Patent

Micron contends it is entitled to judgment as a matter of law of non-infringement of all the Asserted Claims (Claims 1-2, 8, and 11-14) of the '417 Patent on the grounds that Netlist failed to show that the accused DDR4 LRDIMMs satisfy the "CAS latency limitation" in claim 1 based on the Court's constructions of "overall CAS latency" and "actual operational CAS latency." (Dkt. No. 159 at 24.)

In the '417 Patent, the "CAS latency limitation" in Claim 1 requires:

wherein data transfers through the circuity are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

(JX-01 at 42:63-67, Claim 1 of the '417 Patent.)

In the Court's Claim Construction Order, the Court construed "overall CAS latency" of a memory module as "the delay between: (1) the time when a command is executed by the memory module, and (2) the time when data is made available to or from the memory module." (Dkt. No. 173-6 at 34.) The Court also construed "actual operational CAS latency" of a memory device as "the delay between: (1) the time when a command is executed by the memory device, and (2) the time when data is made available to or from the memory device." (*Id.*)

Micron contends that Netlist failed to prove that the CAS latency limitation is satisfied because Dr. Mangione-Smith never identified any "starting point or ending point for his analysis of the CAS latency terms and the CAS latency limitation." (Dkt. No. 159 at 24-25.) Micron further

23

Appx27

contends that Netlist cannot point to any evidence at trial regarding "the delay between (1) the time when a command is executed by the memory module, and (2) the time when data is made available to or from the memory module," nor can Netlist point to any evidence that purports to be "the delay between: (1) the time when a command is executed by the memory device, and (2) the time when data is made available to or from the memory device." (*Id.* at 25.)  Consequently, Micron contends that because Dr. Mangione-Smith failed to identify the delay period for "overall CAS latency" to compare to the delay period for "actual operational CAS latency," he failed to prove the CAS latency limitation for either a read command or a write command. (*Id.*)  Ultimately, Micron's position is that Dr. Mangione-Smith provided an incorrect measure of "overall CAS latency" by analyzing the time between when a command is "executed by" the memory module and when data is "made available to or from" the *data buffer* contained *within* the memory module, not the *actual* memory module recited in the Court's Claim Construction Order. (Dkt. No. 159 at 22-23, 26.)

Netlist responds that substantial evidence supports the jury's infringement verdict. (Dkt. No. 173 at 23-24.)[5]  First, Netlist begins by contending that the jury could reasonably have found that: (1) for the memory module, the "starting point" is when the RCD receives the command and the "end point" is when the read data is outputted from the data buffer and thus made available

---

[5] Netlist also claims that Micron's Motion improperly rehashes its *Daubert* motion, which the Court denied. (Dkt. No. 173 at 23-24 (citing *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, No. 2:13-CV-213-JRG, 2016 WL 362540, at *3 (E.D. Tex. Jan. 29, 2016) (noting that the Federal Circuit has held that a JMOL is not the appropriate context for renewing attacks on an expert's methodology), *aff'd,* 853 F.3d 1370 (Fed. Cir. 2017)).) Micron admits in its Motion that it filed a *Daubert* motion and a summary judgment motion identifying how Dr. Mangione-Smith "improperly focuses on data buffer timing," which is similar, if not the same, as the issue it raises now. (Dkt. No. 159 at 26.) Accordingly, to the extent that Micron attacks Dr. Mangione-Smith's methodology in this Motion, the Court rejects such attempts as improper. One such example is when Micron attacks Dr. Mangione-Smith's analysis, stating that the analysis "cannot be correct" because he used the "data buffer" circuit "within a memory module" rather than the "actual memory module." (Dkt. No. 159 at 26.) This is an improper attack on Dr. Mangione-Smith's methodology. Nonetheless, the Court will review the Motion to the extent that Micron challenges the sufficiency of the evidence.

24

CONFIDENTIAL MATERIAL OMITTED

from the memory module to the memory controller; and (2) for the DRAM device, the "starting point" is when the DRAM receives the read command, a time after the RCD receives the command; and the "end point" is when the read data is outputted by the DRAM and therefore made available from the DRAM to the data buffer. (Dkt. No. 173 at 25-26.)  As support, Netlist cites Dr. Mangione-Smith's testimony explaining how the read and write data flows through the data buffer between the memory device and the host:

> Q. And so for a read command, what's the flow of data look like?
>
> A. So for a read command, the memory controller will send it first to the RCD, and that's when the module gets the command. And then subsequent -- after that, the RCD will send read commands to the individual DRAMs.
>
> Q. And what does the DRAM do when it gets a read command?
>
> A. Well, it responds to that command, pulls out the data that's being asked for, and provides it to the data buffer.
>
> Q. And what happens after that?
>
> A. Then the data buffer holds onto that data for a short period of time, that's the delay, and then it provides it to the host, to the memory controller.

(Dkt. No. 173 at 25 (citing Trial Tr. at 393:1-13).  Netlist contends this is supported by Dr. Stone's testimony when Dr. Stone agreed that "the actual latency of the memory device is between when the command is received by the device and when the read data is at the output of the device in the read context" and that "the output of the DRAM device means the point at which the data is usable by the module." (Dkt. No. 173 at 25 (citing Trial Tr. at 760:17-25).)

Netlist then notes that Dr. Mangione-Smith explained that "the actual operational CAS latency of the DRAM devices themselves is added to the buffer delay of the data buffers to produce the overall CAS latency." (Trial Tr. at 393:23-25.) Dr. Mangione-Smith further testified that the

25

Appx29

CONFIDENTIAL MATERIAL OMITTED

██████████████████████████████████████████████████████

███████████████████████████████████████

In addition, Netlist notes that Dr. Mangione-Smith points to testimony from Micron's witnesses to show that some amount of delay occurs when the data buffer holds on to the read data for a short period of time. (*Id.* at 26 (citing, e.g., Trial Tr. at 392:15-20 ("Q. And what did Mr. Ross say about whether the data buffers they put into the Micron products added some delay to those data transfers? A. Well, we saw some registers in that circuitry, and Mr. Ross was asked about the data buffers, and he agreed that they would add latency to data transfers."); 396:3-12; 536:23-537:1 ("Q. So on LRDIMMs, does the addition of data buffers add delay to data transfers between the memory controller and the DRAMs? A. [Mr. Ross:] Yes."); 561:17-22 (Mr. Cyr testifying that the "data buffer will introduce a propagation delay").) Based on this testimony, Netlist contends that a jury could have reasonably found that this delay in data buffer alone would establish that the overall CAS latency of the memory module is greater than the actual operational CAS latency of the DRAMs. (Dkt. No. 173 at 26.)

Netlist contends, moreover, that additional substantial evidence supports the jury's verdict. (*See* Dkt. No. 173 at 27-29.) For example, Netlist claims that Dr. Stone "admitted on cross-examination that the CAS latency limitation was met for read operations." (*Id.* at 28.) The relevant portion of that cross-examination went as follows:

> Q. … The actual latency is when the data, the read data is output from the DRAM such that it's usable by the device. Correct? Usable by the module.
>
> A. That's correct.
>
> Q. And the overall latency is that plus the buffer. Correct?
>
> A. That's correct.
>
> ***Q. And for read commands, the overall module delay will always be greater than the actual delay of the memory device. Correct?***
>
> ***A. That's correct.***

26

. . .

Q. It literally says that the overall latency is greater than the actual latency of the memory device. Correct?

A. There's a context in which it's correct, yes.

. . .

*Q. The overall is always greater in the read context.*

*A. That's correct.*

*Q. That's for all of Micron's accused LRDIMMs. Correct?*

*A. That's correct.*

(Trial Tr. at 763:14-24, 764:4-6) (emphasis added).  From this exchange, Netlist contends that a reasonable jury would understand that "overall latency" and "actual latency" refer respectively to the "overall CAS latency" of the memory module and the "actual operational latency" of the memory device cited in the claims and consequently, the jury could arrive at the factual determination that Micron's products meet the CAS latency limitation for at least the "read" operation. (Dkt. No. 173 at 29.)

Micron responds, nonetheless, that Netlist cannot prove infringement of the CAS latency limitation because Netlist failed to provide any evidence at trial of the timing requirement of "overall CAS latency" and "actual operational CAS latency" as those terms are construed by the Court. (Dkt. No. 178 at 9.) Micron contends that Netlist's *post hoc* attempt to add that evidence now, by arguing the timing of the "starting point" and "end point" is improper since it was not offered at trial. (*Id.* at 9-10.)  Netlist argues, however, that Micron is wrong that Netlist did not offer any contention at trial of the "starting point" and "end point" for the "overall CAS latency" and "actual operational CAS latency" because Netlist pointed to extensive evidence from Dr. Mangione-Smith and Dr. Stone. (Dkt. No. 185 at 8 (citing *e.g.*, Trial Tr. at 393:1-13 (discussing the flow of data through the data buffer and between the memory device and the host)).)

27

Appx31

Micron further contends that Netlist's argument that a jury may have understood Dr. Stone's cross-examination testimony as referring to the Court's construction of the claim terms is also improper speculation and not substantial evidence because Dr. Stone was "actually and strategically asked about unclaimed latency terms that Netlist's counsel had defined differently." (*Id.* at 10.) Netlist responds not only by claiming that Micron does not explain how the terms used in cross-examination are inconsistent with the claimed terms, but also by demonstrating that "Dr. Stone used these terms interchangeably throughout his direct examination." (Dkt. No. 185 at 8 (citing e.g., Trial Tr. at 685:16-686:3 ("Q. Please explain to the jury the concept of ***CAS latency*** as it's used in this patent. A. Okay. I wanted to point to the word 'latency'. What's latency? That's a delay. It's a difference in time. So each latency starts at a particular time and ends at a particular time. And these are crucial for the operation of a memory module. Okay? So we have latency in our mind. There are two types of latency. We have an ***overall*** and we have an ***actual operational***.") (emphasis added).)

Having reviewed the Motion, the subsequent briefing, and the applicable trial exhibits, the Court finds that a reasonable jury could determine that Micron's products meet the CAS latency limitation. In this case, the CAS latency limitation in Claim 1 of the '417 Patent requires that the overall CAS latency of the memory module be greater than the actual operational CAS latency of the memory devices. (*See* JX-1 at 42:63-67.) During the trial, the jury heard testimony from several witnesses, including Dr. Mangione-Smith, Mr. Cyr, Mr. Ross, and Dr. Stone, that would allow them to find that the overall CAS latency of the memory module in Micron's products is greater than the actual operational CAS latency in the memory devices.

As a preliminary matter, the jury heard Dr. Mangione-Smith explain how the CAS latency limitation is met. (*See e.g.*, Trial Tr. at 390:14-399:10; 402:5-405:15; 416:16-420:10.).) Specifically, the jury heard Dr. Mangione-Smith begin testifying about this limitation by

28

Appx32

explaining the Court's construction of "actual operational CAS latency" and "overall CAS latency" and the requirement that the "overall CAS latency" be greater than the "actual operational CAS latency" of the individual DRAM chips. (Trial Tr. at 390:14-391:23.) Dr. Mangione-Smith subsequently discussed testimony from Mr. Ross where Mr. Ross stated that the data buffers put into Micron's products added latency to the data transfer. (Trial Tr. at 392:15-20; 536:23-537:1 ("Q. So on LRDIMMs, does the addition of data buffers add delay to data transfers between the memory controller and the DRAMs? A. [Mr. Ross:] Yes.").) Dr. Mangione-Smith also discussed testimony from Micron's engineers, such as Mr. Cyr, that stated the data buffers actually add the flow of data for read and write commands. (Trial Tr. at  396:3-12; 561:17-22 ("Q. And will add a time delay in its flow from the – for example, from the host system to the DRAM? A. The -- the data buffer will introduce a propagation delay. Q. And that's a time delay? A. Time delay. Correct.").)  The jury further heard Dr. Mangione-Smith testify that the "actual operational CAS latency of the DRAM devices themselves is added to the buffer delay of the data buffers to produce the overall CAS latency." (Trial Tr. at 393:23-25.) Dr. Mangione-Smith supported this testimony using source code. (*See e.g.*, *id.* at 416:16-25.)  From this testimony, the Court agrees with Netlist that a jury could reasonably conclude that this delay in the data buffer establishes that the overall CAS latency of the memory module is greater than the actual operational CAS latency of the DRAMs. (*See, e.g.*, Trial Tr. at 393:23-25; 416:16-25; Dkt. No. 173 at 26.)  Given that Dr. Stone admitted he did not analyze the applicable source code (*see* Trial Tr. at 708:8-11), a reasonable jury could also have given less weight to Dr. Stone's testimony on this point, to the extent that he reached a different conclusion than Dr. Mangione-Smith.

In addition to the testimony from Dr. Mangione-Smith, Mr. Ross, and Mr. Cyr, the jury heard Micron's own expert witness, Dr. Stone, admit that the CAS latency limitation was met.

29

Specifically, the jury heard Dr. Stone admit that "for read commands, the overall module delay will always be greater than the actual delay of the memory device" and also that for "all of Micron's accused LRDIMMs," the "overall is always greater in the read context." (*Id.* at 763:14-24, 764:14-18.) While Micron claims that Netlist strategically asked Dr. Stone about unclaimed latency terms instead of the claimed "actual operational CAS latency" and "overall CAS latency" terms, the Court is not persuaded by Micron's argument. Dr. Stone used the terms "actual latency" and "overall latency" interchangeably with the claimed "actual CAS latency" and "overall CAS latency." As just another example, when Dr. Stone offered his contrary position, he stated that "[y]ou can actually measure that, 1.5 cycles longer for the *actual* than the *overall*" (Trial Tr. at 691:9-10.) Consequently, the admission by Dr. Stone that the overall module delay will always be greater than the actual delay of the memory device for "read" commands is sufficient evidence to support the jury's verdict.

Ultimately, the Court finds that substantial evidence supports the jury's finding that the CAS latency limitation, which requires that the overall CAS latency of the memory module be greater than the actual operational CAS latency of the memory devices, is met. Accordingly, the Court finds that judgment as a matter of law for non-infringement of the '417 Patent is not appropriate under the arguments Micron's proffers in its Motion.

## IV.    CONCLUSION

For the reasons stated herein, the Court finds that Micron's Motion (Dkt. No. 159) should be and hereby is **DENIED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

30

Appx34

**So ORDERED and SIGNED this 11th day of June, 2025.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | |
| | § | |
| *Defendants*. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is the Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents (the "Motion") filed by Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC. (collectively, "Micron" or "Defendants"). (Dkt. No. 157.) In the Motion, Micron moves for judgment as a matter of law of no willfulness pursuant to Rule 50 of the Federal Rules of Civil Procedure. (*Id.* at 1.)

In this case, Plaintiff Netlist, Inc. ("Plaintiff" or "Netlist") brought this action alleging that Micron infringes claim 16 of U.S. Patent No. 7,619,912 (the "'912 Patent") and claims 1, 2, 8, 11-14 of U.S. Patent No. 11,093,417 (the "'417 Patent") (collectively, the "Asserted Patents"). (Dkt. Nos. 1; 11; 100.)  After the conclusion of the evidence, the jury returned a unanimous verdict finding in relevant part that Netlist proved by a preponderance of the evidence that Micron willfully infringed claim 16 of the '912 Patent and also willfully infringed at least one of the Asserted Claims of the '417 Patent. (Dkt. No. 135 at 6.)

Afterwards, the Court considered the totality of circumstances and concluded that enhancement of the compensatory award was not warranted under 35 U.S.C. § 284. (*See* Final Judgment, Dkt. No. 151 at 3.)  Consequently, the Court elected not to enhance the damages awarded to Netlist. (*Id.*)

Appx36

Micron, nevertheless, moves for judgment as a matter of law of no willfulness on the grounds that no legally sufficient evidence supports the jury's willfulness verdict. (Dkt. 157 at 1.)

The Court notes that a jury's finding of willfulness merely "opens the door" to the Court exercising its discretion to enhance damages. *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 106 (2016) ("Section 284 allows district courts to punish the full range of culpable behavior. Yet none of this is to say that enhanced damages must follow a finding of egregious misconduct."); *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992) ("[A] finding of willful infringement does not mandate that damages be enhanced."). The Court finds that Micron has not explained why the Court should address this issue given the Court's election not to enhance damages. *See Sprint Communs. Co. L.P. v. Time Warner Cable, Inc.*, 255 F. Supp. 3d 1134, 1147 (D. Kan. 2017) ("Finally, Time Warner Cable moves for judgment as a matter of law with respect to the issue of willfulness, which the jury found in Sprint's favor. Time Warner Cable has not explained why the Court should address this issue, however, which has become moot in light of the Court's denial of Sprint's claim for enhanced damages."). Accordingly, having elected not to enhance the damages award, the Court finds that the Motion should be and is **DENIED AS MOOT**.[1]

---

[1] Substantial case law supports the Court's decision. *See VirnetX Inc. v. Apple Inc.*, No. 6:12-CV-00855-RWS, 2018 U.S. Dist. LEXIS 230877, at *51-52 (E.D. Tex. 2018) ("Because the Court declines to award enhanced damages, Apple's willfulness JMOL and new trial motions are moot."); *Presidio Components, Inc. v. American Technical Ceramics Corp.*, Case No. 14-02061-H-BGS, 2016 U.S. Dist. LEXIS 110212, *21 (S.D. Cal. Aug. 17, 2016) (noting that Defendant's JMOL motion on willfulness was "essentially moot because the Court, exercising its sound discretion, ultimately declines to award [Plaintiff] enhanced damages despite the jury's finding of willful infringement."); *Schwendimann v. Arkwright Advanced Coating, Inc.*, No. CV 11-820 (JRT/HB), 2018 U.S. Dist. LEXIS 127732, 2018 WL 3621206, at *21 (D. Minn. July 30, 2018) (citing *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997)) ("A court's denial of enhanced damages renders a motion for judgment as a matter of law on willful infringement moot."); *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 541 F. Supp. 2d 1151, 1165 (W.D. Wash. 2008) ("The Court has already decided *not* to award Baden enhanced damages or attorneys' fees. Because the jury's willfulness finding has no effect on this litigation, the issue is moot and the motion for a new trial on the issue of willfulness is denied.") (citation omitted); *Concordia Pharm., Inc. v. Method Pharm., LLC*, 240 F. Supp. 3d 449, 455 (W.D. Va. 2017) ("Because it is the court that ultimately decides whether to award enhanced damages or attorneys' fees, the jury's verdict on the issue of willfulness is only advisory.") *CloudofChange, LLC v. NCR Corp.*, No. W-19-CV-00513-ADA, 2022 U.S. Dist. LEXIS 195536, at *43 (W.D. Tex. 2022) ("Nonetheless, the issue is largely moot as this Court denied CoC's Motion for Enhanced Damages."); *Shiley, Inc. v. Bentley Labs., Inc.*, 601 F. Supp. 964, 967, n.5 (C.D. Cal. 1985) (concluding that the jury's verdict on the issue of willful infringement is "advisory only" and holding that defendant's motion under Fed. R. Civ. P. 50(b) on the issue of willful infringement is "rendered moot and is denied for that reason").

So **ORDERED** and **SIGNED** this 11th day of June, 2025.

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

3

Appx38

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | |
| | § | |
| *Defendants*. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is the Renewed Motion for Judgment as a Matter of Law on Damages (the "Motion") filed by Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC. (collectively, "Micron" or "Defendants"). (Dkt. No. 156.) In the Motion, Micron moves for judgment as a matter of law ("JMOL") in its favor on damages pursuant to Rule 50 of the Federal Rules of Civil Procedure. (*Id.*) For the reasons discussed herein, the Court finds that the Motion should be **DENIED**.

## I.      BACKGROUND

Plaintiff Netlist, Inc. ("Plaintiff" or "Netlist") alleged that Micron infringes claim 16 of U.S. Patent No. 7,619,912 (the "'912 Patent") and claims 1, 2, 8, 11–14 of U.S. Patent No. 11,093,417 (the "'417 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 100.)  After a trial in this case, the jury returned a unanimous verdict finding in relevant part that Micron infringed all claims of the Asserted Patents, that Netlist was entitled to $425,000,000 as a reasonable royalty for its damages for infringement of the '912 Patent, and $20,000,000 for its damages for infringement of the '417 Patent. (Dkt. No. 135.)  Micron now asserts that the jury did not have a legally sufficient evidentiary basis to award such damages.

## II.    LEGAL STANDARD

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig. Div. Inc.*, 442 F.3d 919, 937–38 (5th Cir. 2006).

## III.    DISCUSSION

Micron asks the Court to enter judgment as a matter of law in its favor on damages for both the '912 Patent and the '417 Patent. (Dkt. No. 156 at 1, 15.)  The Court will address each in turn.

### A.    The '912 Patent

Micron asks the Court to grant JMOL of no or nominal damages for the '912 Patent on the grounds that Netlist has not presented a legally sufficient evidentiary basis for the jury to find $425,000,000 in damages. (Dkt. No. 156 at 2, 12.) Micron contends "the problem is a lack of apportionment" due to Mr. Kennedy assigning all the revenue to the '912 Patent despite evidence showing that the claimed invention is not solely responsible for the benefit Netlist claimed. (*Id.* at

2

1.)  In response, Netlist argues that the Court should deny Micron's Motion with respect not only because Mr. Kennedy's apportionment analysis was proper and the jury's damage award is supported by substantial evidence, but also because Micron's argument fails on procedural grounds.  (Dkt. No. 174 at 2.)  The Court will begin by addressing Netlist's argument that Micron's argument fails on procedural grounds.

### 1.    Procedural Appropriateness

Netlist argues that the Court should decline to consider Micron's challenge to Mr. Kennedy's damages opinion because it is an attack on Mr. Kennedy's methodology, which is improperly raised in a Rule 50(b) motion, and should have raised it in a *Daubert* motion. (Dkt. No. 174 at 2.)  As support, Netlist cites several cases where courts have found that JMOL was not the appropriate context for attacks on an expert's methodology. (Dkt. No. 174 at 2 (citing *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*, No. 2:13-cv-213-JRG, 2016 WL 362540, at *3 (E.D. Tex. Jan. 29, 2016) ("JMOL is not the appropriate context for renewing attacks on an expert's methodology."); *Optis Wireless Tech., LLC v. Apple Inc.*, No. 2:19-cv-66-JRG, Dkt. 740 at 13 (E.D. Tex. May 17, 2022) ("As this Court has previously held, it is improper to use a JMOL motion—or a motion for new trial—as a renewed *Daubert* challenge.").)

As proof that Micron is attacking Mr. Kennedy's methodology, Netlist points out that the heading of Micron's argument section focuses on whether the apportionment was "proper," not whether substantial evidence supports the jury's verdict. (Dkt. No. 184 at 1.)  Additionally, Netlist contends that Micron specifically faults Mr. Kennedy's opinion for failing to "remove the features enabled by the patents (and only the features enabled by the patents) because other technology is also required to enable that feature." (Dkt. No. 184 at 1.) (quotation marks cleaned up). Accordingly, Netlist argues that Micron's apportionment argument is waived.

3

In response, Micron claims that its issue with Mr. Kennedy's methodology was briefed and preserved for appeal in Micron's *Daubert* motion. (Dkt. No. 177 at 1 (citing Dkt. No. 360 at 8 (arguing that "[t]he Court should strike Mr. Kennedy's opinions regarding DDR4 LRDIMMs because he does not reliably apportion the value of the asserted patents.").)  Netlist responds that Micron only raised its *Daubert* motion with respect to LRDIMMs, not RDIMMs, and regardless, it is still improper to raise attacks on methodology in post-trial JMOL motions. (Dkt. No. 184 at  1.) Micron primarily claims, however, that Netlist fails to properly address its argument, and states that its Motion is not premised on whether Mr. Kennedy's methodology was properly admitted, but rather that no reasonable jury could have awarded $425 million for the '912 Patent based on the trial record.  (Dkt. No. 177 at 1.)

In the present case, the Court notes that many arguments raised in Micron's Motion are attacks on Mr. Kennedy and Dr. Mangione-Smith's methodologies. For example, Micron repeatedly attacks the Netlist's experts' theories when it claims that "Mr. Kennedy and Dr. Mangione-Smith failed to properly separate and exclude the value of these other non-patented features."  (Dkt. No. 156 at 8; *see also* Dkt. No. 177 at 1 ("Netlist's Apportionment Analysis Was Not Proper."); at 2 ("Mr. Kennedy's opinion does not remove the features enabled by the patents (and only the features enabled by the patents) because other technology is also required to enable that feature.") (quotation marks cleaned up).)  Notably, when Micron summarizes its argument for the Court, Micron focuses its challenge on the admissibility of evidence rather than the sufficiency. (*See* Dkt. No. 156 at 2 ("In short, Netlist failed to *properly* present evidence . . . .") (emphasis added).)

Accordingly, to the extent that Micron attacks Mr. Kennedy's methodology, as opposed to challenging the sufficiency of the evidence, the Court finds such arguments are improper, and rejects them as either having been waived (if Micron failed to raise them at *Daubert*) or are

improperly re-raised again at the Rule 50(b) stage.  *See KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 889 (E.D. Tex. 2020) ("As a threshold matter, the Court notes that Defendants did not challenge the admissibility of KAIST's experts' apportionment opinions as disclosed in their expert reports. Therefore, any such challenges are procedurally waived and the Court reviews Samsung's challenges only for the sufficiency of the evidence admitted at trial."); *Netlist, Inc. v. Samsung Electronics Co., Ltd., et al.*, Case No. 2:21-cv-00463-JRG, Dkt. No. 606 at 14 (E.D. Tex. July 15, 2024) ("Samsung raised these same arguments at the *Daubert* stage and lost—Samsung does not now get a second bite at that same apple."); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co*., No. 2:13-CV-213-JRG, 2016 WL 362540, at \*4 (E.D. Tex. Jan. 29, 2016), *aff'd*, 853 F.3d 1370 (Fed. Cir. 2017) ("[T]o the extent that Samsung now merely re-urges its prior *Daubert* arguments, the Court rejects such as improper.").

### 2.    The jury's award is supported by a legally sufficient evidentiary basis.

Micron contends that Netlist has not presented a legally sufficient evidentiary basis for the jury to find $425,000,000 in damages on the '912 Patent because Mr. Kennedy failed to apportion for non-infringing technology. (Dkt. No. 156 at 2.) Specifically, Micron asserts that because Mr. Kennedy's calculations were based on a comparison between the Accused Products and the alleged non-infringing alternatives, Mr. Kennedy was required to establish that the differences between the Accused Products and the non-infringing alternatives were limited to the incremental benefit provided by Claim 16 of the '912 Patent.  (*Id.* at 2-3 (citing *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("[T]he ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.")).)  Micron contends, however, that no reasonable jury could have found that Mr. Kennedy's valuation apportioned the incremental value of the claimed invention. (Dkt. No. 156 at 3.)

5

Appx43

Micron notes Mr. Kennedy testified that where Micron could not sell DDR4 DIMMs that operate at above 2400 MT/s, Micron's best alternative would be to decrease the speed of the DIMMs to 2400 MT/s to avoid using the '912 Patent. (Dkt. No. 156 at 4; Trial Tr. at 587:8-13.) Micron further contends that Mr. Kennedy then assigned all the revenue associated with Micron's DDR4 Accused Products operating at speeds over 2400 MT/s to the '912 Patent.  (Dkt. No. 156 at 1, 6.)  Micron claims that doing so, however, was improper because the evidence shows that the claimed invention was not solely responsible for this speed benefit.  (*Id.* at 1, 5-6 (citing e.g., Trial Tr. at 495:15-18 ("Q. And, in fact, you know that there are other patents that also you believe without them those products wouldn't be able to operate above 2400 mega transfers per second. A. That -- yeah, that seems reasonable.")).)  Additionally, Micron claims that Dr. Mangione-Smith conceded that not "all the performance comes from" PDA mode.  (*Id.* at 5 (citing Trial Tr. at 367:18-19).)

Micron contends that this problem is further compounded because Netlist has left nothing but speculation to fill the gap as to how much of the speed benefit is owed to the claimed invention. (Dkt. No. 156 at 7.)  For example, when Micron asked Dr. Mangione-Smith whether he "believe[d] all of the speed increase over 2400 seconds is due solely to this '912 Patent," Dr. Mangione-Smith admitted he had not considered that question.  (*Id.* (citing Trial Tr. at 495:9-11).) As a result, Micron argues that Netlist's damages evidence does not reflect the incremental value that the patented invention adds to the end product. (*Id.* at 6-8.)  Accordingly, Micron argues that the Court should grant JMOL of no or nominal damages for the '912 Patent. (*Id.* at 8.).

In response, Netlist contends that Mr. Kennedy's analysis was proper because his analysis follows the approach endorsed by the Federal Circuit and approved by this Court.  (Dkt. No. 174 at 4 (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other*

6

Appx44

*grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (recognizing that "estimating a 'reasonable royalty' is not an exact science" and includes methods such as "estimat[ing] the value of the benefit provided by the infringed features by a comparing the accused product to non-infringing alternatives.")); Dkt. No. 174 at 11 (citing *Netlist Inc. v. Samsung Elecs. Co., Ltd.*, No. 2:21-cv-463, Dkt. No. 608-1 at *50 (E.D. Tex. July 15, 2024) (noting Samsung's argument that Mr. Kennedy failed to apportion was not persuasive because Mr. Kennedy "included the apportionment to his damages number" by "award[ing] to Netlist the difference in value between the accused product and the next-best alternative.")).)

Netlist contends that not only did Mr. Kennedy's analysis follow this exact approach, but he testified extensively on how he apportioned the value provided solely by the '912 Patent. (Dkt. No. 174 at 4.)  Netlist notes that Mr. Kennedy began by explaining the proper apportionment standard—i.e., that apportionment requires "you to look at the portion of the profit that should be credited to the invention as opposed to other patented technology or other technology." (*Id.* (citing Trial Tr. at 606:7-9).) Then Mr. Kennedy explained that to assess the value of the benefits provided by the '912 Patent, he relied on Dr. Mangione-Smith's testimony and the supporting evidence showing that "without the Netlist technology, [Micron] wouldn't be able to sell these high performance DIMMs and these LRDIMMs for high density servers." (Dkt. No. 174 at 4; Trial Tr. at 586:1-4; *see also* 367:6-13.) ("Q. And so if you didn't have the technology of the '912 Patent . . . what impact would that have on the speeds possible in Micron's modules? [Dr. Mangione-Smith:] A. Well, it would hurt the speed, and as Micron said, it would severely derate the performance. And so it -- I believe that that means that they would not be able to operate at speeds above 2400."). This is because, as the jury heard from Dr. Mangione-Smith, the use of the '912 Patent in the Accused Products is "commercially necessary to operate over 2400 mega transactions per second

7

Appx45

or million transactions per second." (*Id.* (citing Trial Tr. at 586:17-19).)   Mr. Kennedy then explained to the jury that he accounted for this apportionment factor by basing his calculations "just on the benefits provided by the '912 Patent" as testified to by Dr. Mangione-Smith, further stating that "it's already been apportioned by the apportioning out any technical benefits related to other technology because all I'm valuing is the benefit related to the accused features." (*Id.* at 4-5 (citing Trial Tr. at 606:12-17.)

This opinion was further supported by Dr. Mangione-Smith's testimony that though Micron offered several infringing alternatives (e.g., using DDR2 or DDR3 memory devices in DIMMs, or using unregistered DDR4 that do not have an RCD), none of these alternatives were commercially acceptable.  (Dkt. No. 174 at 5; Trial Tr. at 369:2-14.)   Accordingly, Netlist contends that Mr. Kennedy properly apportioned the value of that benefit because the patented features are commercially necessary to enable the 2400 MT/s speed of the Accused Products. (Dkt. 174 at 6.)

Further, in response to Micron's contention that Mr. Kennedy's analysis does not reflect the incremental value that the patented invention adds to the end product, Netlist contends that Mr. Kennedy's royalty calculation was based solely on the speed benefits enabled by the '912 Patent. (*Id.* at 6.)  As support, Netlist contends that Mr. Kennedy relied on the "actual data of what people have paid for speed" and found that Micron would have suffered a "decrease in price" of "1.18 percent for LRDIMMs" and a ".43 percent" for "RDIMMs."  (*Id.* (citing Trial Tr. at 590:1; 590:21-591:1).)   Mr. Kennedy further explained that using "Micron's own sales data," the "total benefit that Micron gained from using Netlist's ['912] technology during that time period" would be "$513.4 million."  (*Id.* (citing Trial Tr. at 591:19-21).)

Additionally, in response to Micron's contention that Mr. Kennedy attributed the entire price (revenue) premium associated with the selling products at speeds above 2400 MT/s to the

8

'912 Patent, Netlist claims that Mr. Kennedy was "highly conservative with his application of the royalty rate to the royalty base." (*Id.* at 6.)  First, Netlists argues that Mr. Kennedy indisputably performed his analysis on the smallest salable patent practicing unit, focusing solely on the Accused Products and solely on the benefit conferred on those products by the '912 Patent. (*Id.* at 6-7.)  Second, Netlist notes that Mr. Kennedy was also conservative in his approach, which is supported by his testimony that selling the "lower speed DIMM" meant Micron would "have to sell them at a lower price." (*Id.* at 7; Trial Tr. at 589:8-9.)  Finally, Netlist argues that even if Mr. Kennedy had attributed the entire price (revenue) premium to the '912 Patent, this Court has held that this would have been proper under Federal Circuit precedent. (Dkt. No. 174 at 7-8 (citing *Netlist Inc. v. Samsung Elecs. Co.*, No. 2:21-cv-463, Dkt. No. 608-1 at *45 (E.D. Tex. July 15, 2024) ("The Court is not persuaded by Samsung's arguments. There is no doubt that Mr. Kennedy opined that a proper award to Netlist would cover 100% of the revenue associated with the technology at issue. While Samsung contends that this is impermissible . . . Samsung is wrong.")); *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (affirming cost savings approach); *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1339 (Fed. Cir. 2015) ("It is not the case that the value of all conventional elements must be subtracted from the value of the patented invention as a whole when assessing damages.").

As further justification for its apportionment approach, Netlist argues that Micron did not offer evidence that these benefits could be achieved without the claimed '912 invention, nor did it offer evidence of any other contributing patents or technology. (Dkt. No. 174 at 9.) At trial, Mr. Kennedy testified that Micron never offered any evidence of the contributions of other patents or technology. (*Id.* at 7.)  Specifically, Mr. Kennedy explained that other apportionment approach should not be implemented here because he "didn't see any evidence of any patents that

9

Appx47

contributed to the accused features that Micron presented," nor did he know of any, and he did not see evidence of any technology that Micron claimed "helped advance those accused features." (Trial Tr. at 607:24-608:2.)

Finally, Netlist notes that the jury was also presented with several alternative apportionments, including Mr. Kennedy's technical apportionment analyses and those provided by Micron's experts. (Dkt. No. 174 at 9.) In particular, Mr. Kennedy presented the jury with the ultimate numbers he arrived at for additional apportionment, which was "105 million" for RDIMMs and "12.15 million" for LRDIMMs. (*Id.*) Netlist contends that the jury did take these alternative approaches into consideration, as they ultimately awarded damages below the highest amounts Mr. Kennedy suggested. (*Id.* at 10.)

After considering all the evidence in a light most favorable to the verdict, the Court finds that the jury's damages award for the '912 Patent is supported by substantial evidence. During trial, the jury heard extensive testimony from Mr. Kennedy about how he apportioned the value provided solely by the '912 Patent. In particular, the jury heard Mr. Kennedy explain the proper apportionment standard and then explain that without the Netlist technology, Micron would not be able to sell these high performance DIMMs and LRDIMMs that "operate at speeds above 2400." (Trial Tr. at 586:1-4; 586:14-19; 606:7-9.) Mr. Kennedy further explained that he accounted for the apportionment factor by basing his calculations "just on the benefits provided by the '912 Patent" as testified to by Dr. Mangione-Smith, stating that "it's already been apportioned by the apportioning out any technical benefits related to other technology because all I'm valuing is the benefit related to the accused features." (*Id.* at 606:12-17.) This testimony came after Dr. Mangione-Smith also testified that if Micron "didn't have the technology of the '912 Patent," they "would not be able to operate at speeds above 2400." (*Id.* at 367:6-13.)

10

Appx48

Mr. Kennedy also explained that he "didn't see any evidence of any patents that contributed to the accused features that Micron presented" nor did he know of any, and he also did see evidence of any technology that Micron claimed "helped advance those accused features." (*Id.* at 607:24-608:2.)  He testified, nevertheless, that he awarded only the value for the "difference in speed based on what Doctor Mangione had opined was related to the patents." (*Id.* at 627:12-16.) Additionally, the jury heard that Mr. Kennedy relied on the "actual data of what people have paid for speed" and found that Micron would have suffered a "decrease in price" of "1.18 percent for LRDIMMs" and a ".43 percent" for "RDIMMs."  (*Id.* at 590:1-2; 590:21-591:1.)  Mr. Kennedy explained that using "Micron's own sales data," the "total benefit that Micron gained from using Netlist's ['912] technology during that time period" would be "$513.4 million." (*Id.* at 591:19-21.) The jury also heard that Mr. Kennedy was "conservative" with his application of the royalty rate to the royalty base. (*Id.* at 594:12-17.)   Additionally, the jury heard several alternative apportionments from Mr. Kennedy as well as damages calculations provided by Micron's experts. (*See, e.g.,* Trial Tr. at 630:3-633:25; 917:7-12.)  In particular, Mr. Kennedy presented the jury with the ultimate numbers he arrived at for this additional apportionment, which was "105 million" for RDIMMs and "12.15 million" for LRDIMMs. (*Id.* at 633:9-25.)

The Court concludes that, contrary to Micron's arguments,[1] Mr. Kennedy adequately estimated the "portion of the value" of the accused products "attributable to the patented technology." *VirnetX, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("This court has recognized that

---

[1] The Court notes that while Micron purportedly brings this Motion to challenge the sufficiency of the evidence, the crux of its Motion are arguments attacking the methodology and admissibility of the evidence. (*See, e.g.*, Dkt. No. 156 at 2 ("[Mr. Kennedy] failed to apportion for non-infringing technology . . ."); at 8 ("Mr. Kennedy and Dr. Mangione-Smith failed to properly separate and exclude the value of these other non-patented features.").) As previously stated, to the extent that Micron attacks Mr. Kennedy's methodology, as opposed to challenging the sufficiency of the evidence heard by the jury, the Court finds such arguments as improper.

estimating a reasonable royalty is not an exact science. . . . A party may . . . value the infringed features by comparing the accused product to non-infringing alternatives.").

Nevertheless, Micron disagreed with Mr. Kennedy's apportionment approach and vigorously cross-examined him, after which Micron presented rebuttal testimony to the jury from its own experts about the proper measure of damages. (*See, e.g.,* Trial Tr. at 621:24-647:13; 917:4-12.). The jury was free to judge the credibility of all of the experts and determine who had persuaded them when awarding damages. *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012). After conducting such an evaluation, the jury found in favor of Netlist and awarded it $425 million in damages for the '912 Patent, which was below the $513.4 million Mr. Kennedy opined was a reasonable royalty. (Dkt. No. 135 at 5; Trial Tr. at 609:13-15.)

Having considered all the record evidence, the Court concludes that the jury reached a reasoned and supportable decision and declines to disturb the jury's judgment. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009) ("A jury's decision with respect to an award of damages must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.") (quotation marks cleaned up); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) ("The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion."). Accordingly, the Court **DENIES** the Motion of no or nominal damages for the '912 Patent.

12

Appx50

## B.    The '417 Patent

Micron contends that Netlist has not presented a legally sufficient evidentiary basis for the jury to find any damages for the '417 Patent because Netlist's theory rests on an unclaimed feature as opposed to the claimed invention. (Dkt. No. 156 at 8.) Specifically, Micron contends that Netlist's damage's theory is predicated on a single feature—distributed buffer architecture—that the undisputed evidence establishes is not claimed in the '417 Patent. (*Id.*) Micron further contends that because Netlist's damages theory hinges on this unclaimed feature, Netlist failed to prove it is entitled to any damages for the '417 Patent. (*Id.* at 9.)

In response, Netlist argues that the Court should deny Micron's Motion with respect to the '417 Patent not only because there is ample evidence in the trial record concerning the benefits afforded by the claimed features of the '417 Patent that support the jury's damage award, but also because Micron's argument is procedurally improper.  (Dkt. No. 174 at 11.)  The Court will begin by addressing Netlist's contention that Micron's argument is procedurally improper.

### 1.    Procedural Appropriateness

Netlist contends that Micron's argument as to the '417 Patent has been waived because it is an attack on an expert's methodology, which this Court and the Federal Circuit have held is not proper in a motion for JMOL. (Dkt. No. 174 at 11-12).  As support, Netlist cites to *Versata* where the Federal Circuit rejected JMOL arguments targeted at both the admissibility of expert testimony and whether the expert's damages model was properly tied to the facts of the case because they were made "[u]nder the guise of sufficiency of the evidence," and should have been resolved under the framework of the Federal Rules of Evidence and through a challenge under *Daubert*. 717 F.3d at 1264. Netlist contends that though Micron frames its Motion as attacking the sufficiency of evidence, Micron is actually challenging the verdict on the basis of "Netlist's damages theory." (Dkt. No. 174 at 12.)  Netlist claims this is supported by the fact that Micron's argument is directed

13

Appx51

entirely to "how" Mr. Kennedy calculated his proposed reasonable royalty.  (Dkt. No. 184 at 4 (citing e.g., Dkt. No. 156 at 10 ("Netlist violated this prohibition on basing damages solely on an unclaimed feature—distributed buffers. In valuing the technical benefit of the '417 patent, Mr. Kennedy…); at 8 ("Netlist's damage's theory is predicated on a single feature . . ."); at 8 ("Its Damages Theory Rests on an Unclaimed Feature"); at 9 ("Netlist's damages theory hinges on this unclaimed feature . . ."))) Consequently, Netlist contends that such arguments challenging the reliability and admissibility of evidence have been procedurally waived. (Dkt. No. 174 at 12.)

While Netlist admits that Micron raised this issue in a motion *in limine*, Netlist notes first that the Court denied that motion *in limine* and carried the issue of whether any limiting instruction would be appropriate until Netlist presented such evidence at trial, and second that Micron did not challenge Mr. Kennedy's methodology at *Daubert* on the basis it raises in this Motion nor did Micron renew its evidentiary objection at trial. (Dkt. No. 174 at 12-13 (citing e.g., *U.S. S.E.C. v. Snyder*, 292 F. App'x 391, 400 (5th Cir. 2008) ("Because Snyder did not object to the admissibility of Hoffman's testimony concerning the accounting practices at issue, that issue has been forfeited.").

Importantly, Micron does not dispute that it failed to raise this specific challenge to Netlist's damage theory at *Daubert* nor does Micron dispute it failed to object to this testimony at trial. (*See* Dkt. No. 177 at 2-3.) Instead, Micron responds that Netlist mischaracterizes its arguments as attacks on Netlist's expert's methodology rather than as an argument that the damages for '417 Patent are not supported by substantial evidence. (*Id.*)  Specifically, Micron contends that the jury's verdict is not supported by substantial evidence because "Netlist's expert testimony for damages was calculated based on an unclaimed feature." (*Id.* at 2-3.)

Appx52

As support that this argument is not waived, Micron cites the Federal Circuit's decision in *Enplas Display Device Corp. v. Seoul Semiconductor Co., Ltd.*, 909 F.3d 398 (Fed. Cir. 2018). There, the Federal Circuit reviewed the district court's denial of JMOL where Enplas argued the jury's $4 million damages award was not supported by substantial evidence because the "only evidence supporting the $4 million award was testimony from SSC's damages expert that explicitly and improperly included non-infringing devices in the royalty calculation." *Id.* at 409. The Federal Circuit noted that before trial Enplas had filed a *Daubert* motion and a motion *in limine* to exclude this testimony, and the district court's order "limited SSC's expert" and "did not allow a damages theory based on sales of non-accused products." *Id.* Moreover, at trial, Enplas "again objected to SSC's expert's methodology," which the district court overruled and held that its opinion had not changed from its prior rulings. *Id.* at 410.

In deciding that Enplas properly challenged the sufficiency of evidence on its appeal to the Federal Circuit, the majority stated in a footnote that *Enplas* was "distinguishable from *Versata.*" *Id.* at 411, n.2. The Court reasoned that while the appellant's briefs in *Versata* confirmed its arguments should have been resolved under *Daubert* or the Federal Rules of Evidence because it argued evidence should have been "excluded" and that the district court "should not have permitted Versata's expert to present his lost profits theory," the appellant in *Enplas* specifically argued that the verdict was not supported by substantial evidence. *Id.* Consequently, the majority found that such argument was not improperly raised under the "guise" of sufficiency of evidence. *Id.*

The facts in the present case vary materially from those in *Enplas*. In this case, Micron argues that "Netlist's expert testimony for damages was calculated based on an unclaimed feature." (Dkt. No. 177 at 2-3.)  However, Micron did not challenge Mr. Kennedy's damages analysis on this basis at *Daubert*, nor did Micron raise an objection to this damage theory at trial after the

15

Appx53

Court denied its motion *in limine. See, e.g., Collins v. Wayne Corp.*, 621 F.2d 777, 785–86 (5th Cir. 1980) ("[A]n objection is required to preserve error in the admission of testimony or the allowance of cross-examination even when a party has unsuccessfully moved *in limine* to suppress that testimony . . . . The courts cannot adopt a rule that would permit counsel to sit silently when an error is committed at trial . . . ."). Moreover, when Micron summarizes its argument for the Court, Micron focuses its challenge on the admissibility of evidence rather than the sufficiency. (*See* Dkt. 156 at 2 ("In short, Netlist failed to *properly* present evidence . . . .") (emphasis added).) Therefore, to the extent that Micron attacks the methodology or admissibility of Mr. Kennedy's damages analysis or Netlist's damages theory, any such challenges are procedurally waived.  The Court cannot allow a party to reserve its *Daubert* motions and trial objections until a jury renders an unfavorable verdict on a damages theory that the party never challenged and never gave the Court a chance to exclude.  Micron has acquiesced to the jury hearing "Netlist's damages theory" by failing to raise an earlier challenge or objection.

Nevertheless, despite finding that Micron's arguments based on "Netlist's damages theory" have been waived, the Court reviews the verdict for the sufficiency of evidence to the extent that Micron challenges the sufficiency of the evidence, rather than the admissibility or methodology of such evidence. *See Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 407 (5th Cir. 2003) ("[T]his Court may review the record to determine the sufficiency of the evidence; the defendant's waiver of any challenges to the admissibility of the expert testimony does not preclude such a sufficiency review by this Court."); *see also KAIST*, 439 F. Supp. 3d at 889.

### 2.    The jury's award is supported by a legally sufficient evidentiary basis.

Micron contends that Netlist has not presented a legally sufficient evidentiary basis for the jury to find any damages for the '417 Patent because Netlist's damages theory rests on an unclaimed feature—distributed buffer architecture—as opposed to the claimed invention.

16

Appx54

(Dkt. No. 156 at 8.) As support, Micron contends that both the blackletter law and the Court's jury instructions make it impermissible to predicate damages on an unclaimed feature. (*Id.* at 9-10 (citing Final Jury Instructions at 1090:16-19 ("If unpatented features contribute to the accused products, you must apportion that value to exclude any value attributable to unpatented features"); *see also e.g., Brumfield, v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024) ("[T]he incremental value to be allocated, in the hypothetical negotiation, is the value of the *claimed* technology (not, *e.g.*, of unclaimed product improvements) over that of noninfringing alternatives.").

Despite this prohibition, Micron contends that Mr. Kennedy, in valuing the technical benefit of the '417 Patent, relied on Dr. Mangione-Smith's testimony that the sole benefit— reduced load—derived from an unclaimed feature identified as "distributed buffers." (Dkt. No. 156 at 10.)  Specifically, Dr. Mangione-Smith testified that:

> Q. And does Micron obtain a benefit from asserting the claims of the '417 Patent?
>
> A. Yes, they do.
>
> Q. What is that benefit?
>
> A. Well, the benefit, as I said, is that the distributed buffers allows the load seen by the memory controller to be reduced. So here's an example. We haven't really talked about the concept of a channel yet, but a channel is one path from the memory controller to multiple DIMMs or multiple slots that it can talk to. It can only talk to one at a time, but you can put multiple DIMMs in that system. Now, on the left-hand side, I've shown something called a 1DPC configuration. That means there's one DIMM per channel, and because of the distributed buffers, even though there's two ranks, it only shows a load of one.

(Trial Tr. at 425:1-15). Micron contends, however, that Dr. Mangione-Smith admitted on cross-examination that the claims do not require multiple buffers:

> Q. Right. So you agree that the '417 Patent claims, they don't require multiple data buffers. Correct?
>
> A. I would think that's a fair assessment.
>
> . . .

17

Appx55

Q. Well, didn't you agree earlier that distributed buffers require more than one buffer? Right?

A. Yes.

Q. And so in order to cover in a claim a distributed data buffer, you would have multiple buffers. Correct?

A. Yes. If you have multiple buffers, you have multiple buffers.

(Trial Tr. at 503:10-22.) Likewise, Micron notes that the named inventor of the '417 Patent confirmed that distributed data buffers are not required by any claimed invention in the '417 Patent. (Dkt. No. 156 at 12 (citing Trial Tr. at 904:23-905:3 ("Q. During your work at Netlist, did you ever work on a DIMM that included distributed buffers? A. No. Q. Did you make any inventions related to distributed buffers while at Netlist? A. Not that I recall."); *see also* 906:16-23) ("Q. Well, outside of the language here, did you ever invent a prod -- a product or technology where there was logic and that logic would be -- respond to a memory command by providing control signals to a buffer, and those control signals enabled communication between memory devices and a memory controller? A. No. Since you mentioned buffer, I was not affiliated with anything that I recall that included a buffer, that name, no."))).

Consequently, Micron contends that because a distributed data buffer architecture is unclaimed, the technical benefit of the '417 Patent cannot be derived from such architecture. (Dkt. No. 156 at 12.)[2]

---

[2]  Micron also argues that Netlist cannot escape this conclusion by "latching onto the 'comprising' format of the claims" since the word "comprising" cannot be used to "open the backdoor to allowing an unrecited feature to undergird a damages award." (Dkt. No. 156 at 12-13 (citing *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1329 (Fed. Cir. 2004) ("Although 'comprising' language is not limiting and may include features not recited in the claim, such language cannot be read to require other structure.").) The Court notes that this argument became an issue during the direct examination of Micron's technical expert, Dr. Harold Stone, when counsel for Micron asked Dr. Stone whether the '417 Patent mentions distributed data buffers or multiple data buffers. (Trial Tr. at 693:17-20.) Counsel for Netlist objected that because the claim "is a comprising claim that only requires at least one buffer," the use of multiple buffers in the accused product was being improperly used as "a basis for non-infringement." (Trial Tr. at 694:9-14.)  The Court sustained the objection as to infringement but permitted it as to the issue of damages. (*Id.* at 694:20-22.) Though Netlist argues that the '417 Patent is not "limited to a single buffer architecture," in part, because the '417 Patent uses "comprising," the Court agrees with Micron that "comprising" language would not allow a patentee to claim the benefits of an otherwise unrecited feature.

Micron further argues that, to the extent that Netlist claims the valuation should be determined from what the patent describes in the specification, the distributed buffer architecture is an "unclaimed product improvement" that cannot prove Netlist's damages regardless of any disclosure. (Dkt. No. 156 at 13.) Moreover, Micron claims that Netlist has not offered any credible evidence that '417 Patent even discloses a distributed data buffer architecture and cannot do so because the patent's specifications contradict such evidence. (*Id.*) Micron contends, therefore, that because the distributed data architecture is unclaimed, if not also undisclosed, the Court should grant JMOL of no or nominal damage for the '417 Patent. (*Id.* at 15.)

In response, Netlist contends that the Micron's argument concerning the damages award for the '417 Patent fails because the evidence presented at trial substantially supports that the jury's award was based on the claimed features of the '417 Patent. (Dkt. No. 174 at 13.) First, Netlist states that the '417 Patent enables a commercially viable DDR4 LRDIMM product that can be configured with 2DPC via the timing of the data transfers through a distributed data buffer architecture. (*Id.* at 14.) As support, Netlist cites Claim 1 of the '417 Patent, which recites:

> circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to **the data buffer control signals** and in accordance with an overall CAS latency of the memory module;
>
> wherein data transfers through the circuitry are registered for **an amount of time delay** such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

('417, cl. 1.; Dkt. No. 174 at 14.) (emphasis original). Netlist claims that the benefit of the '417 Patent, therefore, is the ability for a DIMM with a distributed buffer architecture to be configured with two DIMMs per channel (2DPC). (*Id.* at 14.)

19

Appx57

In reply, Micron argues that Netlist still does not identify any claim limitations reciting the distributed buffer architecture and instead, identifies claim language that includes "data buffer control signals" and timing information. (Dkt. No. 177 at 4.) Micron contends that the claim language cannot recite a distributed data buffer architecture because it does not recite multiple buffers, as both parties' experts admit. (*Id.* at 4 (citing Trial Tr. at 503:10-13 ("Q. Right. So you agree that the '417 Patent claims, they don't require multiple data buffers. Correct? A. [Dr. Mangione-Smith] I would think that's a fair assessment."); Trial Tr. at 693:4-6 ("Does the '417 Patent claim cover multiple or distributed buffers? A. [Dr. Harold Stone] It does not.").

Netlist responds that Micron misses the point of the technical benefit of the '417 Patent. (Dkt. No. 184 at 4.) Netlist contends not only that the distributed data buffer is Micron's implementation of Netlist's invention, but that Micron never disputes it could not have implemented a distributed data buffer approach without infringing the '417 Patent. (*Id.*) Moreover, Netlist contends that the Micron does not dispute that the '417 Patent provides the benefits of (i) a buffer that provides more capacity to be used, (ii) timing control technology, (iii) a logic element configurable to output data buffer control signals, and (iv) one additional clock cycle to be added in order to provide sufficient buffering time between the memory controller and the DRAMs. (Dkt. No. 184 at 5 (citing Trial Tr. at 370:24-25, 392:1-10).) Netlist further contends that Micron does not dispute that without the use of the '417 Patent, "the load would be too high and it would block their products from being used in 2DPC or 3DPC configuration," and the next best alternative would be to use "no data buffers" or "single rank modules." (Dkt. Nos. 174 at 14-15; 184 at 5 (citing Trial Tr. at 426:10-14, 428:21-25).)

Netlist contends, therefore, that Mr. Kennedy's damages analysis properly took these opinions into account when determining the value of the benefits provided by the claimed

20

Appx58

invention of the '417 Patent. (Dkt. No. 174 at 15.) Specifically, Mr. Kennedy testified that his understanding of the technical benefit was obtained from Dr. Mangione-Smith. (Trial Tr. at 592:2-6.) Mr. Kennedy testified he understood from Dr. Mangione-Smith's testimony that the '417 Patent allows the accused DDR4 LRDIMMs to be used in a two DIMMs per channel (2DPC) configuration, which he summarized as essentially "one channel with two DIMMs" that would only be one channel without the '417 technology. (Trial Tr. at 592:6-10.)  Mr. Kennedy further testified that Micron's next best alterative "if [it] couldn't offer two 64-gigabyte LRDIMMs," would be to "sell to that customer one 128-gigabyte DIMM and not charge them any more than that." (Dkt. No. 174 at 15; Trial Tr. at 593:6-13.)  Mr. Kennedy explained that the cost to Micron of this alternative would have been "\$292.75" per customer, which then would then total "\$33.26 million" for the benefit that Micron gained from using Netlist's '417 Patent technology. (Trial Tr. at 594:6-9.)  Finally, Mr. Kennedy testified that this "\$33.26 million" does not account for "all of the benefits that Micron obtained" because of the conservative approach he took. (*Id.* at 594:9-17.)

Netlist also contends that beyond the patent claim itself, the jury was provided with substantial evidence explaining the claimed benefit of the '417 Patent at trial, including testimony from its own witnesses.  (Dkt. No. 174 at 14.)  As an example, Netlist contends that its corporate representative and Vice President of Engineering, Mr. Scott Milton, testified that the patented feature is the distributed data buffer *and* related timing controls:

> Q. (BY MR. SHEASBY) What is the feature that achieved this increase in density?
>
> A. So that would be the distributed data buffer **and the timing controls** that we developed in order to be able to use it.
>
> Q. When did Netlist believe the distributed data buffer with **timing control technology** in the '417 Patent would become most important?
>
> A. At that DDR4 generation, the higher speeds and the higher density.

21

Appx59

(Trial Tr. at 218:15-24; Dkt. No. 174 at 14) (emphasis original). After Mr. Scott Milton testified, Dr. Mangione-Smith explained that chief benefit of the '417 Patent, stating:

> Q. And what's the title of the '417 Patent?
>
> A. "Memory module with data buffering."
>
> Q. And what is that? What is the '417 Patent about at a high level?
>
> A. So it's about **providing a buffer that allows more capacity to be used** in a memory system. So there's a buffer between the memory controller and the individual memory devices in the individual ranks.

(Dkt. No. 174 at 14; Trial Tr. at 370:21-371:2) (emphasis added).) After testifying about these additional elements, Dr. Mangione-Smith further explained that if Micron could not use the '417 Patent, the next best alternative that Micron suggested would be to use no data buffers or to use single rank modules. (Dkt. No. 174 at 14-15.)

In opposition, Micron contends that the Court should disregard such expert testimony on the grounds that it is based on an incorrect understanding of the claims. (Dkt. No. 156 at 11 (citing *Homeland Housewares, LLC v. Whirlpool Corp*., 865 F.3d 1372, 1378 (Fed. Cir. 2017) (ruling first that the Court "must disregard the testimony of an expert that is . . . based on an incorrect understanding of the claims, and then holding that "is the situation here, where Faerber . . . adds an additional claim requirement."")).) Consequently, Micron argues that because a distributed data buffer architecture is unclaimed, the technical benefit of the '417 Patent cannot be derived from such an architecture. (Dkt. No. 156 at 12.)

Netlist further contends that Micron "essentially argues that the value of distributed buffers should be entirely excluded from the damages award because the '417 patent does not explicitly claim the buffer itself, but rather a mechanism enabling the buffer to function in a 2DPC system." (Dkt. No. 174 at 16.) Netlist argues, however, that a damages award may reflect the value that the claimed invention adds to the conventional elements. (*Id.* (citing *Univ. of Pittsburgh of*

*Commonwealth Sys. of Higher Educ. v. Varian Med. Sys., Inc.*, 561 F. App'x 934, 947 (Fed. Cir. 2014) ("[I]f the claimed invention adds significant value to the conventional element(s), the damages award may reflect that value.").) Netlist then claims that the jury heard substantial evidence that the claimed invention is necessary for the benefits provided in a two DIMMs per channel (2DPC) system. (Dkt. No. 174 at 16.)  Micron responds that *University of Pittsburgh* recognizes that unclaimed features, nevertheless, have to be excluded from damages valuations. (Dkt. No. 177 at 5.)

After considering all the evidence in a light most favorable to the verdict, the Court finds that substantial evidence supports that the jury's award was based on the claimed features of the '417 Patent.[3] The jury heard evidence that the '417 Patent claims data buffers and related timing controls. (Trial Tr. at 218:15-24). The jury heard evidence that the '417 Patent, at a high level, is about a buffer between the memory controller and the individual memory devices in the individual ranks that allows more capacity to be used in a memory system. (*Id.* at 370:21-371:2)  The jury also heard evidence that the '417 Patent provides multiple benefits, including (i) a buffer that provides more capacity to be used, (ii) timing control technology, (iii) a logic element configurable to output data buffer control signals, and (iv) one additional clock cycle to be added in order to provide sufficient buffering time between the memory controller and the DRAMs. (*E.g.*, Trial Tr. at 218:15-19, 370:24-25, 381:3-10, 392:1-10).) The jury also heard evidence that without the use of the '417 Patent, "the load would be too high and it would block their products from being used in 2DPC or 3DPC configuration." (Trial Tr. at 426:10-14, 428:21-25).)

---

[3] The Court again notes that while Micron brings this Motion to challenge the sufficiency of the evidence, the crux of the Motion attacks the reliability, methodology, and admissibility of the evidence under the guise of sufficiency of evidence.  (*See, e.g.*, Dkt. No. 156 at 9 ("Netlist's damages theory hinges on this unclaimed feature . . .").) Unlike the appellant in *Enplas*, however, Micron did not challenge Netlist's damages theory under *Daubert* nor object to the admission of the testimony at trial it now complains about and, consequently, has procedurally waived arguments attacking Netlist's damages theory.

The jury then heard Netlist's damages expert takes those opinions into account to determine the value of the benefits provided by the claimed invention of the '417 Patent. This testimony included the cost of this alternative to Micron, which would be "$292.75" per customer and which would have resulted in a total benefit to Micron of "$33.26 million" for using Netlist's '417 technology. (Trial Tr. at 594:6-9.)  The jury subsequently heard evidence that this "$33.26 million" did not account for "all of the benefits that Micron obtained" because of the conservative approach taken by Netlist. (*Id.* at 594:9-17.) After hearing this evidence, the jury found in favor of Netlist and awarded it $20 million in damages for the '417 Patent, which was below the $33.26 million Mr. Kennedy opined was a reasonable royalty. (Dkt. No. 135 at 5; Trial Tr. at 609:13-15.)

Consequently, having considered all of the record evidence, the Court concludes the jury reached a reasonable decision supported by substantial evidence supports and declines to disturb the jury's judgment. *See Core Wireless*, 880 F.3d at 1361 ("The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion.").  Accordingly, the Court **DENIES** the Motion of no or nominal damages for the '417 Patent.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Micron's Motion (Dkt. No. 156) should be and hereby is **DENIED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

24

Appx62

So **ORDERED and SIGNED** this 11th day of June, 2025.

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Rule 59 Motion for a New Trial (the "Motion") filed by Defendants

Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas,

LLC. (collectively, "Micron" or "Defendants"). (Dkt. No. 158.)  In the Motion, Micron moves for

a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. (*Id.* at 1.) For the reasons

discussed herein, the Court finds that the Motion should be **DENIED**.

## I.       BACKGROUND

Plaintiff Netlist, Inc. ("Plaintiff" or "Netlist") alleged that Micron infringes claim 16 of

U.S. Patent No. 7,619,912 (the "'912 Patent") and claims 1, 2, 8, 11, 12, 13, and 14 of U.S. Patent

No. 11,093,417 (the "'417 Patent") (collectively, the "Asserted Patents"). (Dkt. No. 100; Trial Tr.

at 1075:11-15.)   After a trial in this case, the jury returned a unanimous verdict finding that

Defendants infringed the Asserted Claims of the Asserted Patents, that Defendants owed a total of

$445,000,000 in damages for their infringement, and that Defendants willfully infringed the

Asserted Patents.  (Dkt. No. 135 at 4-6.)  In this Motion, Micron moves for a new trial. (Dkt. No.

158 at 1.)

## II.    LEGAL STANDARD

Rule 59 provides that a new trial may be granted on all or part of the issues on which there has been a trial by jury for "any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a). Notwithstanding the broad sweep of Rule 59, "courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Metaswitch Networks Ltd. v. Genband US LLC*, 2017 WL 3704760, at *2 (E.D. Tex. Aug. 28, 2017); *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 643 (E.D. Tex. 2017). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("A new trial is warranted if the evidence is against the great, and not merely the greater, weight of the evidence."). Furthermore, "[u]nless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . . the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

## III.    DEFENDANTS' MOTION FOR NEW TRIAL (DKT. NO. 158)

Micron moves for a new trial based on (1) conduct by Netlist that Micron alleges was inflammatory and misleading, (2) an allegedly prejudicial misstatement of the law by Netlist regarding infringement, (3) the Court's mid-trial claim construction that Micron alleges was unfairly prejudicial, (4) damages that Micron contends were excessive and resulted from an erroneous damages case, and (5) the Court's instruction on willful blindness. (Dkt. No. 158 at 1.) The Court addresses each in turn.

2

Appx65

## A.      Allegedly Inflammatory and Misleading Conduct at Trial

Micron contends that Netlist's conduct at trial was so pervasively inflammatory and misleading that Micron was severely prejudiced to the extent that a new trial is warranted. (Dkt. No. 158 at 1.) Micron contends that there are four categories of conduct by Netlist that were inflammatory and/or misleading: (1) remarks that Micron's domestic investments were a mere "handout" from the "Biden Administration's Chips Act," (2) alleged use of the Court's standing MILs as both a sword and a shield, (3) the allegedly improper assertion that Micron had a duty to identify Micron and third-party patents that practiced the accused technology, and (4) the allegedly improper assertion that multiple Micron witnesses had a duty to investigate whether Micron uses Netlist's technology. (*Id.*)

### 1.      Netlist's Remarks Regarding the "Chips Act"

Micron contends Netlist intended to inflame the passions of the jury by repeatedly suggesting that Micron's investments in domestic facilities were the product of "handouts" from the Chips Act, which Netlist characterized as the "Biden Chips Act" and the "Biden Administration's Chips Act."[1] (Dkt. No. 158 at 1.) As an example of such conduct, Micron identifies Netlist's cross-examination of Micron's corporate representative, Scott Smith. (*See* Dkt. No. 158 at 2.)  The relevant part of that cross-examination by Netlist's attorney was as follows:

> Q. And, in addition, you spoke about the fact to the ladies and gentlemen of the jury that you're building these major factories for DRAM manufacturing in Idaho and in New York. Correct?
>
> A. Yes.

---

[1]  Netlist argues that it did not invent this characterization, but it is instead attributable to Micron's own press release. (Dkt. Nos. 175 at 2; 175-2.) In response, Micron argues that "nowhere" in its press release does it characterize the "CHIPS and Science Act" as the "Biden Chips Act" or the "Biden Administration's Chips Act." (Dkt. 180 at 1.) The Court disagrees with Micron and finds that Micron's own press release both attributes the CHIPS and Science Act to the "Biden-Harris Administration" multiple times and clearly includes the phrase "President Biden's CHIPS program." (*See* Dkt. No. 175-2 (article entitled "Micron, Biden-Harris Administration, U.S. Senate Majority Leader Schumer Announce $6.1B in CHIPS and Science Act").)

Q. But the reality is, is that you are using funding from the Biden Administration's Chips Act to build those plants. Correct?

A. Yes, like other semiconductor companies, yes.

Q. And so any suggestion that you were building these plants on your own without support from the Biden Chips Act is improper.

(Trial Tr. at 876:8-19.) Micron contends that these questions caused it extreme prejudice because they came "at a tense moment in the United States only months before the upcoming presidential election in a sharply divided political climate" and "in a division where President Biden's popularity is known to be especially poor." (Dkt. No. 158 at 2.)

Netlist responds that Micron was the first party to inject the issue of its investment in U.S. manufacturing into the trial, presumably to "influence the passions of the jury by wrapping Micron in the American flag." (Dkt. No. 175 at 1.) Specifically, Netlist notes that counsel for Micron stated during his opening statement that:

Micron doesn't just design products; it makes them, and it makes them here in the United States and it makes them elsewhere. We're investing in semiconductor manufacturing here in the United States, including in Boise, Idaho where we're building the first new memory factory, memory manufacturing factory in 20 years.

(Trial Tr. at 182:10-15.) By raising this issue first, Netlist contends that Micron opened the door for Netlist to cross-examine Scott Smith on this issue. (Dkt. No. 175 at 2.)

Moreover, Micron admits that the Court sought to mitigate any prejudice by giving two separate curative instructions. (*See* Dkt. No. 158 at 2.) First, the Court instructed the jury during the cross-examination of Scott Smith, stating:

In the last exchange, counsel referred to funding for construction from, quote, the Biden Administration's Chips Act. The Chips Act is legislation passed by the United States Congress and signed by the President. It is not the sole source from this Administration, and you shouldn't link it to one administration or the other.

(Trial Tr. at 878:21-879:3.) Micron contends, nevertheless, that it was forced to move for a mistrial on this issue because "there's [no] way to cure that kind of skunk in the jury box." (Dkt. No. 180

4

Appx67

1 (citing Trial Tr. at 908:24-25).) After hearing Micron's request for a mistrial, the Court denied

the request and found that the statements were "perhaps, to some degree, prejudicial," but not to

the "level of prejudice that requires a mistrial," nor would it be "impossible to cure" any prejudice

with an instruction. (*Id.* at 909:24-910:11.) The Court then instructed during its Final Jury

Instructions, stating:

> Ladies and gentlemen, you've also heard during the evidence of this case that
> Micron uses funding from the Chips Act to help assist in building certain of its new
> manufacturing plants in the United States. Plaintiff's counsel characterized the
> Chips Act as being "The Biden Administration's Chips Act". As I clarified for you
> at that time during the trial, the Chips Act is a bipartisan Congressional piece of
> legislation and is not the product of any single political party or administration.
>
> In this regard, ladies and gentlemen, two-thirds of the United States Senate voted
> in favor of the Chips Act, and that included the senior senator from Texas, John
> Cornyn. In addition, in the House of Representatives there was also broad bipartisan
> support for this legislation, including yes votes from Representative Kay Granger
> of Texas, who is the chair of the powerful House Appropriations Committee, as
> well as a yes vote from Representative Michael McCall, also from Texas, who is
> the chair of the prestigious House Foreign Affairs Committee.
>
> In short, ladies and gentlemen, the use of government funding through the Chips
> Act by Micron to assist in building a new domestic manufacturing facilities is not
> reflective of any political party or any partisan ideology.
>
> Further, your decisions in this case must not be influenced in any way by partisan
> political considerations, and you must not allow any of your own political views to
> impact or influence in any way your decisions as to the facts in this case.

(Trial Tr. at 1076:10-1077:12.)  Micron contends, however, that both of these instructions were

insufficient because (1) the instructions did not dissociate Micron's domestic activities from

President Biden, (2) the instructions did not dispel the false notion that Micron was reliant on

government handouts, and (3) Netlist used its rebuttal closing argument to "again inflame the

jury's passions" by arguing that "it was 'offensive and insulting' that Micron received a 'special

pass because they wave an American flag.'" (Dkt. No. 158 at 2 (citing Trial Tr. at 1137:1-19).)

5

Appx68

Netlist argues, however, that it was Micron who re-raised the issue of domestic manufacturing during its closing argument, which made Netlist's response during its rebuttal closing appropriate. (Dkt. No. 175 at 4.) Netlist also contends that Micron did not object to the curative instruction during the Formal Charge Conference as being insufficient nor did Micron object to the Netlist's closing argument at trial. (Dkt. No. 175 at 4; Dkt. No. 187 at 1 (citing Trial Tr. at 1054:1-1062:4.) Accordingly, Netlist contends that Micron waived any right to object now in its post-trial motions. (Dkt. No. 175 at 4; Dkt. No. 187 at 1.)

To warrant a new trial, improper comments by counsel must impair substantial rights and cast doubt on the verdict. *All Freight Sys. v. James*, 115 F. App'x 182, 187 (5th Cir. 2004); *True Believers Ink 2, Corp. v. Russell Brands, LLC*., No. 4:18-CV-00432, 2020 WL 2113600, at *12 (E.D. Tex. May 4, 2020). The conduct must be such as gravely to impair the jury's calm and dispassionate consideration of the case. *All Freight Sys.*, 115 F. App'x at 187; *True Believers Ink 2, Corp.*, 2020 WL 2113600, at *12. In this case, Micron has not shown that the Netlist's conduct affected the verdict. While Micron contends that President Biden's popularity was known to be "especially poor" in this division, it has not demonstrated that the jurors in this case were influenced, even in the slightest, by these comments. The gap between Micron's generalized polling data for a six county area with an approximate population of 170,000 and how eight individual jurors might react to political references at trial is far too great a leap for this Court to make. The lack of evidence showing that Netlist's conduct influenced the jury is sufficient for the Court to deny the Motion as to this argument. *See True Believers Ink 2, Corp.*, 2020 WL 2113600, at *13 ("True Believers provides the Court with no support for its conclusion that Mr. Carter's use of the term 'perjury' affected the verdict. This lack of briefing is enough for the Court to deny True Believers' Motion as it has not demonstrated, factually or legally, that Mr. Carter's line of

6

Appx69

questioning influenced the jury.") The Court concludes that these cross-examination questions and closing arguments did not impair Micron's substantial rights and they do not cast doubt on the verdict, particularly where (i) Micron first injected these issues into trial and the Court gave curative instructions at Micron's request, and (ii) where it was Micron who first raised this issue during its closing argument.

Further, to the extent that Micron claims the curative instructions during the Final Charge Conference were insufficient, the Court finds that Micron did not object to the sufficiency of the Court's curative instructions when given. *See* Trial Tr. at 1054:1-1062:4; *see also z4 Techs., Inc. v. Microsoft Corp.*, No. 6:06-CV-142, 2006 WL 2401099, at \*15 (E.D. Tex. Aug. 18, 2006), *aff'd*, 507 F.3d 1340 (Fed. Cir. 2007) ("The Court presented its proposed jury charge to the parties, and Defendants did not object to the absence of the derivation instruction. Accordingly, Defendants waived any objection to the absence of the instruction."); *see also* Fed. R. Civ. P. 51.  Moreover, as already stated above, the Court finds that it was appropriate for Netlist to respond in its rebuttal closing after Micron re-raised this issue in its closing argument. Such did not impair Micron's substantial rights nor does it cast doubt on the jury's verdict.

For these reasons, the Court finds that Micron's argument concerning the CHIPS Act fail.

### 2.      Netlist's Use of the Court's Standing MILs

Micron next contends Netlist repeatedly used two of the Court's Standing MILs—No. 13 and No. 18—as both a sword and a shield in efforts to mislead the jury and leave Micron with no ability to defend itself.  (Dkt. No. 158 at 3.)  The Court will address each in turn.

7

### a.    Conduct Concerning the Court's Standing MIL No. 13[2]

Micron argues that Netlist made many misleading statements during the trial all while knowing that MIL No. 13 prevented Micron from correcting the misleading statements regarding earlier and/or ongoing litigation.  (*See* Dkt. No. 158 at 3-4.)

For example, Micron contends that Netlist intentionally made false statements that SK Hynix and Samsung proactively took licenses of the Asserted Patents from Netlist because they "recognized the importance of Netlist's innovation," had "adopt[ed] Netlist's patent and designs," and wanted to "follow[] the law of the United States," while contrasting Micron's choice to litigate. (Dkt. No. 158 at 3 (citing e.g., Trial Tr. at 173:15-174:7 (no objection); 227:1-8 (no objection); 577:19-23 (no objection); 578:25-579:6 (no objection); 1137:1-19 (no objection).)  Micron further contends Netlist "carefully omitted" that these licenses only came after years of litigation (or were the subject of current litigation), and MIL No. 13 prevented Micron from discussing these earlier or ongoing litigations to correct the misleading statements. (*See* Dkt. No. 158 at 3-4.)  Netlist notes (as referenced above) that Micron did not object to any of these statements, nor did it seek leave of Court to clarify any of this before the jury. (Dkt. No. 175 at 4.)  Netlist ultimately contends that these statements were accurate and supported by evidence. (*See id.* at 4-5.)

As another example, Micron contends that Netlist repeatedly stated and prompted the Court to instruct the jury over Micron's objections that the Asserted Claims of the Patents were valid, enforceable, and novel, and that Micron had conceded their validity, all while knowing that MIL No. 13 prevented Micron from discussing IPRs and the fact that the PTAB had already invalidated the '912 Patent.  (*See* Dkt. No. 158 at 4-5 (citing Trial Tr. at 163:18-165:4 (instructing

---

[2] The Court's Standing MIL No. 13 precludes parties from "introducing evidence, testimony, or argument regarding either party's other litigations or arbitrations, including parallel proceedings in any other court, tribunal, or forum, including ADR proceedings."

8

jury after preliminary instructions regarding validity, stating "[t]here's not a challenge to the validity of the patents in this case"); 241:15-243:4 (Netlist objecting in open court that "the patents are valid and enforceable," then the Court allowing Micron to cross-examine Mr. Milton on what Netlist did *not* invent); 312:16-313:25 (overruling Netlist's request, which was made outside the presence of the jury, for Dr. Mangione-Smith to opine on the validity of the Asserting Patents); 748:6-749:15 (denying Netlist's request, which was made outside the presence of the jury, to ask Dr. Stone whether he was rendering any validity opinions); 799:25-801:23 (concerning testimony elicited by Micron about whether command signals and DQ sending data were "new" followed by counsel for Netlist objecting that the Asserted Patents "are valid, non-obvious, and novel"); Final Instructions, 1094:13-15 ("Micron is not challenging the validity of the asserted patents in this case. Your job is not to determine whether or not the patents are valid or invalid in view of the prior art."). Micron contends that the collective effect of these statements stressed the novelty of the asserted claims while hiding that the PTAB had already invalidated the only asserted '912 Patent claim. (Dkt. No. 158 at 4.) In response, Netlist contends that it properly reacted to Micron's attempts to argue that Netlist's technology lacked novelty. (Dkt. No. 175 at 5.) Netlist also contends that the Court properly excluded reference to the IPR proceedings and appropriately instructed the jury that validity was not challenged in order to avoid confusion. (*Id.* at 6.)

Finally, Micron contends that Netlist made misleading statements to bolster its willfulness case—i.e., implying that Micron disregarded Netlist's 2021 licensing letter that purportedly provided notice of infringement—while omitting that as soon as Netlist filed suit, Micron immediately contested infringement. (Dkt. No. 158 at 5 (citing Trial Tr. at 176:2-7; 178:16-22, 220:25-222:7, 267:21-268:7, 776:17-784:7, 781:24-782:8).) While Micron admits that the Court then took curative action, Micron contends that this incident contributed to the overall

9

inflammatory conduct. (*Id.*)  In response, Netlist argues that Micron cannot show error or undue prejudice warranting a new trial because Micron was allowed to introduce its responsive evidence, which the jury was able to fully consider. (Dkt. No. 175 at 6-7.)

As a basic proposition, the Court finds that Micron has waived these post-trial arguments where it did not object to the same during trial. As noted, Micron never objected when Netlist stated that SK Hynix and Samsung took licenses from Netlist because they "recognized the importance of Netlist's innovation," had "adopt[ed] Netlist's patent and designs," and wanted to "follow[] the law of the United States." (Trial Tr. at 173:20-21 (no objection); 227:7-8 (no objection); 1137:4 (no objection)).)  Also, to the extent Micron contends Netlist used MIL No. 13 as a shield, Micron never asked the Court to find that Netlist had opened the door justifying leave for Micron to respond to these statements. The Court finds that its rulings during trial, along with its curative instructions, were effective to prevent unfair prejudice to Micron. The Court further notes that it was appropriate, for example, to exclude references to IPR proceedings and to instruct the jury that validity was not challenged as these issues would only lead to juror confusion, especially given that Micron never requested that the Court find the door had been opened for Micron to introduce this particular evidence.[3]  Accordingly, the Court does not find Netlist's use of MIL No. 13 acted as both a sword and a shield, and was not so prejudicial as to warrant a new trial.

---

[3] Micron does claim that by overruling "Micron's objections seeking to include a jury instruction on Micron's IPR proceedings," the prejudice was amplified. (Dkt. No. 158 at 5, n.6 (citing 1057:4-24 (objecting to the absence of an instruction on Micron's IPR petitions as "relevant to Micron's state of mind" and "relevant to willfulness")).) However, the Court concludes that reference to the IPR proceedings would result in jury confusion, as the issue then before the jury was to "validity" and not "willfulness."

10

Appx73

**b.  Conduct Concerning the Court's Standing MIL No. 18[4]**

Micron also contends that Netlist made improper comparisons between accused products and non-accused products during the trial all while knowing that MIL No. 18 prevented Micron from rebutting these comparisons by contrasting its products with those non-accused products. (*See* Dkt. No. 158 at 6-7 (citing Trial Tr. at 168:17-22, 173:15-174:7, 227:4-17; 270:18-271:8, 576:5-577:23, 774:13-23, 867:24-868:11).)  Micron cites as an example that Netlist elicited the following testimony from its VP of Engineering, Scott Milton:

> Q. What does this demonstrative depict?
>
> A. So what we're seeing here in this particular slide is on the left-hand side our HyperCloud product. So we see that register device in the middle, and we see those data buffers, or we at the time called them isolation devices. And on the right-hand side we see the SK hynix DDR4 LRDIMM, and it has those same features. Some of the names are different, but we see RCD and the distributed data buffer architecture in the SK hynix module.

(Trial Tr. at 227:9-17.)

Netlist contends that most of Micron's arguments are waived because Micron did not object to the testimony during trial, much less assert it was a MIL violation.  The Court agrees.  Micron did not object during opening statements (*see* Trial Tr. at 168:17-22, 173:15-174:7), nor did Micron object to relevant questioning during Scott Milton's testimony (*see* Trial Tr. at 227:4-17, 270:18-271:8).  Micron also did not object during David Kennedy's direct examination (*see* Trial Tr. at 576:25-577:23), during Dr. Harold Stone's examination (*see* Trial Tr. at 774:13-23), or during Scott Smith's examination (*see* Trial Tr. at 867:24-868:11). Also, Micron acts as if a *limine* ruling is a final and permanent bar. It is not. It bars mention of identified material without prior

---

[4] The Court's Standing MIL No. 18 precludes parties from "introducing evidence, testimony, or argument for purposes of infringement or non-infringement comparing the accused product or method to the preferred embodiments, the specification, or any non-accused product or method."

11

leave of the Court. Micron now complains of matters it failed to seek leave to address during the trial.

Nonetheless, Micron contends that Netlist's argument regarding waiver "misses the point." (Dkt. No. 180 at 1.) First, Micron argues that the Docket Control Order in this case explicitly states that the Parties' MILs are only for issues that if "improperly introduced at trial would be so prejudicial that the Court could not alleviate the prejudice by giving appropriate instructions to the jury." (Former Lead Case No. 2:22-cv-293, Dkt. No. 335 at 2.) Second, Micron contends that a "new trial can be granted over no objection when it would 'seriously prejudice' the right to a fair trial.'" (Dkt. No. 180 at 2 (citing *Clapper v. Am. Realty Invs., Inc.*, 95 F.4th 309, 317 n.2 (5th Cir. 2024) ("We may grant a new trial, even when counsel fails to object in closing, if the closing argument 'affect[s] the substantial right of the parties' by 'seriously prejudice[ing] [Clapper's] right to a fair trial ....'") (internal citations omitted); *Whitehead v. Food Max of Mississippi, Inc.*, 163 F.3d 265, 276 (5th Cir. 1998) ("Although we may review such challenges even where no contemporaneous objection was made, we are, of course, extremely reluctant 'to address for the first time on review errors which the trial court was not given the opportunity to consider and correct'. This extreme reluctance is grounded in several obvious reasons. Among other things, it is in keeping with the great deference we accord the decision by the trial judge, who was present and heard the evidence, to deny a new trial motion. At least a few pertinent objections were made during the Whiteheads' closing argument . . . . And, for the unobjected to, but now challenged comments, consistent with plain error review, we must reverse when necessary to preserve 'substantial justice'.") (internal citations and parentheticals omitted); *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975) ("[W]e always possess the power to consider errors to which no objection was made. But a healthy regard for the necessity and desirability of having

12

errors corrected at trial rather than on appeal leads us to exercise that power only in exceptional cases where the interest of substantial justice is at stake.").

The Court finds that Micron's arguments are unavailing. First, Micron's argument as to the Docket Control Order carries no weight because that section is intended as to guide the subsequent pursuit of motions *in limine*. That notation does not preserve any issue for post-trial, especially when a party sits on its hands during trial and does not object. Second, the cases cited by Micron focus largely on the failure to object during closing arguments. In this case, however, Micron had many opportunities to object in this regard prior to closing arguments. It did not. Finally, the Court does not find that Micron was "seriously prejudiced" by Netlist's cumulative actions, particularly when compared to the facts in the cases cited by Micron. *See e.g., Whitehead*, 163 F.3d at 277 (noting that plaintiff's counsel continued making improper references and twice violated the court's ruling on defendant's objection). Nothing close to that happened here.

Accordingly, Micron has not preserved this argument. While the trial court should have an opportunity to prevent violations or give instructions to cure any harm, it is hard to do so when there is no objection at the time. *See Collins v. Wayne Corp.*, 621 F.2d 777, 785–86 (5th Cir. 1980) ("As discussed above, an objection is required to preserve error in the admission of testimony or the allowance of cross-examination even when a party has unsuccessfully moved *in limine* to suppress that testimony or cross-examination. Similarly, objection is required to preserve error when an opponent, or the court itself, violates a motion *in limine* that was granted. This rule is necessary to conserve judicial resources. Had plaintiffs' counsel promptly objected to the violations of the motion *in limine* in this case, the trial court could have either avoided the violations or given an instruction to cure any harm suffered by the plaintiffs. The courts cannot

13

adopt a rule that would permit counsel to sit silently when an error is committed at trial with the hope that they will get a new trial because of that error if they lose.").

### 3.     Duty to Identify Micron and Third-Party Patents

Micron further claims that Netlist improperly and repeatedly suggested that Micron had a duty to identify patents owned by it or third parties that covered the Accused Products. (Dkt. 158 at 7 (citing Trial Tr. at 178:2-15 (no objection); 516:19-518:16 (no objection); 582:6-24 (no objection); 608:6-609:9 (no objection); 771:9-772:3 (no objection) 871:12-23 (no objection); 1100:13-1101:8 (no objection); 1139:2-15 (no objection).)  Micron now contends that such a suggestion is improper, and because Netlist improperly attempted to shift the burden by arguing that because Micron had not carried its burden to identify Micron or third-party patents, its damages request was justified. (Dkt. No. 158 at 7.)

Netlist responds that whether Micron or other third-party patents cover the accused products is relevant to damages and apportionment, specifically whether there is additional technology that contributes to the benefits achieved by Micron.  (Dkt. No. 175 at 8.)  Netlist also contends that Micron forfeited the right to complain post-trial because Micron did not object to these questions. (*Id.*)

The Court agrees with Netlist. Micron surrendered its right to complain about these questions now when sat it on its hands during trial and failed to object and thereby give the Court a chance to prevent any violation or cure any harm suffered. Further, the Court agrees with Netlist that the existence or non-existence of other patents is relevant to the *Georgia-Pacific* factors and a technical benefits analysis generally.

### 4.     Duty to Investigate Whether Micron Uses Netlist's Technology

Micron asserts that Netlist repeatedly violated Micron's MIL No. 4, which prohibited any argument or evidence suggesting a party's corporate representative is obligated to prepare on any

14

Appx77

particular topic, by asking multiple witnesses whether they had investigated whether Micron uses Netlist's technology. (Dkt. No. 158 at 7-8 (citing 178:2-7 (no objection); 554:18-555:3 ("Q: Did Micron investigate whether the distributed buffer design it implemented and that was shown at JEDEC was actually derived from Netlist? A. [Mr. Boe Holbrook]: Sir, it's outside of my knowledge."); 772:4-8 (no objection); 881:12-882:7 (no objection).)

Netlist responds that Micron waived this argument since it did not object. (Dkt. 175 at 9.) Netlist further contends that the questioning of Mr. Scott Smith and Mr. Boe Holbrook regarding any investigation of Micron's design was, in fact, within a designated topic. (*Id.* at 9-10 (citing Dkt. No. 175-4 at 11 ("Topic No. 119: The design, operation, configuration, and features of DRAM devices used and/or incorporated in Micron Accused DDR4 LRDIMMs and Micron Accused DDR4 RDIMMs."); Dkt. No. 175-3 at 27 ("Topic No. 77: Any competitive analysis or reverse engineering of any product manufactured, sold, sampled, or distributed by Netlist.").) Netlist also contends that there could be no MIL violation as to Dr. Stone because he was an expert witness and, as such, was not subject to that particular MIL. (Dkt. No. 175 at 9-10.)

The Court agrees with Netlist. Where Micron believed Netlist was violating its MIL, Micron should have objected and given the Court a chance to prevent such violation or cure any harm. However, again Micron failed to object at trial. To any extent such objection is not waived, the Court finds that the questions were within the scope of the designated topics and not a MIL violation. In any event, the Court finds this does not warrant a new trial.

## B. Netlist's Allegedly Prejudicial Misstatement of the Law

Micron argues that Netlist "wrongly suggested that the jury could find infringement merely if a component within the accused device is capable of performing a claimed function in a different product, even though the accused device itself cannot use that capability." (Dkt. No. 158 at 8.) Micron points to a line of questioning during Netlist's cross-examination of Micron's technical

15

Appx78

expert, Dr. Harold Stone. (*Id.* (citing Trial Tr. at 710:23-715:20.) During that examination, counsel for Netlist asked Dr. Stone about the effect of "comprising" claim language and the difference between apparatus and method claims. (Trial Tr. at 710:23-712:21.) When Netlist asked, "And so for an apparatus claim, if there is functionality present in the Micron devices that infringes the claims, the question of when and where it's used is totally irrelevant. Correct?" Micron then objected. (*Id.* at 712:18-21.) After a bench conference, the Court allowed counsel for Netlist to impeach Dr. Stone with his prior inconsistent statement. (*Id.* at 714:18-20.) Counsel for Netlist then attempted to do so. (*See id.* at 716:19-23 ("Doctor Stone, you applied the rule that if there is a mode of operation that practices the claim, then the apparatus practices the claim regardless of whether or when it's used. Correct? A. That's what I said at deposition. That's correct.").) Micron argues that Netlist's assertion that third-party RCDs satisfy the asserted claim limitation when operating in QuadCS mode is legally and factually improper. Micron argues that Netlist's assertion fails because the accused *dual*-rank RDIMMs that the RCDs connect with cannot use encoded QuadCS mode as that mode is only used with *quad*-rank products. (Dkt. No. 158 at 8-9.)

Netlist responds that the jury was properly instructed that "[a]n accused product infringes a claim if it satisfies the claim elements, all of the claim elements, even though it may also be capable of non-infringing modes of operation." (Dkt. No. 175 at 10 (citing Trial Tr. at 1086:10-12).) Netlist further responds that the jury's infringement verdict was supported by substantial evidence including that Dr. Stone admitted that Micron's dual rank modules have the capability of using QuadCS mode. (Dkt. No. 175 at 10-11 (citing Trial Tr. at 744:14-745:5).) Moreover, Netlist contends that the jury understood from Micron's corporate representative that all the Accused Products—including *dual*-rank modules—contain the same RCD circuitry with the same relevant functionality. (Dkt. No. 175 at 11.)

16

Netlist further contends that the Court should reject Micron's argument for a separate and independent reason: Micron ignored Netlist's additional infringement theory—i.e., that single-rank MRS commands for multi-rank settings meet the disputed limitation. (Dkt. No. 187 at 4.) Specifically, Netlist claims that Micron chose not to cross-examine Netlist's technical expert on this theory, nor have its own expert or attorney address this theory. (*Id.*)

The Court is not persuaded that a new trial is warranted. As a preliminary matter, the Court finds that it properly instructed the jury that "[a]n accused product infringes a claim if it satisfies the claim elements, all of the claim elements, even though it may also be capable of non-infringing modes of operation." (Trial Tr. at 1086:10-12; *see Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("It is well settled that an accused device that 'sometimes, but not always, embodies a claim[ ] nonetheless infringes.'") (citation omitted).) Further, the jury's verdict in this case is supported by sufficient evidence. As discussed above, the jury heard evidence regarding Micron's dual rank modules that the RCDs are connected to and have the capability of using the QuadCS mode. The Court disagrees with Micron's contention that Netlist presented no evidence on this issue. The Court also agrees with Netlist that it presented an additional infringement theory—i.e., that single-rank MRS commands for multi-rank settings meet the disputed limitation—which Micron did not address at trial. The Court concludes that the verdict is not against the great weight of the evidence. The Court declines to grant a new trial. Micron's motion for a new trial on this basis should be denied.

## C. The Court's Mid-Trial Jury Instruction

Micron claims it was unfairly prejudiced when the Court not only stopped Micron's expert, Dr. Harold Stone, from opining that the "CAS latency" claim language required "read *and* write data transfers," but then instructed the jury that the '417 Patent's "CAS latency" claim terms could be infringed by either "a read *or* a write command." (Dkt. No. 158 at 9 (citing Trial Tr. at

17

Appx80

806:17-808:3).)  Micron claims it had no opportunity to consider the Court's mid-trial instruction, adjust its non-infringement positions, or proffer appropriate invalidity defenses. (*Id.* at 11.)

The Court finds that Micron was not unfairly prejudiced by the Court's clarifying instruction. As Netlist correctly points out, Micron developed its trial strategy with notice that the Court had construed the CAS latency terms to include "the time when data is made available to *or* from the memory module," which was consistent with the '417 Patent's "read *or* write" claim language. (Dkt. No. 175 at 11; Claim Construction Order, Lead Case No. 2:22-cv-293, Dkt. No. 228 at 34) (emphasis added).) The Court's clarifying instruction during trial was consistent with its pretrial construction. (Dkt. No. 175 at 12; *see* Trial Tr. at 807:7-9 ("I want to clarify for you that under the Court's construction, these claims can be infringed by a read or a write command.").) Furthermore, the Court's instruction was given only after Micron's counsel was warned during a bench conference that "[i]f he attempts to [convert the Court's 'or' construction to an 'and' construction], [the Court would] probably stop him. . . . [and] instruct this jury on what the Court's construction is . . . ."  (Trial Tr. at 804:24-805:2.)  With clear notice, Micron nevertheless proceeded to elicit such testimony from Dr. Stone. (*Id.* at 806:1-2 ("Well, in my opinion, it's read *and* write data transfers, both of them.") Counsel for Netlist objected that Micron was "trying to reconstrue the Court's construction," Micron withdrew the question, and then the Court gave its instruction as it had warned Micron it would, noting that "this issue has been a recurring issue throughout not only Doctor Stone's examination but throughout the case" and finding that "it's appropriate for the Court to clear this up by way of a specific instruction to the jury." (Trial Tr. at 806:17-21.)

The Court finds that its instruction was appropriate, particularly given Micron's attempts to present conflicting opinion testimony. *See Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d

18

Appx81

1312, 1321 (Fed. Cir. 2009) ("Once a district court has construed the relevant claim terms, and unless altered by the district court, then that legal determination governs for purposes of trial. No party may contradict the court's construction to a jury."); *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 971 (Fed. Cir. 2023) ("It is within the discretion of the district court to clarify or elaborate on the claim construction, so long as it is only 'elaborates on a meaning inherent in the previous construction.' *Mformation Techs., Inc. v. Research in Mot. Ltd.*, 764 F.3d 1392, 1397 (Fed. Cir. 2014)."); *Pressure Prods. Med. Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010) (finding that trial court's supplemental definition of a claim term during trial was not a fundamental procedural flaw that jeopardized the jury's verdict because "district courts may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves."); *Fenner Inv., Ltd. v. Microsoft Corp.*, 632 F. Supp. 2d 627, 638 (E.D. Tex. 2009), *aff'd sub nom. Fenner Invs., Ltd. v. Microsoft Corp.*, 369 F. App'x 132 (Fed. Cir. 2010) ("[N]o party should be allowed to argue to the jury claim constructions that are contrary to the court's claim constructions or to reassert to the jury constructions that the court has already expressly or implicitly rejected.").

In sum, the Court does not find that Micron was unfairly prejudiced. A new trial on this basis is not warranted.

### D.    Damages

Micron contends that if the Court does not grant Micron's JMOL on damages, it should at least grant a new trial or remittitur to the damages amounts testified by its experts. (Dkt. No. 158 at 11.) Micron argues that a new trial is warranted based on (1) the erroneous admission of Netlist's damages testimony, (2) the contention that Netlist failed to establish that any dual-rank DIMM implements encoded QuadCS mode, (3) the contention that Netlist violated the entire market value rule and improperly skewed the damages horizon by presenting the entire Accused Products'

19

revenue, and (4) the contention that the award was unduly excessive and against the great weight of the evidence based purportedly on testimony that Micron would have agreed to pay 100% of the revenue related to the Asserted Patents. (Dkt. No. 158 at 12-15.)

### 1. Netlist's Damages Testimony

In its Motion, Micron contends that (1) Netlist's damages evidence as to the '912 Patent impermissibly failed to apportion, (2) Netlist's damages evidence as to the '417 impermissibly rested on an unclaimed feature, and (3) the Court failed to exclude Mr. David Kennedy's damages opinions when it denied Micron's motion to strike. (Dkt. No. 158 at 12.)  However, as Netlist points out in its sur-reply, Micron dropped its "re-hashed *Daubert* argument regarding the admission of Mr. Kennedy's damages testimony." (Dkt. No. 187 at 4.)[5]

The Court is persuaded that Micron's argument is simply a renewed *Daubert* argument, and the Court rejects such an argument as the basis for a new trial. *See United Servs. Auto. Ass'n v. PNC Bank N.A.*, Case No. 2:21-cv-00246-JRG, Dkt. No. 440, at 10 (E.D. Tex. Mar. 13, 2023) ("It is improper to use a motion for new trial as a renewed *Daubert* challenge.")  Moreover, as discussed in the Court's Memorandum Opinion and Order as to Damages, the Court has already rejected Micron's arguments that Netlist's damages evidence as to the '912 Patent impermissibly failed to apportion and Netlist's damages evidence as to the '417 impermissibly rested on an unclaimed feature. Ultimately, the Court is not persuaded that any of Micron's arguments concerning Netlist's damages testimony warrant a new trial.

### 2. Dual-Rank DIMMs

In its Motion, Micron argues that because Netlist failed to establish that any dual-rank DIMM implements encoded QuadCS mode, the jury was unable to determine the damages for only

---

[5] Micron's decision to drop this argument from its reply brief further weakens this argument.

CONFIDENTIAL MATERIAL OMITTED

quad-rank DIMMs. (Dkt. No. 158 at 12.)  Netlist responds that not only did it submit sufficient evidence for the jury to find that Micron's dual-rank products infringe, but also that the testimony of its damages expert accounted for both dual-rank and quad-rank DIMMs and such expert did testify to damages were only RDIMM or LRDIMM products infringe. (Dkt. No. 175 at 13 (citing Trial Tr. at 619:4-7 ████████████████████████████████████

████████████████████████████████████████████████

██████

The Court finds that Micron's arguments do not establish that a new trial is warranted. As a preliminary matter, Micron's argument is predicated on the Court granting JMOL of non-infringement as to the dual-rank DIMMs.  As discussed in the Court's Memorandum Opinion and Orders as to Non-Infringement, the Court finds that Netlist submitted sufficient evidence for the jury to find that Micron's dual-rank products infringe. Accordingly, a new trial on damages for the '912 Patent is not warranted.

### 3. An Alleged Violation of the Entire Market Value Rule and Skewing of the Damages Horizon

Micron contends that it is entitled to a new trial on damages because Netlist's damages theory violated the entire market value rule and improperly skewed the damages horizon by presenting the entire Accused Products' revenue. (Dkt. No. 158 at 13.) Specifically, Micron claims that though its "Accused Products are multi-component products" for which "Netlist's experts testified that only a single component infringes" (i.e., the RCD and the data buffer), Netlist introduced the entire revenue associated with Micron's products. (*Id.* (citing e.g., Trial Tr. at 575:11-14 ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

21

Appx84

CONFIDENTIAL MATERIAL OMITTED

In response, Netlist contends that because Micron did not object to Mr. Kennedy's analysis at the *Daubert* stage or to his testimony at trial, Micron's argument is waived and cannot be raised for the first time in its motion for new trial. (Dkt. No. 175 at 14 (citing *Geoffrion v. Nationstar Mortg. LLC*, 182 F. Supp. 3d 648, 668 (E.D. Tex. 2016) ("Usually, an issue that is raised for the first time on a motion for new trial or renewed motion for judgment as a matter of law is waived.")). Micron claims, however, that it did object when Netlist attempted to introduce Micron's total sales revenue number at opening. (Dkt. No. 180 at 4 (citing an attachment to overnight dispute email entitled "Netlist and Micron's Disputes regarding Opening Demonstratives," Dkt. No. 180-3 at 14) (arguing that "[i]t is improper for Netlist to include the sales revenue number because it skews the damages horizon.").) Netlist responds that Micron made no objection on the record, and instead only half-heartedly made the argument in an overnight email submission to the Court. (Dkt. No. 187 at 5.)

The Court agrees with Netlist on this point: Micron failed to object to the testimony abouot which it now complains and it never obtained a definitive ruling on the record. (*See* Trial Tr. at

22

Appx85

179:15-17 (no objection); 575:11-14 (no objection); 588:21-24 (no objection); 590:8-9 (no objection); 591:23-592:1 (no objection); *see also* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and: (1) if the ruling admits evidence, a party, on the record: (A) timely objects or moves to strike; and (B) states the specific ground, unless it was apparent from the context;").) Accordingly, because Micron never objected on the record, Micron's argument has been waived.[6] Having found that Micron's argument is waived, the Court finds no need to address this argument on the merits. Further, even if waiver did not apply here, Micron has failed to make a persuasive showing that the testimony cited caused it material prejudice or skewed the damages horizon, such that would warrant a new trial.

### 4. Alleged 100% Apportionment of the Revenue

Micron contends that the Court should grant a new trial on damages because the jury's award was excessive and against the great weight of the evidence. Micron argues that the jury

---

[6] Ample case law supports the Court's decision that Micron has waived this argument. *See, e.g., Genmoora Corp. v. Moore Bus. Forms, Inc.*, 939 F.2d 1149, 1156 (5th Cir. 1991) (finding that "Moore did not preserve any error in admitting Pert's testimony because Moore failed properly to object to that testimony at trial or to obtain a proper ruling on the record on its objection. . . . Without a specific objection and a ruling on the record, we are unable properly to evaluate the trial court's exercise of discretion."). In other cases where the nonmoving party contended that the moving party failed to object, the courts expressly found that the moving party did, in fact, object to the evidence. *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1319 (Fed. Cir. 2011) (declining to second-guess the district court's explicit recognition of Microsoft's objections to Uniloc's use of the $19 billion check number as improper under the entire market value rule where the district court explicitly noted that Microsoft objected specifically under the entire market value rule to use of a demonstrative pie chart and though Microsoft did not repeat its objection, it had made Microsoft's position sufficiently clear to preserve the instant challenge); *see also Vectura Ltd. v. GlaxoSmithKline LLC*, 397 F. Supp. 3d 579, 594 (D. Del. 2019) (stating that defendants objected to plaintiff introducing the large revenue number during the trial and going so far as to instruct the parties that it "would police the testimony given, thereby indicating that Defendants would not need to make an individual objection to every instance where the 'billions' figure was mentioned"), *aff'd*, 981 F.3d 1030 (Fed. Cir. 2020) ("The district court's finding of no waiver is particularly well-founded in light of the court's statement during trial that it would enter its own objection if it heard such arguments being made."). Each of those cases stand in stark contrast to this case where no objection was made on the record. To the extent that Micron contends it preserved its objection by submitting an informal submission without a definitive ruling on the record, such is insufficient to preserve an objection. *See* Fed. R. Evid. 103(a) (requiring objections to be made "on the record"); *see also United States v. Cramer*, No. 1:16-CR-26, 2020 U.S. Dist. LEXIS 252209, at *4 (E.D. Tex. 2020) ("Defendants do not assert that they were denied an opportunity to return to the courtroom and have a record made . . . .").

23

award was predicated on testimony that Micron would have agreed to pay Netlist 100% of the revenue purportedly related to the Asserted Patents. (Dkt. No. 158 at 14 (citing 589:3-590:5 (discussing whether Micron would lose sales if it had to reduce the speed); 593:6-594:2 (discussing the cost of Micron's next best alternative).)[7]

As a preliminary matter, Netlist responds that Micron's argument as to an alleged 100% royalty is waived because it was not raised at *Daubert* or during trial. (Dkt. No. 175 at 15.) The Court agrees. Micron's arguments are attacks on the Plaintiff's expert's methodologies that go directly to the reliability of his theories. (*See, e.g.*, Motion, Dkt. No. 158 at 14 (arguing that Netlist's "theory cannot be reconciled with the law or the facts.").) Accordingly, Micron's argument has been procedurally waived because Micron failed to raise it at *Daubert* and is now improperly raising it for the first time in its motion for new trial. *See KAIST IP US LLC v. Samsung Elecs. Co.*, 439 F. Supp. 3d 860, 889, 891 (E.D. Tex. 2020).

Even if Micron's argument is not waived, Netlist argues that Micron is incorrect because its expert never testified that "Micron would have agreed to pay Netlist 100% of the revenue purportedly related to the asserted patents." (Dkt. No. 175 at 15.) Having reviewed the citations to the record provided by Micron, the Court agrees with Netlist.

The Court is also persuaded by Netlist's contention that Plaintiff's expert testified for an award of only the apportioned value of Micron's use of the invention based on a next-best non-infringing alternative approach. This was only a fraction of Micron's revenue from the Accused Products. (*See id.* at 13-14, 15 (citing, e.g., Trial Tr. at 586:14-19; 594:6-9).) Furthermore, the Court notes the Federal Circuit has previously approved this methodology. (*Id.* (citing *Apple Inc.*

---

[7] The Court notes that after Netlist filed its Response Brief contending that Micron's argument has both been waived and is incorrect, Micron decided not to provide the Court with any additional arguments in its Reply Brief that might rebut Netlist's arguments or further support for its position.

24

Appx87

CONFIDENTIAL MATERIAL OMITTED

*v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) (stating that a party may "estimate the value of the benefit provided by the infringed features by comparing the accused product to non-infringing alternatives"), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).)

Even if Plaintiff's expert had testified that Micron would have agreed to pay Netlist 100% of the revenue related to the Asserted Patents, Netlist argues that the Federal Circuit has expressly held that there is nothing improper about awarding the patentee 100% of the incremental value. (Dkt. No. 175 at 15 (citing *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017); *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1240 (Fed. Cir. 2011)).) This Court has already considered this same post-trial argument in a related case, *Netlist, Inc. v. Samsung Electronics Co., Ltd., et al.,* No. 2:21-cv-463, Dkt. No. 606 at *46-47 (E.D. Tex Jul. 15, 2024), and found that precedent supports the contention that a patentee can receive the entirety of the value of the patents in a hypothetical negotiation in certain circumstances. There is substantial evidence in this case that Micron would have agreed to let Netlist retain the full incremental benefit (i.e., 100% of the value) of the patented technology. *See, e.g.*, Trial Tr. at 586:1-4 ("And really the benefits I saw was that Micron and based on what I heard from Doctor Mangione-Smith, that without the Netlist technology, they wouldn't be able to sell these high performance DIMMs and these LRDIMMs for high density servers.");

25

CONFIDENTIAL MATERIAL OMITTED

█████████████████████████████████████████████████

██████████

For the reasons discussed above, the Court finds that a new trial is not warranted.

### E.    The Court's Instruction on Willfulness

Micron argues that the Court should grant a new trial as to Netlist's willfulness claims because (1) no legally sufficient evidence supports the jury's willfulness verdict, and (2) the Court improperly instructed the jury that willful blindness could satisfy the "deliberate or intentional" prong of the willfulness inquiry. (Dkt. No. 158 at 15.)

The Court does not find that a new trial on willfulness is warranted. As discussed in the Court's Memorandum Opinion and Order as to Willfulness, the Court has already concluded that enhancement of the compensatory award is not warranted under 35 U.S.C. § 284, and, consequently, the Court elected not to enhance the damages awarded.  As courts do not grant new trials unless the party seeking the new trial satisfies its burden of showing harmful error, the Court sees no reason to grant a new trial on willfulness when the Court has already elected not to enhance damages. *See Metaswitch Networks Ltd.*, 2017 WL 3704760, at *2; *see also Informatica Corp. v. Bus. Objects Data Integration, Inc.*, 527 F. Supp. 2d 1076, 1083 (N.D. Cal. 2007) ("Because the Court has declined to enhance damages based on willfulness, Defendant's Motion for a New Trial is denied as moot.").[8]

---

[8] As stated in the Court's Memorandum Opinion and Order, case law supports the Court's decision. *See, e.g.*, *VirnetX Inc. v. Apple Inc.*, No. 6:12-CV-00855-RWS, 2018 U.S. Dist. LEXIS 230877, at *51-52 (E.D. Tex. 2018) ("Because the Court declines to award enhanced damages, Apple's willfulness JMOL and new trial motions are moot."); *Baden Sports, Inc. v. Kabushiki Kaisha Molten*, 541 F. Supp. 2d 1151, 1165 (W.D. Wash. 2008) ("The Court has already decided *not* to award Baden enhanced damages or attorneys' fees. Because the jury's willfulness finding has no effect on this litigation, the issue is moot and the motion for a new trial on the issue of willfulness is denied.") (citation omitted).

26

## IV:    CONCLUSION

For the reasons stated herein, the Court finds that Micron's Motion for a New Trial (Dkt. No. 158) should be and hereby is **DENIED**.

The parties are directed to jointly prepare a redacted version of this Order for public viewing and to file the same on the Court's docket as an attachment to a Notice of Redaction within five (5) business days of this Order.

**So ORDERED and SIGNED this 11th day of June, 2025.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

27

# U.S. District Court
## Eastern District of TEXAS [LIVE] (Marshall)
## CIVIL DOCKET FOR CASE #: 2:22-cv-00294-JRG

Netlist, Inc. v. MICRON TECHNOLOGY TEXAS, LLC et al
Assigned to: District Judge Rodney Gilstrap
Case in other court: Federal Circuit, 25-01936
Cause: 35:271 Patent Infringement

Date Filed: 08/01/2022
Date Terminated: 07/11/2024
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Mediator**

**David Folsom**
Jackson Walker LLP
6002-B Summerfield Drive
Texarkana, TX 75503
*dfolsom@jw.com*

**Technical Advisor**

**Michael D. Paul**

**Plaintiff**

**Netlist, Inc.**                                              represented by **Andrew Henderson**
Irell & Manella LLP
1800 Avenue of Stars
Suite 900
Los Angeles, CA 90067
310-277-1010
Email: dhenderson@irell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Strabone**
Irell & Manella LLP - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310-277-1010
Fax: 310-203-7199
Email: astrabone@irell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Anthony Q Rowles**
Irell & Manella LLP - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310-203-7635
Fax: 310-203-7199
Email: trowles@irell.com
*PRO HAC VICE*

Appx91

*ATTORNEY TO BE NOTICED*

**Dovid Z. Kahn**
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Suite 900
Los Angeles, CA 90067
310-277-1010
Email: dkahn@irell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Hong Annita Zhong**
Irell & Manella LLP - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310-203-7183
Fax: 310.203.7199
Email: hzhong@irell.com
*ATTORNEY TO BE NOTICED*

**Jason G Sheasby**
Irell & Manella LLP - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310.203-7096
Fax: 310-203-7199
Email: jsheasby@irell.com
*ATTORNEY TO BE NOTICED*

**Jeffrey A. Lamken**
MoloLamken LLP
600 New Hampshire Ave NW
Suite 660
Washington, DC 20037
202/556-2000
Fax: 202-556-2001
Email: jlamken@mololamken.com
*ATTORNEY TO BE NOTICED*

**Jennifer Leigh Truelove**
McKool Smith, P.C. - Marshall
104 East Houston St
Suite 300
Marshall, TX 75670
903-923-9000
Fax: 903-923-9099
Email: jtruelove@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Kevin Lee Burgess**
McKool Smith P.C.
104 E. Houston Street
Suite 300
Marshall, TX 75670

903-923-9000
Fax: 903-923-9099
Email: kburgess@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Michael William Tezyan**
Irell & Manella, LLP
California
1800 Avenue of the Stars
Ste 900
Los Angeles, CA 90067
310-203-7536
Email: mtezyan@irell.com
*ATTORNEY TO BE NOTICED*

**Philip J Warrick**
Irell & Manella - DC
750 17th Street NW
Ste 850
Washington, DC 20006
202-831-6238
Fax: 310-317-7252
Email: pwarrick@irell.com
*ATTORNEY TO BE NOTICED*

**Rebecca L. Carson**
Irell & Manella - Newport Beach
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
949.760.0991
Fax: 949.760.5200
Email: rcarson@irell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephen M Payne**
Irell & Manella - Newport Beach
840 Newport Center Drive
Suite 400
Newport Beach, CA 92660
949-760-0991
Fax: 949-760-5200
Email: spayne@irell.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas C Werner**
Irell & Manella LLP - Los Angeles
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067-4276
310-203-7956
Fax: 310-282-5798
Email: twerner@irell.com
*ATTORNEY TO BE NOTICED*

**Vivek V. Krishnan**

Appx93

Winston & Strawn LLP - Chicago
35 West Wacker Drive
Suite 4200
Chicago, IL 60601
312-558-9508
Fax: 312-558-5700
Email: vkrishnan@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Yanan Zhao**
Kirkland & Ellis LLP
2049 Century Park East, Suite 3700
Los Anegles
Los Angeles, CA 90067
310-552-4240
Email: yanan.zhao@kirkland.com
*TERMINATED: 12/03/2024*

**Samuel Franklin Baxter**
McKool Smith, P.C. - Marshall
104 East Houston St
Suite 300
Marshall, TX 75670
903/923-9000
Fax: 903-923-9099
Email: sbaxter@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MICRON TECHNOLOGY TEXAS, LLC**          represented by   **Natalie Lynn Arbaugh**
Winston & Strawn/Chicago
2121 N. Pearl Street
Suite 900
Dallas, TX 75201
214-453-6421
Email: narbaugh@winston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aldo A Badini**
Winston & Strawn LLP - New York
200 Park Ave
Floor 43
New York, NY 10166-4193
212.294.4601
Fax: 212.294.4700
Email: abadini@winston.com
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Fair**
Miller Fair Henry PLLC
1507 Bill Owens Parkway
Longview, TX 75604
903-757-6400

Email: andrea@millerfairhenry.com
*TERMINATED: 09/18/2024*

**Brian Joseph Nisbet**
Winston & Strawn LLP - Chicago
35 West Wacker Drive
Suite 4200
Chicago, IL 60601
312.558.5600
Fax: 312.558.5700
Email: bnisbet@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Everingham , IV**
Miller Fair Henry PLLC
1507 Bill Owens Parkway
Longview, TX 75604
903-757-6400
Email: chad@millerfairhenry.com
*TERMINATED: 09/18/2024*

**David P Enzminger**
Winston & Strawn LLP- L.A.
333 South Grand Avenue
38th Floor
Los Angeles, CA 90071-1543
213-615-1780
Fax: 213-615-1750
Email: denzminger@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack Wesley Hill**
Ward, Smith & Hill, PLLC
1507 Bill Owens Parkway
Longview, TX 75604
903-757-6400
Fax: 903-757-2323
Email: wh@jwhpc.com
*TERMINATED: 09/18/2024*

**Jared B Bobrow**
Orrick Herrington & Sutcliffe - Menlo Park
1000 Marsh Road
Menlo Park, CA 94025
650-614-7400
Fax: 650-614-7401
Email: jbobrow@orrick.com
*ATTORNEY TO BE NOTICED*

**Jennifer Haltom Doan**
Haltom & Doan
2900 St. Michael Dr.
Suite 500
Texarkana, TX 75503
903-255-1000
Fax: 903-255-0800

Email: jdoan@haltomdoan.com
*TERMINATED: 03/08/2024*

**Joshua Reed Thane**
Haltom & Doan
6500 Summerhill Road
Crown Executive Center Suite 100
Texarkana, Tx 75503
903-255-1000
Fax: 903-255-0800
Email: jthane@haltomdoan.com
*TERMINATED: 03/08/2024*

**Juan C Yaquian**
Winston & Strawn LLP
800 Capitol St.
Suite 2400
Houston, TX 77001
713-651-2645
Fax: 713-651-2700
Email: jyaquian@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mariah Leigh Hornok**
Haltom & Doan
2900 St. Michael Dr.
Suite 500
Texarkana, TX 75503
903-255-1000
Email: mhornok@haltomdoan.com
*TERMINATED: 03/08/2024*

**Matthew Hopkins**
Winston & Strawn LLP - DC
1901 L Street, N.W.Washington
Washington, DC 20036-3506
202-282-5000
Fax: 202-282-5100
Email: MHopkins@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R McCullough**
Winston & Strawn LLP - Redwood City
255 Shoreline Drive
Ste 520
Redwood City, CA 94065
650.858.6453
Fax: 650.858.6550
Email: mrmccullough@winston.com
*ATTORNEY TO BE NOTICED*

**Maureen L. Rurka**
Winston & Strawn/Chicago
35 West Wacker Drive
Chicago, IL 60601
312-558-7936

Email: mrurka@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Robert Rueckheim**
Winston & Strawn LLP - Redwood City
255 Shoreline Drive
Ste 520
Redwood City, CA 94065
650-858-6443
Fax: 6508586550
Email: MRueckheim@winston.com
*ATTORNEY TO BE NOTICED*

**Rex Andrew Mann**
Winston & Strawn/Chicago
2121 N. Pearl Street
Suite 900
Dallas, TX 75201
214-453-6412
Fax: 214-453-6400
Email: rmann@winston.com
*ATTORNEY TO BE NOTICED*

**Ryuk Park**
Winston & Strawn LLP
255 Shoreline Drive, Suite 520
Redwood City, CA 94065-1432
650-858-6440
Fax: 650-858-6550
Email: rpark@winston.com
*ATTORNEY TO BE NOTICED*

**Thomas M Melsheimer**
Winston & Strawn LLP - Dallas
2121 N Pearl Street
Suite 900
Dallas, TX 75201
214/453-6500
Fax: 214/453-6400
Email: tmelsheimer@winston.com
*ATTORNEY TO BE NOTICED*

**Tracea Lachelle Rice**
Winston & Strawn/Chicago
2121 North Pearl Street
Ste 900
Dallas, TX 75201
214-453-6404
Email: trice@winston.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vivek V. Krishnan**
(See above for address)
*TERMINATED: 01/12/2024*
*PRO HAC VICE*

**William Mitchell Logan**
Winston & Strawn LLP - Houston
800 Capitol St.
24th Floor
Houston, TX 77002
713-651-2766
Email: wlogan@winston.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micron Semiconductor Products Inc**          represented by **Natalie Lynn Arbaugh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aldo A Badini**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Leigh Fair**
(See above for address)
*TERMINATED: 09/18/2024*

**Brian Joseph Nisbet**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Everingham , IV**
(See above for address)
*TERMINATED: 09/18/2024*

**David P Enzminger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack Wesley Hill**
(See above for address)
*TERMINATED: 09/18/2024*

**Jared B Bobrow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Haltom Doan**
(See above for address)
*TERMINATED: 03/08/2024*

**Joshua Reed Thane**
(See above for address)
*TERMINATED: 03/08/2024*

**Juan C Yaquian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mariah Leigh Hornok**
(See above for address)
*TERMINATED: 03/08/2024*

**Matthew Hopkins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R McCullough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maureen L. Rurka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Robert Rueckheim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rex Andrew Mann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryuk Park**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas M Melsheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tracea Lachelle Rice**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vivek V. Krishnan**
(See above for address)
*TERMINATED: 01/12/2024*
*PRO HAC VICE*

**William Mitchell Logan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micron Technology Inc**                     represented by   **Natalie Lynn Arbaugh**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Aldo A Badini**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Andrea Leigh Fair**
(See above for address)
*TERMINATED: 09/18/2024*

**Brian Joseph Nisbet**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Charles Everingham , IV**
(See above for address)
*TERMINATED: 09/18/2024*

**David P Enzminger**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jack Wesley Hill**
(See above for address)
*TERMINATED: 09/18/2024*

**Jared B Bobrow**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jennifer Haltom Doan**
(See above for address)
*TERMINATED: 03/08/2024*

**Joshua Reed Thane**
(See above for address)
*TERMINATED: 03/08/2024*

**Juan C Yaquian**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mariah Leigh Hornok**
(See above for address)
*TERMINATED: 03/08/2024*

**Matthew Hopkins**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew R McCullough**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Maureen L. Rurka**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Appx100

**Michael Robert Rueckheim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rex Andrew Mann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryuk Park**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas M Melsheimer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Tracea Lachelle Rice**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Vivek V. Krishnan**
(See above for address)
*TERMINATED: 01/12/2024*
*PRO HAC VICE*

**William Mitchell Logan**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/01/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number ATXEDC-9047735.), filed by Netlist, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Civil Cover Sheet)(Baxter, Samuel) (Entered: 08/01/2022) |
| 08/02/2022 | | Case Assigned to District Judge Rodney Gilstrap. (nkl, ) (Entered: 08/02/2022) |
| 08/02/2022 | | In accordance with the provisions of 28 USC Section 636(c), you are hereby notified that a U.S. Magistrate Judge of this district court is available to conduct any or all proceedings in this case including a jury or non-jury trial and to order the entry of a final judgment. The form Consent to Proceed Before Magistrate Judge is available on our website. All signed consent forms, excluding pro se parties, should be filed electronically using the event *Notice Regarding Consent to Proceed Before Magistrate Judge*. (nkl, ) (Entered: 08/02/2022) |
| 08/02/2022 | 2 | NOTICE of Attorney Appearance by Jennifer Leigh Truelove on behalf of Netlist, Inc. (Truelove, Jennifer) (Entered: 08/02/2022) |
| 08/02/2022 | 3 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Baxter, Samuel) (Entered: 08/02/2022) |
| 08/02/2022 | 4 | CORPORATE DISCLOSURE STATEMENT filed by Netlist, Inc. (Baxter, Samuel) (Entered: 08/02/2022) |
| 08/02/2022 | 5 | SUMMONS Issued as to MICRON TECHNOLOGY TEXAS, LLC through its agent for service The Corporation Service Company,, Micron Semiconductor Products Inc. by and through its agent for service The Corporation Service Company, Micron Technology Inc., by and through its |

| | | |
|---|---|---|
| | | agent for service The Corporation Service Company (Attachments: # 1 Summons(es) Micron Technology Texas LL, # 2 Summons(es) Micron Technology, Inc.)(nkl, ) (Entered: 08/02/2022) |
| 08/03/2022 | 6 | NOTICE of Attorney Appearance - Pro Hac Vice by Jason G Sheasby on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-9051055. (Sheasby, Jason) (Entered: 08/03/2022) |
| 08/05/2022 | 7 | NOTICE of Attorney Appearance - Pro Hac Vice by Hong Annita Zhong on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-9056600. (Zhong, Hong) (Entered: 08/05/2022) |
| 08/08/2022 | 8 | SUMMONS Returned Executed by Netlist, Inc.. Micron Semiconductor Products Inc served on 8/3/2022, answer due 8/24/2022. (Baxter, Samuel) (Entered: 08/08/2022) |
| 08/08/2022 | 9 | SUMMONS Returned Executed by Netlist, Inc.. Micron Technology Inc served on 8/3/2022, answer due 8/24/2022. (Baxter, Samuel) (Entered: 08/08/2022) |
| 08/08/2022 | 10 | SUMMONS Returned Executed by Netlist, Inc.. MICRON TECHNOLOGY TEXAS, LLC served on 8/3/2022, answer due 8/24/2022. (Baxter, Samuel) (Entered: 08/08/2022) |
| 08/15/2022 | 11 | AMENDED COMPLAINT against All Defendants, filed by Netlist, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Sheasby, Jason) (Entered: 08/15/2022) |
| 08/18/2022 | 12 | SUMMONS Returned Executed by Netlist, Inc.. Micron Semiconductor Products Inc served on 8/17/2022, answer due 9/7/2022. (Baxter, Samuel) (Entered: 08/18/2022) |
| 08/18/2022 | 13 | SUMMONS Returned Executed by Netlist, Inc.. Micron Technology Inc served on 8/17/2022, answer due 9/7/2022. (Baxter, Samuel) (Entered: 08/18/2022) |
| 08/18/2022 | 14 | SUMMONS Returned Executed by Netlist, Inc.. MICRON TECHNOLOGY TEXAS, LLC served on 8/17/2022, answer due 9/7/2022. (Baxter, Samuel) (Entered: 08/18/2022) |
| 09/07/2022 | 15 | ANSWER to 11 Amended Complaint, by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc.(Arbaugh, Natalie) (Entered: 09/07/2022) |
| 09/07/2022 | 16 | CORPORATE DISCLOSURE STATEMENT filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Arbaugh, Natalie) (Entered: 09/07/2022) |
| 09/08/2022 | 17 | NOTICE of Attorney Appearance - Pro Hac Vice by Thomas C Werner on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-9116203. (Werner, Thomas) (Entered: 09/08/2022) |
| 09/08/2022 | 18 | NOTICE of Attorney Appearance - Pro Hac Vice by Yanan Zhao on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-9116308. (Zhao, Yanan) (Entered: 09/08/2022) |
| 09/08/2022 | 19 | NOTICE of Attorney Appearance - Pro Hac Vice by Michael William Tezyan on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-9117824. (Tezyan, Michael) (Entered: 09/08/2022) |
| 09/08/2022 | 20 | NOTICE of Readiness for Scheduling Conference by Netlist, Inc. (Baxter, Samuel) (Entered: 09/08/2022) |
| 09/12/2022 | 21 | ****WITHDRAWN PER #29***Opposed MOTION to Stay by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Text of Proposed Order)(Rueckheim, Michael) Modified on 10/13/2022 (ch, ). (Entered: 09/12/2022) |
| 09/23/2022 | 22 | NOTICE of Attorney Appearance by Jack Wesley Hill on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Hill, Jack Wesley) (Entered: 09/23/2022) |
| 09/23/2022 | 23 | NOTICE of Attorney Appearance by Andrea Leigh Fair on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Fair, Andrea) (Entered: 09/23/2022) |

| | | |
|---|---|---|
| 09/23/2022 | 24 | NOTICE of Attorney Appearance by Charles Everingham, IV on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Everingham, Charles) (Entered: 09/23/2022) |
| 09/26/2022 | 25 | Unopposed MOTION for Extension of Time to File Response/Reply by Netlist, Inc.. (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 09/26/2022) |
| 09/28/2022 | 26 | ORDER granting 25 Unopposed MOTION for Extension of Time to File Response/Reply . Signed by District Judge Rodney Gilstrap on 9/28/2022. (nkl, ) (Entered: 09/28/2022) |
| 09/30/2022 | 27 | RESPONSE to Motion re 21 Opposed MOTION to Stay *filed by Netlist, Inc..* (Attachments: # 1 Declaration of Jason Sheasby in support of Netlist, Inc.'s Opposition, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Text of Proposed Order)(Sheasby, Jason) (Entered: 09/30/2022) |
| 10/12/2022 | 28 | Unopposed MOTION to Withdraw 21 Opposed MOTION to Stay by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Text of Proposed Order)(Hill, Jack Wesley) (Entered: 10/12/2022) |
| 10/13/2022 | 29 | ORDER granting 28 Motion to Withdraw 21 Opposed MOTION to Stay. Signed by District Judge Rodney Gilstrap on 10/13/2022. (ch, ) (Entered: 10/13/2022) |
| 10/21/2022 | 30 | CONSOLIDATION ORDER - The above-captioned cases are hereby ORDERED to be CONSOLIDATED for all pretrial issues with the LEAD CASE, Case No. 2:22-cv-00293. All parties are instructed to file any future filings in the LEAD CASE. Signed by District Judge Rodney Gilstrap on 10/21/2022. (ch, ) (Entered: 10/24/2022) |
| 08/11/2023 | 31 | Sealed Document. Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint and Counterclaims (Rueckheim, Michael) (Entered: 08/11/2023) |
| 08/18/2023 | 32 | REDACTION to 31 Sealed Document *Defendants' Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint and Counterclaims* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Rueckheim, Michael) (Entered: 08/18/2023) |
| 08/28/2023 | 33 | ORDER APPOINTING TECHNICAL ADVISOR. Michael D. Paul added as TECHNICAL ADVISOR. Signed by District Judge Rodney Gilstrap on 08/28/2023. (klc, ) (Entered: 08/28/2023) |
| 08/29/2023 | 34 | NOTICE of Attorney Appearance by Kevin Lee Burgess on behalf of Netlist, Inc. (Burgess, Kevin) (Entered: 08/29/2023) |
| 01/18/2024 | 35 | Sealed Document. (Folsom, David) (Entered: 01/18/2024) |
| 02/28/2024 | 36 | ORDER DECONSOLIDATING CASES - Accordingly, it is ORDERED that the District Clerk DECONSOLIDATE the Micron case, Case No. 2:22-cv-294, from the Samsung case, Case No. 2:22-cv-293 It is further ORDERED that the Micron case, Case No. 2:22-cv-294, is specially set for trial on April 22, 2024, and the pretrial conference for the same is set for 9:00 a.m. CST on March 6, 2024. It is further ORDERED that the pretrial conference and trial dates for the Samsung case, Case No. 2:22-cv-293, are cancelled to be reset at a later date. Signed by District Judge Rodney Gilstrap on 2/28/2024. Associated Cases: 2:22-cv-00293-JRG, 2:22-cv-00294-JRG(ch, ) (Entered: 02/28/2024) |
| 02/28/2024 | 37 | ORDER - The Court ORDERS sua sponte that the parties respective responses to theMotions, if any, must be filed no later than Friday, March 1, 2024. Signed by District Judge Rodney Gilstrap on 2/27/2024. (nkl, ) (Entered: 02/28/2024) |
| 02/28/2024 | | Jury Selection set for 4/22/2024 at 09:00AM before District Judge Rodney Gilstrap. Pretrial Conference set for 3/6/2024 at 09:00 AM before District Judge Rodney Gilstrap. (klc, ) (Entered: 02/28/2024) |
| 02/29/2024 | 38 | OPPOSED SEALED MOTION *Micron Defendants' Motion for Leave to Supplement Dispositive Motions and Motions to Strike Based on Deposition Testimony Obtained After Briefing Closed* |

| | | |
|---|---|---|
| | | by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit A, # 8 Exhibit B, # 9 Proposed Order)(Rueckheim, Michael) (Entered: 02/29/2024) |
| 03/01/2024 | 39 | ORDER - The Court ORDERS sua sponte that Netlists response to the Motion, if any, must be filed no later than 4:00 p.m. CST on Monday, March 4, 2024.. Signed by District Judge Rodney Gilstrap on 3/1/2024. (nkl, ) (Entered: 03/01/2024) |
| 03/01/2024 | 40 | SEALED MOTION *Defendants' Motion for Leave to Supplement Dr. Matthew Lynde's Expert Report* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael R. Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(Rueckheim, Michael) (Entered: 03/01/2024) |
| 03/01/2024 | 41 | Sealed Document. Micron Defendants' Response in Opposition to Plaintiff's Motion for Leave to Supplement Expert Reports (Dkt. 608) (Attachments: # 1 Declaration of Michael R. Rueckheim, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order)(Rueckheim, Michael) (Entered: 03/01/2024) |
| 03/01/2024 | 42 | Sealed Document Netlist Inc.'s Opposition to Micron's Motion to Compel Production of Expert Deposition Transcript from Lead Case (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Proposed Order)(Sheasby, Jason) (Entered: 03/01/2024) |
| 03/01/2024 | 43 | RESPONSE to *Plaintiff Netlist's Motion for Consolidation (Dkt. 607) filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc.* (Attachments: # 1 Affidavit/Declaration of Michael R. Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order)(Rueckheim, Michael) (Entered: 03/01/2024) |
| 03/02/2024 | 44 | ORDER - The Court ORDERS sua sponte that Netlist's response to the Motion (Dkt. No. 40), if any, must be filed no later than 5:00 p.m. CST on Monday, March 4, 2024.. Signed by District Judge Rodney Gilstrap on 3/2/2024. (nkl, ) (Entered: 03/02/2024) (Entered: 03/02/2024) |
| 03/02/2024 | 45 | ORDER re 40 SEALED MOTION *Defendants' Motion for Leave to Supplement Dr. Matthew Lynde's Expert Report. ORDERS sua sponte that Netlists response to the Motion, if any, must be filed no later than 5:00 p.m. CST on Monday, March 4, 2024. Signed by District Judge Rodney Gilstrap on 3/2/2024. (ch, ) (Entered: 03/04/2024)* |
| 03/04/2024 | 46 | NOTICE of Attorney Appearance - Pro Hac Vice by Stephen M Payne on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-10010976. (Payne, Stephen) (Entered: 03/04/2024) |
| 03/04/2024 | 47 | RESPONSE to Motion re 38 OPPOSED SEALED MOTION *Micron Defendants' Motion for Leave to Supplement Dispositive Motions and Motions to Strike Based on Deposition Testimony Obtained After Briefing Closed filed by Netlist, Inc..* (Attachments: # 1 Declaration of Jason G. Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order)(Sheasby, Jason) (Entered: 03/04/2024) |
| 03/04/2024 | 48 | ORDER REGARDING EXHIBITS. Signed by District Judge Rodney Gilstrap on 3/4/2024. (ch, ) (Entered: 03/04/2024) |
| 03/04/2024 | 49 | NOTICE of Attorney Appearance - Pro Hac Vice by Anthony Q Rowles on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-10011435. (Rowles, Anthony) (Entered: 03/04/2024) |
| 03/04/2024 | 51 | Sealed Netlist Inc.s Reply in Support of Netlists Motion for Leave to Supplement Expert Reports [Dkt. 608] (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 12, # 3 Exhibit 13, # 4 Exhibit 14, # 5 Exhibit 15, # 6 Exhibit 16, # 7 Exhibit 17)(Sheasby, Jason) (Entered: 03/04/2024) |

| | | |
|---|---|---|
| 03/04/2024 | 52 | SEALED RESPONSE to 40 SEALED MOTION *Defendants' Motion for Leave to Supplement Dr. Matthew Lynde's Expert Report*, filed by Netlist, Inc. (Attachments: # 1 Declaration of Jason G. Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Proposed Order) (Sheasby, Jason) (Entered: 03/04/2024) |
| 03/04/2024 | 53 | Sealed Document. Micron Defendants' Response to Plaintiff Netlist's Motions in Limine (Dkt. 610) (Attachments: # 1 Declaration of Michael R. Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Proposed Order)(Rueckheim, Michael) (Entered: 03/04/2024) |
| 03/04/2024 | 55 | Sealed Document. PLAINTIFF NETLIST INC.S OPPOSITION TO MICRONS OMNIBUS MOTION IN LIMINE (Dkt. 613) (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Errata 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Proposed Order)(Sheasby, Jason) (Entered: 03/05/2024) |
| 03/05/2024 | 54 | JOINT NOTICE *of Pending Motions Between Netlist and Micron* by Netlist, Inc. (Sheasby, Jason) (Entered: 03/05/2024) |
| 03/05/2024 | 56 | Sealed Document - Joint Pretrial Order (Attachments: # 1 Exhibit A - Netlist's Trial Witness List, # 2 Exhibit B - Micron's Objections to Netlist's Witness List, # 3 Exhibit C - Netlist's Deposition Designations, Micron's Objections and Counters, # 4 Exhibit D - Micron's Trial Witness List, # 5 Exhibit E - Netlist's Objections to Micron's Witness List, # 6 Exhibit F - Micron's Deposition Designations, Netlist's Objections and Counters, # 7 Exhibit G - Joint Exhibit List, # 8 Exhibit H - Netlist's Party Exhibit List, # 9 Exhibit I - Micron's Party Exhibit List, # 10 Exhibit J - Joint Proposed Jury Instructions, # 11 Exhibit K - Joint Proposed Verdict Form)(Sheasby, Jason) (Entered: 03/05/2024) |
| 03/05/2024 | | Clerk's LR CV-10(d) Notice of Deficiency as to 56 Sealed Document,,, - LR CV-5(a)(7) or CR-49(a) requires this document to include a statement after the certificate of service that certifies that a motion to seal has been filed or authorization to seal has been obtained. Recommended cure: Within one day, Filer must refile with the word *Corrected* in the title of the document. The filer should use the same ECF event and when offered the docket text enhancement dropdown, select CORRECTED so it will also appear in the docket text. (nkl, ) (Entered: 03/05/2024) |
| 03/05/2024 | 57 | Sealed Document - Corrected Joint Pretrial Order (Attachments: # 1 Exhibit A - Netlist's Trial Witness List, # 2 Exhibit B - Micron's Objections to Netlist's Witness List, # 3 Exhibit C - Netlist's Deposition Designations, Micron's Objections and Counters, # 4 Exhibit D - Micron's Trial Witness List, # 5 Exhibit E - Netlist's Objections to Micron's Witness List, # 6 Exhibit F - Micron's Deposition Designations, Netlist's Objections and Counters, # 7 Exhibit G - Joint Exhibit List, # 8 Exhibit H - Netlist's Party Exhibit List, # 9 Exhibit I - Micron's Party Exhibit List, # 10 Exhibit J - Joint Proposed Jury Instructions, # 11 Exhibit K - Joint Proposed Verdict Form)(Sheasby, Jason) (Entered: 03/05/2024) |
| 03/05/2024 | 58 | NOTICE of Attorney Appearance - Pro Hac Vice by Tracea Lachelle Rice on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. Filing fee $ 100, receipt number ATXEDC-10014633. (Rice, Tracea) (Entered: 03/05/2024) |
| 03/05/2024 | 59 | ORDER denying 38 Sealed Motion. Signed by District Judge Rodney Gilstrap on 3/5/2024. (Entered: 03/05/2024) |
| 03/06/2024 | 60 | UNOPPOSED MOTION to Withdraw as Attorney *Haltom & Doan Attorneys* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Proposed Order)(Doan, Jennifer) (Entered: 03/06/2024) |
| 03/06/2024 | 65 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Final Pretrial Conference Day 1 held on 3/6/2024 from 09:03 AM to 04:30 PM. (No exhibits)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attorney Attendance Sheet) (aeb) (Entered: 03/08/2024) |

| | | |
|---|---|---|
| 03/07/2024 | 61 | PAPER TRANSCRIPT REQUEST by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc for proceedings held on 03/06/2024 to 03/07/2024 before Judge Rodney Gilstrap. (Rueckheim, Michael) Modified on 3/7/2024 (klc, ). Forwarded to Shawn McRoberts on 3/7/2024 (Entered: 03/07/2024) |
| 03/07/2024 | 62 | PAPER TRANSCRIPT REQUEST by Netlist, Inc. for proceedings held on Final Pretrial Conference 3/6 - 3/7/2024 before Judge Rodney Gilstrap. (Truelove, Jennifer) Modified on 3/7/2024 (klc, ). Forwarded to Shawn McRoberts on 3/7/2024 (Entered: 03/07/2024) |
| 03/07/2024 | 63 | PAPER TRANSCRIPT REQUEST by Netlist, Inc. for proceedings held on 3/6/2024-3/7/2024 Pre-Trial Conference Hearing before Judge Rodney Gilstrap. (Zhao, Yanan) Modified on 3/7/2024 (klc, ). Forwarded to Shawn McRoberts on 3/7/2024 (Entered: 03/07/2024) |
| 03/07/2024 | 66 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Final Pretrial Conference Day 2 held on 3/7/2024 from 09:03 AM to 02:32 PM. (No exhibits)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attorney Attendance Sheet) (aeb) (Entered: 03/08/2024) |
| 03/08/2024 | 64 | ORDER granting 60 Motion to Withdraw as Attorney. Attorney Joshua Reed Thane; Jennifer Haltom Doan and Mariah Leigh Hornok terminated. Signed by District Judge Rodney Gilstrap on 3/8/2024. (nkl, ) (Entered: 03/08/2024) |
| 03/11/2024 | 67 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Pretrial Conference (Volume 1) Proceedings held on 03/06/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 4/1/2024. Release of Transcript Restriction set for 6/10/2024. (smm) (Entered: 03/11/2024) |
| 03/11/2024 | 68 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Pretrial Conference (Volume 2) Proceedings held on 03/07/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 4/1/2024. Release of Transcript Restriction set for 6/10/2024. (smm) (Entered: 03/11/2024) |
| 03/11/2024 | 69 | JOINT NOTICE *of Redactions of the Court's Sealed Memorandum Opinion and Order (Dkt. 50)* by Netlist, Inc. (Attachments: # 1 Exhibit A)(Sheasby, Jason) (Entered: 03/11/2024) |
| 03/11/2024 | 70 | REDACTION to 40 SEALED MOTION *Defendants' Motion for Leave to Supplement Dr. Matthew Lynde's Expert Report* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael R. Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(Rueckheim, Michael) (Entered: 03/11/2024) |

| | | |
|---|---|---|
| 03/11/2024 | 71 | REDACTION to 41 Sealed Document, *Micron Defendants' Response in Opposition to Plaintiff's Motion for Leave to Supplement Expert Reports (Dkt. 608)* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael R. Rueckheim, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Proposed Order)(Rueckheim, Michael) (Entered: 03/11/2024) |
| 03/12/2024 | 72 | ORDER re Renewed Motion to Stay Pending IPR. Signed by District Judge Rodney Gilstrap on 3/11/2024. (nkl, ) (Entered: 03/12/2024) |
| 03/12/2024 | | NOTICE of Hearing: Jury Selection originally scheduled for 4/22/2024 has been RESET for 4/29/2024 at 09:00 AM followed by Trial Day 1 in Ctrm 106 (Marshall) before District Judge Rodney Gilstrap. (aeb) (Entered: 03/12/2024) |
| 03/14/2024 | 73 | ORDER ON PRETRIAL MOTIONS, MOTIONS IN LIMINE, AND EXHIBITS. Signed by District Judge Rodney Gilstrap on 3/14/2024. (nkl, ) (Entered: 03/14/2024) |
| 03/14/2024 | 74 | ORDER to Pay Special Master. Signed by District Judge Rodney Gilstrap on 3/14/2024. (nkl, ) (Entered: 03/14/2024) |
| 03/14/2024 | 75 | REDACTION to 55 Sealed Document,, by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 2, # 3 Exhibit 10, # 4 Exhibit 12, # 5 Exhibit 13, # 6 Exhibit 14, # 7 Exhibit 15, # 8 Exhibit 16, # 9 Proposed Order)(Sheasby, Jason) (Entered: 03/14/2024) |
| 03/25/2024 | 76 | Sealed Defendants Notice of Submission of Updated Party Exhibit List (Attachments: # 1 Exhibit A)(Rueckheim, Michael) (Entered: 03/25/2024) |
| 03/25/2024 | 77 | Sealed Plaintiff Netlist, Inc.'s Notice of Submission of Updated Party Exhibit List (Attachments: # 1 Exhibit A)(Sheasby, Jason) (Entered: 03/25/2024) |
| 03/29/2024 | 78 | NOTICE *of Disclosure of Prior Art* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Rueckheim, Michael) (Entered: 03/29/2024) |
| 03/29/2024 | 79 | OPPOSED SEALED MOTION *for Leave to File Motion to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 03/29/2024) |
| 03/29/2024 | 80 | OPPOSED SEALED MOTION *to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* by Netlist, Inc.. (Attachments: # 1 Declaration of Rebecca Carson, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Proposed Order)(Sheasby, Jason) (Entered: 03/29/2024) |
| 04/04/2024 | 81 | NOTICE *of Submission of Updated List of Trial Witnesses* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc re 76 Sealed Document (Attachments: # 1 Exhibit A - Micron's List of Trial Witnesses)(Rueckheim, Michael) (Entered: 04/04/2024) |
| 04/05/2024 | 82 | SEALED RESPONSE to Motion re 79 OPPOSED SEALED MOTION *for Leave to File Motion to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Declaration - Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order)(Rueckheim, Michael) (Entered: 04/05/2024) |
| 04/05/2024 | 83 | UNOPPOSED SEALED MOTION *Requesting Admission of PX-032 (MICNL203-00163346)* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 PX-032, # 3 Exhibit 1, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Proposed Order)(Sheasby, Jason) (Entered: 04/05/2024) |
| 04/08/2024 | | NOTICE of Hearing: Jury Selection originally set for Monday, April 29, 2024 has been RESET for FRIDAY 4/26/2024 at 09:00 AM followed by Trial Day 1 in Ctrm 106 (Marshall) before District Judge Rodney Gilstrap. (aeb) (Entered: 04/08/2024) |

| Date | Doc # | Description |
|---|---|---|
| 04/08/2024 | | Set/Reset Hearings: Jury Selection and Trial Day 1 previously set for 4/26/2024 has been RESET to its original date of 4/29/2024 at 09:00 AM in Ctrm 106 (Marshall) before District Judge Rodney Gilstrap. (aeb) (Entered: 04/08/2024) |
| 04/11/2024 | 84 | REDACTION to 83 UNOPPOSED SEALED MOTION *Requesting Admission of PX-032 (MICNL203-00163346)* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 7, # 3 Proposed Order)(Sheasby, Jason) (Entered: 04/11/2024) |
| 04/12/2024 | 85 | OPPOSED SEALED MOTION *to Strike Micron's Updated Trial Witness List (Dkt. 81-1)* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Proposed Order)(Sheasby, Jason) (Entered: 04/12/2024) |
| 04/12/2024 | 86 | OPPOSED MOTION to Expedite *Briefing on Netlist's Motion to Strike Micron's Updated Witness List (Dkt. 85)* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 04/12/2024) |
| 04/12/2024 | 87 | SEALED REPLY to Response to Motion re 79 OPPOSED SEALED MOTION *for Leave to File Motion to Strike Portions of Second Supplemental Expert Report of Matthew Lynde*, 80 OPPOSED SEALED MOTION *to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* filed by Netlist, Inc.. (Attachments: # 1 Declaration of Rebecca Carson, # 2 Exhibit F)(Sheasby, Jason) (Entered: 04/12/2024) |
| 04/12/2024 | 88 | RESPONSE to Motion re 86 OPPOSED MOTION to Expedite *Briefing on Netlist's Motion to Strike Micron's Updated Witness List (Dkt. 85) filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc*. (Attachments: # 1 Proposed Order)(Hill, Jack Wesley) (Entered: 04/12/2024) |
| 04/12/2024 | 89 | REDACTION to 82 Sealed Response to Motion, *for Leave to File Motion to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Proposed Order)(Rueckheim, Michael) (Entered: 04/12/2024) |
| 04/15/2024 | 90 | RESPONSE to Motion re 85 OPPOSED SEALED MOTION *to Strike Micron's Updated Trial Witness List (Dkt. 81-1) filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc*. (Attachments: # 1 Exhibit A - Netlist Trial Witness List, # 2 Proposed Order)(Hill, Jack Wesley) (Entered: 04/15/2024) |
| 04/17/2024 | 91 | ORDER granting 86 Motion to Expedite Briefing on Netlist's Motion to Strike Micron's Updated Witness List (Dkt. 85). Signed by District Judge Rodney Gilstrap on 4/17/2024. (NKL) (Entered: 04/17/2024) |
| 04/17/2024 | 92 | NOTICE *of Determination Invalidating Patent-In-Suit* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit A)(Rueckheim, Michael) (Entered: 04/17/2024) |
| 04/17/2024 | 93 | OPPOSED SEALED MOTION *Micron's Motion to Stay or, Alternatively, Sever and Stay the Asserted '912 Patent, In View of Final Written Decision of Invalidity* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Proposed Order)(Rueckheim, Michael) (Entered: 04/17/2024) |
| 04/18/2024 | 94 | UNOPPOSED MOTION re 93 OPPOSED SEALED MOTION *Micron's Motion to Stay or, Alternatively, Sever and Stay the Asserted '912 Patent, In View of Final Written Decision of Invalidity - UNOPPOSED MOTION to Shorten Response Time* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Proposed Order)(Hill, Jack Wesley) (Entered: 04/18/2024) |

| | | |
|---|---|---|
| 04/18/2024 | 95 | ORDER granting 83 Sealed Motion Requesting Admission of PX-032 (MICNL203-00163346). Signed by District Judge Rodney Gilstrap on 4/18/2024. (NKL) (Entered: 04/18/2024) |
| 04/18/2024 | 96 | ORDER granting 85 Sealed Motion to Strike Micron's Updated Trial Witness List (Dkt. 81-1). Signed by District Judge Rodney Gilstrap on 4/18/2024. (NKL) (Entered: 04/18/2024) |
| 04/18/2024 | 97 | MEMORANDUM OPINION AND ORDER re 80 OPPOSED SEALED MOTION *to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* filed by Netlist, Inc., 79 OPPOSED SEALED MOTION *for Leave to File Motion to Strike Portions of Second Supplemental Expert Report of Matthew Lynde* filed by Netlist, Inc... Signed by District Judge Rodney Gilstrap on 4/18/2024. (NKL) (Entered: 04/18/2024) |
| 04/18/2024 | 98 | ORDER granting 94 Motion to Shorten Response Time. Signed by District Judge Rodney Gilstrap on 4/18/2024. (NKL) (Entered: 04/18/2024) |
| 04/19/2024 | 99 | REDACTION to 85 OPPOSED SEALED MOTION *to Strike Micron's Updated Trial Witness List (Dkt. 81-1)* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason G. Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Proposed Order)(Sheasby, Jason) (Entered: 04/19/2024) |
| 04/19/2024 | 100 | NOTICE *OF NARROWING CLAIMS FOR PURPOSES OF TRIAL* by Netlist, Inc. (Sheasby, Jason) (Entered: 04/19/2024) |
| 04/19/2024 | 101 | OPPOSED SEALED MOTION *for Continuance* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Exhibit A, # 2 Proposed Order)(Rueckheim, Michael) (Entered: 04/19/2024) |
| 04/22/2024 | 102 | ORDER re 101 OPPOSED SEALED MOTION *for Continuance. Court ORDERS sua sponte that Netlists response to the Motion, if any, must be filed no later than 5:00 p.m. CST on Tuesday, April 23, 2024. Signed by District Judge Rodney Gilstrap on 4/22/2024. (CH) (Entered: 04/22/2024)* |
| 04/22/2024 | 103 | SEALED RESPONSE to 93 OPPOSED SEALED MOTION *Micron's Motion to Stay or, Alternatively, Sever and Stay the Asserted '912 Patent, In View of Final Written Decision of Invalidity*, filed by Netlist, Inc. (Attachments: # 1 Declaration of Jason G. Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(Sheasby, Jason) (Entered: 04/22/2024) |
| 04/22/2024 | 104 | SEALED RESPONSE to Motion re 101 OPPOSED SEALED MOTION *for Continuance* filed by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 04/22/2024) |
| 04/22/2024 | 105 | Sealed Plaintiff Netlist, Inc.'s Notice of Submission of Updated Party and Joint Exhibit Lists. (Attachments: # 1 Exhibit A Netlist's Updated Trial Exhibit List, # 2 Exhibit B Updated Joint Exhibit List)(Sheasby, Jason) (Entered: 04/22/2024) |
| 04/22/2024 | 106 | NOTICE *Defendants' Notice of Final Election of Invalidity Theories, Prior Art References/Combinations, and Equitable Defenses* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Rueckheim, Michael) (Entered: 04/22/2024) |
| 04/22/2024 | 107 | Sealed Document. NOTICE OF ADDITIONAL FACTS REGARDING DEFENDANTS OPPOSED MOTION FOR CONTINUANCE (ECF No. 101) (Attachments: # 1 Exhibit B - Rueckheim Declaration)(Hill, Jack Wesley) (Entered: 04/22/2024) |
| 04/23/2024 | 108 | Sealed Document - Plaintiff's Response to Micron Defendants' Notice of Additional Facts Regarding Defendants' Opposed Motion for Continuance (Dkt. 107) (Sheasby, Jason) (Entered: 04/23/2024) |
| 04/23/2024 | | NOTICE of Telephonic Conference set for 4/23/2024 at 01:00 PM before District Judge Rodney Gilstrap. ***The Court's telephone conference number is (571) 353-2301. The Guest ID is 682899130. (1) Participants should use a landline phone connection, unless use of a cellular connection is the only viable means available. (2) Participants shall mute themselves upon joining the conference and stay muted unless speaking. (3) When speaking, do not use the |

| | | |
|---|---|---|
| | | speaker option but speak directly into the phone device. (4) Participants shall identify themselves each and every time they speak. (aeb) (Entered: 04/23/2024) |
| 04/23/2024 | 109 | NOTICE of Attorney Appearance - Pro Hac Vice by Maureen L. Rurka on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. Filing fee $ 100, receipt number ATXEDC-10100764. (Rurka, Maureen) (Entered: 04/23/2024) |
| 04/23/2024 | | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Telephonic Conference held on 4/23/2024. Court opened and counsel were identified. Discussion held re: Dkt. No. 101 and responsive filings thereto. Court intends to continue case from its April 29, 2024 trial setting to be reset for the week of May 20, 2024. (Court Reporter Shawn McRoberts) (aeb) (Entered: 04/23/2024) |
| 04/24/2024 | 110 | NOTICE of Attorney Appearance - Pro Hac Vice by Brian Joseph Nisbet on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. Filing fee $ 100, receipt number ATXEDC-10102857. (Nisbet, Brian) (Entered: 04/24/2024) |
| 04/24/2024 | 111 | REDACTION to 93 OPPOSED SEALED MOTION *Micron's Motion to Stay or, Alternatively, Sever and Stay the Asserted '912 Patent, In View of Final Written Decision of Invalidity* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael R. Rueckheim In Support of Motion, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Proposed Order)(Rueckheim, Michael) (Entered: 04/24/2024) |
| 04/24/2024 | 112 | ORDER re 93 Sealed Motion to Stay or, Alternatively, Sever and Stay the Asserted 912 Patent, in View of Final Written Decision of Invalidity; 101 Sealed Motion for Continuance. Signed by District Judge Rodney Gilstrap on 4/24/2024. (NKL) (Entered: 04/24/2024) |
| 04/24/2024 | 113 | PAPER TRANSCRIPT REQUEST by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc for proceedings held on 04/23/2024 before Judge Rodney Gilstrap. (Forward to Shawn McRoberts) (Rueckheim, Michael) Modified on 4/25/2024 (NKL). (Entered: 04/24/2024) |
| 04/25/2024 | 114 | PAPER TRANSCRIPT REQUEST by Netlist, Inc. for proceedings held on 4/23/2024 before Judge Rodney Gilstrap. (Forward to Shawn McRoberts) (Zhao, Yanan) Modified on 4/25/2024 (NKL). (Entered: 04/25/2024) |
| 04/25/2024 | | Jury Selection set for 5/20/2024 at 09:00AM before District Judge Rodney Gilstrap. (KLC) (Entered: 04/25/2024) |
| 04/25/2024 | 115 | Sealed Telephonic Status Conference (04-23-2024) Transcript. (SMM) (Entered: 04/25/2024) |
| 04/26/2024 | 116 | ORDER - ORDERS the parties to mediate in this case promptly and at a mutually agreeable place and date, but no later than May 13, 2024. The mediation shall be conducted by the Hon. David Folsom, 6002 Summerfield Drive,Texarkana, Texas 75503, david@folsomadr.com.. Signed by District Judge Rodney Gilstrap on 4/29/2024. (CH) (Entered: 04/26/2024) |
| 05/01/2024 | 117 | ORDER TO PURCHASE JURY MEALS. Signed by District Judge Rodney Gilstrap on 4/30/2024. (NKL) (Entered: 05/01/2024) |
| 05/02/2024 | 118 | JOINT MOTION to Temporarily Change Lead Counsel Designation for purposes of mediation by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Truelove, Jennifer) (Entered: 05/02/2024) |
| 05/03/2024 | 119 | ORDER granting 118 JOINT MOTION to Temporarily Change Lead Counsel Designation for purposes of mediation. Signed by District Judge Rodney Gilstrap on 5/3/2024. (CH) (Entered: 05/03/2024) |
| 05/14/2024 | 120 | ORDER sua sponte requiring updated Notice of Final Election of Invalidity Theories, Prior Art References/Combinations, and Equitable Defenses. Signed by District Judge Rodney Gilstrap on 05/14/2024. (Entered: 05/14/2024) |
| 05/15/2024 | 121 | NOTICE of Attorney Appearance - Pro Hac Vice by Andrew Henderson on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-10138895. (Henderson, Andrew) (Entered: |

| | | |
|---|---|---|
| | | 05/15/2024) |
| 05/15/2024 | 122 | NOTICE of Attorney Appearance - Pro Hac Vice by Dovid Z. Kahn on behalf of Netlist, Inc.. Filing fee $ 100, receipt number ATXEDC-10139028. (Kahn, Dovid) (Entered: 05/15/2024) |
| 05/16/2024 | 123 | NOTICE *Defendants' Updated Notice of Final Election of Invalidity Theories, Prior Art References/Combinations, and Equitable Defenses* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc re 120 Order (Rueckheim, Michael) (Entered: 05/16/2024) |
| 05/18/2024 | 124 | UNOPPOSED SEALED MOTION *Requesting Admission of PX-33* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 JX-14, # 8 PX-27, # 9 PX-33, # 10 Proposed Order)(Sheasby, Jason) (Entered: 05/18/2024) |
| 05/19/2024 | 125 | ORDER granting 124 Sealed Motion. Signed by District Judge Rodney Gilstrap on 05/19/2024. (KLC) (Entered: 05/19/2024) |
| 05/20/2024 | 126 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Jury Selection and Jury Trial Day 1 held on 5/20/2024 from 09:21 AM to 06:21 PM. (Exhibits admitted)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attendance Sheet) (aeb) (Entered: 05/21/2024) |
| 05/21/2024 | 127 | SEALED DOCUMENT. NETLIST, INC.'S MEMORANDUM REGARDING EXPECTED SCOTT SMITH TESTIMONY (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6)(Sheasby, Jason) (Entered: 05/21/2024) |
| 05/21/2024 | 128 | OPPOSED MOTION Request for Judicial Notice by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit 1, # 3 Proposed Order)(Rueckheim, Michael) (Entered: 05/21/2024) |
| 05/22/2024 | 129 | Sealed Document. Micron Defendants' Response to Memorandum Regarding DKT 127 (Attachments: # 1 Declaration of Ryuk Park, # 2 Exhibit A)(Rueckheim, Michael) (Entered: 05/22/2024) |
| 05/22/2024 | 130 | SEALED RESPONSE to Motion re 128 OPPOSED MOTION Request for Judicial Notice filed by Netlist, Inc. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Proposed Order)(Sheasby, Jason) (Entered: 05/22/2024) |
| 05/22/2024 | 131 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Jury Trial Day 2 held on 5/21/2024 from 08:27 AM to 06:34 PM. (Exhibits admitted)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attorney Attendance Sheet) (aeb) Modified on 5/22/2024 (aeb). (Entered: 05/22/2024) |
| 05/22/2024 | 134 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Jury Trial Day 3 held on 5/22/2024 from 08:28 AM to 06:35 PM. (Exhibits admitted)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attendance Sheet) (aeb) (Entered: 05/23/2024) |
| 05/23/2024 | 132 | Sealed Document - Plaintiff's Notice of Memorandum Regarding PX-023 (Attachments: # 1 PX-23)(Sheasby, Jason) (Entered: 05/23/2024) |
| 05/23/2024 | 133 | NOTICE *Micron Defendants' Response to Memorandum Regarding PX-23 (Dkt. 132)* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc re 132 Sealed Document (Rueckheim, Michael) (Entered: 05/23/2024) |
| 05/23/2024 | | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Informal Charge Conference held on 5/23/2024 from 11:42 AM to 12:13 PM. (No exhibits)(Court Reporter Not Recorded) (aeb) (Entered: 05/23/2024) |
| 05/23/2024 | 135 | JURY VERDICT. (aeb) (Entered: 05/23/2024) |
| 05/23/2024 | 136 | SEALED Jury Verdict. (aeb) (Entered: 05/24/2024) |

| | | |
|---|---|---|
| 05/23/2024 | 137 | SEALED Jury Notes. (aeb) (Entered: 05/24/2024) |
| 05/23/2024 | 138 | SEALED Plaintiff's Final Exhibit List for Jury Trial. (aeb) (Entered: 05/24/2024) |
| 05/23/2024 | 139 | SEALED Defendants' Final Exhibit List for Jury Trial. (aeb) (Entered: 05/24/2024) |
| 05/23/2024 | 140 | SEALED Joint Final Exhibit List for Jury Trial. (aeb) (Entered: 05/24/2024) |
| 05/23/2024 | 141 | Minute Entry for proceedings held before District Judge Rodney Gilstrap: Jury Trial completed on 5/23/2024 from 08:28 AM to 05:19 PM. (Exhibits admitted)(Court Reporter Shawn McRoberts) (Attachments: # 1 Attendance Sheet) (aeb) (Entered: 05/24/2024) |
| 05/30/2024 | 142 | OPPOSED MOTION Requesting Entry of Final Judgment by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 05/30/2024) |
| 06/03/2024 | 143 | REDACTION to 127 Sealed Document *NETLIST, INC.'S MEMORANDUM REGARDING EXPECTED SCOTT SMITH TESTIMONY* by Netlist, Inc.. (Attachments: # 1 Exhibit 3)(Sheasby, Jason) (Entered: 06/03/2024) |
| 06/03/2024 | 144 | REDACTION to 130 Sealed Response to Motion, *128 Micron's Request for Judicial Notice, filed* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 6, # 5 Proposed Order)(Sheasby, Jason) (Entered: 06/03/2024) |
| 06/03/2024 | 145 | REDACTION to 124 UNOPPOSED SEALED MOTION *Requesting Admission of PX-33* by Netlist, Inc.. (Attachments: # 1 Declaration of Jason Sheasby, # 2 Proposed Order)(Sheasby, Jason) (Entered: 06/03/2024) |
| 06/03/2024 | 146 | REDACTION to 132 Sealed Document by Netlist, Inc.. (Sheasby, Jason) (Entered: 06/03/2024) |
| 06/13/2024 | 147 | SEALED RESPONSE to Motion re 142 OPPOSED MOTION Requesting Entry of Final Judgment filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Proposed Order)(Rueckheim, Michael) (Entered: 06/13/2024) |
| 06/19/2024 | 148 | SEALED REPLY to Response to Motion re 142 OPPOSED MOTION *Requesting Entry of Final Judgment* filed by Netlist, Inc. (Sheasby, Jason) (Entered: 06/19/2024) |
| 06/26/2024 | 149 | SEALED SUR-REPLY to Reply to Response to Motion re 142 OPPOSED MOTION Requesting Entry of Final Judgment filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Rueckheim, Michael) (Entered: 06/26/2024) |
| 07/10/2024 | 150 | NOTICE of Attorney Appearance by Jared B Bobrow on behalf of MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Bobrow, Jared) (Entered: 07/10/2024) |
| 07/11/2024 | 151 | FINAL JUDGMENT (Motion(s) 128 , 142 , 40 terminated). Signed by District Judge Rodney Gilstrap on 7/10/2024. (NKL) (Entered: 07/11/2024) |
| 07/25/2024 | 152 | JOINT MOTION for Extension of Time to File *Netlist's Bill of Costs* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 07/25/2024) |
| 07/29/2024 | 153 | ORDER granting 152 Motion for Extension of Time to File Netlist's Bill of Costs. Signed by District Judge Rodney Gilstrap on 7/29/2024. (NKL) (Entered: 07/29/2024) |
| 07/29/2024 | 154 | NOTICE *Regarding Agreed Bill of Costs* by Netlist, Inc. (Attachments: # 1 Exhibit A)(Sheasby, Jason) (Entered: 07/29/2024) |
| 08/01/2024 | 155 | NOTICE *of Determinations Invalidating Patents-in-Suit* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Rueckheim, Michael) (Entered: 08/01/2024) |
| 08/07/2024 | 156 | SEALED MOTION *Micron Defendants' Renewed Motion for Judgment as a Matter of Law on Damages* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, |

| | | |
|---|---|---|
| | | Micron Technology Inc. (Attachments: # 1 Proposed Order)(Rueckheim, Michael) (Entered: 08/07/2024) |
| 08/07/2024 | 157 | SEALED MOTION *Defendants' Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Proposed Order)(Rueckheim, Michael) (Entered: 08/07/2024) |
| 08/07/2024 | 158 | SEALED MOTION *Defendants' Rule 59 Motion for A New Trial* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Affidavit/Declaration of Michael Rueckheim, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Proposed Order)(Arbaugh, Natalie) (Entered: 08/07/2024) |
| 08/07/2024 | 159 | SEALED MOTION *Defendants' Rule 50(B) Motion for Judgment as a Matter of Law for Non-Infringement* by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9 Part 1, # 10 Exhibit 9 Part 2, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Proposed Order)(Rueckheim, Michael) (Entered: 08/07/2024) |
| 08/08/2024 | 160 | JOINT MOTION *For Extension Of Deadlines For Briefing Post-Trial Motions* by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 08/08/2024) |
| 08/08/2024 | 161 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial (Volume 1) Proceedings held on 05/20/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 8/29/2024. Release of Transcript Restriction set for 11/6/2024. (SMM) (Entered: 08/08/2024) |
| 08/08/2024 | 162 | Sealed Trial (Volume 2) Transcript. (SMM) (Main Document 162 replaced on 8/9/2024) (CH). (Entered: 08/08/2024) |
| 08/08/2024 | 163 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial (Volume 2) Proceedings held on 05/21/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 8/29/2024. Release of Transcript Restriction set for 11/6/2024. (SMM) (Entered: 08/08/2024) |
| 08/08/2024 | 164 | Sealed Trial (Volume 3) Transcript. (SMM) (Entered: 08/08/2024) |

| 08/08/2024 | 165 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial (Volume 3) Proceedings held on 05/22/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 8/29/2024. Release of Transcript Restriction set for 11/6/2024. (SMM) (Entered: 08/08/2024) |
| :--- | :--- | :--- |
| 08/08/2024 | 166 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial (Volume 4) Proceedings held on 05/23/2024 before Judge Rodney Gilstrap. Court Reporter/Transcriber: Shawn McRoberts,Telephone number: (903) 923-8546. <br><br> **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** <br><br> Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Motion to Redact due 8/29/2024. Release of Transcript Restriction set for 11/6/2024. (SMM) (Entered: 08/08/2024) |
| 08/09/2024 | 167 | ORDER granting 160 Motion For Extension Of Deadlines For Briefing Post-Trial Motions. Signed by District Judge Rodney Gilstrap on 8/9/2024. (NKL) (Entered: 08/09/2024) |
| 08/09/2024 | 168 | JOINT MOTION to Enter Stipulated Order on Execution of Judgment Against Defendants by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Exhibit A - Declaration, # 2 Exhibit B - Certification, # 3 Exhibit C - Certification, # 4 Proposed Order)(Hill, Jack Wesley) (Entered: 08/09/2024) |
| 08/22/2024 | 169 | ORDER granting 168 Motion to Enter Stipulated Order on Execution of Judgment Against Defendants. Signed by District Judge Rodney Gilstrap on 8/22/2024. (NKL) (Entered: 08/22/2024) |
| 09/16/2024 | 170 | UNOPPOSED MOTION to Withdraw as Attorney by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Proposed Order)(Hill, Jack Wesley) (Entered: 09/16/2024) |
| 09/18/2024 | 171 | ORDER granting 170 Motion to Withdraw as Attorney. Attorney Jack Wesley Hill; Charles Everingham, IV and Andrea Leigh Fair terminated. Signed by District Judge Rodney Gilstrap on 9/18/2024. (NKL) (Entered: 09/18/2024) |
| 09/19/2024 | 172 | SEALED RESPONSE re 157 SEALED MOTION *Defendants' Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents*, filed by Netlist, Inc. (Attachments: # 1 Declaration of Yanan Zhao, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Proposed Order)(Sheasby, Jason) (Entered: 09/19/2024) |
| 09/19/2024 | 173 | SEALED RESPONSE re 159 SEALED MOTION *Defendants' Rule 50(B) Motion for Judgment as a Matter of Law for Non-Infringement*, filed by Netlist, Inc. (Attachments: # 1 Declaration of Jason G. Sheasby, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Proposed Order)(Sheasby, Jason) (Entered: 09/19/2024) |

| | | |
|---|---|---|
| 09/19/2024 | 174 | SEALED RESPONSE re 156 SEALED MOTION *Micron Defendants' Renewed Motion for Judgment as a Matter of Law on Damages* filed by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Sheasby, Jason) (Entered: 09/19/2024) |
| 09/19/2024 | 175 | SEALED RESPONSE re 158 SEALED MOTION *Defendants' Rule 59 Motion for A New Trial* filed by Netlist, Inc.. (Attachments: # 1 Declaration of Stephen Payne, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Proposed Order)(Sheasby, Jason) (Entered: 09/19/2024) |
| 09/27/2024 | 176 | JOINT MOTION to Extend Deadlines by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Proposed Order)(Rueckheim, Michael) (Entered: 09/27/2024) |
| 10/03/2024 | 177 | SEALED REPLY to Response re 156 SEALED MOTION *Micron Defendants' Renewed Motion for Judgment as a Matter of Law on Damages* filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Rueckheim, Michael) (Entered: 10/03/2024) |
| 10/03/2024 | 178 | SEALED REPLY to Response re 159 SEALED MOTION *Defendants' Rule 50(B) Motion for Judgment as a Matter of Law for Non-Infringement* filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Declaration of Michael Rueckheim, # 2 Exhibit 14)(Rueckheim, Michael) (Entered: 10/03/2024) |
| 10/03/2024 | 179 | SEALED REPLY to Response re 157 SEALED MOTION *Defendants' Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents* filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Declaration of Michael Rueckheim, # 2 Exhibit E, # 3 Exhibit F)(Rueckheim, Michael) (Entered: 10/03/2024) |
| 10/03/2024 | 180 | SEALED REPLY to Response re 158 SEALED MOTION *Defendants' Rule 59 Motion for A New Trial* filed by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. (Attachments: # 1 Declaration of Michael Rueckheim, # 2 Exhibit 17, # 3 Exhibit 18)(Rueckheim, Michael) (Entered: 10/03/2024) |
| 10/04/2024 | 181 | ORDER granting 176 JOINT MOTION to Extend Deadlines filed by Micron Semiconductor Products Inc, Micron Technology Inc, MICRON TECHNOLOGY TEXAS, LLC. It is ORDERED that the parties' deadlines for the Post-Trial Motions are extended according to the new proposed schedule above. Signed by District Judge Rodney Gilstrap on 10/4/2024. (slo) (Entered: 10/04/2024) |
| 10/09/2024 | 182 | ORDER re 154 Notice Regarding Agreed Bill of Costs filed by Netlist, Inc.. Signed by District Judge Rodney Gilstrap on 10/8/2024. (NKL) (Entered: 10/09/2024) |
| 10/09/2024 | 183 | BILL OF COSTS. Costs Taxed in the amount of $185000. (NKL) (Entered: 10/09/2024) |
| 10/30/2024 | 184 | SEALED SUR-REPLY to Reply to Response re 156 SEALED MOTION *Micron Defendants' Renewed Motion for Judgment as a Matter of Law on Damages* filed by Netlist, Inc.. (Sheasby, Jason) (Entered: 10/30/2024) |
| 10/30/2024 | 185 | SEALED SUR-REPLY to Reply to Response re 159 SEALED MOTION *Defendants' Rule 50(B) Motion for Judgment as a Matter of Law for Non-Infringement* filed by Netlist, Inc.. (Sheasby, Jason) (Entered: 10/30/2024) |
| 10/30/2024 | 186 | SEALED SUR-REPLY to Reply to Response re 157 SEALED MOTION *Defendants' Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents* filed by Netlist, Inc.. (Sheasby, Jason) (Entered: 10/30/2024) |
| 10/30/2024 | 187 | SEALED SUR-REPLY to Reply to Response re 158 SEALED MOTION *Defendants' Rule 59 Motion for A New Trial* filed by Netlist, Inc.. (Sheasby, Jason) (Entered: 10/30/2024) |
| 12/02/2024 | 188 | UNOPPOSED MOTION to Withdraw as Attorney by Netlist, Inc.. (Attachments: # 1 Proposed Order)(Zhao, Yanan) (Entered: 12/02/2024) |

| | | |
|---|---|---|
| 12/03/2024 | 189 | ORDER granting 188 Motion to Withdraw as Attorney. Attorney Yanan Zhao terminated. Signed by District Judge Rodney Gilstrap on 12/3/2024. (NKL) (Entered: 12/03/2024) |
| 06/11/2025 | 191 | SEALED MEMORANDUM OPINION AND ORDER re 157 SEALED MOTION Defendants' Renewed Motion for Judgment as a Matter of Law of No Willfulness of the Asserted Patents. Signed by District Judge Rodney Gilstrap on 6/11/2025. (NKL) (Entered: 06/11/2025) |
| 06/18/2025 | 194 | JOINT NOTICE *of Redactions to Order Dkt. 190* by Netlist, Inc. (Attachments: # 1 Exhibit A - Redacted Dkt. 190)(Sheasby, Jason) (Entered: 06/18/2025) |
| 06/18/2025 | 195 | JOINT NOTICE *of Redactions to Order Dkt. 192* by Netlist, Inc. (Attachments: # 1 Exhibit A - Redacted Dkt. 192)(Sheasby, Jason) (Entered: 06/18/2025) |
| 06/18/2025 | 196 | JOINT NOTICE *of Redactions to Order Dkt. 193* by Netlist, Inc. (Attachments: # 1 Exhibit A - Redacted Dkt. 193)(Sheasby, Jason) (Entered: 06/18/2025) |
| 07/09/2025 | 197 | NOTICE OF APPEAL - FEDERAL CIRCUIT as to 151 Judgment by MICRON TECHNOLOGY TEXAS, LLC, Micron Semiconductor Products Inc, Micron Technology Inc. Filing fee $ 605, receipt number ATXEDC-10949680. (Rueckheim, Michael) (Entered: 07/09/2025) |
| 07/09/2025 | | Transmission of Notice of Appeal, Final Judgment, Sealed Memorandum Opinion and Order 190 191 192 193 and a certified copy of the Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 197 Notice of Appeal - FEDERAL CIRCUIT (NKL) (Entered: 07/09/2025) |
| 07/09/2025 | 198 | Acknowledgment of Receipt on 7/9/2025 as to 190 Sealed Order, 151 Judgment, 191 Sealed Order, 197 Notice of Appeal - FEDERAL CIRCUIT, 193 Sealed Order, 192 Sealed Order. (NKL) (Entered: 07/09/2025) |
| 07/15/2025 | | NOTICE of Docketing Notice of Appeal from USCA re 197 Notice of Appeal - FEDERAL CIRCUIT filed by Micron Semiconductor Products Inc, Micron Technology Inc, MICRON TECHNOLOGY TEXAS, LLC. USCA Case Number 25-1936 (NKL) (Entered: 07/15/2025) |
| 11/07/2025 | 199 | NOTICE of Attorney Appearance by Jeffrey A. Lamken on behalf of Netlist, Inc. (Lamken, Jeffrey) (Entered: 11/07/2025) |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| **NETLIST, INC.** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. _____ |
| | ) | |
| **MICRON TECHNOLOGY, INC.,** | ) | |
| **MICRON SEMICONDUCTOR** | ) | JURY TRIAL DEMANDED |
| **PRODUCTS, INC., MICRON** | ) | |
| **TECHNOLOGY TEXAS LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## COMPLAINT

1.      Plaintiff Netlist, Inc. ("Netlist"), by its undersigned counsel, for its Complaint against defendants Micron Technology Inc. ("Micron Technology"), Micron Semiconductor Products, Inc. ("Micron Semiconductor"), and Micron Technology Texas, LLC ("Micron Texas") (collectively, "Micron" or "Defendants"), states as follows, with knowledge as to its own acts, and on information and belief as to the acts of others:

2.      This action involves Netlist's U.S. Patent No. 7,619,912 ("the '912 patent," the "Patent-in-Suit" a copy of which is attached hereto as **Exhibit 1**).

## I.      THE PARTIES

3.      Plaintiff Netlist is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 111 Academy Drive, Suite 100, Irvine, CA 92617.

4.      On information and belief, Micron makes dynamic random-access memory ("DRAM"), NAND Flash, and NOR Flash memory, and other memory products in semiconductor fabrication plants in the United States and other countries throughout the world.  On information and belief, Micron sells its products to customers, including customers in this District, in the computer, networking and storage, consumer electronics, solid-state drives and mobile telecommunications markets.

5.      On information and belief, Micron Technology is a corporation organized and existing under the laws of Delaware.  On information and belief, Micron Technology has a regular and established place of business at 805 Central Expressway South, Suite 100, Allen, Texas 75013.  On information and belief, Micron Technology is registered to do business in the State of Texas, and can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

6.      On information and belief, Micron Semiconductor is a corporation organized and existing under the laws of Idaho.  On information and belief, Micron Semiconductor has a regular and established place of business at 805 Central Expressway South, Suite 100, Allen, Texas 75013.  On information and belief, Micron Semiconductor is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Micron Semiconductor can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218.

7.      On information and belief, Micron Texas is a corporation organized and existing under the laws of Idaho.  On information and belief, Micron Texas has a regular and established place of business at 805 Central Expressway South, Suite 100, Allen, Texas 75013.  On information and belief, Micron Texas also has a regular and established place of business at 950 West Bethany Drive, Suite 120, Allen, Texas 75013-3837.  On information and belief, Micron

Texas is registered with the Texas Secretary of State to do business in Texas.  On information and belief, Micron Texas can be served through its registered agent, The Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas, 78701-3218.

8.      On information and belief, Micron Semiconductor and Micron Texas are wholly owned subsidiaries of Micron Technology.  On information and belief, Micron Technology does not separately report revenue from Micron Semiconductor or Micron Texas in its filings to the Securities Exchange Commission, but rather reports combined revenue from its various products and subsidiaries.

9.      On information and belief, Defendants have semiconductor fabrication plants in the United States and other countries throughout the world and manufacture memory products such as DRAM, NAND Flash, and NOR Flash at those plants.  On information and belief, Defendants also use, sell, and offer for sale in the United States, import into the United States and/or export from the United States memory products, including DDR4 load reduced dual in-line memory modules ("LRDIMMs"), and DDR4 registered DIMMs ("RDIMMs").  On information and belief, Defendants have at least used, sold, or offered to sell products and services, including the Accused Instrumentalities, in this judicial district, *e.g.*, through sales and distribution channels managed by Micron Texas.

10.      On information and belief, Defendants place, have placed, and contributed to placing Accused Instrumentalities into the stream of commerce via an established distribution channel knowing or understanding that such products would be sold and used in the United States, including in this judicial district.  On information and belief, Defendants have also derived substantial revenues from infringing acts in this judicial district, including from the sale and use of the Accused Instrumentalities.

Appx119

## II.    JURISDICTION AND VENUE

11.    The Court has subject matter jurisdiction under 28 U.S.C. § 1338, in that this action arises under federal statute, the patent laws of the United States (35 U.S.C. §§ 1, *et seq.*).

12.    Each Defendant is subject to this Court's personal jurisdiction consistent with the principles of due process and/or the Texas Long Arm Statute.

13.    Personal jurisdiction exists generally over the Defendants because each Defendant has sufficient minimum contacts and/or has engaged in continuous and systematic activities in the forum as a result of business conducted within the State of Texas and the Eastern District of Texas. Personal jurisdiction also exists over each Defendant because each, directly or through subsidiaries, makes, uses, sells, offers for sale, imports, advertises, makes available, and/or markets products within the State of Texas and the Eastern District of Texas that infringe one or more claims of the Patents-in-Suit.  Further, on information and belief, Defendants have placed or contributed to placing infringing products into the stream of commerce knowing or understanding that such products would be sold and used in the United States, including in this District.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b) because Defendants (1) have committed and continue to commit acts of patent infringement in this District by, among other things, directly and/or indirectly making, using, selling, offering to sell, or importing products that infringe one or more claims of the Patents-in-Suit, and (2) have done and continue to do business in this District by maintaining regular and established places of business, including at least at 805 Central Expressway South, Suite 100, Allen, Texas 75013.

- 4 -
Appx120

III.    **FACTUAL ALLEGATIONS**

**Background**

15.    Since its founding in 2000, Netlist has been a leading innovator in high-performance memory module technologies.  Netlist designs and manufactures a wide variety of high-performance products for the cloud computing, virtualization and high-performance computing markets.  Netlist's technology enables users to derive useful information from vast amounts of data in a shorter period of time.  These capabilities will become increasingly valuable as the volume of data continues to dramatically increase.

16.    Netlist has a long history of being the first to market with disruptive new products such as the first LRDIMM, HyperCloud®, based on Netlist's distributed buffer architecture later adopted by the industry for DDR4 LRDIMM.  Netlist was also the first to bring NAND flash to the memory channel with its NVvault® NVDIMM.  These innovative products built on Netlist's early pioneering work in areas such as embedding passives into printed circuit boards to free up board real estate, doubling densities via quad-rank double data rate ("DDR") technology, and other off-chip technology advances that result in improved performance and lower costs compared to conventional memory.

17.    In many commercial products, a memory module is a printed circuit board that contains, among other components, a plurality of individual memory devices (such as DRAMs).  The memory devices are typically arranged in "ranks," which are accessible by a processor or memory controller of the host system.  A memory module is typically installed into a memory slot on a computer motherboard.

18.    Memory modules are designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications (e.g. scaled data manipulation and aggregation, on-demand tracking, AI-based image analysis, weather patterning,

etc.).   The structure, function, and operation of memory modules is defined, specified, and standardized by the JEDEC Solid State Technology Association ("JEDEC"), the standard-setting body for the microelectronics industry.   Memory modules are typically characterized by, among other things, the generation of DRAM on the module (*e.g.*, DDR4, DDR3) and the type of module (*e.g.*, RDIMM, LRDIMM).

**The Asserted '912 Patent**

19.      The '912 patent is entitled "Memory Module Decoder."   Netlist owns the '912 patent by assignment from the listed inventors Jayesh R. Bhakta and Jeffrey C. Solomon.   The '912 patent was filed as Application No. 11/862,931 on September 27, 2007, issued as a patent on November 17, 2009, and claims priority to three provisional applications: Nos. 60/588,244 filed on July 15, 2004 60/550,668 filed on March 5, 2004, and 60/575,595 filed on May 28, 2004. The '912 patent also claims priority to application, filed July 1, 2005, now U.S. Patent No. 7,289,386, which is a continuation-in-part of application No. 11/075,395, filed March 7, 2005, now U.S. Patent No. 7,286,436.

20.      Micron has had actual knowledge of the '912 Patent no later than April 28, 2021 via Exhibit A to Netlist's April 28, 2021 letter to Micron, and as of the filing of this Complaint.

21.      The '912 patent relates to memory module technology, and more specifically, to a concept called rank multiplication.  A memory module is a device that contains individual memory devices arranged in "ranks" on a printed circuit board.  At the time of the invention, most computer systems supported accessing only one or two ranks, limiting the number of ranks that can be added per memory module.  Ex. 1, 1:20-2:42.

22.      The '912 patent teaches that one way to upgrade the memory capacity of a memory module is to use on-module logic to present a memory module with, *e.g.*, 2n physical ranks of memory devices, as a module with n (virtual) ranks to the computer system.  *Id.*, 6:64-7:19.  In

this way, "even though the memory module 10 actually has the first number of [physical] ranks of memory devices 30, the memory module 10 simulates a virtual memory module by operating as having the second number of [logical or virtual] ranks of memory devices 30." *Id.*, 7:9-13.  This technique is commonly referred to as "rank multiplication."

23.     Rank multiplication allows a designer to expand the number of ranks and hence the total memory capacity on a memory module.  It also enables them to construct a memory module of a given capacity using lower density memory devices that often cost less.  *Id.*, 4:42-58, 22:5-14.  For example, for the same 1 GB memory capacity, it could be more cost-effective to use thirty-six 256-Mb DRAMs arranged in 4 ranks than eighteen 512-Mb DRAMs arranged in two ranks.  *Id.*, 4:42-58, 4:59-5:5.

24.     Figure 1A illustrates an example of a memory module with rank multiplication capability.  The memory module has a register 60 and a logic element 40.



25.     The logic element receives a set of input control signals from the computer system that include chip-select signals $CS_0$-$CS_1$, address signal $A_{n+1}$, and bank address signals $BA_0$-$BA_m$.

*Id.*, 7:35-53; Fig. 1A.  From the computer system's perspective, it is connected to only two ranks of memory devices, to be selected by $CS_0$ or $CS_1$, even though the memory devices are arranged in four physical ranks.  *Id.*, 6:55-7:19.  In response to the received input control signals, the logic element on the memory module generates a set of output control signals, corresponding to the four physical ranks of the memory devices.  *Id.*, 6:61-63.  The logic element 40 also receives command signals (such as read/write) from the computer system.  *Id.*, 6:55-61, 7:46-53.  In response to the command signal and the input signals, the logic element transmits the command signal to the memory devices on the selected rank of the memory module.  *Id.*  In some embodiments, command signals are transmitted to only a single memory device on a multi-device rank at a time.

**Micron's Infringing Activities**

26.     Defendants are worldwide semiconductor solution providers that primarily manufacture semiconductor memory products such as DRAM, DIMMs, and MCP (Multi-Chip Package), such as HBM.  Defendants develop, manufacture, sell, offer to sell, import into the United States and export from the United States memory components and memory modules (including semi-finished ones) designed for, among other things, use in servers such as those supporting cloud-based computing and other data-intensive applications as well as for use in consumer end products.

27.     Netlist contacted Micron by letter dated April 28, 2021 requesting that it take a license; Micron has declined to take a license.

**DDR4 Memory Modules**

28.     The accused DDR4 products include, without limitation, any Micron DDR4 LRDIMM and RDIMM products made in, sold in, offered for sale in, used in, exported from and/or imported into the United States by Micron.  By way of non-limiting example, the accused DDR4 LRDIMM and RDIMM products include Micron products advertised on Micron's website that

- 8 -

Appx124

employ per DRAM addressability ("PDA") (the "Accused Products").   The accused DDR4 LRDIMM and RDIMM products include all branded, alternatively branded and non-branded products by Micron that employ PDA.

## IV.      FIRST CLAIM FOR RELIEF – '912 PATENT

29.      Netlist re-alleges and incorporates by reference the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

30.      On information and belief, Micron directly infringed and is currently infringing at least one claim of the '912 patent by, among other things, making, using, selling, offering to sell, and/or importing within this District and elsewhere in the United States, without authority, the Accused Products and other products with materially the same structures in relevant parts.  An exemplary claim chart comparing claim 16 of the '912 patent to exemplary DDR4 LRDIMM and RDIMM Accused Products is attached hereto as **Exhibit 2**.  As shown in Exhibit 2, accused DDR4 LRDIMMs and DDR4 RDIMMs, and other products with materially the same structures in relevant parts, infringe at least claim 16 of the '912 patent.

## V.      DEMAND FOR JURY TRIAL

31.      Pursuant to Federal Rule of Civil Procedure 38(b), Netlist hereby demands a trial by jury on all issues triable to a jury.

## VI.      PRAYER FOR RELIEF

WHEREFORE, Netlist respectfully requests that this Court enter judgment in its favor ordering, finding, declaring, and/or awarding Netlist relief as follows:

A.      that Micron infringes the Patents-in-Suit;

B.      all equitable relief the Court deems just and proper as a result of Micron's infringement;

C.      an award of damages resulting from Micron's acts of infringement in accordance with 35 U.S.C. § 284;

D.      enhanced damages pursuant to 35 U.S.C. § 284;

E.      that Micron's infringement of the '912 patent is willful;

F.      that this is an exceptional case and awarding Netlist its reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

G.      an accounting for acts of infringement and supplemental damages, without limitation, pre-judgment and post-judgment interest; and

H.      such other equitable relief which may be requested and to which Netlist is entitled.

Dated: August 1, 2022

Respectfully submitted,

/s/ Jason Sheasby

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice* forthcoming)
jsheasby@irell.com
Annita Zhong, PhD (*pro hac vice* forthcoming)
hzhong@irell.com
Thomas C. Werner (*pro hac vice* forthcoming)
twerner@irell.com
Yanan Zhao (*pro hac vice* forthcoming)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice* forthcoming)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

***Attorneys for Plaintiff Netlist, Inc.***

- 11 -
Appx127

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

NETLIST, INC.,                    (  CAUSE NO. 2:22-CV-294-JRG
                                  )
        Plaintiff,                (
                                  )
vs.                               (
                                  )
MICRON TECHNOLOGY, INC.,          (
et al.,                           )  MARSHALL, TEXAS
                                  (  MARCH 6, 2024
        Defendants.               )  9:00 A.M.
_____


VOLUME 1

_____

PRETRIAL CONFERENCE

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____


SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

Shawn M. McRoberts, RMR, CRR
Federal Official Court Reporter

Appx128

MR. ENZMINGER: And his opinions on willfulness.

THE COURT: And his opinions on willfulness and notice, I believe those are still live.

MR. ENZMINGER: I agree.

THE COURT: Let's walk through those.

MR. ENZMINGER: First, with respect to Mr. Kennedy's opinions regarding the Samsung litigation, I think this is covered by the Court's standing MIL, but belt and suspenders will -- we brought this motion also because what Mr. Kennedy purports to do is to take the Samsung jury verdict and the -- from last year which relates to patents that are not at issue in this case and use that as a comparable from which to develop a royalty rate for comparison.

We think that's highly prejudicial in this case for the same reason it was excluded in the 203 case, which is the Plaintiff clearly just wants to put a large number up without tethering it to the facts of this case. That is a case that has not been tested on appeal. As it turns out, four of the five -- four of the six patents at issue in that case have been subsequently invalidated by the Patent Office; two are under -- still under examination with a decision due later this month.

But more importantly is that there are different products than this case, and in particular a lot of that damages model had to do with HBM products, HBM 2 products that Samsung sold,

and Micron never sold any of those.  So it has no probative value and it's highly prejudicial and we think it needs to be out.

With respect to the double-counting issue, and that's really the one I wanted to spend the most time on.

THE COURT:  Do you have a position on the Rambus license or were you going to leave that to me on the papers?

MR. ENZMINGER:  I'll leave it to you on the papers in view of the fact that the Court did not strike Doctor Mangione's testimony on it.

THE COURT:  Okay.  Double-counting.

MR. ENZMINGER:  Okay.  So an expert -- damages expert has to apportion damages so that the Plaintiff is seeking a claim that covers the value of its technology and no more.

In this case Doctor -- Mr. Kennedy has issued an opinion in which he contends that the technical benefit of the '912 Patent is that it allows those products to operate at speeds above 2400 megatransfers per second and without the use of the asserted claims those products would be unable to operate with acceptable reliability above that speed.  And he further says that operating below that speed is a technical degradation that would be unacceptable.

The problem is that Mr. Kennedy made exactly that same claim word for word with respect to different technology that

he ascribed to the '506 Patent.  In the way that he puts them together, I've laid the two -- Mr. Kennedy's two reports side by side with respect to the '912 and the '506, and they are word for word identical.  Here's a red line.

THE COURT:  Let me interrupt you.

MR. ENZMINGER:  Yes.

THE COURT:  Both the '506 and the '339 were dropped from the prior case.

MR. ENZMINGER:  That doesn't mean the technology doesn't have to be valued, and that's the key here, because he has said -- he has said -- in connection with the '506 report, he said that patent was a hundred percent responsible for the benefit here of speeds above 2400 megatransfers per second.

When the Patent Office invalidated the '506 Patent, Netlist dropped it.  But that doesn't mean the technology doesn't exist.  And so when we get to the *Finjan* case, the problem is there are a number of possibilities here is that the technology that was described in the '506 case, which may or may not belong to Netlist depending on how -- if it appeals the Patent Office decision and how that comes out, or whether, you know, that technology still exists --

THE COURT:  Well, let me stop you a minute.

MR. ENZMINGER:  Yes.

THE COURT:  The problem with double-counting is at least a double recovery.  And if you dropped those patents,

you're not going to recover for them.  So why is it compelling on the Court to exclude the second counting here when the first counting in the earlier case was effectively abandoned by the dropping of those patents?

I'm not saying the technology went away, but the opportunity to recover for it went away when they dropped those patents.  So how does that still leave you with an argument there's double-counting?

MR. ENZMINGER:  Go to slide 18, please.

Because you're still assigning a hundred percent of the value of the increase in speed above 2400 megatransfers per second to one technology when the same expert has already acknowledged that there is other technology that contributed to that -- that increase in speed.

That increase in speed attributable by the other patent either has to be apportioned to the other patent or it has to be apportioned to the public where Netlist can't recover, because it's not just that Netlist can't double recover, they also cannot recover for technology that is not at issue in this lawsuit.

They're already on record in both Doctor Mangione-Smith's prior report and in -- and in Mr. Kennedy's damages report that 100 percent of the technical -- technological improvement of the 2400 -- going above 2400 megatransfers per second comes from the '506 Patent.

Doctor Mangione-Smith in this case says a hundred percent of it comes now, having dropped it, argues that it now comes from the '912 Patent, but it's a failure of technical apportionment.

The quote I'm showing from the *Finjan* case shows what the problem is:  You cannot claim that two different technologies each provide a hundred percent of the benefit, which is what the Plaintiff has done here, both on the technical side when Doctor Mangione says the -- the '506 was the -- was responsible for the ability to go above 2400.  Now he says it's the '912.

You still have to apportion between those two technologies, because it is essentially an admission that the '912 Patent in this case doesn't provide a hundred percent of the technological benefit.  It certainly also cannot provide a hundred percent of the damages benefit from -- economic benefit from that transition because Mr. Kennedy has already claimed a hundred percent of it came from the '506 Patent.

So what needed to happen in this case and didn't, it's not just double-counting or double recovery to the Plaintiff, it's also compensating the Plaintiff for technology and economic value that is not contributed by the patents in this case but is contributed by technology that is not in this case that is either owned by the public or in any event is not in this case.

And so it's not strictly a matter of preventing a double recovery; it's a matter of making sure that the Plaintiff is not compensated for more than the value of these patents. And the value of these patents ranges somewhere between 0, if we believe Mr. Kennedy the first time when he says that the '506 Patent was a hundred percent responsible for the economic benefit of this problem, or it's a hundred percent here. But that's unlikely because we have to accept that Mr. Kennedy knew at least -- thought that there was at least some value in his prior report. And there's no apportionment in this report as between the two.

They have the same problem with respect to the '417 Patent. There --

THE COURT: Counsel, I think I understand your argument here. In the interest of time, let's move on to the willfulness and notice issue.

MR. ENZMINGER: Okay. Let me get to the right slide here.

Mr. Kennedy is a -- is an accountant, and I'm sure that he's a good one. In his report, he indicates that he was asked by Netlist to take a look at some files and -- and presentations provided by Netlist to him and determine whether Micron knew or should have known about the patents. And Mr. Kennedy goes through in a fair number of amount of detail talking about documents and meetings that he was not a part

of.

And our position is very simply this:  Mr. Kennedy is an accountant.  To the extent that the materials that he discusses in his report are admissible in this court for whatever purpose, the jury's fully capable of understanding them without Mr. Kennedy, an accountant, purporting to explain to the jury how they affect Micron's state of mind.

And so we move to exclude Mr. Kennedy's discussion of willfulness in view of the fact that these presentations don't go to pre-suit notice.

THE COURT:  Said another way, you're saying this is beyond his expertise.

MR. ENZMINGER:  It's clearly beyond his expertise.

THE COURT:  Okay.  What else?

MR. ENZMINGER:  That's all.

THE COURT:  All right.  Let me hear from Plaintiff in response.

MR. SHEASBY:  Your Honor, may I approach with slides?

THE COURT:  You may.

MR. SHEASBY:  Your Honor, I'll go in the order of the brief.

So the first issue is the jury verdict that was rendered in the '339 Patent.  The jury split out the particularized damages that were focused on the '339 Patent.  Mr. -- Doctor

MR. SHEASBY:  Thank you, Your Honor.

THE COURT:  Thank you.

Something brief, I hope?

MR. ENZMINGER:  It will be very brief.

On the issue of apportionment, Mr. Sheasby identified the fact that Mr. Kennedy provided a second level of apportionment.  That second level of apportionment is based only and solely on Mr. -- a metric which Mr. Kennedy invented which is the relative R&D intensity between Micron and Netlist.

All he did was he said that Micron's -- Netlist spends a certain percentage of its revenue on -- on R&D and that Micron spends a certain percentage of its revenue on R&D.  He adds those two percentages together and then comes up with a percentage that Micron provides to R&D relatively to -- to Netlist.  And then he uses that for his technical portion That has nothing to do with the facts of this case.  That's just a made-up metric.

But what it doesn't do is it does not apportion as between the admittedly different technologies that Mr. Kennedy and Doctor Mangione-Smith say are responsible for the benefit of going above 2400 megatransfers per second.  That's the apportionment problem.  It's not that Mr. Kennedy doesn't have an alternate damages theory based on a made-up metric.  It's that he didn't apportion as between technology that he and

Doctor Mangione-Smith specifically acknowledged to contribute to this benefit and claims all of it in the first case, all of it in the second case, and doesn't apportion between them.

THE COURT:  All right.  Thank you, counsel.

All right.  With regard to Document 360, Micron's *Daubert* motion to strike portions of the testimony of Mr. David Kennedy, with regard to his opinions concerning the Samsung jury verdict, I'm going to grant the motion as to those.

As to the Rambus license and its comparability, the motion is denied.

As to the allegations of double-counting, in light of the fact that Netlist dropped the '506 and the '339 from the prior Micron case, I see no reason to strike this material.  If Netlist reasserts those patents later, then this can be reurged here or in subsequent litigation, but I'm going to deny the motion to strike it here.

With regard to willfulness and notice, this is beyond Mr. Kennedy's expertise, in my view.  To the extent, as Netlist indicates, they want to discuss the history of the patented inventions or how notice was given to Micron, that is certainly something they can do with their corporate representative on a factual basis.  But to basically offer it with the seal of approval of a recognized expert when it's not within his realm of expertise is beyond what the Court thinks is appropriate, and I'm going to grant the motion as to the

notice and willfulness issues.

As to the opinions that have been characterized as economic opinions that relate to the previous counterclaim by Defendant related to antitrust theories, in light of the Court's summary judgment there, those are moot and I'm going to strike those from his report.  They're not necessary now.

Mr. Sheasby did say in argument that I believe it was paragraphs 593 and 594 should be struck.  To the extent those are not otherwise covered by the rulings I've given you, I agree those two paragraphs should be out as well.  To the extent they are subsumed in what I've already told you, then they are so covered.

All right.  Let's next go to Document 354, which is Netlist's motion to strike the opinions of Doctor Lynde, Micron's damages expert.  And let me hear from Plaintiff on this.

MR. SHEASBY:  Your Honor, Jason Sheasby.  Just one point of clarification.

There were three sort of buckets of paragraphs in Mr. Kennedy's report.  One was just background history.  I think it was paragraphs 54 through -- 52 through 56, and then there was a willfulness section.  Was Your Honor meaning to strike all three or only the ones that expressly went to willfulness and notice?

THE COURT:  I don't want him talking about what

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ( | CAUSE NO. 2:22-CV-294-JRG |
| | ) | |
| Plaintiff, | ( | |
| | ) | |
| vs. | ( | |
| | ) | |
| MICRON TECHNOLOGY, INC., | ( | |
| et al., | ) | MARSHALL, TEXAS |
| | ( | MARCH 7, 2024 |
| Defendants. | ) | 9:00 A.M. |

_____

VOLUME 2

_____

PRETRIAL CONFERENCE

BEFORE THE HONORABLE RODNEY GILSTRAP
UNITED STATES CHIEF DISTRICT JUDGE

_____

SHAWN McROBERTS, RMR, CRR
100 E. HOUSTON STREET
MARSHALL, TEXAS  75670
(903) 923-8546
shawn_mcroberts@txed.uscourts.gov

And so if there was a nexus problem with our evidence, you would have bet they would have moved to strike BMS and Kennedy, but I think I made a substantial proffer that the reason why HyperCloud was successful was because it allowed this dramatic increase in density and because it allowed this dramatic increase in speed, and so I think there is more than sufficient evidence of nexus.

Go to slide 111.

Speed is the praise that was given.

Go to slide 112.

Capacity is the praise that was given for HyperCloud. 2DPC, 2400 MTs per second is what our patents achieve.  I think we've gone well and above the threshold for this, Your Honor.

THE COURT:  All right.  Anything further from Micron on this?

MR. RUECKHEIM:  Just really two things, Your Honor.

Counsel mentioned 2DPC, and I think that just goes to show what I've been saying, is that there is a likelihood of confusion here because 2DPC had distributed data buffers, it had more than one buffer, and the one thing counsel didn't say is that any claim in this case requires more than one buffer.

And so there are many references to HyperCloud and distributed data buffer.  These are very old references.  They go back to 2006.  It's pretty attenuated from the issues in

this case, and having us having to get up and explain why the commercial success of this HyperCloud, was it because it's painted yellow, was it because it has more than one buffer, we don't know.  But what we do know is that the label of HyperCloud as having more than one buffer just isn't relevant to this case at all.  The claims do not require more than one buffer.

Thank you, Your Honor.

THE COURT:  All right.  Well, I am not going to permit a product-to-product comparison in this case.  And I will carry any party's request for a limiting instruction to the jury, but I don't see that there is an adequate basis to exclude industry praise that may relate to the damages issue or other issues unrelated to the infringement question.

I'm going to deny the MIL.  I'm going to tell Defendants, though, if at such point in the presentation of Plaintiff's evidence you believe a limiting instruction would be beneficial, I'm open to that suggestion at that time, but I'm persuaded that there is a reasonable nexus drawn in the experts reports between the industry praise and what's at issue in the case.  And to the extent that can be tested, it can be tested through vigorous cross examination, not through a limine practice.

One of the challenges in these kind of lawsuits is that certain evidence may be proper for one particular discreet

aspect of the case, and it may be highly improper and damaging as to another relevant aspect of the case. And part of what the Court struggles with is trying to not tie the hands where it is relevant but not letting them loose where it is harmful and not relevant and not proper.

I'm trying to make it as clear as I can that for the infringement or non-infringement decision this jury's going to make, this kind of information is not relevant and not proper, but there are legitimate issues that impact the jury's verdict where it is and can be proper. And I'm open to suggestions from the parties as to how to best segregate and delineate where it's proper and where it's improper to the jury, but I don't think an exclusive or exclusionary MIL is appropriate here, so I'm going to deny the MIL.

I'll remind everybody, my standing standard MILs, including the prohibition on a product-to-product comparison, remain unlimited or unaffected by any of these rulings.

All right. Let's go on to Defendant's MIL No. 4.

MS. RICE: Good morning, Your Honor. Tracea Rice for Micron.

And I'll tell you, yesterday they said I should be able to do this in about two minutes, and so I'm going to try to get through this fairly quickly.

At the heart of this motion, Micron is really seeking to exclude two different categories of argument or evidence, the

first being any suggestion that Micron's corporate witnesses somehow had an obligation or duty to prepare themselves outside the scope of their 30(b)(6) topics.  That is, of course, presuming those witnesses were 30(b)(6) deponents. Micron may also put up witnesses who were not 30(b)(6) deponents and -- but this MIL would also affect them as well.

We would find that to be improper, especially to the extent that Netlist suggests that Micron's corporate witnesses somehow had a duty to investigate whether Micron was, in fact, infringing Netlist's patents.  We will find that to be improper.

The second category is a suggestion that corporate witnesses are somehow all knowing regarding the knowledge of the corporation, and that if a witness, in fact, does not know every relevant aspect or fact related to the case, that that would somehow mean that witness is incompetent or ill-prepared.  Again, we would find that to be improper.

And Your Honor, this really boils down to two things, and it's about prejudice and it's about fairness.  To suggest that Micron should be required to prepare their corporate witnesses to this heightened or all-knowing standard, that would be improper.

And Your Honor said it best at the pretrial conference for Samsung and Netlist when you stated that it is unfair to try and charge every 30(b)(6) witness with notice of every

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., *et al.* | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**ORDER ON PRETRIAL MOTIONS, MOTIONS *IN LIMINE*, AND EXHIBITS**

The Court held a Pretrial Conference in the above-captioned matter on Wednesday, March 6, 2024 regarding pending pretrial motions and motions *in limine* ("MILs") filed by Plaintiff Netlist, Inc. ("Netlist") and Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC (collectively, "Micron") (together, with Netlist, the "Parties"). (Case No. 2:22-cv-293, Dkt. Nos. 340, 345, 354, 358, 360, 362, 364, 366, 367, 368, 369, 370, 607, 608, 610, 613, 660; Case No. 2:22-cv-294, Dkt. No. 40.)  This Order memorializes the Court's rulings on the aforementioned pretrial motions and MILs as announced from the bench and into the record, including additional instructions that were given to the Parties. While this Order summarizes the Court's rulings as announced into the record during the pretrial hearing, this Order in no way limits or constrains such rulings from the bench.  Accordingly, it is hereby **ORDERED** as follows:

## PRETRIAL MOTIONS

1.      **Motion for Summary Judgment That the Asserted Patents are Not Standard Essential (Dkt. No. 362)**

The motion was **GRANTED**. (Dkt. No. 67 at 22:21-23:6.) Netlist explicitly disclaims that the Patents are standard essential. Micron, to the extent that it claims the Asserted Patents are standard essential, failed to meet its burden in showing that either party's expert performed an analysis necessary to sustain such a claim. Accordingly, the Court found that the Asserted Patents are not standard essential. (*Id.* at 23:4-6.)

2.      **Motion for Summary Judgment Dismissing Micron's Affirmative Defense of Breach of RAND Obligation or in the Alternative for Severance (Dkt. No. 340)**

The motion was **GRANTED**. (*Id.* at 23:7-14.) The Court found this motion rises and falls with Netlist's Motion for Summary Judgment that the Asserted Patents are Not Standard Essential (Dkt. No. 362). In keeping with the Court's ruling on Dkt. No. 362, the Court found that this motion should be granted. (*Id.*)

3.      **Motion for Summary Judgment of Noninfringement of U.S. Patent Nos. 7,619,912 and 11,093,417 (Dkt. No. 345)**

The motion was **DENIED**. With respect to Micron's first ground for summary judgment, the Court found that Netlist had at least raised a fact question as to whether an RCD in a dual rank memory module can operate in Encoded Quad CS Mode. (*Id.* at 38:13-22.) With respect to the second ground raised by Micron, the Court found Netlist's infringement read relying on the JEDEC standard was not improper as a matter of law. (*Id.* at 38:23-39:3.)

4.      **Motion for Summary Judgment of Lack of Written Description of US Patent No. 11,093,417 (Dkt. No. 370)**

The motion was **DENIED**. The Court found that there was a fact issue that precluded summary judgment. (*Id.* at 70:22-24.) The Court disagreed that Dr. Mangione-Smith's written description opinions were based on an untenable application of the Court's claim construction of

2

Appx446

the term "Overall CAS Latency." (*Id.*) Given the existence of conflicting expert opinion with regards to the sufficiency of the written description for the "Overall CAS Latency" for write commands the Court found that there was at least a fact issue, which would preclude summary judgment. (*Id.*)

**5.      Motion to Strike Expert Report of Dr. Mangione-Smith (Dkt. No. 369)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. First, the Court **GRANTED** the motion with respect to Dr. Mangione-Smith's PDA-independent Maximum Power Savings Mode theory and struck the relevant portions of ¶¶ 54-55, 10 of Exhibit B to Dr. Mangione-Smith's Opening Report, and ¶ 27 of Exhibit I to Dr. Mangione-Smith's Opening Report. (*Id.* at 50:24-52:15.) The Court found that the opinions described therein contained theories not disclosed in infringement contentions. (*Id.*)

Second, the Court **DENIED** the motion with respect to Dr. Mangione-Smith's opinions regarding the technical comparability of the licenses. (*Id.* at 52:24-52:2.)

Third, the Court **DENIED** the motion with respect to Dr. Mangione-Smith's written description opinions and his application of the Court's claim construction with respect to the term "Overall CAS Latency." (*Id.* at 70:12-71:3.) The Court construed the term "Overall CAS Latency" to mean "the delay between (1) the time when a command is executed by the Memory Module, and (2) the time when data is made available to or from the Memory Module." In his rebuttal expert report, Dr. Mangione-Smith opines that a POSITA would understand the delay for a write command to be measured between the execution of the command and "the time when the data is available *from* the memory module (*e.g.*, data buffer) to the memory device." (Mangione-Smith Rebuttal Report, Ex. B ¶ 87.) In other words, for the Overall CAS Latency of a write command Dr. Mangione-Smith does not measure the time when the data is made available *to* the memory module (i.e., when the data is presented to the data pins—as Micron measures it), but rather he

3

Appx447

measures the moment when data is made available *from* the memory module (i.e., when the data leaves the data buffer and is being presented to the memory device *from* the memory module). The Court finds that this ultimately is a dispute of the correct application of the phrase "***to or from*** the Memory Module" in the Court's claim construction. To the extent that Micron disagrees with the reasonableness of Dr. Mangione-Smith's interpretation, Micron is free to take that issue up on cross-examination, but the Court finds that Dr. Mangione-Smith's application of the Court's claim construction is not *per se* improper. The Court will "permit the experts to present competing testimony to the jury about the plain and ordinary meaning" of the phrase "to or from the Memory Module." (Dkt. No. 67 at 70:17-71:3.)

**6.     Motion to Strike Certain Opinions of Micron Defendants' Expert Dr. Harold Stone (Dkt. No. 364)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 92:23-95:12.) The Court **GRANTED** the motion with respect to (1) Dr. Stone's essentiality opinions (Stone Rebuttal, ¶¶ 397-405), (2) Dr. Stone's opinions concerning the legal standard for Direct Infringement (Stone Rebuttal, ¶ 69), (3) Dr. Stone's SSPPU Theory (Stone Rebuttal, ¶¶ 368-372), (4) Dr. Stone's Derivation Opinions (Stone Opening, ¶¶ 157-161), and (5) Dr. Stone's Prior Invention Opinions (Stone Opening, ¶¶ 162-168). (*Id.*) The Court **DENIED** the motion on all other grounds. (*Id.*)

**7.     Daubert Motion and Motion to Strike Expert Testimony of Mr. David Kennedy (Dkt. No. 360.)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 143:5-144:12.) The Court **GRANTED** the motion with respect to (1) ¶¶ 364–372, 688–696 of Mr. Kennedy's opening report as discussing the *Samsung I* (Case No. 2:21-cv-463) jury verdict; (2) ¶¶ 49–52, 54–63, 593–594 of Mr. Kennedy's opening report as discussing issues irrelevant to Mr. Kennedy's expertise; and (3) ¶¶ 16, 31–57, 103, 106, 134, 177 of Mr. Kennedy's rebuttal report as irrelevant

4

Appx448

since they pertain to Micron's antitrust counterclaims that have been dismissed. (*Id.*) The Court **DENIED** the motion on the remaining grounds. (*Id.*)

**8.      Motion to Strike Opinions of Dr. Lynde (Dkt. No. 354)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 171:6-174:1.) The Court struck ¶¶ 118 (last two sentences), 130 (last sentence), 131 (last sentence), 133, 218 (first sentence), and 224 of Dr. Lynde's Rebuttal Report and ¶¶ 56 (last sentence) and 76-81 of Dr. Lynde's Opening Report, as containing legal opinions of contract interpretation. The Court struck ¶¶ 68-73, 76-81 of Dr. Lynde's Opening Report as irrelevant for pertaining to Micron's dismissed antitrust counterclaim. The Court struck ¶¶ 10 (second, third, and last sentences), 33-34, 37-39, 45, 47-51, 52 (third bullet point), 98-106, 199 (second and third sentences), 206 (third and fourth sentences), 207, 235-239, and 242-246 of Dr. Lynde's Rebuttal Report and ¶¶ 18-20, 30 (last sentence), 31 (last sentence), 36-48, 64, 74, 76-81, 82-87, 90, and 92 of Dr. Lynde's Opening Report as pertaining to irrelevant RAND issues. The Court struck ¶ 75 as irrelevant in light of the Court finding that the patents are not standard essential. The Court struck ¶¶ 42-51, 101, 106, 207, and 244 of Dr. Lynde's Rebuttal Report and ¶¶ 17, 20, 31, 36, 39-43, and 44-48 of Dr. Lynde's Opening Report as being irrelevant in light of the Court's finding that the Asserted Patents are not standard essential. The motion was **DENIED** on all other grounds.

**9.      Daubert and Motion Strike Expert Testimony of Peter Gillingham (Dkt. No. 368)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 195:7-196:17.) The parties resolved their dispute as to the redacted portions of Mr. Gillingham's report. (*Id.*) The Court struck ¶¶ 69, 120-122, and 160 as unopposed by Netlist that these portions pertain solely to the former consolidated *Samsung II* case (Case No. 2:22-cv-293) and are irrelevant. (*Id.*) The Court **DENIED** the motion on the remaining grounds. (*Id.*)

5

Appx449

10.     **Motion to Strike Opinions of John B. Halbert (Dkt. No. 358)**

The motion was **DENIED**. (*Id.* at 185:24-186:15.) The Court found that there were several issues that overlapped with the Court's standard *limine* order and explained that such is not a basis for striking expert testimony. (*Id.*) On the remaining grounds, the Court found that Netlist had not raised sufficient bases for striking Mr. Halbert's Report. (*Id.*)

11.     **Motion for Summary Judgment on Micron's Affirmative Defenses (Dkt. No. 366)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 112:17-114:1.) The parties represented that Micron's affirmative defense of Prosecution History Estoppel, Waiver and Estoppel, Statute of Limitations, § 1498, Inequitable Conduct, and Unclean Hands are **WITHDRAWN**. (*Id.*)

The Court **GRANTED** the motion with respect to Micron's laches defense. Micron did not dispute that any laches defense with respect to the '912 Patent had been abandoned or dropped, and the Court found that Micron failed to timely disclose its theories of laches as related to the '417 Patent. (*Id.*)

The Court **DENIED** the motion with respect to Micron license since there is a genuine dispute as to whether Micron sells third-party memory modules that have been licensed from Netlist. (*Id.*)

12.     **Motion for Summary Judgment on Pre-Suit Damages (Dkt. No. 367)**

The motion was **GRANTED-IN-PART** and **DENIED-IN-PART**. (*Id.* at 127:18-128:3.) The Court found that there was no genuine dispute of fact that prior to April 28, 2021 Netlist failed to provide notice for infringement of the '912 Patent. (*Id.*) There is also a dispute of fact as to whether Netlist's April 28, 2021 notice of infringement letter sufficiently notified Micron of the '417 Patent by noticing "continuations" of patents in the '417 Patent family. (*Id.*) Accordingly, the

6

Appx450

Court found that April 28, 2021 is the earliest date for pre-suit notice of infringement for both the '912 and '417 Patents.

**13.     Motion to Consolidate (Dkt. No. 607)**

The motion was **DENIED**. Based on the parties' arguments in the briefing, the Court concludes that the primary reason Netlist seeks consolidation is not for efficiency, but rather to lift the stay on *Micron I* (Case No. 2:22-cv-203). Such is not an appropriate reason for consolidation. The Court finds that consolidation is not warranted in this case.

**14.     Motion for Leave to Supplement Expert Reports (Netlist) (Dkt. No. 608) and Motion for Leave to Supplement Expert Reports (Micron) (Dkt. No. 40, Case No. 2:22-cv-294)**

The motions were **GRANTED**. (*Id.* at 196:24-198:3.) The Court finds that the supplemental reports may correct factual errors, errors in analytical frameworks, address new facts, and address the claim construction order. These are all valid reasons to supplement. However, new theories (either offensive or defensive) are not proper for supplementation herein.

**15.     Motion to Compel Deposition Transcript from Lead Case (Dkt. No. 660)**

The motion was **DENIED**. (*Id.* at 198:4-6.) The parties agreed to a "Samsung-only" deposition in Case No. 2:22-cv-293. The Court finds no compelling reason why Micron is entitled to production of this transcript.

7

Appx451

## MOTIONS *IN LIMINE*

Further to the Court's Standing Order on Motions *In Limine* issued August 11, 2023, it is

**ORDERED** that the Parties, their witnesses, and counsel shall not raise, discuss, or argue the

following before the venire panel or the jury without prior leave of the Court:

**I.     PLAINTIFF'S MOTIONS *IN LIMINE* (Dkt. No. 610)**

Plaintiff's MIL 1     **Preclude Micron from Presenting any Evidence or Argument that SK Hynix's Supply Obligation to Netlist is Not Legally Binding on SK Hynix.**

The MIL was **GRANTED** as unopposed. (Dkt. No. 68 at 5:20-22.)

Plaintiff's MIL 2     **Preclude Micron from Presenting any Allegation that Netlist Has Failed to Comply with JEDEC Obligations**

The MIL was **GRANTED** as unopposed. (*Id.*)

Plaintiff's MIL 3     **Preclude Micron from Presenting Evidence, Argument, or Testimony that Practicing a Standard is a Defense to Infringement or Willfulness**

The MIL was **GRANTED**. (*Id.* at 10:18-11:13.) The Court will be a gatekeeper with

respect to the presentation of evidence of Micron practicing the standard.

Plaintiff's MIL 4     **Preclude Micron from Presenting Testimony on Non-infringement or Claim Terms from Fact Witnesses**

The MIL was **DENIED**. (*Id.* at 12:16-22.) The Court found that the *limine* sought was

overbroad and would even preclude Micron's corporate representatives from testifying as to

Micron's position that the products do not infringe. (*Id.*) The Court found no compelling reason

for such a broad request. (*Id.*) Impeachment is an adequate remedy for Plaintiff's concerns.

8

Appx452

Plaintiff's MIL 5     **Preclude Micron from Presenting Evidence, Argument, or Testimony that Micron Allegedly Disables Encoded QuadCS Mode**

The MIL was **DENIED**. (*Id.* at 16:7-17:6.) With respect to the expert witnesses, the Court found that this was an issue that should have been lodged as a *Daubert* Motion, and with respect to fact witnesses this can be addressed through cross-examination.

## II.    DEFENDANT'S MOTIONS *IN LIMINE* (Dkt. No. 613)

Defendant's MIL 1     **No Argument or Evidence Regarding Netlist's February 2011, February 2015, or April 2015 Slide Decks Unless a Witness with Personal Knowledge Testifies That Presentations Were Provided To Micron Pursuant to Fed. R. Evid. 104(b)**

The MIL was **DENIED** based on Netlist's representation that the sponsoring witnesses for the exhibits at issue, Scott Milton and Noel Whitley, will testify at trial to lay the foundation for the relevance of the exhibits at issue. (*Id.* at 39:3-40:14.)

Defendant's MIL 2     **No Argument or Evidence Regarding the Samsung Trial or Verdict, or Comparison to Samsung and SK Hynix Products**

The MIL was **GRANTED-IN-PART** as agreed by the parties with respect to the *Samsung I* Trial or Verdict. (*Id.* at 40:22-1.) Concerning the Samsung and SK Hynix Products, the MIL was **DENIED-IN-PART** as being already covered by the standing MILs ordered by the Court. (*Id.* at 46:9-13.)

Defendant's MIL 3     **No Argument or Evidence Regarding Netlist's "Distributed [Data] Buffer" Architecture**

The MIL was **DENIED**. (*Id.* at 57:9-58:14.) The Court explained that it will not permit a product-to-product comparison. (*Id.*) The Court found that there was no adequate basis to wholly exclude the presentation of argument and evidence regarding Netlist's "Distributed [Data] Buffer" architecture, but the Court carried the issue of whether any limiting instruction would be appropriate if Netlist chooses to present such evidence.

Appx453

Defendant's MIL 4    **No Argument or Evidence Suggesting a Party's Corporate Representative at Trial is Obligated to Prepare on Any Particular Topic or is Charged with Knowledge of Others Within the Company**

The MIL was **GRANTED**. (*Id.* at 61:24-62:15.) The Court held that counsel must seek leave prior to questioning any 30(b)(6) witness about topics that are not within that witness' designated topics.

Defendant's MIL 5    **No Infringement Claim or Damages Analysis for any Model of the Accused Products Not Specifically Analyzed for Infringement in Dr. Mangione-Smith's Infringement Report, if the Court grants Netlist's Motion for Summary Judgement on Standard Essentiality (Dkt. 362.)**

The MIL was **DENIED**. (*Id.* at 63:13-65:1.) The Court held that the Court's existing standing MILs and the Rules of Civil Procedure all apply without the need for any additional *limine* order, and all expert witnesses will be confined in their testimony to the four corners of their reports. (*Id.*)

10

Appx454

## **EXHIBIT DISPUTES**

The Court ruled on Netlist and Micron's objections to the Parties' respective exhibit lists. (*Id.* at 66:19-110:7.) In light of the Court's rulings, the exhibit lists filed in conjunction with the Joint Pretrial Order are now out of date. Accordingly, the Parties are **ORDERED** to file updated exhibit lists within ten (10) days from the issuance of this order.

**So ORDERED and SIGNED this 14th day of March, 2024.**


_____
RODNEY   GILSTRAP
UNITED STATES DISTRICT JUDGE

11

Appx455

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

SAMSUNG ELECTRONICS CO., LTD., MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and MICRON
TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

---

IPR2022-00615
Patent 7,619,912 C1

---

Before JON M. JURGOVAN, DANIEL J. GALLIGAN, and
KARA L. SZPONDOWSKI, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining Challenged Claim Unpatentable
Dismissing Patent Owner's Motion to Submit Supplemental Information
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a)*

---

[1] Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed a motion for joinder and a petition in
IPR2023-00203 and have been joined as petitioners in this proceeding. *See*
Paper 58.

## I.    INTRODUCTION

### A.    *Background and Summary*

Samsung Electronics Co., Ltd. ("Samsung") filed a Petition (Paper 1, "Pet.") for *inter partes* review of claim 16 ("challenged claim") of U.S. Patent 7,619,912 C1 (Ex. 1001, "the '912 patent").  Netlist, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7) to the Petition.  Samsung filed an authorized Preliminary Reply (Paper 14), and Patent Owner filed an authorized Preliminary Sur-Reply (Paper 15).  The Board instituted *inter partes* review under 35 U.S.C. § 314(a).  Paper 20 ("Institution Decision" or "Inst. Dec.").

Patent Owner requested Rehearing and Precedential Opinion Panel review of the Institution Decision.  Paper 25.  While that request was pending, the Board authorized Patent Owner to file a motion seeking additional discovery on the issue of whether Google was a real party in interest, which would bar the Petition under 35 U.S.C. § 315(b).  Paper 32.  Patent Owner then filed the Motion for Additional Discovery (Paper 34), Petitioner opposed (Paper 36), and Patent Owner replied in support of its Motion (Paper 37).

The Director granted *sua sponte* review (Paper 38) of the Institution Decision, entered a stay of the proceeding, and dismissed the Request for Rehearing and Precedential Opinion Panel Review (Paper 39).  The Director then issued a Decision (Paper 40) denying Patent Owner's Request for Rehearing, granting-in-part and denying-in-part Patent Owner's Motion for Additional Discovery, lifting the stay, and remanding the case to the panel for further proceedings consistent with the Director's Decision.

We entered an Order for Petitioner to complete the additional discovery as authorized by the Director, and for the parties to propose a briefing schedule for the additional discovery. Paper 42. Petitioner filed the authorized additional discovery as exhibits and a Summary of Responses to the Additional Discovery (Paper 46) along with a Motion to Seal (Paper 43), which we granted (Paper 49). We then authorized a schedule for the parties to brief the applicability of the additional discovery to the issue of whether Google was a real party in interest and the Petition thus time-barred under 35 U.S.C. § 315(b). Papers 51–57. After consideration of the evidence, we determined by Order on Remand from the Director (Paper 62 (parties and Board), Paper 64 (public)) that Google was not a real party in interest and that this proceeding thus was not time-barred.

After briefing on the additional discovery but before our Order on Remand from the Director, Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas, LLC ("the Micron entities") filed a petition and requested joinder to this proceeding. IPR2023-00203, Papers 1, 3. We granted the Micron entities' petition for *inter partes* review and joined them as parties on the petitioner side of this case. *Id.* at Paper 8. A copy of that institution decision was entered in this proceeding. Paper 58. We refer to Samsung and the Micron entities together as "Petitioner" in this Decision.

Under authority delegated by the Director, due to the joinder, we adjusted the one-year period for issuing the Final Written Decision to April 19, 2024 and modified the due dates applicable to this proceeding. Paper 63.

3

During the trial, Patent Owner filed a Response (Paper 67) ("PO Resp."), Petitioner filed a Reply (Paper 77) ("Pet. Reply"), and Patent Owner filed a Sur-Reply (Paper 80) ("PO Sur-Reply").

Patent Owner also requested authorization to submit supplemental information from parallel litigation concerning the deposition of Micron's corporate representative who had allegedly taken inconsistent positions impacting the merits of this *inter partes* review. Ex. 3017. We issued an Order (Paper 71) authorizing Patent Owner to file a Motion to Submit Supplemental Information. Patent Owner filed the Motion (Paper 72), Petitioner opposed (Paper 75), and Patent Owner replied in support of its Motion (Paper 76). We dismiss Patent Owner's Motion to Submit Supplemental Information for reasons explained later in this Decision.

Patent Owner then contended that Petitioner's Reply contained new arguments, and Petitioner contended that Patent Owner's Sur-Reply contained new arguments, and each requested authorization to file a motion to strike new arguments in the other's briefing. Ex. 3020. We denied these requests (*id.*) but permitted the parties to file one-page statements identifying new arguments in the other party's briefings, which they did. Papers 86 and 87.

Petitioner and Patent Owner requested oral argument. Papers 84 and 85. A hearing was conducted on January 31, 2024, and the transcript is in the record. Paper 95.

Petitioner objected to evidence (Papers 45, 68, 83) and filed a Motion to Exclude (Paper 89). Patent Owner opposed Petitioner's Motion to Exclude (Paper 90), then amended its opposition (Paper 91), and Petitioner replied (Paper 92) in support of its Motion to Exclude.

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claim is unpatentable.

B. *Real Parties in Interest*

Samsung Electronics Co., Ltd., Samsung Semiconductor, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC are the identified real parties in interest on the petitioner side. Pet. 1; IPR2023-00203, Paper 3, 1.

Patent Owner identifies itself as the sole real party in interest. Paper 4, 1.

C. *Related Matters*

The parties advise that the '912 patent is related to the following pending matters:

- *Samsung Electronics Co., Ltd. et al. v Netlist, Inc.*, 1:21-cv-01453 (D. Del. filed Oct. 15, 2021)

- *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, 2:21-cv-00293 (E.D. Tex. filed Aug. 1, 2022)

- *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, 2:22-cv-00294 (E.D. Tex. filed Aug. 1, 2022)

- *Netlist, Inc. v. Google LLC*, 3:09-cv-05718 (N.D. Cal. filed Dec. 4, 2009)

- *Micron Technology, Inc. et al. v. Netlist, Inc.*, IPR2023-00203 (PTAB filed Nov. 18, 2022)

- *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, IPR2023-00454 (U.S. Patent 11,093,417)

5

- *Samsung Electronics Co., Ltd. v. Netlist, Inc.*, IPR2023-00455 (U.S. Patent 9,858,215)
- U.S. Patent Application No. 17/403,832.

Petitioner contends that the '912 patent is related to the following matters, which are no longer pending:

- *Netlist, Inc. v. Inphi Corporation*, No. 2-09-cv-06900 (C.D. Cal. filed September 22, 2009)
- *Inter Partes* Reexamination 95/000,578 (U.S. Patent 7,619,912);
- *Inter Partes* Reexamination 95/000,579 (U.S. Patent 7,619,912);
- *Inter Partes* Reexamination 95/001,339 (U.S. Patent 7,619,912)
- *Inter Partes* Reexamination 95/000,546 (U.S. Patent 7,289,386)
- *Inter Partes* Reexamination 95/000,577 (U.S. Patent 7,289,386)
- *Inter partes* Reexamination 95/001,337 (U.S. Patent 7,636,274)
- IPR2014-00882 (U.S. Patent 7,881,150)
- IPR2014-00883 (U.S. Patent 8,081,536)
- IPR2015-01021 (U.S. Patent 8,081,536)
- IPR2017-00549 (U.S. Patent 8,756,364)
- IPR2017-00667 (U.S. Patent 7,532,537)
- IPR2017-00668 (U.S. Patent 7,532,537)

Paper 79, 2–3 (Petitioner's Updated Mandatory Notices); Paper 81, 1–2 (Patent Owner's Third Updated Mandatory Notice).

D.    *Overview of the '912 Patent (Ex. 1001)*

The '912 patent is titled "Memory Module Decoder" and is directed to a memory module that is connectable to a computer system. Ex. 1001, codes (54), (57). Figure 1A of the '912 patent is reproduced below.

Figure 1A:



Figure 1A shows a memory module 10 with printed circuit board 20 and memory devices 30 connected to the printed circuit board. *Id.* at 5:9–11. Memory devices 30 are arranged in ranks 32, 34, 36, 38. *Id.* at 22:35–37. The memory devices 39 may be double-data rate (DDR) dynamic random-access memory (DRAM) devices. *Id.* at 6:12–16. The memory module 10 further comprises logic element 40 coupled to the printed circuit board 20. *Id.* at 5:13–14. Logic element 40 receives a set of input control signals and

7

generates output control signals for select memory devices 30. *Id.* at 5:14–21. Phase-lock loop device 50 and register 60 are also mounted on printed circuit board 20. *Id.* at 5:25–27. The phase-lock loop device 50 generates clock signals to memory devices 30, logic element 40, and register 60. *Id.* at 5:28–31. Register 60 receives and buffers control signals including address signals, and transmits corresponding signals to appropriate memory devices 30. *Id.* at 5:31–36.

In Figure 1A, logic element 40 receives a set of input control signals from the computer system that include chip-select signals $CS_0$–$CS_1$, address signal $A_{n+1}$, and bank address signals $BA_0$–$BA_m$. *Id.* at 7:35–53. To the computer system, the memory module has only two ranks selectable with either $CS_0$ or $CS_1$. *Id.* at 6:55–7:19. However, logic element 40 generates a set of output control signals $CS_{0A}$, $CS_{0B}$, $CS_{1A}$, $CS_{1B}$ corresponding to the four ranks 32, 34, 36, 38 of memory devices 30. *Id.* at 6:61–63. Logic element 40 also receives command signals (e.g., read or write) from the computer system and transmits the command signal to memory devices on the selected rank of the memory module. *Id.* at 6:55–61, 7:43–53.

### E. Claim 16 of the '912 Patent

Claim 16 of the '912 patent is an independent claim, and the only claim that is challenged in this proceeding. Claim 16 is reproduced below with Petitioner's identifiers shown in bold brackets.

> **[16.pre]** A memory module connectable to a computer system, the memory module comprising:
>
> **[16.a]** a printed circuit board;
>
> **[16.b]** a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, **[16.b.i]** the plurality

of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;

[16.c] a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, [16.c.i] the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, [16.c.ii] the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, [16.c.iii] the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, [16.c.iv] wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and

[16.d] a phase-lock loop device coupled to the printed circuit board, [16.d.i] the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,

[16.e] wherein the command signal is transmitted to only one DDR memory device at a time.

Ex. 1001, *Inter Partes* Reexamination Certificate, 3:9–43.

9

## A. Evidence

Petitioner relies on the following references:

| Reference | | Date | Exhibit No. |
|---|---|---|---|
| Perego-422[2,3] | US 7,363,422 B2 | Apr. 22, 2008 | 1035 |
| Amidi[4] | US 2006/0117152 A1 | Jun. 1, 2006 | 1036 |
| Ellsberry[5] | US 2006/0277355 A1 | Dec. 7, 2006 | 1037 |

Pet. 4, 14–22.

Petitioner further relies upon the Declaration of Dr. Andrew Wolfe (Ex. 1003). Patent Owner relies on the Declaration of Dr. Michael C. Brogioli (Ex. 2062). The parties deposed each other's experts and rely on those depositions in their arguments (Ex. 1101; Ex. 2103). The parties submitted other evidence into the record, which we will address herein as necessary.

---

[2] Although the Petition refers to this reference as "Perego," we refer to it as "Perego-422" to distinguish it from another reference of record by the same inventor, U.S. Patent 7,356,639 ("Perego-639") (Ex. 1061).

[3] Petitioner contends that Perego-422 is prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 14.

[4] Petitioner contends that Amidi is prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 18.

[5] Petitioner contends that Ellsberry is prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 20.

B. *Asserted Challenges to Patentability*

| Ground | Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|---|
| 1 | 16 | § 103(a) | Perego-422 |
| 2 | 16 | § 103(a) | Perego-422, Amidi |
| 3 | 16 | § 103(a) | Ellsberry |

Pet. 4.

## II.   ANALYSIS

*A.     Principles of Law*

In an *inter partes* review, a petitioner bears the burden of persuasion to prove "unpatentability by a preponderance of the evidence." *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (quoting 35 U.S.C. § 316(e)); *see* 37 C.F.R. § 42.1(d) (2021).

A claim is unpatentable under 35 U.S.C. § 103(a) if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of nonobviousness, i.e., secondary considerations.  *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

B.     *Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Env't Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.* at 696–97.

Petitioner contends that a person of ordinary skill in the art ("POSITA") in the field of memory module design in 2004 or 2005 would have an advanced degree in electrical or computer engineering and at least two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field.  Pet. 5.  Petitioner contends such person would have been familiar with various standards of the day, including JEDEC industry standards, and would have been knowledgeable about the design and operation of standardized DRAM and SDRAM memory devices and memory modules and how they interacted with the memory controller of a computer system.  *Id.* at 6.

Patent Owner applies the skill level of a POSITA proposed by Petitioner for this proceeding.  PO Resp. 4.

On this record, we accept Petitioner's statement of the level of ordinary skill in the art except that we omit the qualifiers "at least" before years of education and experience because they render the level ambiguous

and may encompass levels that are beyond ordinary. Otherwise, we find Petitioner's statement of the level of ordinary skill in the art consistent with the '912 patent and the applied prior art references. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

### C.      Claim Construction

We construe claim terms "using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b)." 37 C.F.R. § 42.100(b). There is a presumption that claim terms are given their ordinary and customary meaning, as would be understood by a POSITA in the context of the specification. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Nonetheless, if the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] . . . the inventor's lexicography governs*." Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17). Only disputed claim terms must be construed, and then only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Petitioner contends that "rank" refers to "an independent set of one or more memory devices on a memory module that act together in response to command signals, including chip select signals, to read or write the full bit-width of the memory module." Pet. 12 (citing Ex. 1003 ¶ 74).

Patent Owner argues that "rank" should be construed as "a predetermined set of DRAMs on a memory module that act together to send or receive a fixed number of data bits via a fixed width data bus, in response to a read or write command and independently from other DRAMs on the memory module." PO Resp. 4.

Patent Owner argues that the parties' dispute over claim construction can be narrowed to the following issue: "whether 'rank' can include just 'one memory device.'" *Id.* Petitioner agrees that this is the dispositive issue for claim construction. Pet. Reply 1. For the following reasons, we determine that the intrinsic evidence of the '912 patent shows that the claim term "rank" may include only one memory device.

Starting with the intrinsic evidence, we begin our analysis by observing that claim 16 of the '912 patent recites "a plurality of double-data-rate (DDR) memory devices." Ex. 1001, 3:13–14 (reexamination certificate). The claim further recites "a first number of DDR memory devices arranged in a first number of ranks" and "a second number of DDR memory devices arranged in a second number of ranks." *Id.* at 3:15–16, 3:23–24 (reexamination certificate). The only restrictions in the claim on the first and second numbers of memory devices and ranks are that "the second number of DDR memory devices [is] smaller than the first number of DDR memory devices" and "the second number of ranks is less than the first number of ranks." *Id.* at 3:25–28 (reexamination certificate). Hence, the

14

language of claim 16 does not preclude the possibility that a rank could have a single memory device.

Claim 55 of the '912 patent depends from claim 1 and recites "each rank of the first number of ranks comprises a plurality of the DDR DRAM chip packages." *Id.* at 5:56–59 (reexamination certificate); *see also* Pet. Reply 7. This implies that each of the ranks recited in claim 1 could include a single memory device. Ex. 1001, 1:29–31 (reexamination certificate). Otherwise, the limitation would be superfluous. Claim 55 informs how "rank" should be understood in claim 16.

The specification of the '912 patent similarly describes its memory module without restriction on the specific number of memory devices that can be included in each rank (except that the second number of memory devices or ranks must be less than the first number of memory devices or ranks). *Id.* at 3:3–14 (summary), 6:64–7:18.

During the trial, the parties disputed at length the meaning of the "Logic Tables" section of the '912 patent. *Id.* at 7:55–9:21; Pet. 12–13; PO Resp. 6–10; Pet. Reply 9–10. The disputed paragraph from this section is shown below.

> The "Command" column of Table 1 represents the various commands that a memory device (e.g., a DRAM device) can execute, examples of which include, but are not limited to, activation, read, write, precharge, and refresh. *In certain embodiments, the command signal is passed through to the selected rank only (e.g., state 4 of Table 1). In such embodiments, the command signal (e.g., read) is sent to only one memory device or the other memory device so that data is supplied from one memory device at a time. In other embodiments, the command signal is passed through to both associated ranks (e.g., state 6 of Table 1). In such embodiments, the command signal (e.g., refresh) is sent to both memory* devices

> *to ensure that the memory content of the memory devices remains
> valid over time.* Certain embodiments utilize a logic table such
> as that of Table 1 to simulate a single memory device from two
> memory devices by selecting two ranks concurrently.

Ex. 1001, 8:44–64 (emphasis added). Patent Owner argues that the '912 patent consistently describes memory devices as part of multi-device ranks and thus that a POSITA would understand this passage as referencing a memory module with at least two ranks, each rank having at least two memory devices. PO Resp. 7 (citing Ex. 1001, 6:31–38, 20:64–65, 22:34–35; Figs. 1A, 1B, 2A, 3A; Ex. 2062 ¶¶ 106–107). Petitioner contends that the language emphasized in the block quoted paragraph above means that the selected rank has only one memory device. Pet. Reply 9–10 (citing Ex. 1001, 8:48–60; Ex. 1100, 11–12; Ex. 1098/2063, 5–6).

The disputed paragraph may be better understood with reference to Table 1, shown below, and Figure 1A (*see* § I.D).

TABLE 1

| State | $CS_0$ | $CS_1$ | $A_{n+1}$ | Command | $CS_{0A}$ | $CS_{0B}$ | $CS_{1A}$ | $CS_{1B}$ |
|-------|--------|--------|-----------|---------|-----------|-----------|-----------|-----------|
| 1 | 0 | 1 | 0 | Active | 0 | 1 | 1 | 1 |
| 2 | 0 | 1 | 1 | Active | 1 | 0 | 1 | 1 |
| 3 | 0 | 1 | x | Active | 0 | 0 | 1 | 1 |
| 4 | 1 | 0 | 0 | Active | 1 | 1 | 0 | 1 |

TABLE 1-continued

| State | $CS_0$ | $CS_1$ | $A_{n+1}$ | Command | $CS_{0A}$ | $CS_{0B}$ | $CS_{1A}$ | $CS_{1B}$ |
|-------|--------|--------|-----------|---------|-----------|-----------|-----------|-----------|
| 5 | 1 | 0 | 1 | Active | 1 | 1 | 1 | 0 |
| 6 | 1 | 0 | x | Active | 1 | 1 | 0 | 0 |
| 7 | 1 | 1 | x | x | 1 | 1 | 1 | 1 |

Note:

1. $CS_0$, $CS_1$, $CS_{0A}$, $CS_{0B}$, $CS_{1A}$, and $CS_{1B}$ are active low signals.

2. $A_{n+1}$ is an active high signal.

3. 'x' is a Don't Care condition.

4. Command involves a number of command signals that define operations such as refresh, precharge, and other operations.

Ex. 1001, 7:60–8:18.

In Table 1, states 1, 2, 4, 5 select only one rank with chip select signals $CS_{0A}$, $CS_{0B}$, $CS_{1A}$, $CS_{1B}$, which are active low ("0") and inactive high ("1"). *See id.* at 8:19–42 (describing what is selected in each logic state). States 3 and 6, however, pair the ranks together so that when $CS_{0A}$ and $CS_{0B}$ are activated, $CS_{1A}$ and $CS_{1B}$ are deactivated, and vice versa. States 3 and 6 permit two smaller memory devices to emulate a larger one.

The first two emphasized sentences above (*id.* at 8:47–54) could be interpreted both as Petitioner and Patent Owner propose. Under Patent Owner's interpretation, the "selected rank" includes the "one memory device or the other memory device" each in multi-device ranks. Under Petitioner's interpretation, the "selected rank" may be the one memory device connected to $C_{S1A}$ of the pair of memory devices connected to chip select signals $CS_{1A}$ and $CS_{1B}$.

17

However, the subsequent emphasized sentences (*id.* at 8:54–60) could only be understood in favor of Petitioner's interpretation. If "the command signal is passed through to both associated ranks" and "the command signal is sent to both memory devices," each rank must have only one memory device. Thus, we agree with Petitioner that this passage means that a rank may have only one memory device.

Patent Owner argues that this paragraph of the '912 patent (*id.* at 8:44–64) must be read in conjunction with its Figures which show multiple memory devices per rank. PO Resp. 7 (citing Ex. 1001, 6:31–38, 20:64–65, 22:34–35, Figs. 1A, 1B, 2A, 3A; Ex. 2062 ¶¶ 106–107). However, the disputed paragraph refers to "certain embodiments" which do not necessarily correspond exactly to what the Figures depict, and the Figures are described as "exemplary" and "compatible with" or "in accordance with certain embodiments described herein." *See, e.g.*, Ex. 1001, 3:32–48. We find no statement here or elsewhere in the '912 patent that a rank must include multiple memory devices, and cannot include a single memory device.

The "Back-to-Back Adjacent Read Commands" section of the '912 patent provides another example of single-device ranks. Ex. 1001, 23:26–25:67; *see* Pet. Reply 7–13. This section relates to solving a problem that occurs when back-to-back read commands cross the memory boundaries between ranks of memory devices, and memory controllers must take measures to avoid data collisions or interference. Ex. 1001, 23:60–67. Back-to-back adjacent read commands are referred to as "BBARX" in the '912 patent. *Id.* This section explains that the circuit of Figure 6B of the '912 patent uses isolation device 120 to avoid collisions between memory

18

devices "a" and "b" of different ranks. *Id.* at 24:1–58. This section thus supports that a rank may have only one memory device.

The '912 patent provides Examples 1 and 2 of Verilog code relating to the operation of field-effect transistor (FET) switches used to avoid conflicts during back-to-back read operations (which the '912 patent refers to as "BBARX"). *Id.* at 14:24–20:53, 23:60–67. Patent Owner argues that Example 2 of this code shows that FET switches are used to send a command to a single memory device in a rank of multiple memory devices and shows that the ranks discussed in the "Logic Tables" section of the '912 patent include multiple memory devices. PO Resp. 26 (citing Ex. 1003 ¶¶ 36–43). Petitioner disagrees, contending that code relates to FET switches on the DQS[6] strobe lines, not the command lines, and thus does not relate to the "Logic Tables" section which discusses the command signal, not the DQS strobe lines. Pet. Reply 11–13.

We agree with Petitioner that the Verilog code of Example 2 relates to enabling and disabling FET switches on the DQS strobe lines, not the command lines. Petitioner provides an annotated version of Figure 6B shown below.

---

[6] The JEDEC DDR standards refer to data signals as "DQ", data strobe signals as "DQS", control signals as "RQ", and clock signal as "CK". Pet. 30 (citing Ex. 1003 ¶ 124).

Figure 6B:



*Id.* at 11 (citing Ex. 1001, 24:39–58, Fig. 6B). Figure 6B shows isolation device 120 connected between logic element 40 and memory devices 30 (e.g., memory devices "a" and "b"). Ex. 1001, 3:65–67, 24:1–58. Isolation device 120 comprises switches 122, 124 (e.g., FETs), which control when respective DQSa and DQSb strobe signals are output to memory devices "a" and "b" on common strobe line 114. *Id.* at 24:31–38.

Petitioner also provides an annotated version of an excerpt from Example 2 of the Verilog code at Exhibit 1001, 19:1–53, shown below:

```
always @(posedge clk_in)
  begin
  if (
    (rd0_o_R2 & ~rd1_o_R4)                                    // pre-am rd if no ped on rnk 1
    | rd0_o_R3                                                // 1st cyc of rd brst
    | rd0_o_R4                                                // 2nd cyc of rd brst
    | (rd0_o_R5 & ~rd1_o_R2 & ~rd1_o_R3)                      // post-rd cyc if no ped on rnk 1
    | (wr0_o_R1)                                              // pre-am wr
    | wr0_o_R2 | wr0_o_R3                                     // wr brst 1st & 2nd cyc
    | (wr0_o_R4)                                              // post-wr cyc (chgef9)
    | wr1_o_R1 | wr1_o_R2 | wr1_o_R3 | wr1_o_R4 // rank 1 (chgef9)
    )
              en_fet_a <= 1'b1;                               // enable fet
  else
              en_fet_a <= 1'b0;                               // disable fet
  end
```

Pet. Reply 13. Petitioner contends that the code highlighted in green indicates when to enable/disable the same FET switches on the DQS strobe lines (not the command lines) to switch the strobe line between data bursts, as stated in the comments section of the code, to avoid problems due to BBARX. *Id.* at 12–13. The highlighted code is followed on the same lines by comments "//1st cyc of rd brst" and "//2nd cyc of rd brst" which refer to a first read cycle followed by a second read cycle, i.e., which is a BBARX situation that presents the possibility of a collision of DQS data strobe signals for the memory devices 'a' and 'b' sharing common strobe line 114 shown in the '912 patent's Figure 6B above. The code stating "en_fet_a <= 1'b1" and "en_fet_a <= 1'b0" refers to enabling and disabling, respectively, the FET 122 for the DQS signal for memory device 'a' shown in Figure 6B. Ex. 2062 ¶ 40. From inspection of Figure 6B and the code of Example 2, we agree with Petitioner that the code of Example 2 relates to enabling and disabling a FET 122 on the DQS data strobe line, not the command line discussed in the "Logic Tables" section of the '912 patent.

Dr. Brogioli offers testimony explaining the Verilog code in the '912 patent and, specifically, contrasting Verilog code Examples 1 and 2. Ex. 2062 ¶¶ 36–43. Dr. Brogioli testifies that, in Example 2, "[s]ignal 'en_fet_a' is used to enable or disable the FET switch for memory device 'a' in physical rank 0 (rnk0), and 'en_fet_b' is used to enable or disable FET switch for memory device 'b' from physical rank 1 (rnk1)." *Id.* ¶ 40. According to Dr. Brogioli, "[b]y providing for the selective enabling or disabling of the FET switch associated with memory device 'a' or memory device 'b,' Example 2 teaches how to transmit a command to a single memory device on a physical rank of multiple memory devices." *Id.*

Dr. Brogioli testifies that

Example 1 provides for the generation of *multiple* control signals to control *multiple* DQS signals from *multiple* memory devices in each rank. This is achieved by using multiple FET switches: fet1a, fet2a, and fet3a to control DQS signals from three different memory devices belonging to the same physical rank (rnk0); and fet1b, fet2b, and fet3b to control DQS signals from 3 different memory devices belonging to the same physical rank (rnk1).

*Id.* ¶ 42. Dr. Brogioli annotates a portion of the Verilog Example 1 as shown below.

*Id.* In the annotated Verilog code above, Dr. Brogioli notes that the code for fet1a, fet2a, and fet3a corresponds to "Memory devices in rnk0" and that the code for fet1b, fet2b, and fet3b corresponds to "Memory devices in rnk1."

*Id.* Dr. Brogioli opines that

Example 1 teaches enabling or disabling the DQ and DQS lines for a plurality of memory devices in each corresponding rank, not a single memory device. But as explained above, Example 2, teaches selectively enabling or disabling of the FET switch associated with memory device "a" or memory device "b" in each corresponding rank.

*Id.* ¶ 43.

Even if we were to accept Dr. Brogioli's testimony that the FETs control transmission of commands (*id.* ¶ 40), we do not agree with

Dr. Brogioli's conclusion that Example 2 involves multiple memory devices in each rank. As his testimony for Example 1 makes clear, the Verilog code specifically identifies multiple FETs when there are multiple memory devices in each rank. *Id.* ¶ 42. Example 2, however, identifies commands for two FETs, which Dr. Brogioli acknowledges are in separate ranks. *Id.* ¶ 40. Thus, "en_fet_a" would appear to pertain to memory device a, which is the memory device of rank 0 just as "en_fet_b" pertains to memory device b, which is the memory device of rank 1. Dr. Brogioli does not identify Verilog code in Example 2 that controls other memory devices in each rank, suggesting that Example 2 pertains to single-device ranks, as opposed to Example 1. Thus, we find the Verilog code in the '912 patent supports Petitioner's position that a rank may be only one device.

We previously explained that the prosecution history of the examination and reexamination do not elucidate the proper construction of "rank." Inst. Dec. 31–32. Nothing that has transpired during the trial changes our view of the prosecution history.

We consider claim constructions from district courts in our analyses if they are timely made of record. 37 C.F.R. § 42.100(b). Petitioner contends that the District Court for the Eastern District of Texas considering the '912 patent and its related '215 patent concluded that "rank" can include a single memory device. Paper 79, 2 (Petitioner's Updated Mandatory Notices) (citing Ex. 1117, 11–14). This is consistent with our discussion of the intrinsic record above.

Based on the foregoing, we conclude that "rank" as used in the '912 patent can include only "one memory device." Because the intrinsic record is clear, we need not resort to extrinsic evidence to determine the scope of

23

the term "rank."  *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence."); *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of *intrinsic* evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) (*en banc*) (noting that extrinsic evidence is "in general . . . less reliable than the patent and its prosecution history in determining how to read claim terms").  With this construction, we proceed to address the challenge grounds asserted by Petitioner.

### D.     Obviousness of Claim 16 Over Ellsberry (Ground 3)

We now address the parties' contentions concerning whether Ellsberry is prior art to the '912 patent under their respective priority dates and whether Ellsberry qualifies as a "printed publication"; and Petitioner's contention that Ellsberry teaches or suggests each limitation of claim 16. We conclude that claim 16 is obvious notwithstanding Patent Owner's arguments to the contrary.

#### 1.     Priority

Petitioner bears the initial burden of production on priority.  *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2015).  Petitioner satisfies that burden by arguing that Ellsberry, having publication and filing dates before the filing date of the '912 patent, renders claim 16 of the '912 patent obvious under § 103(a).  *Id.*; Pet. 63–111.  The burden of production on the issue of priority then shifts to Patent Owner to show that Ellsberry is not prior art.  *Dynamic Drinkware*, 800 F.3d at 1380.

Patent Owner must show that each application in a priority chain leading back to an application predating Ellsberry complies with the written description requirement of § 112 and reasonably conveys to those skilled in the art that the inventors had possession of the subject matter of claim 16 as of the earlier filing date. *Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997); *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). Patent Owner does not satisfy its burden of production for the reasons that follow.

The '912 patent was filed on September 7, 2007, as U.S. Application 11/862,931 ("the '931 application"), and issued November 17, 2009. Ex. 1001, codes (21), (22), 1:3–16. The '912 patent indicates that it is a continuation of U.S. Application 11/173,175, filed on July 1, 2005, which issued as U.S. Patent 7,289,386 ("the '386 patent"). *Id.* at code (63). The '386 patent claims priority to U.S. Provisional 60/588,244 ("the '244 provisional"), filed July 15, 2004. *Id.* at code (60), 1:6–11.

The '912 patent further indicates that the '386 patent is a continuation-in-part of U.S. Application 11/075,395, filed March 7, 2005, which issued as U.S. Patent 7,286,436 ("the '436 patent"). *Id.* at code (63), 1:11–13. The '436 patent claims priority to U.S. Provisional 60/550,668 ("the '668 provisional") filed March 5, 2004, and U.S. Provisional 60/575,595 ("the '595 provisional") filed May 28, 2004. *Id.* at code (60).

Petitioner contends that the '668, '595, and '244 provisionals and the '436 patent do not provide written description support under § 112 ¶ 1 for claim 16 of the '912 patent. Pet. 63–69. Accordingly, Petitioner contends that the priority date for the '912 patent is July 1, 2005. *Id.* at 20–21. Ellsberry was filed on June 1, 2005 as U.S. Application 11/142,989.

25

Ex. 1037, codes (21), (22).  Petitioner contends that Ellsberry constitutes prior art to claim 16 of the '912 patent under §§ 102(a) and (e) and that Ellsberry renders claim 16 obvious under § 103(a).  Pet. 20–21 (citing *id.* at § VI.B.1; Ex. 1003 ¶¶ 189–196).

More specifically, Petitioner contends that the '668 and '595 provisionals do not disclose the claimed "logic element" or that such a "logic element" receives "at least one row/column address signal, bank address signals, and at least one chip-select signal." *Id.* at 63 (citing Ex. 1003 ¶ 189).  Patent Owner does not dispute Petitioner's contentions concerning the '668 and '595 provisionals.

Instead, Patent Owner relies on the '244 provisional and '436 patent as providing written description support for claim 16 of the '912 patent. PO Resp. 54–75; PO Sur-Reply 21–40.  Petitioner contends that the '244 provisional has no disclosure of "bank address" signals as required by claim 16.  Pet. 63.  Petitioner further contends that the '436 patent, which is in a separate priority chain from the '244 provisional, lacks any embodiment including "a circuit" comprising "a logic element" and "a register" as required by claim 16 and as shown in Figure 1A of the '912 patent (elements 40 and 60, respectively).  *Id.* at 64 (citing Ex. 1003 ¶ 190).  Petitioner, therefore, contends that Ellsberry is not prior art because it predates the earliest effective filing date of the '912 patent.  *Id.* at 68–69 (citing Ex. 1003 ¶¶ 188, 196).

### a)    *'244 Provisional*

Patent Owner argues that the '244 provisional provides written description support for the "bank address" signals that Petitioner contends are missing.  PO Resp. 62–70.  Specifically, Patent Owner asserts that a

26

POSITA would have understood "control signals" to include "bank address" signals under the JEDEC DRAM standards of the day. *Id.* at 63 (citing Ex. 2062 ¶¶ 62–66). Patent Owner asserts that Petitioner's expert, Dr. Wolfe, acknowledged that personal computers would send bank address signals (*id.* at 64); that Figure 1 of the '244 provisional would be understood to be a JEDEC-style memory module because of its chip select signals (*id.* at 64–65); that the JEDEC standards required bank address signals (*id.* at 65–68); and that the '244 provisional mentions "one control signal (such as an address signal)," which would be understood as an "address signal" that would include the bank address signal "BA2" (*id.* at 69–70).

Petitioner replies that the '244 provisional does not provide support for the "bank address" signals and provides the following diagram to explain.



Pet. Reply 34–35. The diagram shows that Figure 1A of the '912 patent includes bank address signals $BA_0$–$BA_m$ whereas Figure 1 of the '244 provisional does not show any bank address signals, but does show control

signals.  Petitioner further asserts that Patent Owner's argument that the control signals contain the bank address signals is belied by the fact that all other address signals are set out in separate lines in the figures.  *Id.* at 35 (citing PO Resp. 63–68).  In addition, Petitioner contends that Patent Owner's argument that commands would include bank address signals is incorrect because those commands would go to the memory devices, and not to the logic performing rank multiplication.  *Id.* (citing Ex. 2103, 109:3–110:8, 111:3–13, 112:15–113:23, 114:23–116:4).  Rank multiplication is achieved by the logic element using two input chip select signals to generate one of four output chip select signals to select one of the four ranks of memory devices.  *See, e.g.*, Pet. 6–7; Ex. 1003 ¶¶ 173, 190; PO Resp. 1–3; Ex. 2062 ¶¶ 31–35.

Petitioner further notes that Patent Owner argued during reexamination that rank multiplication can be performed by row or column address and not bank address signals.  Pet. 7; Pet. Reply 35.  For the same reason, Petitioner argues that the '244 provisional's reference to using "an address signal" is not a disclosure of using a "bank address signal" for rank multiplication.  *Id.* at 35–36 (citing PO Resp. 69, 72; Ex. 1005 ¶ 10, Fig. 1 ("$A_{n+1}$")).

Petitioner further contends that Patent Owner asserted that "bank address" signals were known for "DDR" memory devices, but argues that this is an obviousness argument, and obviousness is insufficient to show an actual disclosure of the '244 provisional that would demonstrate that the inventors had possession of how to use "bank address signals" for rank multiplication.  *Id.* at 36 (citing *Ariad*, 598 F.3d at 1352; *Rivera v. ITC*, 857 F.3d 1315, 1322 (Fed. Cir. 2017)).  Petitioner further argues that the '244

28

provisional does not even disclose "DDR memory devices" and that Patent Owner makes another obviousness argument based on "DRAM" devices, many of which were not capable of double-data-rate (DDR) operation. *Id.* (citing Ex. 1034, 5–6). Petitioner argues that the '244 patent mentions "data" only once, but does not explain or illustrate the data strobe lines (DQS) for DDR transactions, or how to avoid BBARX collisions for DDR devices. *Id.* at 36–37 (citing Ex. 1034, 6–7 (Figs. 12, 13); Ex. 1101, 80:4–81:16).

Patent Owner replies that the written description requirement does not require the exact terms appearing in the claim to be used *in haec verba* and asserts that Petitioner's arguments fail to consider what a POSITA would have recognized as opposed to what the specification states verbatim. PO Sur-Reply 22. Patent Owner reiterates that the control signals mentioned in the '244 provisional would include bank address signals. *Id.* at 22–28. Patent Owner further asserts that DDR or DDR2 SDRAMs were the most commonly available DRAM devices at the time of the '244 provisional and that a POSITA would have understood that its teachings pertained to such devices. *Id.* at 23–28.

We agree with Petitioner that the '244 provisional does not provide written description support under § 112 ¶ 1 for claim 16 of the '912 patent. There is no mention of "bank address" signals in the '244 provisional. In order to find that "bank address" signals are present, according to Patent Owner's arguments and the evidence presented, one would have to (1) assume at least that the '244 provisional pertains to DDR memory modules (when there is no mention of DDR and there were other types of DRAM devices on the market) because Figure 1 suggests them by its use of

29

chip select signals and the term "rank," and because they were the most common at the time; (2) understand that DDR DRAMs use bank address signals according to the JEDEC standards; (3) recognize that bank address signals are not mentioned in the '244 provisional; (4) infer that bank address signals would be included as part of the control signals (even though the other address signals are explicitly mentioned and set out separately); and (5) infer that the bank address signals are used for rank multiplication (when row/ and column/address could have been used for this purpose). This is a chain of inferences too long and speculative to show that the '244 provisional demonstrates that the inventors had possession of the subject matter of claim 16.

### b) '436 Patent

Petitioner also contends that the '436 patent fails to disclose a "circuit" comprising "a logic element" and "a register" as required by limitation [16.c] of claim 16 of the '912 patent. Pet. 64 (citing Ex. 1003 ¶ 190).

Patent Owner argues that the '436 patent teaches that "the logic element [] 640 comprises a programmable-logic device (PLD) 642" that "uses sequential and combinatorial logic procedures" to produce gated CAS signals or gated chip-select signals for each of the four ranks in Figure 11A of the '436 patent. PO Resp. 55 (citing Ex. 1009, 17:41–45, 18:3–11) (emphasis omitted). Patent Owner argues that Petitioner's expert, Dr. Wolfe, establishes that a POSITA would understand that PLD 642 includes a logic element to perform sequential and combinatorial logic, and that the sequential logic would include a register to store state values. *Id.* at

55–56 (citing Ex. 2103, 117:16–119:18; Ex. 1009, 17:41–45, 18:3–11; Ex. 2062 ¶ 78).

Patent Owner's arguments are not persuasive to demonstrate that the '436 patent provides written description support for claim 16 of the '912 patent. First, the '436 patent teaches that in certain embodiments its logic element 640 comprises a PLD 642 that uses sequential and combinatorial logic procedures. Ex. 1009, 17:41–45, 18:3–11. Under Patent Owner's arguments, a POSITA would have had to infer that "sequential procedures" requires a register when there is no mention of this in the '436 patent, and when other types of devices, such as flip-flops and memory, could hold state as well.[7] For example, Dr. Brogioli recognizes that devices other than a register could be used when he refers to a "*storage* or register" as holding state (Ex. 2062 ¶ 78 (emphasis added)), as does Dr. Wolfe when he refers to a "register or an *equivalent*" (Ex. 2103, 118:16–20 (emphasis added)).

Furthermore, even assuming Patent Owner is correct that a "sequential procedure" implies the existence of a register, that register would be, according to the '436 patent, part of logic element 640. Ex. 1009, 17:41–45, 18:3–11. In contrast, claim 16 recites that "the circuit comprises a logic

---

[7] Sequential Logic Circuits and the SR Flip-flop (electronics-tutorials.ws) https://www.electronics-tutorials.ws/sequential/seq_1.html (last viewed 4/12/2024) ("Unlike **Combinational Logic** circuits that change state depending upon the actual signals being applied to their inputs at that time, **Sequential Logic** circuits have some form of inherent 'Memory' built in. . . . bistable latches and flip-flops are the basic building blocks of sequential logic circuits. Sequential logic circuits can be constructed to produce either simple edge-triggered flip-flops or more complex sequential circuits such as storage registers, shift registers, memory devices or counters"). Ex. 3021.

31

element and a register." Ex. 1001, 3:17–18 (reexamination certificate). In other words, claim 16 recites that the "logic element" and "register" are two different things whereas the '436 patent describes the register as included in the logic element.

Moreover, Petitioner argues that Patent Owner did not show that the '436 patent provides written description support for limitation [16.e] requiring that "the command signal is transmitted to only one DDR memory device at a time." Pet. Reply 29 (citing Ex. 1101, 107:24–108:12, 113:1–114:8, 115:16–116:24, 118:6–119:10) (emphasis omitted). Patent Owner argues that this is a new argument. Paper 87, 1. Petitioner alleged, however, that the '436 patent lacked written description support and provided specific examples in the Petition. Pet. 64. In its Response, Patent Owner argued that the '436 patent supports claim 16 of the '912 patent. PO Resp. 54–62. Petitioner's argument in its Reply has nexus and was responsive to Patent Owner's argument in its Response, and was a fair extension of the previously raised Petition argument that the '436 patent lacks support for claim 16 and providing examples to explain why. *Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023) (petitioner's reply argument is not new if it has nexus and is responsive to patent owner's response argument, and is a fair extension of argument raised in petition). In any event, Patent Owner had the opportunity to respond to Petitioner's Reply arguments, and availed itself of that opportunity. PO Sur-Reply 28–40.

Patent Owner further argues that, under Petitioner's theory, the '436 patent's reference to "[o]ther numbers of memory components 610 in each of the ranks 620, 625, 630, 635 are compatible with embodiments described

32

herein" means that there could be only one memory device per rank, and that a command signal would thus be sent to only one device at a time, which would satisfy limitation [16.e]. PO Sur-Reply 39–40 (citing Ex. 1009, 17:11–13) (alteration in original).

Even if we accept Patent Owner's argument as correct and assume it does not constitute a new argument as Petitioner alleges (*see* Paper 86), this would not negate the other discussed deficiencies in the '436 patent's written description.

Furthermore, to antedate Ellsberry based on the '436 patent, Patent Owner must show that the '436 patent provides written description support for all of the limitations of claim 16. Patent Owner, however, only addresses in its Response how the '436 patent allegedly provides written description support for "each disputed limitation," i.e., those raised by Petitioner. PO Resp. 54–62. This is insufficient because, "to gain the benefit of the filing date of an earlier application under 35 U.S.C. § 120, each application in the chain leading back to the earlier application must comply with the written description requirement of 35 U.S.C. § 112." *Zenon Env't, Inc. v. U.S. Filter Corp.*, 506 F.3d 1370, 1378 (Fed. Cir. 2007) (quoting *Lockwood*, 107 F.3d at 1571); *see also In re Hogan*, 559 F.2d 595, 609 (CCPA 1977) ("[T]here has to be a continuous chain of copending applications each of which satisfies the requirements of § 112 with respect to the subject matter presently claimed." (quoting *In re Schneider*, 481 F.2d 1350, 1356 (CCPA 1973)) (alteration in original).

To show that claim 16 is entitled to the benefit of the March 7, 2005, filing date of the '436 patent, Patent Owner had "to show not only the existence of the earlier application [the '436 patent], but why the written

description in the earlier application supports the claim." *Tech. Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008). "In the context of the allegedly anticipating [Ellsberry] prior art, that means producing sufficient evidence and argument to show that an ancestor to the ['912] patent, with a filing date prior to the [Ellsberry] date, contains a written description that supports all the limitations of claim [16]." *Id.* Patent Owner did not endeavor to do this as to all limitations of claim 16 with respect to the '436 patent, and, therefore, Patent Owner's attempt to gain the benefit of the filing of the '436 patent fails for this additional reason.

For the foregoing reasons, we determine that the '668, '595, and '244 provisionals and the '436 patent do not provide written description support under § 112 ¶ 1 for claim 16 of the '912 patent. Thus, we do not reach the parties' remaining arguments such as whether the '436 patent describes that row and/or bank address signals are used to generate output signals, or whether the '244 provisional or '436 patent address BBARX collisions. PO Resp. 56–62, Pet. Reply 29–34.

2.      *Printed Publication*

Petitioner contends that Ellsberry is prior art to claim 16 of the '912 patent under §§ 102(a) and (e), and renders the claim obvious under § 103(a). Pet. 4, 20–21 (citing § VI.B.1; Ex. 1003 ¶¶ 189–196). Patent Owner argues that Ellsberry was not published until December 2006, after the invention date of the '912 patent, and thus is not a "printed publication" under § 311(b). PO Resp. 54. Petitioner replies that Patent Owner's argument that Ellsberry is not prior art as of its pre-AIA § 102(e) date is legally incorrect, as the Board has repeatedly held. Pet. Reply 16 (citing

34

Exs. 1098 and 2063 (same), 7–10; Ex. 1099, 27–29; Ex. 1100, 29; MPEP
§ 2217).

We agree with Petitioner on this issue, which is currently on appeal
before the Court of Appeals for the Federal Circuit. *Lynk Labs, Inc. v.
Samsung Electronics Co., Ltd.*, Appeal No. 23-2346, Doc. 14, page 15 (Fed.
Cir. Jan. 10, 2024).

In an *inter partes* review, a petitioner "may request to cancel as
unpatentable 1 or more claims of a patent only on a ground that could be
raised under section 102 or 103 and only on the basis of prior art consisting
of patents or ***printed publications***." 35 U.S.C. § 311(b).

Ellsberry is a printed publication, having been published in December
2006, as Patent Owner acknowledges. *See* Ex. 1037, code (43) (publication
date of Dec. 7, 2006); *see also* PO Resp. 54 (acknowledging publication in
December 2006). Ellsberry is prior art at least under 35 U.S.C. § 102(e)(1),
being "an application for patent, ***published*** under section 122(b), by another
filed in the United States before the invention by the applicant for patent."
*See* Ex. 1037, code (22) (filing date of June 1, 2005). Thus, Petitioner
asserts a permissible ground of unpatentability under 35 U.S.C. § 311(b)
because it argues that claim 16 is unpatentable under 35 U.S.C. § 103(a) on
the basis of prior art (Ellsberry), which is a printed publication.

Accordingly, we determine that Ellsberry is prior art to the '912 patent
at least under pre-AIA 35 U.S.C. § 102(e)(1).

### 3. *Ellsberry (Ex. 1037)*

Ellsberry is titled "Capacity-Expanding Memory Device." Ex. 1037,
code (54). "A control unit and memory bank switch are mounted on a
memory module to selectively control write and/or read operations to/from

memory devices communicatively coupled to the memory bank switch." *Id.*
at code (57). "By selectively routing data to and from the memory devices,
a plurality of memory devices may appear as a single memory device to the
operating system." *Id.*

Figure 2 of Ellsberry is shown below.



Fig. 2

Figure 2 "illustrates a block diagram of a capacity-expanding memory
system 200 according to one embodiment." *Id.* ¶ 28. In Figure 2, system
200 has a DIMM interface 202 that couples to a "memory socket and
communication bus over which data, memory addresses, commands, and
control information are transmitted." *Id.* "The capacity-expanding feature
of the invention is accomplished by a combination of control unit 204 and
one or more memory bank switches 206 & 208." *Id.* Figure 2 of Ellsberry
illustrates system 200 with control ASIC 204 that receives addresses and
commands from DIMM interface 202 and generates corresponding control
signals on bus 210 and addresses on bus 220 to selectively connect memory
banks 212–228 to DIMM interface 202 via switch ASICs 206, 208. *Id.*
¶¶ 28–29.

36

Figure 12 of Ellsberry is shown below.



Fig. 12

Figure 12 of Ellsberry shows another configuration of the control unit and bank switch. *Id.* ¶ 52. In Figure 12, a single chip-select memory configuration includes one control unit 1202 and one bank switch 1204 which are used to control two memory banks 1206, 1208, each memory bank having one memory device 1210. *Id.* ¶ 55.

   4. *Correspondence of Ellsberry to Claim 16*

Petitioner contends that Ellsberry teaches or suggests all limitations of claim 16. Pet. 69–111.

The preamble limitation [16.pre] of claim 16 recites "memory module connectable to a computer system." Ex. 1001, 3:9–11 (reexamination certificate). Petitioner contends that Ellsberry describes a memory module 106 with a capacity expanding device 108, connected to a computer system

37

100 that includes a processing unit 102 and I/O controller 104. Pet. 69 (citing Ex. 1037 ¶¶ 23, 27, Fig. 1; Ex. 1003 ¶¶ 198–199).

Patent Owner does not dispute that Ellsberry discloses the preamble limitation [16.pre].

Petitioner shows that the preamble limitation [16.pre] of claim 16 is taught by Ellsberry. It is thus unnecessary for us to determine whether the preamble is limiting.

Claim 16 further recites limitation [16.a] as "a printed circuit board." Ex. 1001, 3:12 (reexamination certificate). Petitioner contends that Ellsberry teaches a memory module with a printed circuit board. Pet. 72–73 (citing Ex. 1037 ¶ 2, Fig. 5).

Patent Owner does not dispute that Ellsberry discloses limitation [16.a].

Petitioner shows that limitation [16.a] of claim 16 is taught by Ellsberry.

Claim 16 further recites limitation [16.b] as "a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board." Ex. 1001, 3:13–16 (reexamination certificate). Petitioner contends that Ellsberry teaches DDR and DDR 2 memory devices mounted on a circuit board. Pet. 73–74 (citing Ex. 1037 ¶¶ 3, 23, 26, 46; Ex. 1038, 4, 23; Ex. 1003 ¶¶ 209–213).

Claim 16 further recites limitation [16.b.i] as "the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks." Ex. 1001, 3:14–16 (reexamination certificate). Petitioner contends that Ellsberry discloses a memory module with two memory devices arranged in two single device ranks controlled by separate

chip select signals ($CS_{0A}$, $CS_{0B}$).  Pet. 74–76 (citing Ex. 1037 ¶¶ 3, 26, 30, 32, Fig. 12; Ex. 1003 ¶¶ 215, 218–221).  Petitioner thus contends "a first number of DDR memory devices" is two and the "first number of ranks" is two.  *Id.*  Alternatively, Petitioner contends "a first number of DDR memory devices" is four and the "first number of ranks" is four.  *Id.* at 76 (citing Ex. 1037, Fig. 13; Ex. 1003 ¶ 216).  Petitioner's expert states that "bank" (as used in Ellsberry) and "rank" were interchangeable terms at the time.  Ex. 1003 ¶ 76.  Both terms are mentioned in Ellsberry.  *See, e.g.*, Ex. 1037, code (57), Fig. 9.

Patent Owner contends that limitation [16.b.i] of claim 16 requires multiple-device ranks.  PO Resp. 75–82.  For the reasons discussed in § II.C, *supra*, and addressed further with respect to limitation [16.e], *infra*, we determine that "rank" can include only "one memory device."  Thus, we disagree with Patent Owner's attempted distinction over the art.

Petitioner shows that limitations [16.b] and [16.b.i] of claim 16 are taught by Ellsberry.

Limitation [16.c] of claim 16 recites "a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register."  Ex. 1001, 3:17–18 (reexamination certificate).  Petitioner contends that Ellsberry teaches this limitation.  Pet. 77–80 (citing Ex. 1003 ¶¶ 224–225).  Specifically, Petitioner contends that Ellsberry teaches that the "circuit" is a control unit ASIC, that the "logic element" is a control block, and that the "register" corresponds to register 302.  *Id.* at 77.

Petitioner contends that Ellsberry discloses limitation [16.c.i] of claim 16 reciting "the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one

row/column address signal, bank address signals, and at least one chip-select signal." *Id.* at 75–78; Ex. 1001, 3:18–22 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches a command processing system 300 with a control block possessing address/command decode logic 304, configuration decode logic 306, and bank switch state machine 308. Pet. 78–79 (citing Ex. 1037, Fig. 3). Petitioner notes that Ellsberry describes memory addresses and command information are received from DIMM interface 202, buffered in register 302, decoded in logic 304, and that a bank switch state machine 308 determines which memory bank should be activated or accessed. *Id.* at 79 (citing Ex. 1037 ¶ 39). Petitioner contends that a person of ordinary skill in the art would have understood that Ellsberry's control block includes a "logic element" and "register" receiving row/column address signal, bank address signals, and chip-select signals. *Id.* (citing Ex. 1003 ¶ 224).

Petitioner contends that Ellsberry teaches limitation [16.c.ii] of claim 16 reciting "the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks." Pet. 86–95 (citing Ex. 1003 ¶¶ 232–243); Ex. 1001, 3:22–28 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches that the "set of input signals" corresponding to a single DDR2 memory device and the memory module uses two DDR2 memory devices to simulate a larger memory device. *Id.* at 87–88 (citing Ex. 1037, Figs. 7D, 12 [signals AC, C0]; Ex. 1003 ¶ 233). Petitioner contends that Ellsberry teaches that the "set of input signals" includes bank address, row address,

and column address signals consistent with the JEDEC standard.  *Id.* at 87–95 (citing Ex. 1037, Figs. 7D, 8A).

Petitioner further contends the "second number of DDR memory devices" is one, which is less than the "first number of DDR memory devices," which is two, and that the "second number of ranks" is one which is less than the "first number of ranks," which is two.  *See* Ex. 1037, Fig. 12. According to Petitioner, these relations would also be satisfied for the alternative when the "first number of DDR memory devices" is four and the "first number of ranks" is four.  *See* Pet. 76 (citing Ex. 1037, Fig. 13).

Patent Owner contends that limitation [16.c.ii] of claim 16 requires multiple-device ranks.  PO Resp. 75–82.  As discussed above in § II.C, *supra*, and addressed further regarding limitation [16.e], *infra*, we determine that "rank" can include only one memory device.  Thus, we disagree with Patent Owner's attempted distinction over the art.

Petitioner contends that Ellsberry teaches the limitation [16.c.iii] of claim 16 reciting "the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks." Pet. 95–99 (citing Ex. 1037, Figs. 12, 13; Ex. 1003 ¶¶ 244–246); Ex. 1001, 3:28–31 (reexamination certificate).  Petitioner contends that Ellsberry teaches that "the circuit" corresponds to the Control Unit ASIC and that the "set of output signals" corresponds to Ellsberry's signals ACA, CS0A, ACB, CS0B that are responsive to the "set of input signals" corresponding to Ellsberry's signals AC, CS0.  Pet. 95–96 (citing Ex. 1037, Fig. 12). Petitioner contends that Ellsberry teaches that the "circuit generat[es] the set of output signals in response to the set of input signals" because the

relationship between the input signals and output signals is described in Ellsberry. *Id.* at 97–99 (citing Ex. 1037 ¶¶ 37, 42, 40, Figs. 7D, 8A; Ex. 1003 ¶¶ 232–243, 246). Petitioner further contends that "the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks" corresponds to single device ranks 1206, 1208 corresponding to chip-select signals CS0A, CS0B. *Id.* at 95–96 (citing Ex. 1037, Fig. 12). In addition to this embodiment with two single-device ranks, Petitioner contends similar mappings apply to Ellsberry's embodiment with four-single device ranks. *Id.* (citing Ex. 1037, Fig. 13).

Petitioner contends that Ellsberry teaches the limitation [16.c.iv] of claim 16 reciting "wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks." Pet. 99–103 (citing Ex. 1003 ¶¶ 248–254); Ex. 1001, 3:32–37 (reexamination certificate). Petitioner contends that the "command signal" corresponds to a read or write command under the JEDEC standard. Pet. 99 (citing Ex. 1029, 6, 49). Petitioner further contends that Ellsberry selects "one" rank and transmits the command signal to the selected "one" rank. *Id.*

Furthermore, Petitioner notes that Ellsberry states "[t]he control unit maps a received logical address to a physical address corresponding to the particular memory bank configuration employed. It also directs commands to the memory banks to indicate which memory bank should be operational and which one should be passive (do nothing)."

*Id.* at 100 (quoting Ex. 1037 ¶ 11). Petitioner further notes that Ellsberry states that the control unit may send either the same command to both memory banks or different commands to each memory bank with a "no operation" command to the other memory bank. *Id.* at 100–01 (citing Ex. 1037 ¶ 42, Fig. 8A; Ex. 1029, 48, 49; Ex. 1003 ¶¶ 229, 233–235, 249, 250). Petitioner contends this Ellsberry disclosure is similar to Example 1 of the Verilog code in the '912 patent. *Id.* at 102 (citing Ex. 1003 ¶ 251). Petitioner contends another embodiment of Ellsberry selects a target rank based on a row address bit that is bank specific, like Example 2 of the Verilog code in the '912 patent. *Id.* (citing Ex. 1003 ¶ 252).

Patent Owner does not dispute that Ellsberry teaches limitations [16.c], [16.c.i], [16.c.iii], and [16.c.iv].

Petitioner has shown that Ellsberry teaches limitations [16.c], [16.c.i]. [16.c.ii], [16.c.iii], and [16.c.iv] of claim 16.

Claim 16 recites a limitation [16.d] as "a phase-lock loop device coupled to the printed circuit board." Petitioner contends that Ellsberry teaches limitation [16.d]. Pet. 103–06 (citing Ex. 1037 ¶ 2, Figs. 12, 13; Ex. 1003 ¶¶ 255–257). Specifically, Petitioner contends that Ellsberry teaches a "phase lock loop (PLL) 238 [(yellow)] regenerates a clock signal that can be used by the components on the memory system 200." *Id.* at 104 (citing Ex. 1037 ¶ 30, Fig. 2; Ex. 1003 ¶ 256) (alteration in original). Petitioner further contends that Ellsberry's PLL is coupled to the circuit board. *Id.* at 105 (citing Ex. 1037 ¶ 48, Fig. 5). In particular, Petitioner contends that Ellsberry teaches that external phase lock loop (PLL) 514 receives a clock signal from the edge interface 506 and provides a clock

signal to the memory module components. *Id.* (citing Ex. 1037 ¶¶ 39, 45, 48, 49, Figs. 2–4, 12; Ex. 1003 ¶ 257).

Claim 16 recites the limitation [16.d.i] as "the phase-lock loop device is operatively coupled to the plurality of DDR memory devices, the logic element, and the register." Ex. 1001, 3:39–41 (reexamination certificate). Petitioner contends that Ellsberry discloses limitation [16.d.i]. Pet. 106–09 (citing Ex. 1003 ¶¶ 259–263). Specifically, Petitioner contends Ellsberry's PLL receives a clock signal PCLK and generates a clock signal NCLK that is provided to the Control Unit ASIC and Switch ASIC. *Id.* at 106 (citing Ex. 1037 ¶ 30, Figs. 2–5, 12, 13; Ex. 1003 ¶¶ 255–257). Petitioner contends the Switch ASIC then uses the clock NCLK to derive the clock ECLK provided to the memory devices. *Id.* Petitioner thus contends Ellsberry's PLL is also operatively coupled to the plurality of DDR memory devices. *Id.* at 106–07 (citing Ex. 1037, Fig. 12; Ex. 1003 ¶ 260).

Petitioner contends Control Unit ASIC uses the clock signal NCLK from the PLL to derive its own local clocks that are provided to both the Control Block and register 302 in the Control Unit ASIC. *Id.* at 108 (citing Ex. 1037, Figs. 3, 12, 13; Ex. 1003 ¶ 261).

Petitioner contends that, to the extent Ellsberry does not sufficiently disclose a local clock of the Control Unit ASIC is provided to the register 302, a person of ordinary skill in the art would have understood that register 302 is clocked by a local clock signal as indicated by the small triangle at the bottom of the register 302. *Id.* at 108–09 (citing Ex. 1003 ¶ 262). Petitioner notes that Ellsberry states that the PLL "regenerates a clock signal that can be used by the components on the memory system 200." *Id.* at 109 (quoting Ex. 1037 ¶ 30). Thus, Petitioner contends that Ellsberry's PLL provides a

clock to the Control Unit ASIC, which can be used to operate its components, including the register 302, and that a person of ordinary skill in the art "would have understood and been motivated to use the local clock in the Control Unit ASIC to operate the register 302." *Id.* (citing Ex. 1003 ¶ 262).

Patent Owner does not dispute that Ellsberry teaches limitations [16.d] and [16.d.i].

Petitioner has shown that Ellsberry teaches limitations [16.d] and [16.d.i] of claim 16.

Petitioner contends that Ellsberry discloses limitation [16.e] of claim 16 reciting "wherein the command signal is transmitted to only one DDR memory device at a time." Pet. 109–11 (citing Ex. 1003 ¶¶ 264–265); Ex. 1001, 3:42–43 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches that an Activate, Write or Read command signal is transmitted to only the selected memory device and the other memory device receives a no-operation command. Pet. 109–11 (citing Ex. 1037 ¶¶ 10, 33, 42, Figs. 8A, 12; Ex. 1003 ¶ 264).

Patent Owner argues that the Board's prior decision in IPR2023-00203 that Ellsberry's Figure 12 discloses a complete memory module was incorrect. PO Resp. 75 (citing Ex. 2063, 10–11; Ex. 2062 ¶ 239). Patent Owner argues that Ellsberry's Figures 10–13 each depict one data group of a memory module, not the entire memory module. *Id.* at 75–76 (citing Ex. 2062 ¶ 240). In support of its argument, Patent Owner provides the following figure, which is an annotated composite of Ellsberry's Figures 2 and 12.



Fig. 2

Fig. 12

*Id.* at 76 (citing Ex. 1037, Figs. 2, 12). Patent Owner contends that Ellsberry's Figure 12 shows a data group which is a part of the entire memory module shown in Ellsberry's Figure 2 which has multiple memory devices per rank. *Id.* at 76–77.

Patent Owner also argues that Ellsberry's Figures 6 and 11, shown below, support its argument that each rank includes multiple memory devices.

46



Fig. 6

Fig. 11

*Id.* at 77. Patent Owner asserts that Figure 6 shows multiple data groups per rank even though Figure 11, like Figure 12, shows only a single bank switch and one data group. *Id.* (citing Ex. 1037 ¶ 51; Ex. 2062 ¶¶ 242–243). Patent Owner argues that "a POSITA would understand that Figures 10–13 are used to illustrate how each data group and switch on the memory module can be implemented, and not how many data groups the memory modules are to have." *Id.* at 77–78 (citing Ex. 1038, 50–51, 57, 77, 81; Ex. 2061, 40 n.11; Ex. 1037 ¶ 52; Figs. 2, 5–6; Ex. 2062 ¶ 244).

Patent Owner further argues that Petitioner's experts, Dr. Wolfe and Dr. Subramanian, testified that they had never used or known of a memory module with DDR or newer generations of DRAMs that was 16 or fewer bits wide. *Id.* at 78 (citing Ex. 2103, 146:2–12, 155:13–25; Ex. 2104, 258:3–259:7). Patent Owner asserts that from a POSITA's perspective there were no known 8-bit-wide memory modules, especially JEDEC-style ones, and that 8-bit-wide memory modules would be going against the industry trend of increasing module data width. *Id.* at 79 (citing Ex. 2103, 146:2–12, 155:13–25; Ex. 2104, 258:3–259:7; Ex. 1034, 20–21; Ex. 2062 ¶¶ 245–246).

47

Patent Owner further argues that the Board questioned why Ellsberry needed to comply with JEDEC, and asserts that Ground 3 relies on implementations that follow the JEDEC standard but there is no substantial evidence that a JEDEC-compliant memory module would have a single device per rank. *Id.* at 79–80 (citing Ex. 2063, 12; Pet. 93; Ex. 1037 ¶¶ 50, 57; Ex. 1029, 1–3; Pet. 69–111; Ex. 1032, 4.20.4-5; Ex. 2062 ¶ 247; Ex. 2103, 46:3–15; Ex. 2112, 1; Ex. 1090, 86:19–87:17).

Patent Owner further criticizes Petitioner's contention that it would have been obvious to make a module with only a single data group because it would have been simpler to make, would require fewer parts, and would present fewer error sources. *Id.* at 81 (citing Pet. 76; *Arendi S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1362 (Fed. Cir. 2016)). Patent Owner argues that there is no evidence that a POSITA had ever thought of constructing an 8-bit wide DDR memory module. *Id.* at 81–82 (citing Ex. 2062 ¶ 251; Ex. 2103, 146:2–12, 155:13–25; Ex. 2104, 258:3–259:13). Patent Owner further asserts this does not make any technical or economic sense, and "[i]f simplicity is desired, Ellsberry would just couple a 1Gbx8 (or 512Mbx8) device directly with the CPU, as the cost saved by removing PCB, PCB routing, costly switch ASIC and control ASIC would more than offset any potential price difference between a single 1Gbx8/512Mbx8 and two 512Mbx8/256Mbx8 devices." *Id.* at 82 (citing Ex. 2062 ¶ 252). Patent Owner concludes that Petitioner is using the claim as a roadmap to piece together the modifications, and is engaging in hindsight. *Id.*

Petitioner argues that Ellsberry does not require multiple switches. Pet. Reply 38 (citing PO Resp. 75–78; Pet. 74–77; Ex. 2103, 157:1–161:3, 164:6–15, 177:13–178:3; Ex. 1037 ¶ 28). Petitioner further contends that

48

Ellsberry describes Figure 12 as a memory module and not just part of a module, and makes clear that a memory module just requires one or more memory devices. *Id.* (citing Ex. 1037 ¶¶ 21, 23, 52). Petitioner further states that Ellsberry specifically claims a "memory module" with "one or more memory bank switches." *Id.* (citing Ex. 1037, claims 6, 8).

In addition, Petitioner argues that claim 16 does not exclude memory modules that are 8- or 16-bits wide. *Id.* at 39 (citing *id.* at 5; PO Resp. 78–82). Petitioner contends that the JEDEC SPD standards for memory modules specifically permitted those widths. *Id.* (citing *id.* at 14–15). Moreover, Petitioner asserts that Perego-422 specifically taught those widths. *Id.* (citing *id.* at 18, 21–22, where $W_A=W_{DP}$). Furthermore, Petitioner states that the Board explained that memory modules such as Ellsberry's Figure 12 could still "expand the capacity" of the memory module with multiple ranks. *Id.* (citing Exs. 1098 and 2063 (same), 12).

In Sur-Reply, Patent Owner asserts that JEDEC specifications do not permit memory modules below 32-bits wide. PO Sur-Reply 40–42 (citing Ex. 1006, 8; Ex. 1107, 8). Patent Owner further asserts that Perego-422 and Ellsberry are "completely different architectures." *Id.* at 42 (citing Ex. 1035; Ex. 1037). Patent Owner contends that while Perego-422 can program WA for different access cycles, Ellsberry's data access width is fixed. *Id.* Patent Owner contends there is a lack of any known examples of x8 or x16 DDR1 or DDRs SDRAM modules and that a POSITA would not have found it obvious to construct such a memory module. *Id.* (citing Pet. 81–86).

The parties' disputes concerning limitation [16.e] can be resolved by inspection of Ellsberry. Ellsberry states

> FIGS. 10, 11, 12 and 13 illustrate different configurations of *memory modules* (e.g., DIMMs) that can be built using *combinations of the control unit and bank switch* according to various embodiments of the invention.

Ex. 1037 ¶ 10. We understand this to mean that Figures 10–13 are memory modules notwithstanding that they could also be used as parts of a larger memory module according to Figure 2's configuration. That they are combinations of the control unit and bank switch (singular) means there could be only one bank switch in the memory module.

> Ellsberry further states
>
> [t]he capacity-expanding feature of the invention is accomplished by a combination of a control unit 204 and ***one*** or more memory bank switches 206 & 208.

*Id.* ¶ 28. This confirms that a memory module may include only one memory bank switch, as shown in Figures 10–13.

> Ellsberry's Figure 12 shows a memory module with
>
> one control unit 1202 and one bank switch 1204 [that] are used to control two memory banks 1206 & 1208, each memory bank having one memory device 1210.

*Id.* ¶ 55. Petitioner is correct that Ellsberry discloses transmitting a command (Activate, Write or Read) to only the selected one of the two memory devices in Figure 12, and a no-operation (NOP) command to the other memory device. Pet. 109–11 (citing Ex. 1037 ¶¶ 10, 33, 42, Figs. 8A, 12; Ex. 1003 ¶¶ 264–265).

Accordingly, we determine that Ellsberry discloses limitation [16.e] of claim 16 reciting "wherein the command signal is transmitted to only one DDR memory device at a time."

Thus, we do not agree with Patent Owner's arguments that Ellsberry's Figures 10–13 do not constitute respective memory modules, but are only parts of the memory module shown in Figure 2. As to Patent Owner's arguments concerning bit width, claim 16 does not require any particular bit width, so Patent Owner is arguing a feature that is not commensurate in scope with the claim. *In re Self*, 671 F.2d 1344, 1348 (CCPA 1982). Nor does claim 16 recite that the memory module is compliant with a JEDEC standard. Patent Owner also does not explain why a POSITA could not have drawn on teachings in JEDEC standards without fully complying with them as needed for a particular application.

Furthermore, Petitioner directs us to evidence that JEDEC standards permitted 8-bit and 16-bit wide modules. Pet. Reply 14–15 (citing Ex. 1107, 7–8, 13; Ex. 1106, 7–8, 13; Ex. 1101, 141:11–19, 144:10–147:25, 149:10–18, 151:3–153:22); *see* Ex. 1107, 8 (disclosing that "[b]yte 6 is used to designate the module's data width" and including a table indicating values from 0–255). Patent Owner cites this disclosure and asserts that "JEDEC specifications do not permit memory modules below 32-bit wide." PO Sur-Reply 40–42 (reproducing disclosure from Ex. 1107, 8 and Ex. 1106, 8). The cited portions, however, show that the data width can be defined below 32 bits given that a byte can represent 255 values as in Exhibit 1107. *See also* Ex. 1106, 8 (disclosing a "16 bit width identifier").

Moreover, we do not agree with Patent Owner's argument that claim 16 requires sending a command to a single device that is in a multi-device rank. A rank may have only one device for reasons explained in § II.C.

We determine that Petitioner has shown by a preponderance of the evidence that Ellsberry teaches or suggests each limitation of claim 16.

51

### 5. Secondary Considerations

Patent Owner does not present objective evidence of non-obviousness other than to respond to Petitioner's assertion of evidence of "simultaneous invention." PO Resp. 82–83. As discussed, Ellsberry teaches all of the limitations of claim 16, and there is no objective evidence of non-obviousness in the record.

### 6. Conclusion

Petitioner has shown by a preponderance of the evidence that Ellsberry teaches or suggests each limitation of claim 16 of the '912 patent. Accordingly, Petitioner has shown by a preponderance of the evidence that claim 16 of the '912 patent is unpatentable as obvious over Ellsberry.

### E. Obviousness of Claim 16 Over Perego-422 (Ground 1)

Our determination that claim 16 is obvious over Ellsberry (Ground 3) is dispositive. Therefore, we need not reach Petitioner's contention that claim 16 is obvious over Perego-422.

### F. Obviousness of Claim 16 Over Perego-422 and Amidi (Ground 2)

Our determination that claim 16 is obvious over Ellsberry (Ground 3) is dispositive. Therefore, we need not reach Petitioner's contention that claim 16 is obvious over the combination of Perego-422 and Amidi.

### G. Supplemental Information

Patent Owner sought to submit supplemental information in the form of testimony from a Micron representative concerning the meaning of the term "rank." Paper 72. As we determined that the intrinsic evidence is clear that a "rank" may include only one memory device, we do not and need not

resort to extrinsic evidence on this topic. Therefore, we dismiss Patent Owner's motion to introduce this extrinsic evidence.

### H. Motion to Exclude

Petitioner sought to exclude Exhibits 1090, 2056, 2058, 2059, 2104, 2107, 2108, 2112, 2113, 2117 and portions of Exhibit 1101. Paper 89. Because we do not rely on any of these Exhibits in a manner adverse to Petitioner, we dismiss the Motion to Exclude as moot.

### III. CONCLUSION

For the foregoing reasons, we determine that Petitioner establishes by a preponderance of the evidence that claim 16 of the '912 patent is unpatentable.

### IV. ORDER

Accordingly, it is:

ORDERED that claim 16 of the '912 patent has been shown to be unpatentable;

FURTHER ORDERED that Patent Owner's Motion to Submit Supplemental Information is dismissed;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.[8]

---

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this

Decision, we draw Patent Owner's attention to the April 2019 Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding.  *See* 84 Fed. Reg.
16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

In summary:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claim(s) Shown Unpatentable | Claim(s) Not shown Unpatentable |
|---|---|---|---|---|
| 16 | 103(a) | Perego-422 | | |
| 16 | 103(a) | Perego-422, Amidi | | |
| 16 | 103(a) | Ellsberry | 16 | |
| **Overall Outcome** | | | 16 | |

IPR2022-00615
Patent 7,619,912 C1

FOR PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Eric J. Faragi
Brianna L. Porter
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
dlsamsungnetlistiprs@bakerbotts.com

Matthew A. Hopkins
WINSTON & STRAWN LLP
mhopkins@winston.com
Winston-IPR-Netlist@winston.com

FOR PATENT OWNER:

Hong Annita Zhong
Phillip Warrick
Jason Sheasby
Jonathan M. Lindsay
Michael W. Tezyan
IRELL & MANELLA LLP
hzhong@irell.com
pwarrick@irell.com
jsheasby@irell.com
jlindsay@irell.com
mtezyan@irell.com
netlistipr@irell.com

56

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:22-CV-00294-JRG |
| | § | |
| MICRON TECHNOLOGY, INC., MICRON | § | |
| SEMICONDUCTOR PRODUCTS, INC., | § | |
| MICRON TECHNOLOGY TEXAS LLC, | § | |
| | | |
| *Defendants.* | | |

## VERDICT FORM

In answering the following questions and completing this Verdict Form, you are to follow all the instructions that I have given you in the Court's Final Jury Instructions. Your answers to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Final Jury Instructions. You should refer to and consider the Final Jury Instructions as you answer the questions in this Verdict Form.

**IT IS VERY IMPORTANT THAT YOU FOLLOW THE INSTRUCTIONS PROVIDED IN THIS VERDICT FORM**

**READ THEM CAREFULLY AND ENSURE YOUR VERDICT COMPLIES WITH THEM**

3

**QUESTION NO. 1a:**

Did Netlist, the Plaintiff, prove by a preponderance of the evidence that Micron, the

Defendants, infringed Claim 16 of **'912 Patent**?

Yes: ___✓___   **OR**  No: _____

**QUESTION NO. 1b:**

Did Netlist, the Plaintiff, prove by a preponderance of the evidence that Micron, the

Defendants, infringed any of the Asserted Claims of the **'417 Patent**?

Yes: ___✓___   **OR**  No: _____

4

Appx515

**If you answered "YES" to Question 1a, then answer Question 2a. If you answered "NO" to Question No. 1a, then DO NOT answer Question No. 2a.**

## QUESTION NO. 2a

What sum of money, if paid now in cash, has Netlist proven by a preponderance of the evidence would compensate it for its damages for infringement of the **'912 Patent**?

Answer in United States Dollars and Cents, if any:

$ _____ 425,000,000.⁰⁰ _____

**If you answered "YES" to Question 1b, then answer Question 2b. If you answered "NO" to Question No. 1b, then DO NOT answer Question No. 2b.**

**Answer Question No. 2b ONLY as to any Asserted Claim of the '417 Patent that you have found infringed.**

## QUESTION NO. 2b

What sum of money, if paid now in cash, has Netlist proven by a preponderance of the evidence would compensate it for its damages for infringement of the **'417 Patent**?

Answer in United States Dollars and Cents, if any:

$ _____ 20,000,000⁰⁰ _____

5

Appx516

**If you answered "YES" to Question 1a, then answer Question 3a. If you answered "NO" to Question No. 1a, then DO NOT answer Question No. 3a.**

## QUESTION NO. 3a

Did Netlist prove by a preponderance of the evidence that Micron willfully infringed

claim 16 the **'912 Patent**?

Yes: _____✓_____   **OR**   No: _____

**If you answered "YES" to Question 1b, then answer Question 3b. If you answered "NO" to Question No. 1b, then DO NOT answer Question No. 3b.**

**Answer Question No. 3b ONLY as to any Asserted Claim of the '417 Patent that you have found infringed.**

## QUESTION NO. 3b

Did Netlist prove by a preponderance of the evidence that Micron willfully infringed

ANY of the Asserted Claims of the **'417 Patent**?

Yes: _____✓_____   **OR**   No: _____

6

Appx517

**<u>FINAL PAGE OF JURY VERDICT FORM</u>**

You have now reached the end of the Verdict Form and should review it to ensure that it accurately reflects your unanimous determinations. The Jury Foreperson should then sign and date the Verdict Form in the spaces below. Once this is done, notify the Court Security Officer that you have reached a verdict. The Jury Foreperson should keep the Verdict Form and bring it when the jury is brought back into the courtroom.

Signed this ___23Rd___ day of May, 2024

_____
Jury Foreperson

7

Appx518

Trials@uspto.gov
571-272-7822

Paper 45
Entered:  July 30, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

SAMSUNG ELECTRONICS CO., LTD, MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS, INC., and
MICRON TECHNOLOGY TEXAS LLC,[1]
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

———————

IPR2023-00454
Patent 11,093,417 B2

———————

Before GEORGIANNA W. BRADEN, JON M. JURGOVAN, and
KEVIN C. TROCK, *Administrative Patent Judges*.

BRADEN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing Petitioner's Motion to Exclude
*35 U.S.C. § 318(a)*

———————

[1]  Micron Technology, Inc., Micron Semiconductor Products, Inc., and
Micron Technology Texas LLC filed motions for joinder and petitions in
IPR2023-01141 and IPR2023-01142 and have been joined as petitioners to
these proceedings.

IPR2023-00454
Patent 11,093,417 B2

## I.   INTRODUCTION

In this *inter partes* review, Samsung Electronics Co., Ltd. ("Samsung"), Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC (collectively "Petitioner") challenge the patentability of claims 1–15 of U.S. Patent No. 11,093,417 B2 ("the '417 patent," Ex. 1001), which is assigned to Netlist, Inc. ("Patent Owner").

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a), addresses issues and arguments raised during the trial in this *inter partes* review.  For the reasons discussed below, we determine Petitioner has proven by a preponderance of the evidence that claims 1–15 of the '417 patent are unpatentable.  *See* 35 U.S.C. § 316(e) (2018) ("In an inter partes review instituted under this chapter, the petitioner shall have the burden of proving a proposition of unpatentability by a preponderance of the evidence.").

### A.   Procedural History

Samsung filed a Petition (Paper 1, "Pet.") challenging claims 1–15 of the '417 patent on the following basis:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–15 | 103(a)[2] | Perego,[3] JESD79-2[4] |
| 1–15 | 103(a) | Perego, JESD79-2, Ellsberry[5] |

[2] The Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284, 287–88 (2011), amended 35 U.S.C. § 103 effective March 16, 2013.  Petitioner applies the pre-AIA version of § 103.  Pet. 5.
[3] US 7,363,422 B2, issued Apr. 22, 2008 (Ex. 1071).
[4] Joint Electron Devices Engineering Council (JEDEC) DDR2 SDRAM Specification (JESD79-2), September 2003 (Ex. 1064).
[5] US 2006/0277355 A1, published Dec. 7, 2006 (Ex. 1073).

2

IPR2023-00454
Patent 11,093,417 B2

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–15 | 103(a) | Perego, JESD79-2, Halbert[6] |

Pet. 5. Patent Owner filed a Preliminary Response. Paper 6. With Board authorization (Ex. 3001), Samsung filed a Preliminary Reply (Paper 9) to the Preliminary Response, and Patent Owner filed a Preliminary Sur-reply (Paper 10). Trial was instituted on the asserted grounds of unpatentability. Paper 11 ("Inst. Dec."), 42. After institution, Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC were joined as petitioners to this proceeding based on a petition and a motion for joinder in IPR2023-01141. Paper 26.

During the trial, Patent Owner filed a Response (Paper 22, "PO Resp."), Petitioner filed a Reply (Paper 27, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 32, "PO Sur-reply").

Petitioner filed a motion to exclude certain evidence. Paper 35. Patent Owner opposed the motion (Paper 36), and Petitioner filed a reply in support of the motion (Paper 39).

An oral hearing was held on January 11, 2024, a transcript of which appears in the record. Paper 46 ("Tr.").

Petitioner relies on testimony from Andrew Wolfe, Ph.D. Ex. 1003. Patent Owner relies on testimony from Steven Przybylski, Ph.D. Ex. 2024. The parties have entered in the record deposition transcripts of these declarants. Ex. 2033 (Wolfe Deposition); Ex. 1095 (Przybylski Deposition).

---

[6] US 7,024,518 B2, issued Apr. 4, 2006 (Ex. 1078).

3

IPR2023-00454
Patent 11,093,417 B2

### B.  Real Parties in Interest

The identified real parties in interest on the petitioner side are the following:  Samsung, Samsung Semiconductor, Inc., Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC.  Pet. 1; IPR2023-01141, Paper 2, 1.

Patent Owner identifies itself as the real party in interest.  Paper 4, 1.

### C.  Related Matters

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters.  Pet. 1–3; Paper 4 (Patent Owner's Mandatory Notices), 1–3; IPR2023-01141, Paper 2, 1–3.  We are issuing concurrently a final decision in IPR2023-00455 involving related U.S. Patent No. 9,858,215 B1 ("the '215 patent").

### D.  The '417 Patent and Illustrative Claim

The '417 patent relates to memory modules having ranks of memory. Ex. 1001, code (57).  Claim 1 is independent and is reproduced below with Petitioner's claim element identifiers in brackets, which do not impact our analysis.  See Pet. xiii–xiv.

> [1.a.1] A memory module [1.a.2] operable in a computer system to communicate data with a memory controller of the computer system via a N-bit wide memory bus in response to read or write memory commands received from the memory controller, [1.a.3] the memory bus including address and control signal lines and data signal lines, [1.a.4] the memory module comprising:
>
> > [1.b] a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system;
> >
> > [1.c.1] logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via

4

IPR2023-00454
Patent 11,093,417 B2

the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals, [1.c.2] the set of input address and control signals including a plurality of input chip select signals and other input address and control signals, the plurality of input chip select signals including one chip select signal having an active signal value and one or more other input chip select signals each having a non-active signal value, [1.c.3] the set of registered address and control signals including a plurality of registered chip select signals corresponding to respective ones of the plurality of input chip select signals and other registered address and control signals corresponding to respective ones of the other input address and control signals, the plurality of registered chip select signals including one registered chip select signal having an active signal value and one or more other registered chip select signals each having a non-active signal value, [1.c.4] wherein the logic is further configurable to output data buffer control signals in response to the read or write memory command;

[1.d.1] memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks, [1.d.2] wherein the plurality of N-bit wide ranks correspond to respective ones of the plurality of registered chip select signals such that each of the plurality of registered chip select signals is received by memory devices [in[7]] one respective N-bit wide rank of the plurality of N-bit-wide ranks, [1.d.3] wherein one of the plurality of N-bit wide ranks including memory devices receiving the registered chip select signal having the active signal value and the other registered address and control signals is configured to receive or output a burst of N-bit wide data signals in response to the read or write command; and

---

[7]  The word "in" was included in an amendment under 37 C.F.R. § 1.312, which the Examiner indicated was entered.  Ex. 1002, 299, 313.  Thus, its omission from the issued claim appears to be the result of an error by the Office.

5

IPR2023-00454
Patent 11,093,417 B2

[1.e.1[8]] circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, [1.e.2] the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and [1.e.3] in accordance with an overall CAS latency of the memory module;

[1.f] wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

Ex. 1001, 42:7–67.

## II.  ANALYSIS

### A.  Principles of Law

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")). This burden of persuasion never shifts to Patent Owner. *See Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said

---

[8]  In the discussion of element 1.e, Petitioner provides additional element identifiers that are not reflected in the claim listing. *See* xiii–xiv, Pet. 85–94.

IPR2023-00454
Patent 11,093,417 B2

subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### B.   Level of Ordinary Skill in the Art

Petitioner argues that a person of ordinary skill in the art "would have had an advanced degree in electrical or computer engineering and at least two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field" and that "[a]dditional training can substitute for educational or research experience, and vice versa." Pet. 9 (citing Ex. 1003 ¶ 48); *see* Pet. Reply 1. Petitioner argues that a person of ordinary skill in the art "would have been familiar with various standards of the day including the JEDEC [(Joint Electron Devices Engineering Council)] industry standards, and knowledgeable about the design and operation of standardized DRAM and SDRAM[9] memory devices and memory modules and how they interacted with the memory controller of a computer system." Pet. 9 (citing Ex. 1003 ¶ 48). Petitioner identifies other items within the ordinarily-skilled artisan's knowledge base, including "the structure and operation of circuitry used to access and control computer memories, including sophisticated circuits such as ASICs

---

[9] DRAM (Dynamic Random-Access Memory) operates asynchronously with slower speeds and higher latency, while SDRAM (Synchronous Dynamic Random-Access Memory) synchronizes with the system clock for faster, more efficient data transfer. Ex. 1071, 4:1–12.

IPR2023-00454
Patent 11,093,417 B2

(Application-Specific Integrated Circuits) and CPLDs (Complex

Programmable Logic Devices) and more low-level circuits such as tri-state

buffers, flip flops and registers" and

> JEDEC DDR and DDR2 SDRAM standards used to standardize
> the functioning of memory devices, and the JEDEC 21-C
> standard used to standardize different possibilities for the
> physical layout of memory devices on a module as well as
> different possibilities for density and organization of the memory
> devices to achieve a given memory capacity.

*Id.* at 9–10 (citing Ex. 1003 ¶¶ 48–50; Ex. 1001, 6:43–58, 23:23–24:22,

39:21–28; Exs. 1060, 1062, 1064, 1066).

Patent Owner "applies the skill level proposed by Petitioner with one

modification"—that a person of ordinary skill in the art "would have been

'knowledgeable about the operation of standardized DRAM and SDRAM

memory devices and memory modules including these commercially

available devices,'" as opposed to knowledgeable about the *design and*

operation of DRAM and SDRAM memory devices and modules, as in

Petitioner's proposal. PO Resp. 7–8 (quoting Ex. 2024 ¶ 68).

Patent Owner's attempt to omit knowledge of memory module design

is problematic because, for example, "in order to render an invention

unpatentable for obviousness, the prior art must enable a person of ordinary

skill to make and use the invention," *In re Kumar*, 418 F.3d 1361, 1368

(Fed. Cir. 2005), and it is not apparent how a person having no knowledge of

memory module design could *make* the claimed memory module. Thus,

Patent Owner's proposal, on its face, would define a level of ordinary skill

that precludes an obviousness conclusion.

Patent Owner's declarant, Dr. Przybylski, appears to have a slightly

different position than Patent Owner, testifying that

8

Appx527

IPR2023-00454
Patent 11,093,417 B2

> the design of memory modules using semiconductor memories
> and the design of those semiconductor memories are two distinct
> areas of knowledge and a [person of ordinary skill in the art] with
> *an ordinary level of skill in the design of memory modules* would
> not possess the training, knowledge or expertise to attempt to
> design semiconductor memory design.

Ex. 2024 ¶ 68. Thus, Dr. Przybylski's testimony indicates that an ordinarily skilled artisan at the critical time would have been knowledgeable about the design of memory modules.

At oral argument, we addressed this topic with the parties. Tr. 11:10–13:24, 43:9–46:10, 85:16–87:9. Patent Owner agreed that memory module design was within the knowledge of a person of ordinary skill in the art. Tr. 45:13–16. The parties agreed that a person of ordinary skill in the art would have had knowledge of the operation of the memory devices that go into the memory modules but would not necessarily have needed to know how to design those memory devices. Tr. 45:17–46:6, 85:16–86:4. Ultimately, however, the parties agreed that a person of ordinary skill in the art would have had knowledge about the design and operation of memory modules and the operation of memory devices within those modules. Tr. 46:2–6 (Patent Owner's agreement), 85:16–86:2 (Petitioner's agreement).

Thus, we consider the parties' dispute to be resolved, and we adopt Petitioner's construction with two modifications. First, we adopt the parties' agreement that a person of ordinary skill in the art would have had knowledge about the design and operation of standardized DRAM and SDRAM memory modules and the operation of memory devices within those modules, omitting the Petition's proposed requirement of knowledge of the *design* of standardized DRAM and SDRAM memory devices. This

9

IPR2023-00454
Patent 11,093,417 B2

includes knowledge of JEDEC industry standards.  Second, we delete the qualifier "at least" to eliminate vagueness as to the amount of experience.

Accordingly, a person of ordinary skill in the art would have had an advanced degree in electrical or computer engineering and two years working in the field, or a bachelor's degree in such engineering disciplines and three years working in the field, where additional training could substitute for educational or research experience, and vice versa. Additionally, a person of ordinary skill in the art would have had knowledge about the design and operation of standardized DRAM and SDRAM memory modules and the operation of memory devices within those modules.  We consider the resulting agreed-upon definition of the level of ordinary skill in the art to be consistent with the '417 patent and the prior art of record.

## C. Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)."  37 C.F.R. § 42.100(b).  Independent claim 1 recites memory devices arranged in ranks.  Petitioner argues that a "rank" is "an independent set of one or more memory devices on a memory module that act together in response to command signals, including chip-select signals, to read or write the full bit-width of the memory module."  Pet. 26 (citing Ex. 1003 ¶ 126); Pet. Reply 1–2.  Patent Owner disagrees that a rank can be a single memory device but states that "the Board need not resolve that dispute to address the parties' arguments regarding the challenged claims" because Patent Owner "applies Petitioner's proposed construction" "[s]olely for purposes of responding to this Petition."  PO Resp. 8–9.

10

IPR2023-00454
Patent 11,093,417 B2

Patent Owner also apprises us of a construction of "rank" from related district court litigation. PO Resp. 8 (citing Ex. 2030, 12–15). Our Rules provide that "[a]ny prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the inter partes review proceeding will be considered." 37 C.F.R. § 42.100(b). We have considered this construction, and we note that, like Petitioner's proposed construction, it provides that a rank can be one memory device. *See* Ex. 2030, 14 ("Accordingly, the Court concludes a 'rank' can include a single memory device.").

In our patentability analysis, we adopt the construction of "rank" applied by both parties in this proceeding, and we need not engage in any further claim construction because there are no claim construction disputes that bear on the issues before us. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

D. *Alleged Obviousness of Claims 1–15 in View of Perego and JESD79-2*

Petitioner asserts that claims 1–15 are unpatentable because they would have been obvious to a person of ordinary skill in the art at the critical time in view of the combined teachings of Perego and JESD79-2. Pet. 5, 28–111. Patent Owner opposes. PO Resp. 18–39; PO Sur-reply 6–20. For reasons that follow, we determine Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable under 35 U.S.C. § 103(a).

11

IPR2023-00454
Patent 11,093,417 B2

### 1. Overview of the Asserted Prior Art

#### a. Perego (Ex. 1071)

Perego pertains to memory systems and discloses a memory module with a configurable width buffer device.  Ex. 1071, code (57).  One embodiment of Perego is shown in Figure 3C, reproduced below.



**Fig. 3C**

Perego's Figure 3C, above, is a block diagram illustrating a "memory module that includes a configurable width buffer device" having configurable width buffer device 391 (not shown) that is connected on the bottom to interface connections 390a in connector 390 and that is connected on the sides to memory devices 360 via channels 370.  Ex. 1071, 2:43–45, 7:30–39.

Another embodiment of Perego is shown in Figure 5B, reproduced below.

12

IPR2023-00454
Patent 11,093,417 B2



Fig. 5B

Perego's Figure 5B, above, is block diagram illustrating a configurable width buffer device 391, and we discuss this figure and the accompanying disclosure in detail in our analysis below. *See* Ex. 1071, 2:51–53, 13:6–8 ("FIG. 5B illustrates a configurable width buffer device 391 as seen in FIG. 3C in an embodiment of the present invention."). Perego also discloses that Double Data Rate 2 ("DDR2") memory devices can be used on its memory modules. *Id.* at 10:56–59.

13

Appx532

IPR2023-00454
Patent 11,093,417 B2

### b.  JESD79-2 (Ex. 1064)

JESD79-2 is a JEDEC standard for DDR2 memory devices. Ex. 1064.  It was published in September 2003 and provides industry standards for the programming and operating modes of DDR2 SDRAM.  *Id.* at 12.  The standard specifically addresses additive latency (AL) in the DDR2 SDRAM Extended Mode Register Set (EMRS).  *Id.* at 14.  Per the standard, the Read Latency (RL) is controlled by the sum of the additive latency (AL) and the CAS latency (CL).  *Id.* at 24.  Therefore, according to JESD79-2, if a user chooses to issue a R/W (read/write) command before the Internal RAS-CAS-Delay Time (tRCDmin), then AL (greater than 0) must be written into the EMRS(1).  *Id.*  The Write Latency (WL) is always defined as RL - 1 (read latency -1) where read latency is defined as the sum of additive latency plus CAS latency (RL=AL+CL).  *Id.*  Read or Write operations using AL allow seamless bursts (refer to seamless operation timing diagram examples in Read burst and Write burst section).  *Id.* JESD79-2 discloses that the RL is equal to an additive latency (AL) plus CAS latency (CL), where CL is defined by the Mode Register Set (MRS), similar to the existing SDR and DDR SDRAMs, while AL is defined by the Extended Mode Register Set (1) (EMRS(1)).  *Id.* at 26.

### 2.  Analysis of Claim 1

Claim 1 recites a memory module having various components that are configured or configurable to operate in a particular manner, which we address in more detail below.  To address claim 1, Petitioner relies on Perego's memory module disclosures in combination with JESD79-2's disclosures of DDR2 memory operations.  Pet. 28–96.  Patent Owner disputes Petitioner's contentions and argues that an ordinarily skilled artisan

14

IPR2023-00454
Patent 11,093,417 B2

at the critical time would not have had reason to alter Perego's memory

modules as Petitioner suggests.  PO Resp. 18.

### a) Preamble (1.a.1)

The preamble of claim 1 recites the following:

A memory module operable in a computer system to communicate data with a memory controller of the computer system via a N-bit wide memory bus in response to read or write memory commands received from the memory controller, the memory bus including address and control signal lines and data signal lines, the memory module comprising.

Petitioner argues that Perego's Figures 3B, 3C, 4A, 4B, and 4C show

memory modules that communicate data with a memory controller of a

computer system via a bus.  Pet. 33–39.  Perego's Figure 4A is reproduced

below.



FIG. 4A

Perego's Figure 4A, above, is a diagram showing memory module 400 with

buffer 405 connected to memory devices 410a–h over a pair of

channels 415a and 415b.  Ex. 1071, 9:26–33.

For the recited memory commands, Petitioner cites Perego's

disclosure of storing and retrieving data in response to commands, and

Petitioner argues that a person of ordinary skill in the art would "have

15

IPR2023-00454
Patent 11,093,417 B2

understood from their own knowledge of JEDEC standards, including JESD79-2, the specific ways to issue read and write commands to Perego's DDR2 memory devices." Pet. 39–40 (citing Ex. 1071, 6:15–25, 9:50–60, Fig. 3B; Ex. 1064, 6, 24–33, 49; Ex. 1003 ¶¶ 216–218).

Petitioner argues that Perego discloses address and control lines and data lines on the memory bus. Pet. 40–41 (citing Ex. 1071, 5:12–15, 5:21–24, 9:43–45, 9:58–60, Figs. 3B, 4A, 4B; Ex. 1003 ¶¶ 220–224); *see* Ex. 1071, 5:12–15 ("One of memory subsystem ports 378a-378n includes I/Os, for sending and receiving data, addressing and control information over one of point-to-point links 320a-320n."), 5:21–24 ("In other embodiments, memory subsystems are connected to a memory subsystem port via a bus (i.e., a plurality of signal lines)."). Petitioner notes that these are the vertical RQ and DQ lines in Figure 4A. *See* Pet. 41 (parenthetical identifying "RQ and DQ lines connecting to the memory bus" in Figures 4A and 4B), 44 (noting that the address and control lines are "the vertical RQ lines coupled to the edge of the module in Figures 4A–4B").

For the "N-bit wide memory bus" recited in claim 1, Petitioner argues that Perego discloses several data width options for its memory bus, and Petitioner specifically relies on Perego's 64-bit data width. Pet. 37–38 (citing Ex. 1071, 3:12–22, 3:41–47, 3:62–4:12, 4:65–5:24, 6:15–25, 9:50–60, 11:8–12, 14:16–51, Figs. 3B, 4A, 4B, 5A, 5B; Ex. 1003 ¶¶ 208–219; Ex. 1064, 24–33, 49; Ex. 1062, 5). Perego discloses an embodiment in which the interface of its buffer has "128 pins of which selectable subsets of 1, 2, 4, 8, 16, 32, 64 or all 128 pins ($W_{DP}$) may be used in order to configure the width of configurable width buffer device 391." Ex. 1071, 14:19–23. Petitioner argues that a person of ordinary skill in the art "would have

16

IPR2023-00454
Patent 11,093,417 B2

understood that a data width of $W_{DP}=64$ corresponds to the 64-bit data width of a JEDEC-compliant registered DIMM [(dual inline memory module)]." Pet. 38 (citing Ex. 1062, 5; Ex. 1003 ¶ 215). Petitioner's declarant Dr. Wolfe testifies in support of this assertion, citing JEDEC standards showing a 64-bit DIMM. Ex. 1003 ¶ 215 (citing Ex. 1071, 2:4–6; Ex. 1062, 5). Petitioner argues that a person of ordinary skill in the art would have "been motivated to implement Perego's memory modules in a registered DIMM format with DDR memory devices that fits into DIMM connectors and uses DIMM module input signals, according to JEDEC standards, including JESD21-C and JESD79-2," which would have "allow[ed] these modules to be used in JEDEC-compliant memory systems." Pet. 32–33 (citing Ex. 1003 ¶¶ 180–185).

Patent Owner does not dispute that the combination of Perego and JESD79-2 teaches the subject matter recited in the preamble, but does dispute Petitioner's contentions regarding implementing Perego's module as a JEDEC-compliant DIMM. PO Resp. 18–24 (citing Ex. 2024 ¶¶ 128–134). Based on Petitioner's persuasive contentions and evidence, summarized and cited above, we find that the combination of Perego and JESD79-2 teaches the subject matter recited in the preamble. In view of this finding, we need not decide whether the preamble is limiting.

We address the parties' dispute about a JEDEC-compliant module below in our discussion of the "input chip select signals" subject matter of claim 1.

### b)   Printed circuit board (1.b)

Claim 1 recites "a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding

17

IPR2023-00454
Patent 11,093,417 B2

plurality of contacts of a module slot of the computer system."  Petitioner argues that Perego's disclosure of including memory modules on printed circuit boards (PCBs) with connectors (such as connectors 390a in Figure 3C) teaches this subject matter.  Pet. 42–43 (citing Ex. 1071, 5:56–6:11, 7:39–41, Figs. 3B, 3C; Ex. 1003 ¶¶ 228–233); *see, e.g.*, Ex. 1071, 5:60–62 (disclosing that "memory subsystems are incorporated onto individual substrates (e.g., PCBs)").

Patent Owner does not dispute this contention.  *See generally* PO Resp.  Nonetheless, the burden remains on Petitioner to demonstrate unpatentability.  *See Dynamic Drinkware*, 800 F.3d at 1378.  Based on the entire trial record, we agree with Petitioner's analysis and we credit Dr. Wolfe's testimony supporting Petitioner's position.  Accordingly, we find that Perego discloses limitation 1.b.

Petitioner also argues that a person of ordinary skill in the art would have understood that Perego's memory modules could be implemented in a standard dual in-line memory module (DIMM), which would use a PCB with edge connections.  Pet. 43 (citing Ex. 1071, 3:25–28, 6:34–43; Ex. 1069, 2; Ex. 1062, 29, 66; Ex. 1003 ¶ 232).  Patent Owner disputes Petitioner's contentions about implementing Perego's module as a JEDEC-compliant DIMM, and we address this dispute below in our discussion of the "input chip select signals" subject matter of claim 1.

c)   *Input chip select signals (1.c.1, 1.c.2)*

Claim 1 recites

logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals,

18

IPR2023-00454
Patent 11,093,417 B2

the set of input address and control signals including a plurality of input chip select signals and other input address and control signals, the plurality of input chip select signals including one chip select signal having an active signal value and one or more other input chip select signals each having a non-active signal value.

As recited in the preamble, the "address and control signal lines" are on the memory bus that connects the memory module with the memory controller of the computer. Thus, the recited "input chip select signals" are signals that the module receives from the memory controller.

### (1)  Petitioner's Arguments

Petitioner contends that Perego's buffer devices have logic that receives input address and control signals for a memory command from a memory controller via signal lines, specifically the vertical control lines labeled "RQ" in Figures 4A and 4B. Pet. 43–48 (citing Ex. 1071, 4:3–6, 9:43–60, Figs. 4A, 4B, 5A, 5B; Ex. 1003 ¶¶ 234–243). As Petitioner points out (Pet. 48), Perego discloses "control lines (RQ) transport control (e.g., read, write, precharge . . . ) information and address (e.g., row and column) information." Ex. 1071, 9:50–53. Perego discloses that control and address information is "contained in packets" in one embodiment, but it then discloses that, "[i]n alternate embodiments, control lines (RQ) may comprise *individual control lines*, for example, row address strobe, column address strobe, etc., and address lines." Ex. 1071, 9:50–60 (emphasis added). We further discuss Perego's disclosure of individual control lines below when we address the parties' disputes about input chip select signals.

Petitioner also contends that JESD79-2 discloses that "read and write commands include both address signals (e.g., BA0–BA2, A0–A15) and control signals (e.g., CS chip select, RAS, CAS, WE)." Pet. 48 (citing

19

IPR2023-00454
Patent 11,093,417 B2

Ex. 1064, 6, 49; Ex. 1003 ¶ 238).  Petitioner argues that it "would have been obvious to a [person of ordinary skill in the art] in light of JESD79-2 and knowledge of the JEDEC standards that the memory controller would provide multiple chip-select signals to the memory module" where the signals correspond to multiple ranks of memory devices and where one of the signals is active to select the target rank and the other signals are inactive.  *Id.* at 57–58 (citing Ex. 1062, 6; Ex. 1066, 6–7; Ex. 1003 ¶¶ 251–252); *see also id.* at 52–54 (explaining that chip select signal (CS) is active low).

Petitioner then contends that Perego is consistent with JESD79-2's disclosure of selecting particular groups of memory devices because "Perego discloses that its module includes multiple sets of memory devices (e.g., 'ranks,' . . . ), each of which can be a target of a memory read or write command, and each of which acts together in response to a memory read or write command."  Pet. 54–57 (citing Ex. 1071, 6:12–24, 15:37–45, Figs. 3C, 4A, 4B, 4C; Ex. 1003 ¶¶ 249–250).

According to Petitioner, a person of ordinary skill in the art would have had reason to combine the teachings of Perego and JESD79-2 because Perego discloses that its memory modules can use DDR2 memory devices and "the JEDEC standard for DDR2 memory devices is JESD79-2."  Pet. 30 (citing Ex. 1071, 3:62–4:12, 8:1–4, 10:54–67; Ex. 1064); *see also id.* at 30–33 (further explaining rationale to combine).  Petitioner then asserts that a person of ordinary skill in the art would have been motivated to make Perego's memory modules JEDEC-compliant "to allow these modules to be used in JEDEC-compliant memory systems, such as those using DIMM

20

IPR2023-00454
Patent 11,093,417 B2

modules of the format described by JESD21-C." *Id.* at 33 (citing Ex. 1003 ¶ 185).

Petitioner further argues that a person of ordinary skill in the art would have understood that "Perego's buffer device 'register[s]' address and control signals similar to a JEDEC-compliant conventional registered DIMM." Pet. 49–50 (citing Ex. 1071, 6:15–30, 13:54–59, Fig. 5C; Ex. 1062, 12; Ex. 1003 ¶¶ 239–240).

### (2)  Patent Owner's Arguments

Patent Owner argues that a JEDEC-compliant module that receives chip select signals "is fundamentally at odds with" Perego's architecture, which Patent Owner asserts is "a Rambus-style point-to-point topology." PO Resp. 9 (citing Ex. 1071, code (57), 4:38–45, 5:35–55, 8:10–17, 8:20–26), 23.  According to Patent Owner, "Perego discloses Rambus-style modules that employ a point-to-point architecture and configurable bit-width interfaces that are fundamentally different than the conventional memory bus required by JEDEC module standards and do not include chip-select lines or otherwise convey chip-select signals." *Id.* at 1.  Patent Owner further argues that "Perego repeatedly and consistently emphasizes the benefits of its point-to-point architecture over a conventional JEDEC-style bus." *Id.* at 9–10 (citing Ex. 1071, 3:47–56, 4:65–5:1, 5:6–15, 5:32–55, 6:15–19, 13:49–59, 21:46–50, Figs. 3A/3B, Fig. 5A).  Patent Owner explains that "in contrast to a conventional registered DIMM ('RDIMM'), in Perego's architecture, control/address information is transmitted to the module via packets and multiplexed with data in order to be transmitted via the point-to-point links." *Id.* at 10 (citing Ex. 1071, 13:49–59).

21

IPR2023-00454
Patent 11,093,417 B2

Patent Owner's declarant, Dr. Przybylski, testifies that "Perego specifically refers to a dynamic point-to-point topology to connect the memory controller to the memory subsystem/module" and that a person of ordinary skill in the art, "being familiar with the Rambus XDR architecture, would recognize this terminology as being specific to the XDR architecture." Ex. 2024 ¶ 96 (citing Ex. 1071, 3:41–47, 5:32–35, 6:57–7:29, 8:1–9; Ex. 2009, 10–12, 15, 17).

The assignee of the Perego patent is Rambus, Inc. (Ex. 1071, code (73)), and there is no dispute that Perego discloses features that are consistent with Rambus's point-to-point architecture.  And, it may be true that a person of ordinary skill in the art would have understood Perego's point-to-point terminology to refer to the Rambus XDR architecture, and Perego mentions Rambus XDR memory devices.  Ex. 1071, 8:1–9.  But, as explained below, Perego's disclosures are not limited to that architecture. For example, Perego discloses that "one or more busses *or* a plurality of point-to-point links may be used to couple one or more buffer devices to a master (e.g., a controller or microprocessor device)" and that a "dynamic point-to-point link topology *or* any combination of point-to-point links or busses may be used to interface the master device and a corresponding buffer device." *Id.* at 3:41–47 (emphasis added).  Thus, Perego discloses that a bus, as an alternative to point-to-point links, may be used to connect the module to the memory controller.

Dr. Przybylski further explains that

> Perego's memory system (300 or 305) is built with a plurality of point-to-point buses (320) connecting a memory controller (310) with memory subsystems (330).  Ex. 1071, Figure 3A, 3B, 4:63–5:15.  These memory subsystems can be inserted into sockets (380) and in these embodiments comprise

22

IPR2023-00454
Patent 11,093,417 B2

> modules (340, 400).  Though several embodiments of buses 320 are disclosed they are all point-to-point with one end connected to the memory controller and the other to the memory subsystem. Ex. 1071, Figures 3A, 3B, 6A, 6B, 7, 8A, 8B, 8C, 4:63–5:15, 20:48–64, 20:65–21:3, 21:39–22:9.  The point to point links are used to convey read and write data, and address and control information can be multiplexed with data or be transported on their own buses.  Ex. 1071, Figures 5A, 5B, 5:16–31, 8:10–19, 13:49–59.

Ex. 2024 ¶ 95.  Here, Dr. Przybylski refers to the elements labeled 320 in Perego as "point-to-point buses," but Perego does not use this terminology. Rather, Perego refers to every instance of element 320 as "point-to-point link[s]."  *See* Ex. 1071, 4:66–67, 5:14–15, 5:56, 5:63–64, 6:11, 6:17, 6:23–24, 7:1, 7:3, 7:8–9, 8:20, 8:42, 8:48–49, 8:67, 9:8, 9:48, 11:9, 11:12, 11:22, 11:27–28, 11:40, 12:14–15, 12:41.  Indeed, Perego discloses that "[s]ignaling over point-to-point links 320a–320n *or alternatively*, over bussed topologies, may incorporate different modulation methods."  *Id.* at 8:42–47 (emphasis added).  Perego goes on to explain the difference between a "point-to-point link" and a bus.  *Id.* at 8:51–65.  Thus, Perego discloses busses as an alternative to the point-to-point topology that Dr. Przybylski says is indicative of Rambus XDR.

Data width is another indicator that Perego is not limited to a Rambus architecture.  Dr. Przybylski relies on Exhibit 2009 to explain Rambus XDR technology.  *See* Ex. 2024 ¶ 96 (citing Exhibit 2009 to explain that "point-to-point" refers to Rambus XDR).  The largest module data width disclosed in that exhibit is 36 bits.  Ex. 2009, 10 (disclosing a 32-bit module data width, which may be 36-bits wide with ECC).  Perego, however, discloses a module data width of up to 128 bits (Ex. 1071, 14:16–23), which is further

23

IPR2023-00454
Patent 11,093,417 B2

evidence that Perego's disclosure encompasses more than just Rambus XDR.

Perego also discloses that the buffer can be configured with a data width of 64 bits. Ex. 1071, 14:19–23 ("In an embodiment of the present invention, interface 596 includes 128 pins of which selectable subsets of 1, 2, 4, 8, 16, 32, 64 or all 128 pins ($W_{DP}$) may be used in order to configure the width of configurable width buffer device 391."). Petitioner asserts, with supporting testimony from Dr. Wolfe, that a person of ordinary skill in the art "would have understood that a data width of $W_{DP}$=64 corresponds to the 64-bit data width of a JEDEC-compliant registered DIMM module." Pet. 38 (citing Ex. 1003 ¶ 215; Ex. 1062, 5); *see* Ex. 1062 (Jan. 2002 JESD21-C RDIMM Specification), 5 (providing DIMM organization of "x72 ECC, x64").

Dr. Przybylski's testimony confirms that a 64-bit width was a JEDEC width. For example, Dr. Przybylski testifies that a person of ordinary skill in the art "would recognize the x64 and x72-wide memory modules mentioned in the '417 Patent, 2:47–53, as referencing JEDEC-standard compliant memory modules." Ex. 2024 ¶ 72 (citing Ex. 1066, 4). Dr. Przybylski also testifies that a person of ordinary skill in the art would have understood that, as of January 2005, a "disclosed DIMM module has a 64-bit data bus, just as all the JEDEC-standardized SDRAM-based DIMMs of the day." *Id.* ¶ 82.

Thus, the evidence shows that a 64-bit data width is a JEDEC-compliant module width and is not limited to a Rambus XDR module width, supporting Petitioner's contention that Perego's disclosure suggests a module that can be configured to have a JEDEC interface. *See* Pet. 38. We do not agree with Patent Owner's suggestion that Perego's configurable

24

IPR2023-00454
Patent 11,093,417 B2

buffer width makes it unsuitable to be implemented as an RDIMM, which has a fixed buffer width.  *See* PO Resp. 23 ("Furthermore, the RDIMM relied on by Petitioners has a fixed buffer width (EX2003, 43:12–20; EX1064, 1–6, EX2024, ¶ 24), whereas configurable width buffer devices are central to Perego." (citing Ex. 1071, Abstract, Title, Figs. 3C, 4A, 5A, 5B, 13:6–17, 13:49–59, 14:52–15:6, 15:31–45, 17:22–33).  We see no incompatibility where Perego discloses the RDIMM width along with other widths.

Petitioner also relies on Perego's disclosure of using individual control lines.  Pet. 41 (citing Ex. 1071, 9:43–45, 9:58–60).  Perego discloses an alternative to a packetized signaling approach in which "control lines (RQ) may comprise individual control lines, for example, row address strobe, column address strobe, etc., and address lines."  Ex. 1071, 9:50–60.  Petitioner argues that individual control lines are indicative of a JEDEC-style memory bus.  Pet. Reply 6–7 (citing Ex. 1071, 9:58–60, 10:54–59, Fig. 4A; Ex. 1064, 6; Ex. 2025, 3; Ex. 1003 ¶¶ 217–218; Ex. 2033, 141:6–145:24, 148:18–149:6).

Patent Owner counters that, "[e]ven when Perego discusses providing 'individual control lines,' it never mentions a chip-select signal line (or any of the other signal lines characteristic of a JEDEC-style RDIMM, such as CKE, DQS, etc.)."  PO Resp. 22 (citing Ex. 1071, 9:58–60; Ex. 2024 ¶¶ 129, 139; Ex. 1066, 6; Ex. 1069, 12; Ex. 2001, 20–23).  Although this passage of Perego does not mention chip select signals, it mentions "row address strobe, column address strobe, etc., and address lines" as exemplary individual control lines.  Ex. 1071, 9:58–60.  The evidence shows that row address strobe (RAS) and column address strobe (CAS) are JEDEC module input

25

IPR2023-00454
Patent 11,093,417 B2

signals and not Rambus signals.  Ex. 1066, 6 (RDIMM pins for RAS and CAS); Ex. 1062, 6 (same); Ex. 1095, 235:1–236:25 (Dr. Przybylski's testimony in which he agrees that a Rambus direct DRAM does not have pins for RAS and CAS signals as in DDR devices).

Dr. Przybylski also testifies that

> [a]nother of the essential aspects of Direct RDRAMs that differentiate them from all of the JEDEC-defined SDRAMs is the encoding of the 8-bit RQ control bus.  Instead of presenting the entire command and address at once on 24 signal lines, captured by a single clock edge, the Direct RDRAM RQ bus has only 8 transmission lines.  In addition, instead of 1 command spread across 24 signal lines, row commands with their row addresses are gathered into a packet and sent over 8 bit periods on only 3 lines.  Column commands are sent with the column addresses, data masking and precharge indicators over 5 metal traces in the same 8 bit period.

Ex. 2024 ¶ 46.  This testimony shows that individual address lines as disclosed in Perego are not characteristic of Rambus-type memories.  Thus, contrary to Patent Owner's argument above, Perego expressly discloses "signal lines characteristic of a JEDEC-style RDIMM."  *See* PO Resp. 22.

Patent Owner also argues that Perego's disclosure of individual lines "relates to secondary channel signal lines," i.e., those between the buffer and the memory devices, and not the primary channel between the memory controller and the memory module.  PO Sur-reply 9 (citing Ex. 1071, 9:43–60).  Perego's disclosure of using "individual control lines" appears in a discussion of Figure 4A (reproduced above in § II.D.2.a), in which Perego discloses that "[s]ignal lines of channels 415a and 415b include control lines (RQ), data lines (DQ) and clock lines (CFM, CTM)."  Ex. 1071, 9:43–45.  Channels 415a and 415b are the channels between the buffer and the memory devices, so Perego's disclosure of individual lines certainly pertains

26

Appx545

IPR2023-00454
Patent 11,093,417 B2

to the secondary channels, as asserted by Patent Owner.  Figure 4A, however, shows that the primary channel has the same signals lines—RQ, DQ, CTM, and CFM (shown vertically).  In view of Perego's other disclosures suggesting non-Rambus module interfaces, discussed above, we do not understand Perego's disclosure that "control lines (RQ) may comprise individual control lines, for example, row address strobe, column address strobe, etc., and address lines" to be limited only to the RQ lines between the buffer and the memory devices.  Rather, we find that this disclosure, read in light of Perego as a whole, at least suggests individual control lines on the primary channel as well.

Furthermore, other evidence also suggests that Perego is not limited to a Rambus-style architecture at the module interface.  For example, Perego discloses that "the buffer device may be a configurable width buffer device to provide upgrade flexibility and/or provide high bandwidth among a variety of *possible module configurations* in the system." Ex. 1071, 3:25–28 (emphasis added).  This indicates that Perego's disclosure is concerned with more than just one type of memory module, such as a Rambus module.

Perego further discloses that its buffered module provides flexibility because "new generations of controllers may be phased in which exploit features of new generations of memory devices while retaining backward compatibility with existing generations of memory devices." Ex. 1071, 6:34–43.  In this context, it makes sense that Perego would leave the option open to use a bus on the interface between the module and the controller and not be limited to a point-to-point system, which would limit the ability to interface with a system that uses a bus, such as a JEDEC system.  Indeed, Perego states:

27

IPR2023-00454
Patent 11,093,417 B2

> However, using conventional signaling schemes, the bussed approaches lend efficiency towards resource utilization of a system and permits module interfacing for upgradeability.
>
> There is a need for memory system architectures or interconnect topologies that provide flexible and cost effective upgrade capabilities while providing high bandwidth to keep pace with microprocessor operating frequencies.

Ex. 1071, 2:22–29.  Thus, Perego discloses that upgradeability was a goal and that busses permit such action.

Based on the foregoing discussion, we find that Perego's disclosure suggests a JEDEC-compliant interface to a memory controller.

Furthermore, the evidence shows that JEDEC-compliant modules were dominant in the market at the relevant time.  For example, Dr. Przybylski testifies that,

> in the 2004-2005 timeframe, the vast majority of the DRAM devices and modules sold would have been compliant with one of the JEDEC standards, such that a general reference to DRAM, especially in the context of usage main memory of general purpose computer and server systems, would suggest to a [person of ordinary skill in the art] the use of JEDEC-standard compliant SDRAM devices or modules.

Ex. 2024 ¶ 72.  Petitioner asserts that the dominance of JEDEC-compliant modules "provid[es] additional motivation for the proposed combination." Pet. Reply 5–6.  Patent Owner counters that the "mere fact that JEDEC-standardized modules dominated the market at the time of the invention also does not provide motivation to modify Perego."  PO Sur-reply 11 (citing *Virtek Vision Int'l ULC v. Assembly Guidance Sys., Inc.*, 97 F.4th 882 (Fed. Cir. 2024).  We agree with Petitioner on this point.  In the case relied on by Patent Owner, the Federal Circuit stated that "*KSR* did not do away with the

28

IPR2023-00454
Patent 11,093,417 B2

requirement that there must exist a motivation to combine various prior art references in order for a skilled artisan to make the claimed invention," and the court reversed the Board's conclusion of obviousness finding that there was "no evidence of a design need or market pressure." *Virtek*, 97 F.4th at 887–88.  Here, Patent Owner's own expert explains that JEDEC was a driving market force at the relevant time.

Patent Owner also argues that modification of Perego's architecture and memory system with a JEDEC-compatible bus would make it non-functional.  PO Resp. 29–30, 23–24 ("JEDEC-complaint, chip-select-dependent RDIMM architecture defined in JESD21-C is fundamentally at odds with the Rambus point-to-point topology and variable bit width interfaces of Perego.").  But Patent Owner's "proposed" modifications would make Perego's system non-functional for Rambus, not for JEDEC, which was the dominant memory module style in the market.  Given JEDEC as the standard, an ordinarily skilled artisan would have reason to pursue such a known option.

Patent Owner also argues that "Perego contrasts its memory modules with 'conventional DIMM module designs.'"  PO Resp. 23–24 (quoting Ex. 1071, 6:27–33; citing Ex. 1071, 1:31–49, 2:15–30).  Perego, however, draws a distinction based on the lack of buffered data lines in a conventional DIMM:

> In this embodiment, memory subsystems 330a-330n are buffered modules.  By way of comparison, buffers disposed on the conventional DIMM module in U.S. Pat. No. 5,513,135 are employed to buffer or register control signals such as RAS, and CAS, etc., and address signals.  Data I/Os of the memory devices disposed on the DIMM are connected directly to the DIMM connector (and ultimately to data lines on an external bus when the DIMM is employed in memory system 100).

29

IPR2023-00454
Patent 11,093,417 B2

Ex. 1071, 6:25–33.  This passage shows that Perego discloses data buffering on the memory module, which was not present in DIMMs of that time.  *See* Ex. 2024 ¶ 32 ("The two most common styles of JEDEC-standardized modules are called Unbuffered DIMMs (or UDIMMS), which contain principally just SDRAMs, and Registered DIMMs, which also include a register device for buffering the address and command buses (but not the data bus).").  We do not read Perego's disclosure of the lack of data buffering on DIMMs of the time as discounting all DIMM teachings.

We find that Perego suggests a JEDEC-compliant interface with its disclosure of a 64-bit module width, and we further find that a person of ordinary skill in the art would have been motivated to make a module JEDEC-compliant based on JEDEC's dominance in the market at the time. *See* Ex. 1003 ¶ 183 (Dr. Wolfe's testimony that a person of ordinary skill in the art "would have been motivated to implement Perego's memory modules in a registered DIMM format that fits into the DIMM connectors of the time and uses the input and output signals of a DIMM module according to the relevant JEDEC standards, including JESD21-C.").

Patent Owner also argues that Petitioner's reliance on JESD21-C (Exs. 1062, 1066) for details of a JEDEC-compliant memory module is improper because JESD21-C is not part of any challenge in the Petition.  PO Resp. 24–25.  Rather, Patent Owner notes, JESD79-2 is the relied-upon JEDEC standards reference, and it relates to memory devices, not memory modules. *Id.* at 1, 20.  Thus, Patent Owner argues that the asserted combination of references does not teach the recited "input chip select signals," which are inputs to the module, not to individual memory devices. *Id.* at 31.

30

IPR2023-00454
Patent 11,093,417 B2

We see no impropriety in Petitioner's reference to JESD21-C as support for its "input chip select signals" contentions.  As an initial matter, Patent Owner argues that "chip-select signals . . . are a hallmark of JEDEC-compliant bus architecture."  PO Resp. 21 (citing Ex. 2024 ¶ 129; Ex. 1069, 2).  Patent Owner's cited support states that "the chip-select bus[] is essential in a JEDEC-style memory system."  Ex. 1069, 2.  This is the type of knowledge that the parties agree a person of ordinary skill in the art would have had.  *See* Pet. 9 (asserting that a person of ordinary skill in the art "would have been knowledgeable about the JEDEC DDR and DDR2 SDRAM standards used to standardize the functioning of memory devices, and the JEDEC 21-C standard"); PO Resp. 8 (asserting that a person of ordinary skill in the art would have been "knowledgeable about the operation of *standardized* DRAM and SDRAM memory devices and memory modules" (emphasis added)); *id.* at 43 (arguing what a person of ordinary skill in the art would have understood "based on knowledge of the art and contemporaneous JEDEC standards"); Ex. 2024 ¶ 72 (Dr. Przybylski "not[ing] that in the 2004-2005 timeframe, the vast majority of the DRAM devices and modules sold would have been compliant with one of the JEDEC standards, such that a general reference to DRAM, especially in the context of usage main memory of general purpose computer and server systems, would suggest to a [person of ordinary skill in the art] the use of JEDEC-standard compliant SDRAM devices or modules").

As discussed above, we find that Perego suggests a JEDEC-compliant interface with its disclosure of a 64-bit module width and that a person of ordinary skill in the art would have been motivated to make a module JEDEC-compliant based on JEDEC's dominance in the market at the time.

31

IPR2023-00454
Patent 11,093,417 B2

Once a module is JEDEC-compliant, a person of ordinary skill in the art would have known that it would be "configurable to receive . . . a plurality of input chip select signals," which would be sent by a separate memory controller that is not claimed, based on the knowledge of JEDEC standards, including JESD21-C. *See* Ex. 1062, 6 (identifying "SDRAM chip select lines" for DIMMs), *cited in* Pet. 57–58.

Furthermore, Patent Owner argues that "[c]hip-select signals are used to select ranks." PO Resp. 21–24 (citing Ex. 2031, 7 ("Rank: any DRAMs connected to the same CS")). Exhibit 2031's header ("JEDEC Standard No. 21-C") indicates that the exhibit pertains to JESD21-C, which is the module standard, and the exhibit states that it "describes the serial presence detects for the DDR2 version of the synchronous DRAM *modules*." Ex. 2031, 1 (emphasis added). The page cited by Patent Owner pertains to a field that "describes the number of ranks (Rank: any DRAMs connected to same physical CS) and package on the SDRAM module, and module height." *Id.* at 7. As Petitioner points out, JESDS79-2 discloses that "Chip Select . . . provides for external Rank selection on systems with multiple Ranks" and that chip select "is considered part of the command code." Ex. 1064, 6; *see* Pet. Reply 4–5. Thus, JESD79-2, which is part of the asserted grounds, discloses that chip select signals are received at the module for "external Rank selection" consistent with Patent Owner's cited evidence, which pertains to the module.

#### d) *Registered address and control signals (1.c.3)*

Claim 1 recites

the set of registered address and control signals including a plurality of registered chip select signals corresponding to respective ones of the plurality of input chip select signals and

32

Appx551

IPR2023-00454
Patent 11,093,417 B2

other registered address and control signals corresponding to respective ones of the other input address and control signals, the plurality of registered chip select signals including one registered chip select signal having an active signal value and one or more other registered chip select signals each having a non-active signal value.

Petitioner argues that JESD79-2 discloses read and write commands that include a chip select signal to identify the target rank of memory devices using an active low signal with non-active ranks receiving a high signal. Pet. 58–59 (citing Ex. 1064, 6, 24–33, 49; Ex. 1003 ¶¶ 255–263). Petitioner argues that Perego is consistent with this because it "teaches that only the targeted rank of memory devices would participate in the read or write operation, while the other memory devices would 'remain in a ready or standby state until called upon to perform memory access operations.'" *Id.* at 59–60 (quoting Ex. 1071, 21:16–20; citing Ex. 1071, 15:40–45; Ex. 1003 ¶¶ 257–260). Petitioner argues that a person of ordinary skill in the art "would have known that under the JEDEC standards it was standard for a memory module to use registered chip-select signals to target one rank of memory devices for a read or write operation." *Id.* at 60 (citing Ex. 1064, 6; Ex. 1062, 12–13; Ex. 1066, 10, 12–13, Ex. 1069, 2–3; Ex. 1003 ¶ 259).

Patent Owner does not separately address this limitation, apart from its arguments about chip select signals, which we discuss above. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware*, 800 F.3d at 1378. We note, however, that Patent Owner disputes Petitioner's contentions that the combination of Perego and JESD79-2 teaches ranks, and we address this below.

33

IPR2023-00454
Patent 11,093,417 B2

Based on the entire trial record, we agree with Petitioner's analysis and we credit Dr. Wolfe's testimony supporting Petitioner's position. Accordingly, we find that Perego discloses limitation 1.c.3.

### e)   Data buffer control signals (1.c.4)

Claim 1 recites "wherein the logic is further configurable to output data buffer control signals in response to the read or write memory command." Petitioner argues that a person of ordinary skill in the art

> would have understood that Perego's buffer device includes logic that outputs data buffer control signals to transceivers (e.g., 575, included in interface 520a, 520b, 510, and 590), multiplexing/demultiplexing circuits 597, and to input/output latches 597f-m, to selectively activate these circuit elements of the "buffer" according to the targeted rank and direction of the read and write operation.

Pet. 63 (citing Ex. 1071, 14:62–15:6, 15:34–37, 17:41–44, 17:61–62, Figs. 5A, 5B; Ex. 1003 ¶¶ 270–271).

Patent Owner does not dispute Petitioner's contentions for this limitation. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware*, 800 F.3d at 1378. Based on the entire trial record, we agree with Petitioner's analysis and we credit Dr. Wolfe's testimony supporting Petitioner's position. Accordingly, find that Perego discloses limitation 1.c.4.

### f)   Ranks (1.d.1, 1.d.2, 1.d.3)

Claim 1 recites

> memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks, wherein the plurality of N-bit wide ranks correspond to respective ones of the plurality of registered chip select signals such that each of the plurality of registered chip select signals is received by memory devices [in] one respective N-bit wide rank of the plurality of N-bit-wide

34

IPR2023-00454
Patent 11,093,417 B2

> ranks, wherein one of the plurality of N-bit wide ranks including memory devices receiving the registered chip select signal having the active signal value and the other registered address and control signals is configured to receive or output a burst of N-bit wide data signals in response to the read or write command.

Petitioner argues that Perego teaches memory circuits arranged in ranks by disclosing groups of memory devices that are accessed together in a memory operation.  Pet. 64–73 (citing Ex. 1071, 2:4–6, 3:62–4:3, 4:19–22, 6:12–24, 8:1–4, 10:56–58, 14:10–40, 15:37–45, 17:22–28, 21:16–20, Figs. 3C, 4A, 4B, 4C, 5A, 5B; Ex. 1003 ¶¶ 274–296).  For example, Perego discloses "grouping memory devices into multiple independent target subsets (i.e. more independent banks)." Ex. 1071, 15:37–45, *quoted in* Pet. 67.

Petitioner also argues that "it would have been obvious to a [person of ordinary skill in the art] to arrange Perego's DDR memory devices into '*ranks*,' and a [person of ordinary skill in the art] would have been motivated to do so, in light of the JEDEC standards."  Pet. 72 (citing Ex. 1064, 6; Ex. 1062, 13, 26–28; Ex. 1003 ¶¶ 287–289).  Petitioner relies on JESD79-2's disclosure of chip select signals for ranks.  *Id.* at 72 (citing Ex. 1064, 6; Ex. 1003 ¶¶ 287–289; Ex. 1062, 13).

Patent Owner disagrees with Petitioner, arguing that Perego does not disclose ranks.  PO Resp. 33–36.  Patent Owner specifically argues that "Rambus memory devices are incompatible with the concept of ranks because they are each accessed individually and thus do not 'act together' as proposed by Petitioner." *Id.* at 33 (citing, *inter alia*, Ex. 2024 ¶¶ 162–175).

We do not agree with Patent Owner that Perego is incompatible with ranks.  Perego expressly discloses the use of DDR2 SDRAM memory devices on the module.  Ex. 1071, 56–59.  Dr. Przybylski testifies that, in

35

Appx554

IPR2023-00454
Patent 11,093,417 B2

Perego, "the memory system can include modules that include either Direct RDRAMs, which are not organized into ranks as, for example, DDR2 SDRAMs are." Ex. 2024 ¶ 113. Thus, Patent Owner's own evidence shows that DDR2s would be organized in ranks. Based on this evidence, we find that a person of ordinary skill in the art at the critical time would have arranged Perego's DDR2 memory devices into ranks because that is how DDR2s are organized. *See* Pet. 72 (asserting that ranks would have been obvious); Ex. 1062, 29, 35 (illustrating DDR SDRAM devices "surface mounted" on both sides of a PCB in a DIMM format); Ex. 1071, 2:4–6 ("DIMM"); Ex. 1003 ¶ 278.

Because we agree with Petitioner's obviousness assertions and Patent Owner's admission that DDR2s would be in ranks, we need not address the parties' contentions whether Perego alone discloses ranks, including whether Perego's disclosure at column 15, lines 37–45 teaches ranks. *See* PO Resp. 35 (citing Ex. 2003, 202:8–202:10); *see also* Paper 35 (Petitioner's Motion to Exclude, 1 (seeking to exclude Exhibit 2003, 202:8–202:10)).

Patent Owner also argues that "it is not clear that any such rank would 'read or write the full bit-width of the memory module' as required by Petitioner's construction." PO Resp. 35 (citing Ex. 2024 ¶¶ 173–175). Dr. Przybylski explains that, "[i]f the Board finds that Figures 4A, 4B, and 4C show memory devices 410 that can be DDR2 SDRAMs as Petitioner asserts, then the rank elements of claim 1 of the '417 patent are still not present in Perego" because "the two interface units 520a and 520b operate together and so if indeed each of these collections offers a 64-bit data path to the buffer device, the structure that is disclosed is a 128-bit rank not two 64-bit ranks." Ex. 2024 ¶ 175.

36

IPR2023-00454
Patent 11,093,417 B2

Dr. Przybylski appears to be referring to Perego's disclosure of bandwidth concentration, which is described in the following passage:

> According to an embodiment of the present invention, multiplexers 530a and 530b perform bandwidth-concentrating operations, between interface 510 and interfaces 520a and 520b, as well as route data from an appropriate source (i.e. target a subset of channels, internal data, cache or write buffer). The concept of bandwidth concentration involves combining the (smaller) bandwidth of each channel in a multiple channel embodiment to match the (higher) overall bandwidth utilized in a smaller group of channels. This approach typically utilizes multiplexing and demultiplexing of throughput between the multiple channels and smaller group of channels. In an embodiment, buffer device 405 utilizes the combined bandwidth of interfaces 520a and 520b to match the bandwidth of interface 510.

Ex. 1071, 11:56–12:2. Perego further explains the bandwidth concentration embodiment as follows:

> Referring to FIG. 4B, buffer device 405 may operate in a bandwidth concentrator approach. By employing quad channels 415a 415d on each of modules 450a 450d, bandwidth in each module may be concentrated from all quad channels 415a 415d on each module to corresponding point-to-point links 620a 620d. In this embodiment, throughput on each of point-to-point links 620a 620d is concentrated to four times the throughput achieved on each of quad channels 415a 415d. Here, each of channels 415a 415d transfers information between one or more respective memory devices on each channel and buffer device 405 simultaneously.

*Id.* at 21:4–15.

We agree with Dr. Przybylski that Perego discloses that interface units 520a and 520b can operate together. The bandwidth concentration disclosure, however, is one embodiment, and Perego follows this disclosure by explaining that "[a]ny number of channels 415a 415d, for example; two

37

IPR2023-00454
Patent 11,093,417 B2

channels 415c and 415d may transfer information simultaneously and the memory devices on the other two channels 415a and 415b remain in a ready or standby state until called upon to perform memory access operations." Ex. 1071, 21:16–20. Thus, Perego's disclosure is not limited to the bandwidth concentration embodiment, as Patent Owner's arguments and Dr. Przybylski's testimony suggest.

Additionally, Perego discloses an embodiment in which "individual device select lines 633a and 633b are employed to perform device selection." Ex. 1071, 9:64–67. These are essentially chip select signals as required by the challenged claims.

Accordingly, based on the entirety of the trial record, we find that Perego teaches the required ranks and chip select signals.

>   g)  *Latency (1.e.1, 1.e.2, 1.e.3, 1.f)*

Claim 1 recites

> circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module,

> wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

Petitioner argues that Perego discloses circuitry in the buffer devices of Figures 5A and 5B that is coupled between the data signal lines in the memory bus and corresponding data pins of memory devices in each of the ranks. Pet. 85–88 (citing Ex. 1071, 4:38–42, 6:12–15, 7:30–34, 10:59–67,

38

IPR2023-00454
Patent 11,093,417 B2

11:1–7, 13:6–10, 13:18–24, 14:65–15:2, 17:61–63, 18:65–19:3, Figs. 5A, 5B, 5C; Ex. 1003 ¶¶ 324–333).  Petitioner argues that Perego's data bursts are routed through the buffer device between the targeted rank of memory and the memory controller and that a person of ordinary skill in the art would have understood that buffer control signals are used "to activate only the channel transferring the data burst between the memory controller and the targeted rank" and "to selectively activate those circuit elements of the buffer according to the targeted rank and direction of the read and write operations." *Id.* at 90–91 (citing Ex. 1071, 6:15–25, 11:56–61, 12:9–12, 13:54–59, 14:62–15:6, 15:34–40, 17:41–44, 17:61–62, 21:16–20, Figs. 5A, 5B; Ex. 1003 ¶¶ 338–342).

As to the "CAS latency" recitations, Petitioner argues that the data are transferred according to an overall CAS latency of the memory module, citing Perego's disclosure of "access latency values" and JESD79-2's disclosure of CAS latency values.  Pet. 92–94 (citing Ex. 1071, 12:20–34, Fig. 5B; Ex. 1064, 12, 14, 26, 28, Fig. 26; Ex. 1062, 68 n.1; Ex. 1003 ¶¶ 344–353).  Petitioner argues that the data transfers in Perego are registered using latches 597f–m in Figure 5C.  *Id.* at 95–96 (citing Ex. 1071, 12:65–13:5, 17:61–63, 18:65–19:3, Figs. 5B–5C; Ex. 1003 ¶¶ 359–362).  Petitioner also argues that, "[u]nder the JEDEC standards, 'an additional clock cycle' is added to the 'CAS latency' of the memory devices to leave enough time for the register on the memory module to perform its functions." *Id.* at 95 (citing Ex. 1062, 68 n.1; Ex. 1064, 12, 14; Ex. 1003 ¶¶ 359–362).  Petitioner argues that it would have been obvious to a person of ordinary skill in the art to add an additional clock cycle in Perego "so that the memory module complies with the timing of the JEDEC standards, and

39

IPR2023-00454
Patent 11,093,417 B2

so the '*circuitry*' has enough time to perform its functions (including '*register[ing]*' the data signals for interfaces 520a/b with latches 597f-m . . .) using 'internal' clock circuit 570a-b." *Id.* (brackets by Petitioner; citing Ex. 1071, 12:65–13:5, 17:61–63, 18:65–19:3, Figs. 5B–5C; Ex. 1003 ¶¶ 359–362).

Patent Owner disputes Petitioner's contentions regarding the overall CAS latency. PO Resp. 36–39. We find Petitioner's contentions persuasive.

First, Perego discloses that "buffer device 350 transceives and provides isolation between signals interfacing to controller 310 and signals interfacing to the plurality of memory devices 360." Ex. 1071, 6:12–15. This is similar to the '417 patent's disclosure "to add a buffer which electrically isolates the ranks of memory devices 30 from the memory controller 20." *Id.* at 22:46–49. Thus, Perego expressly discloses buffering data and its benefit—isolating the memory devices from the memory controller.

Second, the evidence shows that there would be some delay with a data buffer. *See* Ex. 1095, 132:20–133:6 (Dr. Przybylski's testimony that, with a buffer on the data line of a memory module, "[i]nevitably, there's some delay, depending on the type of buffer and its characteristics internally").

Third, a person of ordinary skill in the art would have understood that CAS latency is measured in clock cycles. *See* Ex. 1095, 251:20–252:7 (Dr. Przybylski's testimony, referring to Exhibit 1064, that "[in DDR2, the latency is measured in clock cycles"); *see also* Pet. 18 n.5 (Petitioner's citation to DDR2 RDIMM for whole clock cycle delays).

40

IPR2023-00454
Patent 11,093,417 B2

Patent Owner argues that Petitioner's contention about the data buffer necessarily adding delay "is an entirely new rationale, relying on new and different evidence, which is not permitted in Reply." PO Sur-reply 18. We disagree because for limitation 1.e.3 Petitioner contends that a person of ordinary skill in the art "would have understood that any scheduled data transfer to or from the memory module must account for the latency of the entire module . . . including the latency of the memory devices . . . combined with the latency added by the buffer device (e.g., 1 clock cycle for the buffer device . . .)." Pet. 94. Thus, the Petition sets forth Petitioner's contention that the buffer adds delay.

Accordingly, based on the entirety of the trial record, we agree with Petitioner and find that Perego teaches the coupled circuitry and CAS latency as recited by the challenged claim.

### h)   Objective evidence of non-obviousness

Patent Owner does not present objective evidence of non-obviousness other than to respond to Petitioner's assertion of evidence of "simultaneous invention." PO Resp. 55. As discussed, the combination of Perego and JESD79-2 teaches or renders obvious all of the limitations of claim 1, and there is no objective evidence of non-obviousness in the record.

### i)   Conclusion for Claim 1

We have considered the full trial record, and, for the reasons discussed above and based on Petitioner's contentions and evidence, we conclude that claim 1 would have been obvious to a person of ordinary skill in the art based on the combined teachings of Perego and JESD79-2.

41

IPR2023-00454
Patent 11,093,417 B2

### 3. Dependent Claims 2–15

Below we summarize Petitioner's contentions for claims 2–15, which Patent Owner does not dispute apart from its arguments for claim 1.

Claim 2 depends from claim 1 and recites "wherein each of the memory devices has a corresponding load, and the circuitry is configured to isolate the loads of the memory devices from the memory bus." Petitioner argues that Perego's buffer device, and particularly latches 597f–m within the buffer device, isolate the load of the memory devices from the memory bus. Pet. 97 (citing Ex. 1071, 4:38–45, 6:12–15, 6:44–46, 17:61–63; Ex. 1003 ¶¶ 379–385); *see* Ex. 1071, 6:12–15 (disclosing that "buffer device 350 transceives and provides isolation between signals interfacing to controller 310 and signals interfacing to the plurality of memory devices 360").

Claim 3 depends from claim 1 and recites "wherein the burst of N-bit wide data signals includes a set of consecutively transmitted data bits for each data signal line in the memory bus, and wherein the set of consecutively transmitted data bits are successively transferred through the circuitry in response to the data buffer control signals." Petitioner argues that a person of ordinary skill in the art "would have understood from JESD79-2 that DDR2 memory devices transmit or receive data in 'bursts,'" which "are timed in accordance with latencies . . . so that the data communication between the memory controller and the memory module is properly synchronized." Pet. 98–100 (citing Ex. 1064, 12–14, 24–32; Ex. 1003 ¶¶ 386–394). Petitioner contends that it would have been obvious for the data buffer control signals to control the routing to comply with JESD79-2 timing. *Id.* at 98 (citing Ex. 1064, 12–14; Ex. 1003 ¶ 391).

42

IPR2023-00454
Patent 11,093,417 B2

Claim 4 depends from claim 1 and recites "wherein each of the memory devices is 4-bits wide, and wherein each of the plurality of ranks is 64-bits or 72-bits wide and includes 16 or 18 memory devices configured in pairs."  Petitioner cites JESD79-2's disclosure of "x4" DDR2 memory devices and notes that 16 or 18 such devices would be used, respectively, for widths of 64 and 72 bits, the latter accounting for error correction.  Pet. 100 (citing Ex. 1071, 10:48–53 (noting use of error correction code (ECC)); Ex. 1064, 7–8; Ex. 1062, 5–6, 15–16; Ex. 1066, 4, 6; Ex 1003 ¶¶ 395–400); *see* Ex. 1062, 5 (disclosing "DIMM organization" of "x72 ECC, x64").

Claim 5 depends from claim 1 and recites "wherein the memory devices are organized in four ranks and the set of input address and control signals include four chip select signals, one for each of the four ranks."  Petitioner cites to its contentions for claim 1 and refers to Perego's Figure 4B showing "each memory interface 415a-415d can correspond to a single rank, and the set of input address and control signals include four chip select signals, one for each of the four ranks "consistent with the JEDEC standards."  Pet. 101 (citing Ex. 1071, 64–73, 51–58; Ex. 1062, 6 ("Physical banks"); Ex. 1066, 6–7, 16–17; Ex. 1003 ¶¶ 401–406) (emphasis omitted).

Claim 6 depends from claim 1 and recites "wherein the circuitry includes logic pipelines configurable to enable the data transfers between the memory devices and the memory bus through the circuitry."  Petitioner cites Perego's disclosure of a "scheme that could potentially route any single data bit signal to any data pair line or to any of the interface 596 data connections" (Ex. 1071, 18:49–54), and Petitioner argues that a person of ordinary skill in the art would have understood that such routing would "include '*logic pipelines*' to enable the '*data transfers*' through the

43

IPR2023-00454
Patent 11,093,417 B2

'*circuitry*,' all in response to control signals that enable the data transfer."
Pet. 101–03 (citing Ex. 1064, 23–25, 49; Ex. 1071, 13:49–59, 17:22–18:9,
18:48–54, Figs. 5B, 5C; Ex. 1003 ¶¶ 407–415).

Claim 7 depends from claim 1 and recites "wherein the logic is further
configured to report the overall CAS latency to the memory controller in
response to a mode register set command received from the memory
controller."  Petitioner argues that a person of ordinary skill in the art
"would have been motivated to report latency parameters during
initialization, including reporting '*the overall CAS latency*' of the module,
'to properly configure the memory devices upon boot of the system' and to
ensure proper timing of commands from the memory controller."  Pet. 104
(quoting Ex. 1071, 12:32–34; citing Ex. 1071, 12:20–27, 12:35–42, 12:45–
50; Ex. 1003 ¶¶ 419–420, 422); *see* Ex. 1071, 12:20–23 ("A serial interface
574 may be employed to couple signals utilized in initialization of module or
memory device identification values, test function, set/reset, *access latency
values*, vendor specific functions or calibration." (emphasis added)).

Claim 8 depends from claim 1 and recites "wherein the memory
module has a specified data rate, and wherein the burst of N-bit wide data
signals are transferred between the one of the plurality of N-bit wide ranks
and the memory controller at the specified data rate."  Petitioner argues
Perego discloses that the same clock signals are used between the buffer and
the memory devices as are used between the buffer and the memory
controller and that a person of ordinary skill in the art would have
understood that the same specified data rate is used on both of these
interfaces of the buffer.  Pet. 104–05 (citing Ex. 9:43–49, 10:5–13, Figs. 4A,
4B; Ex. 1003 ¶¶ 425–430).

IPR2023-00454
Patent 11,093,417 B2

Claim 9 recites, "The memory module of claim 1, further comprising a phase locked loop clock driver configured to output a clock signal in response to one or more signals received from the memory controller, wherein the predetermined[10] amount of time delay is at least one clock cycle time delay." Petitioner argues that Perego's buffer device's clock circuit "implements the functionality of a 'PLL' driver to generate clock signals for the module, phase aligned with the clock signals received from the memory controller." Pet. 106–07 (citing Ex. 1071, 12:52–64; Ex. 1069, 11; Ex. 1073 ¶¶ 30, 48, Figs. 2–6, 10–13); *see* Ex. 1071, 12:52–55 ("Clock circuit 570a–b may include clock generator circuit (e.g., Direct Rambus[] Clock Generator), which may be incorporated onto buffer device 405 and thus may eliminate the need for a separate clock generating device."). For the delay being at least one clock cycle, Petitioner refers to its contentions for limitation 1.f. Pet. 106–07.

Claim 10 depends from claim 9 and recites

wherein the memory devices are dynamic random access memory devices configured to operate synchronously with the clock signal, and wherein each memory device in the one of the plurality of N-bit wide ranks is configured to receive or output a respective set of bits of the burst of N-bit wide data signals on both edges of each of a respective set of data strobes.

Petitioner argues that Perego's disclosure of using DDR2 SDRAM devices in combination with JESD79-2's disclosure that DDR2's transfer data on both edges of a complementary set of data strobes teaches this subject matter. Pet. 107–08 (citing Ex. 1071, 4:6–12, 10:58–59; Ex. 1060;

---

[10] Claim limitation 1.f recites "an amount of delay," not a "predetermined amount of delay." Like Petitioner, we presume claim 9 refers to the "amount of delay" in claim 1. *See* Pet. 107 n.6.

IPR2023-00454
Patent 11,093,417 B2

Ex. 1064, 24–32; Ex. 1069; Ex. 1003 ¶¶ 438–441); *see* Ex. 1071, 4:6–12 (disclosing that a "memory device includes a transceiver for transmitting and receiving data" and that a "transceiver includes a transmitter circuit to output data synchronously with respect to rising and falling edges of a clock signal as well as a receiver circuit"), 10:56–59 (disclosing that DDR2 DRAMs and SDRAMs may be used on module 400).

Claim 11 depends from claim 1 and recites "wherein the circuitry includes data paths, and wherein the circuitry is configurable to enable the data paths in response to the data buffer control signals so that the burst of N-bit wide data signals are transferred via the data paths."  Petitioner argues that Perego discloses data paths "for selectively coupling the memory bus, on one hand, to the rank of memory devices targeted by the buffer device for a read or write command, on the other hand," and Petitioner refers to its contentions for relevant limitations of claim 1.  Pet. 108–10 (citing Ex. 1071, 15:34–37; Ex. 1003 ¶¶ 442–448).

Claim 12 depends from claim 11 and recites "wherein the data paths are disabled when no data signals associated with any memory command are being transferred through the circuitry."  Petitioner argues that this subject matter would have been obvious "to avoid collisions and save power, and because there is no reason to enable them."  Pet. 110 (citing Ex. 1003 ¶¶ 449–452; Ex. 1071, 15:40–43, 21:16–28; Ex. 1068, 89–90, 132–33); *see* Ex. 1071, 16–20 (disclosing that memory devices can be "in a ready or standby state until called upon to perform memory access operations").

For claims 13, 14, and 15, each of which depends from claim 12, Petitioner refers to its contentions for claims 2, 8, and 3, respectively, which recite similar subject matter but are dependent from claim 1.  Pet. 111.

46

IPR2023-00454
Patent 11,093,417 B2

Other than its arguments for independent claim 1, which we address above in § II.D.2, Patent Owner does not raise additional arguments for these claims. Nonetheless, the burden remains on Petitioner to demonstrate unpatentability. *See Dynamic Drinkware*, 800 F.3d at 1378. We have reviewed Petitioner's arguments and evidence, summarized above, and we find them persuasive. Therefore, having considered the full record developed during the trial, we conclude that claims 2–15 are unpatentable as having been obvious over the combined teachings of Perego and JESD79-2.

### E.   Remaining Challenges

Because we determine that all challenged claims are unpatentable as discussed above, we need not separately assess the challenges to patentability based on the combination of Perego, JESD79-2, and Ellsberry and the combination of Perego, JESD79-2, and Halbert. 35 U.S.C. § 318(a) ("If an inter partes review is instituted and not dismissed under this chapter, the Patent Trial and Appeal Board shall issue a final written decision with respect to the patentability of any patent claim challenged by the petitioner and any new claim added under section 316(d)."); *Bos. Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809 F. App'x 984, 990 (Fed. Cir. 2020) (nonprecedential) ("We agree that the Board need not address issues that are not necessary to the resolution of the proceeding.").

### III. PETITIONER'S MOTION TO EXCLUDE

Petitioner filed a Motion to Exclude Exhibit 2010 and portions of Exhibit 2003. Paper 35. Patent Owner relies on Exhibit 2010 to challenge Petitioner's combination of Perego and Ellsberry. PO Resp. 51; PO Sur-reply 24. We do not reach this ground and, therefore, do not rely on Exhibit 2010 in a manner adverse to Petitioner. We have considered the cited

47

Appx566

IPR2023-00454
Patent 11,093,417 B2

portions of Exhibit 2003 in our analysis above and do not rely on this testimony in a manner adverse to Petitioner.

Therefore, we dismiss the Motion to Exclude as moot.

## IV. CONCLUSION[11]

For the reasons discussed above, we determine that Petitioner has proven, by a preponderance of the evidence, that claims 1–15 of the '417 patent are unpatentable, as summarized in the following table:

| Claim(s) | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–15 | 103(a) | Perego, JESD79-2 | 1–15 | |
| 1–15 | 103(a) | Perego, JESD79-2, Ellsberry[12] | | |
| 1–15 | 103(a) | Perego, JESD79-2, Halbert | | |
| **Overall Outcome** | | | 1–15 | |

---

[11] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[12] As explained above, because we determine that the challenged claims are unpatentable based on the combination of Perego and JESD79-2, we decline to address the remaining grounds.

48

IPR2023-00454
Patent 11,093,417 B2

## V.  ORDER

Accordingly, it is

ORDERED that claims 1–15 of the '417 patent have been shown to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude (Paper 35) is *dismissed*; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

49

IPR2023-00454
Patent 11,093,417 B2

FOR PETITIONER:

Eliot Williams
Theodore Chandler
Ferenc Pazmandi
John Gaustad
Brianna Potter
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
john.gaustad@bakerbotts.com
brianna.potter@bakerbotts.com

Juan Yaquian
Winston & Strawn LLP
jyaquian@winston.com

For PATENT OWNER:

Hong Zhong
Jonathan Lindsay
Philip Warrick
IRELL & MANELLA LLP
hzhong@irell.com
jlindsay@irell.com
pwarrick@irell.com

Michael Heim
Chris Limbacher
HEIM, PAYNE & CHORUSH LLP
mheim@hpcllp.com
climbacher@hpcllp.com

50

Appx569

[REDACTED]

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

|  |  |
|---|---|
| NETLIST, INC.,<br><br>       Plaintiff,<br><br>  vs.<br><br>MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; MICRON<br>TECHNOLOGY TEXAS LLC,<br><br>      Defendants. | Case No. 2:22-cv-294-JRG<br><br>JURY TRIAL DEMANDED |

**MICRON DEFENDANTS' RENEWED MOTION FOR
JUDGMENT AS A MATTER OF LAW ON DAMAGES**









CONFIDENTIAL MATERIAL OMITTED









CONFIDENTIAL MATERIAL OMITTED











Appx587



# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>          Plaintiff,<br><br>     vs.<br><br>MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; MICRON<br>TECHNOLOGY TEXAS LLC,<br><br>          Defendants. | Case No. 2:22-cv-294-JRG<br><br>JURY TRIAL DEMANDED |

## DEFENDANTS' RULE 59 MOTION FOR A NEW TRIAL



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>      Plaintiff,<br><br>    vs.<br><br>MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; MICRON<br>TECHNOLOGY TEXAS LLC,<br><br>      Defendants. | Case No. 2:22-cv-294-JRG<br><br>JURY TRIAL DEMANDED |

## <u>MICRON DEFENDANTS' NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE THAT Defendants Micron Technology, Inc., Micron Semiconductor Products, Inc., and Micron Technology Texas LLC[1] ("Micron") hereby appeal to the U.S. Court of Appeals for the Federal Circuit from (1) the Final Judgment of the District Court (Dkt. No. 151), (2) the Memorandum Opinion and Order denying Micron's Motion for Judgment as a Matter of Law of Non-Infringement for U.S. Patent Nos. 7,619,912 and 11,093,417 (Dkt. No. 190), (3) the Memorandum Opinion and Order denying Micron's Motion for Judgment as a Matter of Law of no Willfulness (Dkt. No. 191), (4) the Memorandum Opinion and Order denying Micron's Renewed Motion for Judgment as a Matter of Law on Damages (Dkt. No. 192), (5) the Memorandum Opinion and Order denying Micron's Motion for a New Trial (Dkt. No. 193), (6) the Claim Construction Memorandum Opinion and Order (Dkt.

---

[1] Although Micron Technology Texas LLC was dissolved in October 2023, it joins this notice of appeal as necessary and to the extent appropriate under Idaho Code § 30-25-702 for the purpose of winding up its activities and affairs.

1

Appx615

No. 228, Case No. 2:22-cv-00293-JRG), and (7) any and all other decisions, findings, orders, rulings, opinions, and/or conclusions entered in this action or merged into, incorporated in, or related to the Final Judgment decided adversely to Micron.

Dated: July 9, 2025

Respectfully submitted,

*/s/ Michael R. Rueckheim*
Thomas M. Melsheimer
State Bar No. 13922550
TMelsheimer@winston.com
Natalie Arbaugh
State Bar No. 24033378
NArbaugh@winston.com
Rex Mann
State Bar No. 24075509
RMann@winston.com
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
Telephone: (214) 453 6500
Facsimile: (214) 453 6400

David P. Enzminger (pro hac vice)
DEnzminger@winston.com
WINSTON & STRAWN LLP
333 South Grand Avenue, 38th Floor
Los Angeles, CA 90071-1543
Telephone: (213) 615-1700
Facsimile: (213) 615-1750

Michael R. Rueckheim
State Bar No. 24081129
MRueckheim@winston.com
Ryuk Park (pro hac vice)
RPark@winston.com
Matthew R. McCullough
MRMcCullough@winston.com
WINSTON & STRAWN LLP
255 Shoreline Drive, Suite 520
Redwood City, CA 94065
Telephone: (650) 858 6500

2

Appx616

Facsimile: (650) 858 6559

Aldo A. Badini
abadini@winston.com
WINSTON & STRAWN LLP
200 Park Ave., Floor Ave., Flr. 43
New York, NY 10166-4193
Telephone: (212) 294-4601
Facsimile: (212) 294-4700

Brian J. Nisbet
Maureen L. Rurka
bnisbet@winston.com
mrurka@winston.com
WINSTON & STRAWN LLP
5 West Wacker Drive, Ste. 4200
Chicago, IL 60601
Telephone: (312) 558-5600
Facsimile: (312) 5585700

Matthew Hopkins (pro hac vice)
State Bar No. 1500598
mhopkins@winston.com
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, D.C. 20036
Telephone: (202) 282 5000
Facsimile: (202) 282 5100

William M. Logan
State Bar No. 24106214
wlogan@winston.com
Juan C. Yaquian (pro hac vice)
State Bar No. 24110559
JYaquian@winston.com
WINSTON & STRAWN LLP
800 Capital Street, Suite 2400
Houston, TX 77002
Telephone: (713) 651 2600
Facsimile: (713) 651 2700

**ATTORNEYS FOR DEFENDANTS
MICRON TECHNOLOGY, INC.,
MICRON SEMICONDUCTOR PRODUCTS,
INC., MICRON TECHNOLOGY TEXAS,
LLC**

3

Appx617

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 9, 2025, the foregoing document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record, including counsel of record for Plaintiff Netlist Inc.

*/s/ Michael R. Rueckheim*
Michael R. Rueckheim

███████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

NETLIST, INC.,

      Plaintiff,

    vs.

MICRON TECHNOLOGY, INC.;
MICRON SEMICONDUCTOR
PRODUCTS, INC.; MICRON
TECHNOLOGY TEXAS LLC,

      Defendants.

Case No. 2:22-cv-294-JRG

JURY TRIAL DEMANDED

## MICRON DEFENDANTS' RULE 50(B)
## MOTION FOR JUDGMENT AS A MATTER OF LAW
## FOR NON-INFRINGEMENT REGARDING U.S. PATENT NOS. 7,619,912 AND
## 11,093,417

███████████





IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

MARSHALL DIVISION

NETLIST, INC.,                          )
                                        )
        Plaintiff,                      )
                                        )
        -vs-                            ) Civil Action No.
                                        ) 2:22-cv-294-JRG
MICRON TECHNOLOGY, INC.,                )
MICRON SEMICONDUCTOR                    )
PRODUCTS, INC., MICRON                  )
TECHNOLOGY TEXAS, LLC,                  )
                                        )
        Defendants.                     )

██████████████████████████████████

_____

VIDEO RECORDED EXAMINATION OF

DAVID KENNEDY

_____

TAKEN ON

THURSDAY, FEBRUARY 15, 2024

CERTIFIED STENOGRAPHER:
JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
CCR-WA (No. 21007264), CSR-CA (No. 14420),
REALTIME SYSTEMS ADMINISTRATOR
JOB NO.:  928980

Appx656

Appx657

Appx658

Appx659

Appx660

Appx661

Appx662

Appx663

Appx664

Appx665

Appx666

Appx667

Appx668

CONFIDENTIAL MATERIAL OMITTED

NETLIST vs
MICRON TECHNOLOGY

David Kennedy
February 15, 2024

181

Appx669

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

NETLIST, INC,

  Plaintiff,

  vs.

MICRON TECHNOLOGY, INC.;
MICRON SEMICONDUCTOR
PRODUCTS, INC.; MICRON
TECHNOLOGY TEXAS LLC,
Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 2:22-CV-294-JRG

JURY TRIAL DEMANDED

███████████████

## PLAINTIFF NETLIST, INC.'S OPPOSITION TO MICRON DEFENDANTS'
## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES













CONFIDENTIAL MATERIAL OMITTED









CONFIDENTIAL MATERIAL OMITTED

- 10 -





- 12 -









CONFIDENTIAL MATERIAL OMITTED



# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | | |
|---|---|---|
| NETLIST, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 2:22-cv-294-JRG |
| vs. | ) | |
| | ) | JURY TRIAL DEMANDED |
| MICRON TECHNOLOGY, INC., | ) | |
| MICRON SEMICONDUCTOR | ) | ████████████████ |
| PRODUCTS INC., MICRON | ) | |
| TECHNOLOGY TEXAS LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## NETLIST'S OPPOSITION TO MICRON'S MOTION FOR A NEW TRIAL
## (DKT. 158)









CONFIDENTIAL MATERIAL OMITTED



CONFIDENTIAL MATERIAL OMITTED



CONFIDENTIAL MATERIAL OMITTED

- 7 -





CONFIDENTIAL MATERIAL OMITTED





Appx731











| | | |
|---|---|---|
| NETLIST, INC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 2:22-CV-294-JRG |
| | ) | |
| MICRON TECHNOLOGY, INC.; | ) | JURY TRIAL DEMANDED |
| MICRON SEMICONDUCTOR | ) | |
| PRODUCTS, INC.; MICRON | ) | ███████████████ |
| TECHNOLOGY TEXAS LLC, | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF NETLIST, INC.'S SUR-REPLY TO MICRON DEFENDANTS'
RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES**



CONFIDENTIAL MATERIAL OMITTED







- 4 -





Dated: October 30, 2024

Respectfully submitted,

*/s/ Jason Sheasby*

Jason Sheasby

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@mckoolsmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@mckoolsmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Facsimile: (903) 923-9099

Jason G. Sheasby (*pro hac vice*)
jsheasby@irell.com
Annita Zhong, Ph.D. (*pro hac vice*)
hzhong@irell.com
Thomas C. Werner (*pro hac vice*)
twerner@irell.com
Yanan Zhao (*pro hac vice*)
yzhao@irell.com
Michael W. Tezyan (*pro hac vice*)
mtezyan@irell.com

**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel. (310) 277-1010
Fax (310) 203-7199

**Attorneys for Plaintiff Netlist, Inc.**

- 7 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC,<br><br>      Plaintiff,<br><br>      vs.<br><br>MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; MICRON<br>TECHNOLOGY TEXAS LLC,<br>Defendants. | Civil Action No. 2:22-CV-294-JRG<br><br>JURY TRIAL DEMANDED<br><br>████████████ |

## PLAINTIFF NETLIST, INC.'S SUR-REPLY TO DEFENDANTS' RULE 59 MOTION FOR A NEW TRIAL











**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| NETLIST, INC., | §<br>§ |
| *Plaintiff*, | §<br>§ |
| v. | §   CIVIL ACTION NO.  2:22-CV-00293-JRG<br>§               (Lead Case) |
| SAMSUNG ELECTRONICS CO, LTD, *et al.* | §<br>§<br>§ |
| *Defendants*. | §<br>§ |

| | |
|---|---|
| NETLIST, INC., | §<br>§ |
| *Plaintiff*, | §<br>§ |
| v. | §   CIVIL ACTION NO.  2:22-CV-00294-JRG<br>§ |
| MICRON TECHNOLOGY, INC., *et al.* | §<br>§ |
| *Defendants*. | §<br>§ |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

In these consolidated patent cases, Netlist alleges infringement by Samsung and Micron (and their affiliates) (together, "Defendants") of claims from four patents related to computer memory—U.S. Patent Nos. 7,619,912 (the "'912 Patent"); 9,858,215 (the "'215 Patent"); 10,268,608 (the "'608 Patent"); and 11,093,417 (the "'417 Patent"). The parties present ten disputes[1] about the proper construction of claim terms from the patents. Having considered the

---

[1] The parties briefed disputes for eleven claim terms, but Netlist has since withdrawn its assertion of a number of claims from the '912 Patent. *See* Joint Notice of Mootness Regarding Construction of Claims No Longer Asserted, Dkt. No. 201. As result, there is no longer a live dispute concerning one of the terms. *See id.* at 2–3.

parties' briefing and arguments of counsel during a September 26, 2023 hearing, the Court resolves the disputes as follows.

## I.     BACKGROUND

### A.     U.S. Patent 7,619,912

The '912 Patent relates "specifically to devices and methods for improving the performance, the memory capacity, or both, of memory modules." '912 Patent at 1:22–24. Generally, doubling the memory size of a DRAM[2] device more than doubles the associated cost. For example,

> by fabricating a 1-GB memory module using thirty-six 256-Mb memory devices [instead of 18 512-Mb devices], the cost of the resulting 1-GB memory module can be reduced since the unit cost of each 256-Mb memory device is typically lower than one-half the unit cost of each 512-Mb memory device. The cost savings can be significant, even though twice as many 256-Mb memory devices are used in place of the 512-Mb memory devices.

*Id.* at 4:51–58. "In other words, the price per bit ratio of the higher-density DRAM devices is greater than that of the lower-density DRAM devices." *Id.* at 4:62–64. Thus, under certain market conditions, there is an economic incentive for using pairs of lower-density DRAM devices instead of individual higher-density devices. *Id.* at 4:64–5:5.

The problem, however, is that a computer system may not be configured to provide the required control signals, like chip-select signals, for the lower-density chips. For example, a system expecting four ranks of memory might only provide two chip-select signals, but more are needed if replacing higher-density devices with lower-density devices. *See id.* at 7:20–35.

To address the problem, the patent teaches using a logic element, such as a programmable

---

[2] DRAM stands for "dynamic random-access memory." Stone Decl., Dkt. No. 129-6 ¶ 23. That the memory is "dynamic" means "the memory only remembers its information while power is maintained; if power is turned off, the contents of the DRAMs are lost." *Id.*

Appx5002

logic device (PLD), to "translate" the computer system's signals to signals appropriate for the lower-density memory devices. As an example, Table 1 shows a logic table for translating two chip-select signals and a row/column address signal from the computer ($CS_0$, $CS_1$, $A_{n+1}$) to four chip-select signals connected to the memory devices ($CA_{0A}$, $CA_{0B}$, $CA_{1A}$, $CA_{1B}$). *Id.* at 7:60–67.

The claims recite this "translation" functionality as responding to command and input signals from the computer by generating command and output signals to the memory devices. For example, Claim 1 recites:

> a circuit mounted to the printed circuit board, the circuit comprising
> **a logic element** and a register, **the logic element** receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, the set of input control signals corresponding to **a second number of DDR memory devices** arranged in a second number of ranks, the second number of DDR memory devices smaller than **the first number of DDR memory devices** and the second number of ranks less than the first number of ranks, the circuit generating a set of output control signals in response to the set of input control signals, the set of output control signals corresponding to the first number of DDR memory devices arranged in the first number of ranks, wherein *the circuit further responds to a first command signal and the set of input control signals from the computer system by generating and transmitting a second command signal and the set of output control signals to the plurality of memory devices*, the first command signal and the set of input control signals corresponding to the second number of ranks and the second command signal and the set of output control signals corresponding to the first number of ranks;

*Id.* at 32:66–33:23 (all emphasis added). The "second number of DDR memory devices" are the higher-density devices replaced by the lower-density "first number of DDR memory devices."

**B.**     **U.S. Patents 9,858,215 and 11,093,417**

The '215 and '417 Patents have a common disclosure. Like the '912 Patent, these patents relate "specifically to devices and methods for improving the performance, the memory capacity, or both, of memory modules." '215 Patent at 1:43–45; *see also* '417 Patent at 1:48–50. Typically, DRAM is arranged in "ranks." '215 Patent at 2:41–47. During operation, those ranks are selected by address and command signals received from the processor, such as chip-select signals. *Id.* at 2:61–65.

As shown in FIG. 2 (below), in a conventional memory module, each memory device (30a, 30b) has data lines (DQa, DQb) and a strobe line (DQSa, DQSb). The data lines (102a, 102b) are connected to a common data line (112) and the strobe lines (104a, 104b) are connected to a common strobe line (114). This means the computer system is exposed to the loads of both memory devices at the same time, which can negatively affect performance. '215 Patent at 6:60–7:13; *see also id.* at 9:43–45 ("increased load on the memory bus can degrade speed performance").



**FIG. 2 of the '215 and '417 Patents**



**FIG. 4A of the '215 and '417 Patents**

In contrast, FIG. 4A (above) shows a circuit (40) that "selectively isolates" the loads of the memory devices from the computer system. The circuit has a pair of switches (120a, 120b) on data lines (102a, 102b). Each switch can be actuated to selectively connect one or both data lines to a common data line (112). This allows a data signal to be transmitted from the memory controller to the memory devices of one or both ranks (32a, 32b) via the data lines (102a, 102b) and thereby isolate the memory devices when advantageous to do so. *See generally* '215 Patent at 8:27–56.

Notably, these patents also include the subject matter of the '912 Patent. Specifically, the description relating to FIGS. 9A–19 of the '215 Patent and '417 Patent is generally the same as the description of FIGS. 1A–14 of the '912 Patent. The '215 Patent and '417 Patent add sections on "Load Isolation," "Back-to-Back Adjacent Read Commands," "Serial-Presence-Detect Device," "Tied Data Strobe Signal Pins," and "Memory Density Multiplication," in addition to the '912 Patent's subject matter on "Command Signal Translation." *See generally* '215 Patent at 5:18–13:49, 17:41–37:9.

### C.      U.S. Patents 10,268,608

The '608 Patent relates specifically to "multi-rank memory modules and methods of

operation." '608 Patent at 1:37–38. The patent teaches a memory module having memory devices, a module control circuit, and buffer circuits between respective sets of data signal lines in a data bus and respective sets of the memory devices. Each buffer circuit is positioned between a set of data lines and a set of memory devices. The buffer circuit buffers data signals in response to module control and clock signals. Each respective buffer circuit includes a delay circuit configured to delay the respective set of data signals by an amount determined based on at least one of the module control signals. '608 Patent at [57].

As far as claim construction is concerned, the parties only dispute whether the preamble of Claim 1 of the '608 Patent is limiting.

## II.    LEGAL STANDARDS

### A.    Claim Construction Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996), *aff'g*, 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given

6 / 37

Appx5006

their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain claim terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B.      Means-Plus-Function Claiming[3]

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc in relevant portion). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

However, § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014)));; *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding

---

[3] Each of the patents has an effective filing date before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, § 3, 125 Stat. 284, 285-93 (2011). The Court therefore refers to the pre-AIA version of the statute.

to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. "The first step . . . is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). "The next step is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

"[S]tructure can be recited in various ways, including [by using] 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's operation and 'how the function is achieved in the context of the invention.'" *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1366 (Fed. Cir. 2022) (quoting *Apple, Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1299 (Fed. Cir. 2005)). For § 112 ¶ 6 limitations implemented by a programmed general-purpose computer or microprocessor, the corresponding structure described in the patent specification must usually include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In that case, the

corresponding structure is not a general-purpose computer but rather the special-purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### C.     Indefiniteness

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 908.

"Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must make that showing by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III.     THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving the appropriate level of ordinary skill, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Only Micron offers, through its expert's declaration, a level of ordinary skill in the art for consideration. According to Micron's expert, a skilled artisan at the time of invention for the '215 and '417 Patents

> would have been someone with an advanced degree in electrical or computer engineering and at least two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field. Such a person would have been knowledgeable about the design and operation of computer memories, most particularly DRAM and SDRAM devices that were compliant with various standards of the day, and how they interact with other components of a computer system, such as memory controllers. He or she would also have been familiar with the structure and operation of circuitry used to access and control computer memories, including sophisticated circuits such as ASICs and CPLDs and less sophisticated circuits such as tri-state buffers, flip flops, and registers.

Stone Decl., Dkt. No. 144-3 ¶ 21. Since no other party challenges that proposed level of skill, the Court adopts it for analysis of the disputed terms.

## IV.   THE DISPUTED TERMS

A.   **"first number of DDR memory devices arranged in a first number of ranks" and "second number of DDR memory devices in a second number of ranks" ('912 Patent);**

**"memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks" ('417 Patent);**

**"plurality of memory integrated circuits mounted on the printed circuit board and arranged in a plurality of ranks including a first rank and a second rank" ('215 Patent)**

Appx5011

| Netlist's Construction | Defs.' Construction |
|---|---|
| "a predetermined group of [DDR] memory devices on a memory module that can send or receive a fixed number of data bits via a fixed width data bus, in response to a read or write command and independently from other [DDR] memory devices on the memory module"[4] | "Rank" means "an independent set of one or more memory devices on a memory module that act together in response to command signals, including chip-select signals, to read or write the full bit-width of the memory module." |

The parties present two disputes, each centered on the meaning of "rank." First, they dispute whether a "rank" of memory can have a single memory device. Second, they dispute whether a "rank" of memory must be capable of sending or receiving a fixed number of data bits via a fixed width data bus. *See* Dkt. No. 129 at 1.

### 1.     *Whether a rank of memory can be a single memory device*

According to Netlist, a "rank" must include more than one memory device. Netlist first relies on JEDEC[5] standards at the time of the effective filing dates of the underlying applications, which require a rank of either 64 or 72 bits, but does not define devices wider than 16 bits. Dkt. No. 129 at 2–4. Netlist also relies on Micron's expert's testimony that "[i]n the past for this definition of a rank . . . it has been more than one chip." *Id.* at 2–3 (quoting Strone Depo. Tr., Dkt. No. 129-5 at 44:15–20). Netlist says the specification supports this conclusion by consistently referring to "ranks" as multiple memory devices (plural). *Id.* at 4.

Defendants counter with four reasons why the intrinsic evidence shows a "rank" can be a single memory device. First, the '215 Patent describes and claims "*at least one* first memory

---

[4] Netlist's proposed construction for the '912 Patent includes the reference to "DDR." *See* Joint Cl. Constr. Chart, Dkt. No. 160-1 at 1 (Term 1). Also, Netlist's proposed construction for the '215 Patent uses "memory integrated circuits" rather than "memory devices." *Id.* at 8 (Term 14).

[5] JEDEC, or the Joint Electron Device Engineering Council, sets specifications for semiconductor memory circuits.

Appx5012

integrated circuit in [a] first rank and *at least one* second memory integrated circuit in [a] second rank," suggesting the possibility of a one-device rank. Dkt. No. 143 at 2 (citing '215 Patent at 3:31–35, 37:34–38; emphasis added). Second, Claim 55 of the '912 Patent recites "each rank . . . comprises a plurality of DDR DRAM chip packages," so if "rank" requires more than one memory device this phrase is superfluous. *Id.* Third, the specification repeatedly contemplates memory modules with two memory devices arranged in two ranks, one device in each rank. *Id.* at 2–3 (citing, *inter alia*, Figure 6A of the '912 Patent). Finally, cited prior art defines a "rank" as having *one or more* memory devices. *Id.* at 3 (quoting U.S. Patent 6,982,892 at 2:60–61 (emphasis added)).

Regarding Netlist's *extrinsic* evidence, Defendants call it unnecessary in light of the *intrinsic* evidence and "untethered to the asserted patents or their priority dates." *Id.* at 4–5. Regardless, it notes one treatise from around the time of the invention states "a rank of memory is a 'bank' of *one or more* DRAM devices that operate in lockstep in response to a given command." *Id.* at 5 (citing Bruce Jacob et al., *Memory Systems: Cache, DRAM, Disk* (2007), Dkt. No. 129-19 at 413 (emphasis added)).

The Court agrees with Defendants. As Jacob explains:

In modern memory systems, multiple DRAM devices are commonly grouped together to provide the data bus width and capacity required by a given memory system. For example, 18 DRAM devices, each with a 4-bit-wide data bus, are needed in a given rank of memory to form a 72-bit-wide data bus. In contrast, embedded systems that do not require as much capacity or data bus width typically use fewer devices in each rank of memory—*sometimes as few as one device per rank*.

Bruce Jacob et al., *Memory Systems: Cache, DRAM, Disk* (2007), Dkt. No. 129-19 at 414 (emphasis added). Although Netlist stresses the last sentence of this excerpt applies only to embedded systems, Dkt. No. 150 at 4, nothing to which Netlist refers suggests the ordinary meaning of "rank"

13 / 37

differs depending on the system's complexity. To the contrary, while a one-device rank may be more likely found in an embedded system rather than a personal computer or server, Jacob shows the ordinary meaning of "rank" applies to both types of systems.

Other evidence supports this conclusion. For one, Jacob's definition is consistent with the PTAB's preliminary construction in a decision granting *inter partes* review of the '215 Patent. *See* Dkt. No. 143-3 at 12 ("On this preliminary record, we determine that the intrinsic evidence supports Petitioner's position that a rank may have only one memory device."). Perhaps most persuasively, Netlist itself previously stated a "rank" can be a single device. *See* App. Br., Dkt. No. 143-23 at 7 (noting that, in FIG. 2 of U.S. Patent 7,881,150, "each 'rank' includes only a single memory device"[6]).

Netlist's best argument relates to the JEDEC standards at the time, but it is still not persuasive. Those standards require a rank of 64 or 72 bits, but do not define DDR memory greater than 16 bits. *See* Dkt. No. 129 at 2. Thus, simple math suggests there will never be a rank consisting of only one memory device in an embodiment using that standard. That, however, does not alter the ordinary meaning of "rank" as used in the claims. Accordingly, the Court concludes a "rank" can include a single memory device.

  2. *Netlist's "fixed width data bus" requirement and "partial read" capability*

Netlist claims the parties disagree about how a skilled artisan would determine which memory devices on a memory module belong to a particular rank. Dkt. No. 129 at 7. To help in that regard, Netlist asserts each "rank" is associated with its own chip-select signal and outputs or receives data via a "fixed width" bus, and "[n]othing in the '912 patent suggests . . . a rank of memory

---

[6] FIG. 2 of the '150 Patent is identical to FIG. 2 of the '215 and '417 Patents).

devices refers to a group of memory devices that is dynamically reconstituted to account for the changing memory bit width." *Id.* at 7–8. According to Netlist, "a POSITA would understand that a 'rank' must have the capability to send or receive the full bit-width of the memory module, but need not always do so." *Id.* at 9. Defendants question why this dispute matters, but nonetheless note the "patents contemplate 'increasing the number of memory devices per rank.'" Dkt. No. 143 at 6 (citing '912 Patent at 2:24–27).

To start, the Court agrees with Netlist that nothing in the patent suggests a changing memory bit width for a particular embodiment. The language to which Defendants point simply compares different memory modules to one another. *See* '912 Patent at 2:27–30 ("For example, a memory module with four ranks has double the memory capacity of a memory module with two ranks and four times the memory capacity of a memory module with one rank.").

That said, Netlist's proposed construction on this issue is too light on structure and too heavy on "capabilities." "Rank" has a clear structural definition, and the Court need not resolve the various capabilities the embodiments may or may not have because of that structure. As such, the Court declines to adopt Netlist's "fixed width data bus" language and "partial read" capability as not sufficiently tied to structure. *See Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("Apparatus claims cover what a device *is*, not what a device *does*.").

Finally, the Court rejects Defendants' proposed language of "in lockstep" as potentially confusing to a jury for those cases in which a "rank" comprises only one device. The Court, however, agrees that, in embodiments with ranks having more than one memory device, those devices operate together. With that in mind, the Court construes "rank" in these terms as "a 'bank' of one or more devices on a memory module that operate in response to a given signal."

B.     **"[row/column] address signal" ('912 Patent, all claims)**

| Netlist's Construction | Defs.' Construction |
|---|---|
| Plain and ordinary meaning. | "a varying electrical impulse that conveys an address of either a row or a column of memory locations from one point to another" |

Each claim requires "a logic element . . . receiving a set of input control signals from the computer system, the set of input control signals comprising at least one row/column address signal . . . ." '912 C1 Patent at 1:33–36 (Claim 1)[7]; *see also id.* at 2:27–30 (Claim 15), 3:53–56 (Claim 28), 4:47–52 (Claim 39). The parties dispute whether the address signals can include "packetized control and address information" that is decoded by logic into output signals.

Defendants take a two-step approach to reach their construction. First, they point to a previously agreed-to construction for "signal" from earlier litigation. *See* Dkt. No. 143 at 9. Then they *assume* the agreed-to construction includes "packetized" signals and claim "Netlist offers no construction that would exclude 'packetized' signals and identifies no disclaimer or lexicography that would justify such a construction." *See id.* at 10.

Defendants' argument concerns Netlist's assertion, in 2009, of the '912 Patent against Google in the United States District Court for the Northern District of California. *See* Joint Cl. Const. & Prehr'g Statement, Dkt. No. 143-8. During that litigation, the parties informed the court they agreed on the construction of "signal" as "a varying electrical impulse that conveys information from one point to another." *See id.*, Ex. A. Netlist then filed an IDS with the Patent Office citing that Joint Statement. Information Disclosure Statement (June 8, 2010), Dkt. No. 143-9 at 5 (Cite No. 92). Defendants argue filing the IDS with the Office constitutes disclaimer. Dkt. No. 143

---

[7] Referring to the *Inter Partes* Reexamination Certificate, Dkt. No. 129-1 at 43–50.

at 8 (citing *Golden Bridge Tech. Inc. v. Apple Inc.*, 758 F.3d 1362 (Fed. Cir. 2014)).

Netlist does not contest the IDS might be binding in certain circumstances, but argues no construction is necessary for the jury to understand the scope of "signal." Dkt. No. 129 at 13. Regardless, says Netlist, "[p]acketized information transfer is not an electrical impulse, i.e., a high or a low which translates into a 1 or 0," and "[t]he intrinsic record makes no reference to packetized transfer of information as being the same as signals." Dkt. No. 150 at 5–6.

The Court agrees with Netlist. Rather than presenting the underlying dispute to the Court— here, whether "[row/column] address signal" includes "packetized" signals—Defendants point to a 2010 agreed construction that resolved a *different* dispute—"whether types of signals (e.g., command and control signals) needed to have 'pins of a device dedicated for that specific information.'" Dkt. No. 143 at 9 (citing Netlist's Open'g Cl. Constr. Br. (N.D. Cal.), Dkt. No. 143-12 at 9–13). Given the different disputes, that prior construction has no effect here.

If anything, based on the intrinsic record, Defendants must show why the ordinary meaning of "[row/column] address signal" *includes* packetized information. After all, the '912 Patent does *not* refer to packetized information for addressing. Nor do traditional DIMMS include "multiplex control and address information demuxed from the data." *See* Wolfe Depo. Tr., Dkt. No. 129-23 at 28:8–16. Because Defendants fail to present any evidence to the contrary, the Court rejects that the scope of the disputed term includes "packetized" signals. Otherwise, the Court will give this term a "plain and ordinary meaning" construction.

> **C.** **"A memory module connectable to a computer system, the memory module comprising" ('912 Patent, preamble of all asserted claims);**
>
> **"A memory module operable to communicate with a memory controller via a memory bus, the memory bus including signal lines, the signal lines including**

**a set of control/address signal lines and a plurality of sets of data/strobe signal lines, the memory module comprising:" ('608 Patent, Claim 1)**

| Netlist's Construction | Defs.' Construction |
|---|---|
| Limiting preamble | Preamble not limiting |

"In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim. Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina Mktg, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002).

Here, the preambles do not "only state a purpose or intended use for the invention." In fact, they state no purpose or intended use at all, instead requiring the memory module to be connectable to a computer system or operable to communication with a controller via a memory bus. As Micron's expert explains, "DRAM chips are mounted on small printed-circuit boards . . . typically referred to as memory modules." Stone Decl., Dkt. No. 129-6 ¶ 26. And "DRAM chips and the interfaces to the boards that include the DRAM chips, e.g., memory modules, are standardized so that memories from different vendors can be used in a variety of computers from different manufacturers." *Id.* ¶ 27.

Based in part on this explanation from Dr. Stone, the Court agrees with Netlist. The important concepts of a "small printed-circuit board" and "standardized interfaces" to computers are absent from the body of the claims. Thus, not only do the claims fail to recite a structurally complete invention, "[a] skilled artisan would understand a 'memory module' is distinct from, and has essential structural requirements not necessarily found in, other modular computer accessories[, including] the structure necessary to connect to a memory controller." Cl. Constr. Order (*Samsung*

Appx5018

*I*), Dkt. No. 129-7 at 28. Accordingly, the Court holds these are limiting preambles.

### D.        The Buffer Control Terms ('215 Patent, Claims 1, 21; '417 Patent, Claim 1)

| Netlist's Construction | Def.' Constructions |
|---|---|
| These limitations do not require the first rank and second rank of memory integrated circuits to be on different forks. | "logic coupled to the buffer and configured to respond to the **first memory command** by providing first control signals **to selectively electrically couple the input of the buffer to a first data signal line at the output of the data buffer** to enable communication of the first data burst between the at least one first memory integrated circuit and the memory controller through the buffer, **and disabling a second data signal line at the output of the buffer connected to the second memory integrated circuit**" ('215 Patent, Claim 1) |
|  | "wherein logic is further configured to respond to the **second memory command** by providing second control signals to **selectively electrically couple the input of the buffer to a second data signal line at the output of the data buffer** to enable communication of the second data burst between the at least one second memory integrated circuit and the memory controller through the buffer, **and disabling a first data signal line at the output of the buffer connected to the first memory integrated circuit**" ('215 Patent, Claim 1) |
|  | "**a data buffer** coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, **the buffer configurable to selectively electrically couple a single data signal line at the input of the buffer to a first signal line and second signal line at the output of the buffer** to transfer N-bit wide data signals between the N-bit wide memory bus and the memory devices **in the one of the plurality of N-bit wide rank**, **wherein each signal line at the output of the buffer is connected to a different N-bit wide rank**" ('417 Patent, Claims 1, 6, 11) |

Despite that the claims do not facially require enabling one data buffer while disabling other data buffers, Defendants argue the claims should be so limited based on the specification and

19 / 37

Appx5019

the prosecution history. Regarding the specification, Defendants point to the differences between FIG. 2 and FIG. 4A and characterize the invention as using a "fork-in-the-road" architecture for enabling load isolation. Dkt. No. 143 at 14. Defendants then stress allegedly disavowing statements made by Netlist in IPR proceedings for related patents in which Netlist characterized the ability to "selectively electrically couple" the memory controller to the data buffer as a key contribution of the inventions. *Id.* at 15–17.

According to Netlist, however, there is no such fork-in-the-road requirement. For one, says Netlist, FIGS. 8A and 8B show an embodiment without such an arrangement, suggesting a "fork in the road" is not essential to the invention. Dkt. No. 129 at 18–21, 23–24; Dkt. No. 150 at 8–9.

The Court agrees with Netlist. Regarding the specification, the Court rejects Defendants' assertion that "the only relevant disclosure . . . is directed to using a buffer to disable a data path for isolation." Dkt. No. 143 at 14. The "Load Isolation" section composes only part of the disclosures. *See* '215 Patent at 5:17–11:37. In fact, much of the disclosures repeat the subject matter of the '912 Patent—the translation of address and control signals from the computer system to memory modules using a logic element. *See id.* at 13:50–17:40. The disclosures also include sections on "Back-to-Back Adjacent Read Commands," *id.* at 12:37–13:49, "Serial-Presence-Detect Device[s]," *id.* at 17:41–30:3, and "Tied Data Strobe Signal Pins," *id.* at 30:5–37:9. The claims at issue include some subject matter from these other sections.[8] Thus, the Court is not convinced the

---

[8] For example, Claims 1 and 21 of the '215 Patent relate to memory commands that cause the memory module to receive or output data bursts, '215 Patent at 37:51–62, which the patent discusses under the "Back-to-Back Adjacent Read Commands" section, *see generally id.* at 11:39–13:50. Similarly, the last two limitations of Claim 1 of the '417 Patent concern CAS latency, '417 Patent at 42:54–67, which the patent discloses under the "Serial-Presence-Detect Device" section, *id.* at 22:36–62.

Appx5020

claims are directed only to the "load isolation" disclosure as opposed to other aspects of the patents.

Regarding Netlist's IPR statements, they specifically concerned the phrase "selectively electrically coupled" in the claims at issue, which Netlist clearly tied to the "Load Isolation" part of the disclosure. For example, Netlist had an entire section of its brief dedicated to explaining the importance of "load isolation." *See* App.'s Br., Dkt. No. 143-23 at 10–14. It explained:

> Adding the configurability to **selectively electrically couple** a device data line to a common data line was a key contribution of the inventions. When a memory device's data line is permanently electrically connected to the common data line, as is the case for both memory devices in the conventional memory module of FIG. 2, the computer system is always exposed to the electrical load of each such memory device on a module. But when a switch or other mechanism is used to **selectively electrically couple** the data lines, such as shown in FIG. 3A, the electrical load of the memory devices can be disconnected from the computer system by the switch. When the switch is not actuated, there is no electrical connection between the device data line and common data line, which means there is no electrical connection between the computer system (connected to the common data line) and the memory device (connected to the device data line). When that happens, the electrical load of the memory module is reduced to the load of the circuit 40 (*i.e.*, the switches and other components of the circuit, but not the memory devices).
>
> Solving the problem of increased loading due to additional memory devices was essential to overcoming the shortcomings of prior art memory modules.

*Id.* at 41–42 (emphasis added).

Here, however, the claims at issue use different language than "selectively electrically coupled" and, as discussed *supra*, are not so clearly tied to this "load isolation" concept to justify finding clear and unmistakable disclaimer. Accordingly, the Court rejects any fork-in-the-road requirement for these claims.

### E.  "logic" ('215 Patent, Claim 1; '417 Patent, Claim 1)

| Netlist's Construction | Micron's Construction |
| --- | --- |
| Plain and ordinary meaning, not subject to § 112 ¶ 6. | Subject to § 112 ¶ 6, but there is no disclosure of adequate structure or algorithm for the functions of: <br><br> For Claim 1 of the '417 Patent <br> "output[ting] data buffer control signals in response to the read or write memory command" <br><br> For Claim 1 of the '215 Patent: <br> "(i) respond[ing] to the first memory command by providing first control signals to the buffer to enable communication of the first data burst between the at least one first memory integrated circuit and the memory controller through the buffer; and <br><br> (ii) further respond[ing] to the second memory command by providing second control signals to the buffer to enable communication of the second data burst between the at least one second memory integrated circuit and the memory controller through the buffer" |

Claim 1 of the '417 Patent recites "[a] memory module operable in a computer system" comprising:

> a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system; [and]
>
> logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signal . . . .

'417 Patent at 42:7–22. The claims further require the input address and control signals to include registered chip-select signals that are either "active" or "non-active." *Id.* at 42:22–40. Claim 1 of the '215 Patent includes a similar "logic" limitation, but requires the "logic" to be connected to a buffer that itself is coupled between a memory integrated circuit and a memory bus. *See* '215

Appx5022

Patent at 37:47–62.

Pointing to *Williamson* and *Egenera, Inc. v. Cisco Sys.*, 972 F.3d 1367 (Fed. Cir. 2020), Micron argues "the 'logic' limitations are claimed in a purely functional manner and fail to recite sufficient structure for performing the claimed functionality." Dkt. No. 143 at 24–26. In *Egenera*, the court considered whether the phrase "logic to modify said received messages to transmit said modified messages to the external communication network and to the external storage network" was subject to § 112 ¶ 6. Egenera argued the recited "logic to modify" was structural because it was part of a "control node," but the court rejected that argument. *See Egenera*, 972 F.3d at 1374 ("Mere inclusion of a limitation within a structure does not automatically render the limitation itself sufficiently structural. . . . [T]he question is not whether 'logic' is utterly devoid of structure but whether the claim term recites sufficient structure to perform the claimed functions."). Egenera also argued the claim language defined the "inputs, outputs, connections, and operation" of the logic component, thus providing sufficiently definite structure, but the court also rejected that argument. *Id.* ("[T]he claims and specification provide no structural limitation to the 'inputs, outputs, connections, and operation' of the claimed 'logic to modify.'").

Here, the "logic" is distinguishable from *Egenera*'s "logic to modify." In *Egenera*, the appellant argued that "logic" denoted "software, firmware, circuitry, or some combination thereof." The district court called that definition "'so broad and formless as to be a generic black box for performing the recited computer-implemented functions.'" *Egenera*, 972 F.3d at 1374 (quoting the district court). As used in these claims, however, "logic" clearly connotes *physical* structure rather than software, as the claims require the "logic" to be coupled to either a printed circuit board (in the '417 Patent) or a buffer (in the '215 Patent). Thus, "logic" here is not so "broad and formless" as the "logic to modify" of *Egenera*.

Moreover, the limitation requires connection of address and control signal lines, the receipt of address and control signals over those lines, and the output of chip-select signals based on the input signals. This is consistent with the specifications' disclosure of PLDs, ASICs, FPGAs, and CPLDs as "logic elements." *See, e.g.*, '417 Patent at 7:17–31 (noting that, "[i]n certain embodiments, the circuit [40] comprises a logic element selected from a group consisting of: a programmable-logic device (PLD), an application-specific integrated circuit (ASIC), a field-programmable gate array (FPGA), a custom-designed semiconductor device, and a complex programmable-logic device (CPLD)"). In light of that disclosure, and because a skilled artisan would have "been familiar with the structure and operation of circuitry used to access and control computer memories," Stone Decl., Dkt. No. 144-3 ¶ 21, the Court finds this limitation recites sufficiently definite structure to avoid invoking § 112 ¶ 6. Accordingly, this term will be given a "plain and ordinary meaning" construction.

### F.        "circuitry" ('417 Patent, Claims 1, 6, 11)

| Netlist's Construction | Micron's Construction |
|---|---|
| Plain and ordinary meaning, not subject to § 112 ¶ 6 | Subject to §112, ¶ 6, but there is no disclosure of adequate structure or algorithm for the function of "transfer[ring] the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signal" |

Claim 1 recites:

> circuitry coupled between the data signal lines in the N-bit wide memory
>     bus and corresponding data pins of memory devices in each of the
>     plurality of N-bit wide ranks, the circuitry being configurable to
>     transfer the burst of N-bit wide data signals between the N-bit wide
>     memory bus and the memory devices in the one of the plurality of
>     N-bit wide ranks in response to the data buffer control signals and
>     in accordance with an overall CAS latency of the memory module[.]

'417 Patent at 42:54–62. Claims 6 and 11 further limit the "circuitry" to include "logic pipelines" and "data paths," respectively. *See id.* at 43:19–22 (Claim 6), 44:10–14 (Claim 11). Micron contends "circuitry" is governed by 35 U.S.C. § 112 ¶ 6 but is indefinite for lack of corresponding structure. Dkt. No. 143 at 28–30.

"[W]hen the structure-connoting term 'circuit' is coupled with a description of the circuit's operation, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and § 112 ¶ 6 presumptively will not apply." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1320 (Fed. Cir. 2004). In *Linear Tech*, the court held the claims' recitation of the circuit's objective was sufficient to avoid invoking § 112 ¶ 6. *Id.* (noting "[t]he contextual language describes the objective of the 'circuit,' [which is] 'monitoring a signal from the output terminal,' and the desired output of the 'circuit,' [which is] 'generating a first feedback signal'").

Here, too, the claims at issue provide the objective and desired output of the circuit.

25 / 37

Specifically, Claim 1 recites "transfer[ring] the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module." '417 Patent at 42:57–62. Moreover, the claims recite registering data transfers through the circuitry "for an amount of time delay *such that* the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices." *Id.* at 42:64–67 (emphasis added). Given Micron's characterization of a skilled artisan as one "knowledgeable about the design and operation of computer memories, most particularly DRAM and SDRAM devices that were compliant with various standards of the day, and how they interact with other components of a computer system, such as memory controllers," Stone Decl., Dkt. No. 144-3 ¶ 21, the Court holds § 112 ¶ 6 does not apply and will give this term a "plain and ordinary meaning" construction.

### G.    "the at least one of the circuit components" ('215 Patent, Claim 15)

| Netlist's Construction | Micron's Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This dispute relates to both Claim 14 and Claim 15 of the '215 Patent. The former requires the buffer of Claim 1 to include "circuit components configurable to provide a first data path or a second data path depending on whether the first rank or the second rank is selected to communicate data with the memory controller." '215 Patent at 39:24–28. Claim 15, which depends from Claim 14, then recites "the at least one of the circuit components is configured to provide the first data path in response to the first control signals, and is configured to provide the second data path in response to the second control signals." *Id.* at 39:29–33. Micron argues this phrase from Claim 15 has at least two possible and equally plausible meanings: (1) "<u>wherein</u> [[the]] at least

one of the circuit components is configured to provide . . .”; or (2) “~~the at least one of~~ the circuit components are configured to provide . . .” Dkt. No. 143 at 24. As such, Micron says, this phrase is indefinite. *Id.*

The Court disagrees. For one, there is no material difference in scope between Micron’s two proffered meanings. In other words, regardless of whether (1) “at least one of the circuit components” or (2) “the circuit components” are configured as required by the claims, those two phrases effectively mean the same thing. In addition, the only substantive limitation added by Claim 15 is the requirement that the provision of the data paths be “in response” to control signals. Thus, construing the phrase as “the circuit components” reflects how a skilled artisan would understand the term because it best aligns the language of Claim 15 with that of Claim 14. The Court therefore adopts that construction.

### H.     “burst of data strobe signals” (’215 Patent, Claims 12, 13, 28, 29)

| Netlist’s Construction | Micron’s Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite. |

Claim 1 of the ’215 Patent is directed to

> [a] memory module operable in a computer system to communicate data with a memory controller of the computer system via a memory bus in response to memory commands received from the memory controller, the memory commands including a first memory command and a subsequent second memory command, the first memory command to cause the memory module to receive or output a first data burst and the second memory command to cause the memory module to receive or output a second data burst . . .

’215 Patent at 37:12–21. Claim 12, which depends from Claim 1, specifies:

> the first memory command is a first read command and the second memory command is a second read command, wherein the first read command and the second read command are back to back adjacent

read commands, and wherein the memory module outputs the first data burst together with **a first burst of data strobe signals** in response to the first read command, wherein [the] memory module outputs the second data burst together with **a second burst of data strobe signals** in response to the second read command, wherein the second data burst follows the first data burst on the memory bus, and wherein the buffer is configured to prevent the **first burst of data strobe signals** and the **second burst of data strobe signals** from colliding with each other.

*Id.* at 39:1–14 (emphasis added).

Micron challenges this term as indefinite because the bursts could come from either "combined" or "non-combined" strobes. Dkt. No. 143 at 23. With "combined" strobes, two different memory devices have their strobe pins tied together. Stone Decl., Dkt. No. 144-3 ¶ 47. "Non-combined" strobes come from a single memory device. *Id.* ¶ 48. Netlist argues the term is broad enough to include both sources. Dkt. No. 129 at 26.

Micron focuses on the wrong question. Specifically, Micron looks to what *originates* the required "burst of data strobe signals," rather than the "bursts" themselves. The claims only require "the memory module [to] output[] the first data burst together with a first burst of data strobe signals." They say nothing about the underlying structural configuration that creates the "bursts." Thus, Micron at most shows the claims are indifferent as to the configuration of the *source* of the "bursts," and not what a "burst" is or is not. As such, it has not carried its burden on indefiniteness, and the Court will give this term a "plain and ordinary meaning" construction.

I.    **"operable in a computer system to communicate data" ('215 Patent, Claim 1; '417 Patent, Claim 1)**

| Netlist's Construction | Defs.' Construction |
|---|---|
| Plain and ordinary meaning | "configured in a computer system to communicate data" |

Defendants question whether this term "requires mere capability (including after modification) or whether it requires structure that presently is configured to perform the recited function." Dkt. No. 143 at 20. They point to *TQ Delta, LLC v. CommScope Holding Co.*, No. 2:21-CV-309-JRG, 2022 WL 2071073 (E.D. Tex. June 8, 2022), in which the Court explained "'operable to' should be construed to refer to being configured to operate in the recited manner.'" *Id.* Netlist, however, asserts "[t]hat concern is not present here" because a skilled artisan "would understand that memory modules are designed to communicate data with a memory controller . . . without modification." Dkt. No. 129 at 27–28.

Based on the briefing, the parties apparently agree with the well-established principle "that a device capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). In other words, if the claims recite some structure "operable" to perform a task, an accused device must be *presently* "operable" to perform that task to infringe. Given the parties' apparent agreement on that point, the Court will give this term a "plain and ordinary meaning" construction.

### J. "data buffer control signals" ('417 Patent, Claims 1, 3, 11)

| Netlist's Construction | Defs.' Construction |
|---|---|
| Plain and ordinary meaning | "a signal sent to a buffer to selectively electrically couple the data signal line at the input of the buffer to a first signal line and a second signal line at the output of the buffer wherein each of the first signal line and the second signal line is connected to a different rank" |

This term first appears near the end of the "logic" limitation of Claim 1. Specifically, the claim requires logic "configurable to output data buffer control signals in response to the read or write memory command." '417 Patent at 42:38–49.

Defendants base their construction on the limited disclosure of "control signals" in the specification. Dkt. No. 143 at 19 (noting the disputed term does not appear in the original specification). They suggest "[a]ny other construction 'would likely render the claims invalid for lack of written description.'" *Id.* (quoting *Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016)).

The Court disagrees for two reasons. First, Defendants' construction, which uses the phrase "selectively electrically couple," introduces the "fork-in-the-road" approach into the claims. *See* Dkt. No. 143 at 19 (arguing "Netlist cannot escape its prosecution statements that describe the invention as requiring a fork-in-the-road implementation"). The Court has already rejected that position. *See* Part IV.D. *supra*. Second, the Court is not persuaded mixing the claim-construction and written-description inquiries is proper on this record. In *Ruckus Wireless*, the Federal Circuit's decision hinged on first applying all the other rules of claim construction and still finding the term "ambiguous." *See Ruckus Wireless, Inc.*, 824 F.3d at 1004 ("If, after applying all other available tools of claim construction, a claim is ambiguous, it should be construed to preserve its validity."). Here, however, Defendants make no attempt to show "data buffer control signals" is ambiguous. See Dkt. No. 143 at 19. The Court will therefore give this term a "plain and ordinary meaning" construction.

K.      **"overall CAS latency [of the memory module]"** (**'417 Patent, Claim 1; '215 Patent, Claims 3, 4, 24, 25**)

**"actual operational CAS latency of each of the memory devices"** (**'417 Patent, Claim 1**)

**"actual operational CAS latency of each of the plurality the memory integrated circuits"** (**'215 Patent, Claims 3, 4**)

**"actual operational CAS latency of the memory integrated circuits"** (**'215 Patent, Claims 24, 25**)

| Netlist's Construction | Micron's Construction |
|---|---|
| Plain and ordinary meaning | **"overall CAS latency":**<br><br>"The delay between: (1) the time when a read command is executed by the memory module, and (2) the time when the first piece of data is made available at an output of the memory module."<br><br>**"actual operational CAS latency of each of the memory devices":**<br><br>"the delay between: (1) the time when a read command is executed by each of the plurality of memory integrated circuits, and (2) the time when the first piece of data is made available at an output of each of the plurality of memory integrated circuits"<br><br>**"actual operational CAS latency of each of the [plurality of] memory devices":**<br><br>"the delay between: (1) the time when a read command is executed by the memory integrated circuits, and (2) the time when the first piece of data is made available at an output of the memory integrated circuits" |

"CAS latency" means "column address strobe latency." As used in the claims, "overall CAS latency" refers to the "CAS latency" of a memory module, and "actual operational CAS latency" refers to the "CAS latency" of a memory device on the module. For example, Claim 1 of the '417 Patent requires:

> circuitry . . . configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory

> devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an **overall CAS latency** of the memory module;
>
> wherein data transfers through the circuitry are registered for an amount of time delay such that the **overall CAS latency** of the memory module is greater than an **actual operational CAS latency** of each of the memory devices.

'417 Patent at 42:54–67 (emphasis added). *See also* '215 Patent at 38:1–10 (reciting, in Claims 3 and 4, "overall CAS latency" and "actual operational CAS latency of each of [a] plurality of memory devices"); *id.* at 40:47–55 (reciting, in Claims 24 and 25, "overall CAS latency" and "actual operational CAS latency of . . . memory integrated circuits").

The parties generally agree "CAS latency" is a time between a command being executed and the presentation of data somewhere within the system, depending on the context of the surrounding language. For example, the parties agree the "overall CAS latency" of a memory module for a read command is the delay between (1) the time when the read command is executed by the memory module, and (2) the time when data is made available.[9]

The dispute concerns whether "CAS latency" refers *only* to "read" commands (Micron's position), or also to "write" commands (Netlist's position). According to Micron, the industry understood "CAS latency" at the relevant time as synonymous with "read latency." Dkt. No. 143 at 22. It accuses Netlist of trying to improperly broaden the meaning of "CAS latency." *Id.* at 23.

Netlist disagrees for three reasons. First, Netlist points to the claims, which it says support a construction that includes both "read" and "write" commands. Dkt. No. 129 at 29 (noting Claim 1 of the '417 Patent is expressly directed to both read and write commands and concerns "data

---

[9] Netlist's agreement is not explicit, but it does not challenge the structure of Micron's proposed construction—only that it is limited to "read" commands. *See* Dkt. No. 129 at 28–29.

Appx5032

transfers through the circuitry"). *Id.* Second, Netlist alleges Micron's construction would improperly exclude disclosed embodiments. *Id.* (citing '215 Patent at 20:22–47). Last, Micron's construction narrows the scope of the term's ordinary meaning without showing clear disavowal. *Id.* at 30.

The disclosure addresses "CAS latency" in only one paragraph:

> The circuit 40 comprises the SPD device 240 which reports the CAS latency (CL) to the memory controller of the computer system. The SPD device 240 reports a CL which has one more cycle than does the actual operational CL of the memory array. Data transfers between the memory controller and the memory module are registered for one additional clock cycle by the circuit 40. The additional clock cycle is added to the transfer time budget with an incremental overall CAS latency. This extra cycle of time advantageously provides sufficient time budget to add a buffer which electrically isolates the ranks of memory devices 30 from the memory controller 20. The buffer comprises combinatorial logic, registers, and logic pipelines. The buffer adds a one-clock cycle time delay, which is equivalent to a registered DIMM, to accomplish the address decoding. The one-cycle time delay provides sufficient time for read and write data transfers to provide the functions of the data path multiplexer/demultiplexer. Thus, for example, a DDR2 400-MHz memory system as described herein has an overall CAS latency of four, and uses memory devices with a CAS latency of three.

'215 Patent at 20:22–47 (cleaned up for easier reading).

Based on this paragraph, the Court agrees with Netlist. The disclosure explains the one-cycle time delay "provides sufficient time for *read and write data transfers* to provide the functions of the data path multiplexer/demultiplexer." '215 Patent at 20:39–42. Moreover, the disclosure refers to data transfers *between* the memory controller and the memory module" rather than in only one direction or the other. *Id.* at 20:27–29. Similarly, the claim limitations in which these terms appear refer to "caus[ing] the memory module to *receive or output*" a data burst, *id.* at 37:16–22 (emphasis added), and "data transfers *through* the circuitry," '417 Patent at 42:63 (emphasis added).

Regarding the extrinsic evidence, Micron's expert agrees "CAS latency can relate to both read and write data transfers." Stone Depo. Tr., Dkt. No. 129-5 at 76:16–18. And while Micron suggests "CAS latency" *usually* refers to "read latency," it also recognizes these "are not well-known terms of art." *See* Dkt. No. 143 at 22. Moreover, the parties agree "write latency" is closely related to "read latency." Dkt. No. 129 at 30 (citing JESD79-2, Dkt. No. 129-2 at 24); Dkt. No. 143 at 23 ("While CAS latency was only associated with Read Latency (RL) at the relevant time, Write Latency (WL) was a concept that was defined *in terms of* Read Latency.").

Based on the totality of the evidence, a skilled artisan would understand "CAS latency" includes both "read latency" and "write latency," depending on the context. The Court therefore rejects Micron's position and construes:

- **"overall CAS latency"** of a memory module as "the delay between: (1) the time when a command is executed by the memory module, and (2) the time when data is made available to or from the memory module";

- **"actual operational CAS latency"** of a memory device as "the delay between: (1) the time when a command is executed by the memory device, and (2) the time when data is made available to or from the memory device"; and

- **"actual operational CAS latency"** of a memory integrated circuit as "the delay between: (1) the time when a command is executed by the memory integrated circuit, and (2) the time when data is made available to or from the memory integrated circuit."

L. **"wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices" ('417 Patent, Claim 1)**

| Netlist's Construction | Micron's Construction |
|---|---|
| Plain and ordinary meaning. | Indefinite |

Micron contends this phrase is indefinite under either Netlist's or Micron's proposed

construction for "CAS latency." Dkt. No. 143 at 21. Under Micron's construction, which limits a "CAS latency" to a "read latency," "[i]t is nonsensical to 'register' data *to be written* 'for an amount of time delay'" that relates to a read latency. *Id.* And under Netlist's "apparent" construction, there would be no time delay for "overall CAS latency," which could then never be greater than the "actual operation CAS latency of the memory device." *Id.*

According to Netlist, the "conflict" Micron identifies with respect to its construction for "CAS latency" further supports the notion that term is not limited to a "read" latency. Dkt. No. 150 at 10. Netlist also notes Micron's reliance on Netlist's "proposed construction" is from another proceeding rather than the "plain and ordinary meaning" construction it asserts now. *Id.*

The Court agrees with Netlist. As noted *supra*, "CAS latency" is not limited to only a "read latency," see Part IV.K., which negates Micron's first argument. Micron's second argument—that registering data being transferred through the circuitry could never make a zero delay greater than anything—relates to infringement rather than indefiniteness. While it may be true that, under Netlist's interpretation of "CAS latency," the recited limitation can never be met by an accused device, that does not mean the term is indefinite—only that infringement is impossible. The Court therefore holds Micron has not carried its burden of showing this term is indefinite.

## V.     CONCLUSION

| The Disputed Terms | The Court's Construction |
|---|---|
| The "Rank" Terms ('912 Patent, '417 Patent, '215 Patent) | A "rank" of memory is "a 'bank' of one or more devices on a memory module that operate in response to a given signal" |
| "signal" / "row [/column] address signal" ('912 Patent, all claims) | Plain and ordinary meaning |

| | |
|---|---|
| "A memory module connectable to a computer system, the memory module comprising" ('912, preamble to all asserted claims)<br><br>"A memory module operable to communicate with a memory controller via a memory bus, the memory bus including signal lines, the signal lines including a set of control/address signal lines and a plurality of sets of data/strobe signal lines, the memory module comprising: ('608 Patent, Claim 1) | The preambles are limiting. |
| The Data Buffer Control Terms ('215 Patent, Claims 1, 21; '417 Patent, Claim 1) | The claims do not require a "fork-in-the-road" approach. |
| "logic" ('417 Patent, Claim 1; '215 Patent, Claim 1) | Plain and ordinary meaning |
| "circuitry" ('417 Patent, Claims 1, 6, 11) | Plain and ordinary meaning |
| "the at least one of the circuit components" ('215 Patent, Claim 15) | "the circuit components" |
| "burst of data strobe signals" ('215 Patent, Claims 12, 13, 28, 29) | Plain and ordinary meaning |
| "operable in a computer system to communicate data" ('215 Patent, Claim 1;'417 Patent, Claim 1) | Plain and ordinary meaning |
| "data buffer control signals" ('417 Patent, Claims 1, 3, 11) | Plain and ordinary meaning |
| "overall CAS latency" of a memory module ('417 Patent, Claim 1; '215 Patent, Claims 3, 4, 24, 25) | "the delay between (1) the time when a command is executed by the memory module, and (2) the time when data is made available to or from the memory module" |
| "actual operational CAS latency" of a memory device ('417 Patent, Claim 1) | "the delay between: (1) the time when a command is executed by the memory device, and (2) the time when data is made available to or from the memory device" |

Appx5036

| "actual operational CAS latency" of a memory integrated circuit<br><br>('215 Patent, Claims 3, 4, 24, 25) | "the delay between: (1) the time when a command is executed by the memory integrated circuit, and (2) the time when data is made available to or from the memory integrated circuit" |
|---|---|
| "wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices"<br><br>('417 Patent, Claim 1) | Plain and ordinary meaning |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. No party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

So **ORDERED and SIGNED** this 21st day of November, 2023.

_____
RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

_____

IPR2023-00454
Patent 11,093,417 B2

_____

Before PATRICK M. BOUCHER, JON M. JURGOVAN, and
DANIEL J. GALLIGAN, *Administrative Patent Judges*.

GALLIGAN, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

# I.  INTRODUCTION

## A.  *Background*

Samsung Electronics Co., Ltd. ("Petitioner") filed a petition for *inter partes* review (Paper 1 ("Pet." or "Petition")) challenging claims 1–15 of U.S. Patent 11,093,417 B2 (Ex. 1001 ("'417 patent")).  Netlist, Inc. ("Patent Owner") filed a Preliminary Response.  Paper 6 ("Prelim. Resp.").  With our authorization (Ex. 3001), Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 9), and Patent Owner filed a Sur-reply to Petitioner's Preliminary Reply (Paper 10).

Under 37 C.F.R. § 42.4(a), we have authority to determine whether to institute review.  The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted unless the information presented in the Petition and the Preliminary Response shows "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."

For the reasons explained below, we institute an *inter partes* review of all challenged claims on all grounds raised in the Petition.

## B.  *Related Matters*

As required by 37 C.F.R. § 42.8(b)(2), the parties identify various related matters, including the following:  *Netlist, Inc. v. Samsung Electronics Co., Ltd. et al.*, No. 2:22-cv-00293 (E.D. Tex.) ("the district court litigation");  and IPR2023-00455, which involves U.S. Patent No. 9,858,215 B1, to which the '417 patent claims priority through an intervening continuation application.  Pet. 1–3; Paper 4 at 1–3.

### C. Real Parties in Interest

Petitioner identifies itself and Samsung Semiconductor, Inc. as the real parties in interest. Pet. 1. Patent Owner identifies itself as the real party in interest. Paper 4 at 1.

### D. The '417 Patent and Illustrative Claim

The '417 patent relates to memory modules having ranks of memory. Ex. 1001, code (57). Claim 1 is independent and is reproduced below.

1.    A memory module operable in a computer system to communicate data with a memory controller of the computer system via a N-bit wide memory bus in response to read or write memory commands received from the memory controller, the memory bus including address and control signal lines and data signal lines, the memory module comprising:

a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system;

logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals, the set of input address and control signals including a plurality of input chip select signals and other input address and control signals, the plurality of input chip select signals including one chip select signal having an active signal value and one or more other input chip select signals each having a non-active signal value, the set of registered address and control signals including a plurality of registered chip select signals corresponding to respective ones of the plurality of input chip select signals and other registered address and control signals corresponding to respective ones of the other input address and control signals, the plurality of registered chip select signals including one registered chip select signal having an active signal value and one or more other registered chip select signals each having

3

a non-active signal value, wherein the logic is further configurable to output data buffer control signals in response to the read or write memory command;

memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks, wherein the plurality of N-bit wide ranks correspond to respective ones of the plurality of registered chip select signals such that each of the plurality of registered chip select signals is received by memory devices [in][1] one respective N-bit wide rank of the plurality of N-bit-wide ranks, wherein one of the plurality of N-bit wide ranks including memory devices receiving the registered chip select signal having the active signal value and the other registered address and control signals is configured to receive or output a burst of N-bit wide data signals in response to the read or write command; and

circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module;

wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

---

[1] The word "in" was included in an amendment under 37 C.F.R. § 1.312, which the Examiner indicated was entered. Ex. 1002, 299, 313. Thus, its omission from the issued claim appears to be the result of an error by the Office.

### E. *Asserted Grounds of Unpatentability*

Petitioner presents the following grounds:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–15 | 103(a) | Perego,[2] JESD79-2[3] |
| 1–15 | 103(a) | Perego, JESD79-2, Ellsberry[4] |
| 1–15 | 103(a) | Perego, JESD79-2, Halbert[5] |

## II. ANALYSIS

### A. *Discretionary Denial*

#### 1. *35 U.S.C. § 314(a)*

Patent Owner argues that we should exercise discretion to deny institution under 35 U.S.C. § 314(a) because the factors identified in *Apple, Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("*Fintiv*"), weigh in favor of denying institution in view of the district court litigation. Prelim. Resp. 62–65.

A Memorandum from Director Vidal titled *Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation* (USPTO June 21, 2022) ("Interim Procedure")[6] provides that "the PTAB will not deny institution of an IPR or PGR under *Fintiv* . . . where a petitioner stipulates not to pursue in a parallel district

---

[2] US 7,363,422 B2, issued Apr. 22, 2008 (Ex. 1071).
[3] Joint Electron Devices Engineering Council (JEDEC) DDR2 SDRAM Specification (JESD79-2), September 2003 (Ex. 1064).
[4] US 2006/0277355 A1, published Dec. 7, 2006 (Ex. 1073).
[5] US 7,024,518 B2, issued Apr. 4, 2006 (Ex. 1078).
[6] Available at
https://www.uspto.gov/sites/default/files/documents/interim_proc_discretionary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf.

court proceeding the same grounds as in the petition or any grounds that could have reasonably been raised in the petition." Interim Procedure 9. Petitioner has submitted such a stipulation for all claims in this proceeding, which are all of the claims of the '417 patent. Ex. 1093; Paper 8 at 1; Paper 9 at 1. Thus, we do *not* exercise discretion to deny institution under 35 U.S.C. § 314(a).

### 2. *35 U.S.C. § 325(d)*

Patent Owner argues that we should exercise discretion to deny institution under 35 U.S.C. § 325(d) because, according to Patent Owner, the same or substantially the same prior art previously was presented to the Office. Prelim. Resp. 59–62; Paper 10 at 1–4. For the reasons stated below, we decline to exercise discretion to deny on this basis.

Section 325 of Title 35 of the United States Code addresses the relationship of proceedings before the Board with other proceedings in the Office, and provides, in part, that

> [i]n determining whether to institute or order a proceeding under this chapter, chapter 30, or chapter 31,[7] the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office.

35 U.S.C. § 325(d).

In evaluating arguments under Section 325(d), we use a two-part framework, determining, first, "whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office." *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH,*

---

[7] Chapter 31 (35 U.S.C. §§ 311–319) relates to *inter partes* review.

IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential). If either condition of the first part of the framework is satisfied, we then determine "whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims." *Id.*

When deciding whether to exercise our discretion under Section 325(d) in view of the *Advanced Bionics* framework, we weigh the following nonexclusive factors:

(a) the similarities and material differences between the asserted references and the prior art involved during prosecution;

(b) the cumulative nature of the asserted references and the prior art evaluated during prosecution;

(c) the extent to which the asserted references were evaluated during prosecution, including whether a rejection rested on any reference;

(d) the extent of overlap between the arguments made during prosecution and Petitioner's reliance on the asserted references or Patent Owner's contentions concerning them;

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in analyzing the asserted references; and

(f) the extent to which additional evidence and facts presented in the petition warrant reconsideration of the asserted references or arguments.

*See Becton, Dickinson & Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 at 17–18 (PTAB Dec. 15, 2017) (precedential as to § III.C.5, first paragraph) (formatting altered); *see also Advanced Bionics*, Paper 6 at 9–11 (noting that the Board considers the *Becton Dickinson* factors in an *Advanced Bionics* analysis).

Patent Owner argues that the first part of the *Advanced Bionics* framework is met because the same art (Ellsberry and Halbert) and substantially the same art (a continuation-in-part of Perego and a similar,

later version of JESD79-2) were disclosed during prosecution. Prelim. Resp. 60–61. Petitioner does not dispute that the asserted references or similar ones were disclosed during prosecution of the '417 patent but instead argues that it "is untenable" to "conclude that the Examiner considered them" "given the sheer number of references—*nearly 900*." Paper 9 at 1. Our precedent provides that art disclosed on an IDS is deemed to have been presented previously to the Office. *Advanced Bionics*, Paper 6 at 7–8. Thus, we determine that the same or substantially the same art previously was presented to the Office.

In the second part of the *Advanced Bionics* framework, we consider "whether the petitioner has demonstrated a material error by the Office" by evaluating *Becton Dickinson* factors (c), (e), and (f). *Advanced Bionics*, Paper 6 at 10. Petitioner argues that the claims were allowed "without any substantive rejection" and that the "Examiner identified a single reference—Janzen, *not* the references at issue—as the 'closest prior art.'" Paper 9 at 2; *see also* Pet. 15 ("During prosecution of the 417 Patent, the Examiner never issued a rejection and simply allowed the claims."). Petitioner contends that Patent Owner "does not (and cannot) contend that the combinations at issue are cumulative to Janzen." Paper 9 at 2. Patent Owner counters that the "pertinent question is instead whether the examiner erred in finding that Janzen is closer art than the combination, a finding that Petitioner does not contest." Paper 10 at 2.

On the record before us, we determine that *Becton Dickinson* factors (c), (e), and (f) indicate a material error by the Office. As to factor (c) (the extent to which the asserted references were evaluated during prosecution, including whether a rejection rested on any reference), the Examiner did not reject the pending claims at all, let alone based on the references asserted by

Petitioner. *See* Ex. 1002, 228 (Notice of Allowability "responsive to claims as filed dated 11/25/2019," which is the filing date of the '417 patent (Ex. 1001, code (22))). Although the asserted references were presented to the Office, the record does not indicate that there was any substantial evaluation of the references. Thus, factor (c) weighs against denying institution.

We find that factors (e) (whether Petitioner has pointed out sufficiently how the Examiner erred in analyzing the asserted references) and (f) (the extent to which additional evidence and facts presented in the petition warrant reconsideration of the asserted references or arguments) also weigh against denying institution. The Examiner's Notice of Allowability states the following:

> Janzen (US 2003/0018845) appears to be the closest prior art and teaches a memory device having a number of ranks having different burst order addressing for read and write operations. However, [Janzen] does not teach the limitation, "the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module; wherein data transfers through the circuitry are registered for an additional amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices."

Ex. 1002, 229–30 (emphasis added). With the exception of the underlined word "additional," this subject matter is recited in claim 1.

To address this subject matter, Petitioner introduces detailed testimony from Dr. Wolfe explaining how Perego, Ellsberry, and Halbert teach or suggest a larger CAS latency for the memory module than for the memory devices on the module. Ex. 1003 ¶¶ 354–378; *see* Pet. 95, 118–19,

9

124–26. We discuss this evidence in more detail below, but as one example, Dr. Wolfe explains that a person of ordinary skill in the art would have understood that "Perego's latching of the data signals and the use of internal synchronizing clock signals adds a predetermined amount of time delay for each data transfer through the buffer because the output of the latch needs to be in synchronization with an internal clock" and that "such registering of the data signals would require the addition of a fixed time delay, such as one clock cycle, for each registered data transfer through the circuitry with respect to the actual operational CAS latency of each of the plurality of memory integrated circuits." Ex. 1003 ¶ 360 (citing Ex. 1071, 12:65–13:5, 17:61–63, Fig. 5C).[8] As discussed below in our analysis of claim 1, we are sufficiently persuaded that this evidence supports Petitioner's contention that Perego teaches registering data for an amount of time such that the CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices. This testimony explaining how a person of ordinary skill in the art would have understood the teachings of Perego was not before the Examiner, and we find that this additional evidence warrants reconsideration of the rejection under *Becton Dickinson* factor (f) and shows that the Examiner erred in not finding a teaching in the prior art of CAS latency of the memory module being greater than an actual operational CAS latency of each of the memory devices.

For these reasons, we determine that Petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims, and we do not deny institution under 35 U.S.C. § 325(d).

---

[8] We omit the underline emphasis that Dr. Wolfe and Petitioner included for the names of prior art references.

### B. Principles of Law

A patent claim is unpatentable under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) any secondary considerations, if in evidence. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### C. Level of Ordinary Skill in the Art

Petitioner argues that a person of ordinary skill in the art "would have had an advanced degree in electrical or computer engineering and at least two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field" and would have had knowledge of various standards for memory, such as JEDEC, and circuitry used in memories. Pet. 9–10 (citing Ex. 1003 ¶¶ 48–50). Petitioner also contends that "[a]dditional training can substitute for educational or research experience, and vice versa." Pet. 9 (citing Ex. 1003 ¶ 48).

Patent Owner does not dispute this assessment. *See* Prelim. Resp. 6 ("For purposes of this preliminary response only, Patent Owner applies the skill level proposed by Petitioner.").

To the extent necessary, and for purposes of this Decision, we accept the uncontested assessment offered by Petitioner, except that we delete the qualifier "at least" to eliminate vagueness as to the amount of experience.

The qualifier expands the range indefinitely without an upper bound, and thus precludes a meaningful indication of the level of ordinary skill in the art.

### D. Claim Construction

We interpret claim terms using "the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2022).

Independent claim 1 recites memory devices arranged in ranks. Petitioner argues that a "rank" is "an independent set of one or more memory devices on a memory module that act together in response to command signals, including chip-select signals, to read or write the full bit-width of the memory module." Pet. 26 (citing Ex. 1003 ¶ 126). Patent Owner does not agree with Petitioner that a rank can include a single memory device, but Patent Owner does not explain its position because it says its arguments "are independent of that dispute." Prelim. Resp. 6.

On this record, we determine that we need not construe the term "rank" to assess whether Petitioner meets the standard for institution. *See Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

### E. Alleged Obviousness over Perego and JESD79-2 (Claims 1–15)

Petitioner asserts that claims 1–15 are unpatentable as obvious over the combined teachings of Perego and JESD79-2. Pet. 5, 28–111. Patent Owner opposes. Prelim. Resp. 13–46.

12

*1. Overview of the Prior Art*

Perego pertains to memory systems and discloses a configurable width buffer device that is coupled to memory devices and allows a data path width to be varied. Ex. 1071, code (57).

JESD79-2 is a JEDEC standard for second generation double data rate ("DDR2") memory devices. Ex. 1064.

We discuss additional pertinent details of the references in our analysis below.

*2. Claim 1*

Claim 1 recites a memory module having various components that are configured or configurable to operate in a particular manner, which we address in more detail below. To address the subject matter of claim 1, Petitioner relies on Perego's memory module disclosures in combination with JESD79-2's disclosures of DDR2 memory operations. Pet. 28–96. Petitioner argues that a person of ordinary skill in the art would have been motivated to combine the teachings of Perego and JESD79-2 because Perego discloses that its memory modules can use DDR2 memory devices and "the JEDEC standard for DDR2 memory devices is JESD79-2." Pet. 30 (citing Ex. 1071, 3:62–4:12, 8:1–4, 10:54–67; Ex. 1064); *see also* Pet. 30–33 (further explaining rationale to combine).

Patent Owner argues that JEDEC79-2's memory organization is incompatible with Perego's "Rambus-style memory organization." Prelim. Resp. 37–39. Patent Owner argues that these are "two distinct approaches" and cites extrinsic evidence allegedly showing that Rambus memories lack a chip select network. Prelim. Resp. 37 (citing Ex. 1069, 9, 11, 12); *see also* Prelim. Resp. 39 ("Modifying Perego to fit into the JEDEC framework that has fixed ranks and fixed bandwidth would require changing the

13

fundamental operating principle of Perego, which is evidence of non-obviousness.").

On this record, we are sufficiently persuaded by Petitioner's argument that a person of ordinary skill in the art would have combined the teachings of Perego and JESD79-2. As Petitioner correctly points out (Pet. 30), Perego discloses using DDR2 memory devices. Ex. 1071, 10:56–59 ("Other memory devices may be implemented on module 400, for example, Double Data Rate 2 (DDR2) DRAM devices and Synchronous DRAM (SDRAM) devices."). On this record, we find this teaching to use DDR2 sufficiently supports Petitioner's rationale to combine Perego with JESD79-2, which is the JEDEC DDR2 SDRAM Specification. Ex. 1064, 1 (cover page). As to Patent Owner's argument that Rambus memories lack a chip select network (Prelim. Resp. 37), the reference on which Patent Owner relies discloses that chip select information is still used in the particular Rambus devices described. *See* Ex. 1069, 11 ("[I]n the Rambus bus organization, all addresses, commands, data, and chip-select information are sent on the same bus lines."), 12 ("[T]he example system uses a total of nine (9) lines to carry all necessary information, including addresses, commands, chip-select information, and data."). Thus, on this record, Patent Owner's focus on the lack of a chip select network, which is not recited in the claims of the '417 patent, appears misplaced. We address Patent Owner's more specific arguments below in the discussion of individual claim recitations.

*a) Preamble*

The preamble of claim 1 recites the following:

A memory module operable in a computer system to communicate data with a memory controller of the computer system via a N-bit wide memory bus in response to read or write memory commands received from the memory controller, the

14

memory bus including address and control signal lines and data signal lines, the memory module comprising.

Petitioner argues that Perego's Figures 3B, 3C, 4A, 4B, and 4C show memory modules that communicate data with a memory controller of a computer system via a bus. Pet. 33–39. For the recited memory commands, Petitioner cites Perego's disclosure of storing and retrieving data in response to commands, and Petitioner argues that a person of ordinary skill in the art would "have understood from their own knowledge of JEDEC standards, including JESD79-2, the specific ways to issue read and write commands to Perego's DDR2 memory devices." Pet. 39–40 (citing Ex. 1071, 6:15–25, 9:50–60, Fig. 3B; Ex. 1064, 6, 24–33, 49; Ex. 1003 ¶¶ 216–218). Petitioner argues that Perego discloses address and control lines and data lines on the memory bus. Pet. 40–41 (citing Ex. 1071, 5:12–15, 5:21–24, 9:43–45, 9:58–60, Figs. 3B, 4A, 4B; Ex. 1003 ¶¶ 220–224); *see* Ex. 1071, 5:12–15 ("One of memory subsystem ports 378a-378n includes I/Os, for sending and receiving data, addressing and control information over one of point-to-point links 320a-320n."), 5:21–24 ("In other embodiments, memory subsystems are connected to a memory subsystem port via a bus (i.e., a plurality of signal lines).").

Apart from its argument that Perego and JESD79-2 would not be combined, which we address above, Patent Owner does not dispute Petitioner's contentions for the preamble.

On this record, we are sufficiently persuaded by Petitioner's contentions for the preamble, and, for purposes of institution, we need not decide whether the preamble is limiting.

*b)* *Printed Circuit Board*

Claim 1 recites "a printed circuit board having a plurality of edge connections configured to be electrically coupled to a corresponding plurality of contacts of a module slot of the computer system." Petitioner argues that Perego's disclosure of including memory modules on printed circuit boards (PCBs) with connectors (such as connectors 390a in Figure 3C) teaches this subject matter. Pet. 42–43 (citing Ex. 1071, 5:56–6:11, 7:39–41, Figs. 3B, 3C; Ex. 1003 ¶¶ 228–233). Petitioner also argues that a person of ordinary skill in the art would have understood that Perego's memory modules could be implemented in a standard dual in-line memory module (DIMM), which would use a PCB with edge connections. Pet. 43 (citing Ex. 1071, 3:25–28, 6:34–43; Ex. 1069, 2; Ex. 1062, 29, 66; Ex. 1003 ¶ 232).

Patent Owner does not dispute Petitioner's contentions for this limitation.

On this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

*c)* *Logic*

Claim 1 recites

logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals.

Petitioner argues that the combination of Perego and JESD79-2 teaches this subject matter. Pet. 43–51. In particular, Petitioner argues that Perego's buffer devices in Figures 5A and 5B have logic that receives input address and control signals, which in the proposed combination would

16

comply with JESD79-2. Pet. 43–49 (citing Ex. 1071, 9:43–53, Figs. 4A, 4B, 5A, 5B; Ex. 1064, 6, 24–33, 49 (Table 10 (Command truth table)); Ex. 1003 ¶¶ 234–243). Petitioner argues that a person of ordinary skill in the art would have understood that "Perego's buffer device 'register[s]' address and control signals similar to a JEDEC-compliant conventional registered DIMM." Pet. 49–50 (citing Ex. 1071, 6:15–30, 13:54–59, Fig. 5C; Ex. 1062, 12; Ex. 1003 ¶¶ 239–240).

Patent Owner does not dispute the contentions summarized above but does argue that Petitioner's contentions for related limitations are deficient. We address these arguments below.

On this record, we are sufficiently persuaded that the combination of Perego and JESD79-2 teaches

> logic coupled to the printed circuit board and configurable to receive a set of input address and control signals associated with a read or write memory command via the address and control signal lines and to output a set of registered address and control signals in response to the set of input address and control signals,

as recited in claim 1.

### d) Chip Select Signals

Claim 1 recites

> the set of input address and control signals including a plurality of input chip select signals and other input address and control signals, the plurality of input chip select signals including one chip select signal having an active signal value and one or more other input chip select signals each having a non-active signal value.

Petitioner argues that JESD79-2 discloses read and write commands that include chip select signals to identify the target rank of memory devices. Pet. 51–52 (citing Ex. 1064, 6, 24–33, 49). Petitioner argues that it "would have been obvious to a [person of ordinary skill in the art] in light of

JESD79-2 and knowledge of the JEDEC standards that the memory controller would provide multiple chip-select signals to the memory module" where the signals correspond to multiple ranks of memory devices and where one of the signals is active to select the target rank and the other signals are inactive. Pet. 57–58 (citing Ex. 1062, 6; Ex. 1066, 6–7; Ex. 1003 ¶¶ 251–252); *see also* Pet. 52–54 (explaining that chip select signal (CS) is active low). Petitioner also contends that Perego is consistent with JESD79-2's disclosure of selecting particular groups of memory devices because "Perego discloses that its module includes multiple sets of memory devices (e.g., 'ranks,' . . . ), each of which can be a target of a memory read or write command, and each of which acts together in response to a memory read or write command." Pet. 54–57 (citing Ex. 1071, 6:12–24, 15:37–45, Figs. 3C, 4A, 4B, 4C; Ex. 1003 ¶¶ 249–250).

Patent Owner disputes Petitioner's contentions for this subject matter. Prelim. Resp. 13–17. Patent Owner's arguments largely fail to address the combination of teachings that Petitioner sets forth. For example, Patent Owner characterizes the Petition as arguing that, "because JEDEC-compliant DRAM devices would receive chip-select signals and DDR2 SDRAMs are compatible with Perego's invention, Perego discloses a set of input address and control signals that include 'a plurality of input chip select signals' to be received by a logic device on a DRAM module." Prelim. Resp. 13–14 (citing Pet. 51–54). Petitioner, however, does not argue that Perego discloses chip select signals. Rather, Petitioner cites JESD79-2 for its disclosure of chip select signals. *See* Pet. 51–52 (citing Ex. 1064, 6, 24–33, 49). For the reasons discussed above in § II.E.2, we disagree with Patent Owner's arguments that a person of ordinary skill in the art would not have combined the teachings of Perego and JESD79-2. *See* Prelim. Resp. 13–17.

Appx5056

Patent Owner also argues that

> Petitioner does not provide any competent analysis as to why Perego necessarily or even obviously employs JESD79-2 for its DDR2 SDRAM devices, nor why if it employs JESD79-2, it would then go beyond this specification and also include a chip-select bus on the memory module for providing input chip-select signals to Perego's buffer device.

Prelim. Resp. 17. On this record, we disagree with Patent Owner's arguments. Patent Owner's use of the word "necessarily" implies that Petitioner is relying on inherency, which is not the case. Rather, Petitioner argues that a person of ordinary skill in the art "would have been motivated to combine the teachings of JESD79-2 with the memory module described in Perego" because Perego discloses the use of DDR2 memories and "the JEDEC standard for DDR2 memory devices is JESD79-2." Pet. 30. As discussed above in § II.E.2, we find this reasoning sufficiently persuasive on this record.

As to Patent Owner's suggestion that "providing input chip-select signals to Perego's buffer device" would "go beyond" JESD79-2 (Prelim. Resp. 17), we are sufficiently persuaded by Petitioner's contentions that this would have been obvious based on JESD79-2 and the knowledge of other JEDEC standards. In particular, Petitioner argues that it "would have been obvious to a [person of ordinary skill in the art] in light of JESD79-2 and knowledge of the JEDEC standards that the memory controller would provide multiple chip-select signals to the memory module," citing in support JEDEC DIMM standards that show pins for receiving chip select signals at the memory module. Pet. 57–58 (citing Ex. 1003 ¶¶ 251–252, Ex. 1064, 6; Ex. 1062, 6; Ex. 1066, 6–7). Thus, Patent Owner's argument that JESD79-2 "describes the input/output to SDRAM devices, and not the

input/output to a logic device coupled between a memory controller and memory devices" (Prelim. Resp. 14 (citing Ex. 1064)) does not fully address Petitioner's contentions for this subject matter.

Patent Owner also argues that "Perego specifically contrasts the relied-on configuration with 'conventional DIMM module' designs that Petitioner suggests are JEDEC compliant." Prelim. Resp. 18 (citing Ex. 1071, 6:27–33). Although Perego draws a distinction based on the lack of buffered data lines in a conventional DIMM (Ex. 1071, 6:27–33), we do not view Perego as discounting all DIMM teachings. Indeed, as Petitioner points out (Pet. 31), Perego's goal is to preserve "[b]ackward compatibility with existing generations of memory devices," of which DIMM was one at that time. Ex. 1071, 6:37–39; *see also* Ex. 1071, 2:4–6 ("U.S. Pat. No. 5,513,135 discloses a contemporary dual inline memory module (DIMM) having one or more discrete buffer devices.").

For the reasons discussed above and based on the evidence presented with the Petition, on this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

>> e) *Registered Chip Select Signal Having an Active Value*

Claim 1 recites

> the set of registered address and control signals including a plurality of registered chip select signals corresponding to respective ones of the plurality of input chip select signals and other registered address and control signals corresponding to respective ones of the other input address and control signals, the plurality of registered chip select signals including one registered chip select signal having an active signal value and one or more other registered chip select signals each having a non-active signal value.

Similar to its argument for the previous limitation, Petitioner argues that JESD79-2 discloses read and write commands that include a chip select signal to identify the target rank of memory devices using an active low signal with non-active ranks receiving a high signal. Pet. 58–59 (citing Ex. 1064, 6, 24–33, 49; Ex. 1003 ¶¶ 255–263). Petitioner argues that Perego is consistent with this because it "teaches that only the targeted rank of memory devices would participate in the read or write operation, while the other memory devices would 'remain in a ready or standby state until called upon to perform memory access operations.'" Pet. 59–60 (quoting Ex. 1071, 21:16–20; citing Ex. 1071, 15:40–45; Ex. 1003 ¶¶ 257–260). Petitioner argues that a person of ordinary skill in the art "would have known that under the JEDEC standards it was standard for a memory module to use registered chip-select signals to target one rank of memory devices for a read or write operation." Pet. 60 (citing Ex. 1064, 6; Ex. 1062, 12–13; Ex. 1066, 10, 12–13, Ex. 1069, 2–3; Ex. 1003 ¶ 259). Petitioner argues that Perego teaches "rank multiplication" by targeting memories on particular subsets of channels and that Perego's logic, in the combination with JESD79-2, would use the received chip select signals to select the particular targeted memories. Pet. 60–61 (citing Ex. 1003 ¶¶ 241, 261); *see also* Pet. 50–51 (discussing "rank multiplication" in Perego).

Patent Owner disputes Petitioner's contentions that it would have been obvious to send one active chip select signal with the remaining chip select signals non-active. Prelim. Resp. 26–33. In particular, Patent Owner argues that, even if Perego uses JEDEC-compliant DRAMs, the registered chip select signals sent to those devices can all be set to low (i.e., active) because other commands, such as a No Operation (NOP) command, can be used to deselect a non-targeted device. Prelim. Resp. 26–27 (citing

Ex. 1064, 48–49). Patent Owner argues that Ellsberry and Halbert suggest sending all active signals as well. Prelim. Resp. 28–29.

Patent Owner's arguments at most show that there are other suitable options for selecting particular memory devices for operations, but Petitioner's asserted combination need not present the best of those options. *See Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) ("Our caselaw is clear. It's not necessary to show that a combination is 'the *best* option, only that it be a *suitable* option.'" quoting *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1197–98 (Fed. Cir. 2014)). Indeed, in Patent Owner's proposed scenario in which "a non-targeted device can be sent a NOP command with a signal value of 'L' for !CS to indicate no-operation or *non-selection*" (Prelim. Resp. 27 (emphasis added)), there is still signaling that selects or deselects certain memory devices, regardless of the labels applied to such signaling.

Patent Owner also argues that Perego teaches sending commands only to targeted devices such that Perego has no need for chip select signals. Prelim. Resp. 31–33 (citing Ex. 1071, 6:12–24, 9:64–10:4, 20:41–46, 21:16–20). On this record, we are sufficiently persuaded by Petitioner's contentions that it would have been obvious to use the recited registered chip select signals based on JESD79-2's disclosure of chip select signals in DDR2 devices and Perego's disclosure of the use of DDR2s. *See* Pet. 30–33 (discussing reasons to combine), 58–61 (discussing complementary disclosures of selecting targeted memories). Patent Owner's argument that "Petitioner has not provided any competent evidence that Perego either discloses or suggests a plurality of registered chip selects signals" having different values as recited in claim 1 (Prelim. Resp. 33) ignores the asserted combination.

Patent Owner also argues that Perego's disclosures in column 15 at lines 37–45 and column 6 at lines 12–24 do not disclose chip select signals as allegedly asserted by Petitioner. Prelim. Resp. 22–25 (citing Pet. 55). Petitioner, however, does not assert that these passages disclose chip select signals. Rather, Petitioner cites these passages in support of its assertion that Perego discloses that one or more devices can be selected for an operation. *See* Pet. 54–55. Patent Owner appears to agree with this assertion when it states that in Perego "command signals are only sent to targeted memory devices." Prelim. Resp. 31 (citing Ex. 1071, 6:12–14).

For the reasons discussed above and based on the evidence presented with the Petition, on this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

### f) Data Buffer Control Signals

Claim 1 recites "wherein the logic is further configurable to output data buffer control signals in response to the read or write memory command." Petitioner argues that a person of ordinary skill in the art

> would have understood that Perego's buffer device includes logic that outputs data buffer control signals to transceivers (e.g., 575, included in interface 520a, 520b, 510, and 590), multiplexing/demultiplexing circuits 597, and to input/output latches 597f-m, to selectively activate these circuit elements of the "buffer" according to the targeted rank and direction of the read and write operation.

Pet. 63 (citing Ex. 1071, 14:62–15:6, 15:34–37, 17:41–44, 17:61–62, Figs. 5A, 5B; Ex. 1003 ¶¶ 270–271).

Patent Owner does not dispute Petitioner's contentions for this limitation.

On this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

*g)   Ranks*

Claim 1 recites "memory devices mounted on the printed circuit board and arranged in a plurality of N-bit wide ranks."

Petitioner argues that Perego teaches memory circuits arranged in ranks by disclosing groups of memory devices that are accessed together in a memory operation.  Pet. 64–73 (citing Ex. 1071, 2:4–6, 3:62–4:3, 4:19–22, 6:12–24, 8:1–4, 10:56–58, 14:10–40, 15:37–45, 17:22–28, 21:16–20, Figs. 3C, 4A, 4B, 4C, 5A, 5B; Ex. 1003 ¶¶ 274–296).  For example, Perego discloses "grouping memory devices into multiple independent target subsets (i.e. more independent banks)."  Ex. 1071, 15:37–45, *quoted in* Pet. 67.

Petitioner provides the version of Perego's Figure 3C below.



**Fig. 3C**

Pet. 64, 70.  Perego's Figure 3C above is a block diagram of configurable width buffered module 395 having configurable width buffer device 391 (shaded red) connected on each side via channels 370 to multiple memory devices 360 (shaded green on the left and blue on the right).  Ex. 1071, 2:43–45, 7:30–34; Pet. 64, 70.  Noting Perego's disclosure that "one or more of channels 370" can be used in an operation (Ex. 1071, 6:12–24), Petitioner

24

argues that, "when Perego's buffer device has two channels, and each channel is connected to one rank, Perego's module includes two ranks of memory devices (green and blue . . . )." Pet. 69–70 (citing Ex. 1003 ¶ 283).

Petitioner also points to Perego's disclosure of a configurable width buffer having interfaces that may be programmed to have a 64-bit width by connecting to multiple devices having a total width of 64 bits. Pet. 67 (citing Ex. 1071, 14:10–15, Figs. 5A, 5B). Petitioner argues that "Perego teaches that the data width accessed in a memory transaction ($W_A$), and the data width of the buffer interfacing with the memory controller ($W_{DP}$), can both be the same (e.g., both 64 bits), such that the ratio $W_A/W_{DP} = 1:1$." Pet. 69 (citing Ex. 1071, 14:16–40, 17:22–28, Fig. 5C; Ex. 1003 ¶ 281). According to Petitioner, a person of ordinary skill in the art "would understand that $W_A$ refers to the bit-width of each '*rank*' of memory devices (e.g., 64 bits can be read or written at a time) when only '***one***' of the 'one or more channels 370' . . . is used for a read or write operation." Pet. 69 (citing Ex. 1071, 6:12–24, 14:23–27, Fig. 3C; Ex. 1003 ¶¶ 282–283).

Petitioner also argues that "it would have been obvious to a [person of ordinary skill in the art] to arrange Perego's DDR memory devices into '*ranks*,' and a [person of ordinary skill in the art] would have been motivated to do so, in light of the JEDEC standards." Pet. 72 (citing Ex. 1064, 6; Ex. 1062, 13, 26–28; Ex. 1003 ¶¶ 287–289). Petitioner relies on JESD79-2's disclosure of chip select signals for ranks. Pet. 72 (citing Ex. 1064, 6; Ex. 1003 ¶¶ 287–289; Ex. 1062, 13).

Patent Owner argues that Perego does not teach "ranks" of memory devices. Prelim. Resp. 33–39. According to Patent Owner, "Petitioner has not provided any competent evidence that the devices connected to a single channel or interface 'act together' in response to a single read/write

command." Prelim. Resp. 34; *see also* Prelim. Resp. 38 ("***Perego's memory systems operate on an individual device basis***, and do not 'act together' as required by the concept of 'rank.'"). On this record, we disagree with Patent Owner.

Perego discloses that each of the interfaces in configurable width buffer device 391 of Figure 5B, on which Petitioner relies (Pet. 67–69), may connect to multiple devices, resulting in a width of 64 bits. Ex. 1071, 14:12–15; *see* Pet. 67 (discussing this disclosure). In particular, Perego discloses that "interfaces 520a and 520b may be programmed to connect to 16'x4' width memory devices, 8'x8' width memory devices or 4'x16' width memory devices." Ex. 1071, 14:12–15; *see* Pet. 67 (discussing this disclosure). Perego explains that the "maximum memory device access width" is "the largest number of bits that can be accessed in a *single memory device transfer operation* to or from configurable width buffer device 391." Ex. 1071, 14:23–27 (emphasis added). Perego also discloses that a memory operation may occur on one of channels 370. Ex. 1071, 6:12–24; *see* Pet. 69 (discussing this disclosure). On this record, in view of Perego's disclosures, we are sufficiently persuaded that, when there are multiple memory devices that account for the memory device access width (e.g., 64 bits), then those devices "act together" as in Petitioner's proposed construction. *See* Pet. 26. Furthermore, Perego discloses a serialization ratio of 1:1, meaning that the memory device access width ($W_A$) and the configured buffer device interface width ($W_{DP}$) are the same. Ex. 1071, 14:32–40, 17:22–28. In such a configuration, each rank would match the full bit-width of the memory module as in Petitioner's proposed construction. *See* Pet. 26.

Patent Owner also argues that Petitioner's contentions fail because Petitioner's "definition for a rank requires the use of chip-select signals" but

Perego "never mentions 'chip-select' signals, lines or the []like." Prelim. Resp. 36–37. Petitioner, however, relies on JESD79-2 for its disclosure of chip select signals (*see* Pet. 72), and, as noted above in § II.E.2, we are sufficiently persuaded by Petitioner's argument that a person of ordinary skill in the art would have combined the teachings of Perego and JESD79-2 given Perego's express disclosure of using DDR2, for which the industry specification is JESD79-2.

In addition to its argument that Perego discloses one rank per channel, Petitioner also argues that the memory devices connected to two channels may be considered one rank when the devices on the channels act together. Pet. 70–72 (citing Ex. 1071, 21:16–20, Figs. 4B, 4C). For example, Perego discloses, with reference to Figure 4B, that "[a]ny number of channels 415a-415d, for example, two channels 415c and 415d *may transfer information simultaneously* and the memory devices on the other two channels 415a and 415b remain in a ready or standby state until called upon to perform memory access operations." Ex. 1071, 21:16–20 (emphasis added).

Patent Owner argues that "Petitioner does not explain why channels 415c/d together read or write *full bit-width of the memory module* under its own theory, given that if each channel width equals the width of the full module, two channels would have a data width twice that of the memory module." Prelim. Resp. 40–41. Petitioner's contention about using only one channel is in the context of a buffer device with two channels. *See* Pet. 69–70. We understand Petitioner's contention to be that, when there are more than two channels and memory devices on two channels act together by "transfer[ring] information simultaneously" (Ex. 1071, 21:16–20), then the data accessed in a transaction would equal the bit width of the rank (devices on the two acting channels). *See* Pet. 70–72.

27

Patent Owner also argues that, "although much of the Petition's theory relies on the module width being 64 bits, the data width in Perego's Figure 4B is 16 bits." Prelim. Resp. 41. Even assuming Patent Owner is correct about Figure 4B, Perego expressly discloses a 64-bit wide embodiment, as discussed above. Ex. 1071, 14:12–15; Pet. 67.

Patent Owner also argues that "Perego's modules do not have a fixed width," which Patent Owner suggests runs counter to JEDEC compliant memories. Prelim. Resp. 34–35 (citing Ex. 2003, 43:12–20); *see also* Prelim. Resp. 36 ("Nothing in the '417 patent or any JEDEC documents suggests, however, a rank of memory devices refers to a group of memory devices that is dynamically reconstituted to account for the changing memory bit width."). Patent Owner, however, does not set forth a construction of "rank" that excludes such dynamic reconfigurability. On this record, it is not clear how a device that can have many configurations, one of which satisfies the limitations of a claim, would not render obvious the subject matter of that claim merely because it is capable of additional configurations.

Patent Owner also argues that Perego's disclosure in column 15 at lines 37–45 does not teach arranging memory in ranks. Prelim. Resp. 22–23 (citing Pet. 55). For the reasons discussed above in this section, we are sufficiently persuaded that Perego teaches ranks of memory devices by its disclosures of memories that act together to read or write, which are consistent with "grouping memory devices into multiple independent target subsets (i.e. more independent banks)." Ex. 1071, 15:37–45.

For the reasons discussed above and based on the evidence presented with the Petition, on this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

h) *Chip Select Signals Received by Memory Devices*

Claim 1 recites "wherein the plurality of N-bit wide ranks correspond to respective ones of the plurality of registered chip select signals such that each of the plurality of registered chip select signals is received by memory devices [in] one respective N-bit wide rank of the plurality of N-bit-wide ranks."

Petitioner argues that chip select signals would have been received by memory devices consistent with JEDEC standards. Pet. 73–74 (citing Ex. 1064, 6; Ex. 1069, 2–3; Ex. 1003 ¶¶ 297–301); *see* Ex. 1064, 6 ("Package Pinout" table showing input for Chip Select).

Patent Owner cites the following disclosure from Perego: "According to embodiments of the present invention, subsets of available memory devices on configurable width buffered module 395 are activated or powered-on during various modes of operation. Thus, configurable width buffered module 395 is able to achieve power savings by only powering particular memory devices." Ex. 1071, 20:41–46, *quoted in* Prelim. Resp. 32. Patent Owner argues that, "[i]f the non-targeted ones are not even powered on, no registered signals could be received by them." Prelim. Resp. 32. We agree with Patent Owner that, if a device does not have power, it would not operate to receive signals, but Perego does not state that every embodiment operates like this. For its part, Petitioner relies on Perego's disclosure of devices being in a "ready or standby state" to support its contention that it would have been obvious to send a non-active chip select signal to those devices. *See* Pet. 59–60 (quoting Ex. 1071, 21:16–20; citing Ex. 1071, 15:40–45). On this record, we do not understand a "ready or standby state" to be a state in which no power is supplied to the memory device. Patent Owner argues that in such a state, "no commands are sent to

the non-targeted memory devices" (Prelim. Resp. 32), but Petitioner's combination is based on chip select signals as disclosed in JESD79-2 in combination with Perego's teachings of targeting only select memories.

For the reasons discussed above and based on the evidence presented with the Petition, on this record, we are sufficiently persuaded by Petitioner's contentions for this limitation.

### i) Receive or Output Data in Response to Memory Commands

Claim 1 recites

> wherein one of the plurality of N-bit wide ranks including memory devices receiving the registered chip select signal having the active signal value and the other registered address and control signals is configured to receive or output a burst of N-bit wide data signals in response to the read or write command.

Petitioner argues that Perego teaches this subject matter because it discloses reading from or writing to a target subset of devices (rank) while other devices remain in a standby state such that they are not selected as the target devices. Pet. 74–79 (citing Ex. 1071, 6:21–22, 11:56–61, 15:31–45, 21:16–20, Figs. 3C, 4A, 4B, 4C, 5A, 5B; Ex. 1003 ¶¶ 302–323). For example, Perego discloses "grouping memory devices into multiple independent target subsets (i.e. more independent banks)" and "rout[ing] data from an appropriate source (i.e. target a subset of channels, internal data, cache or write buffer)." Ex. 1071, 15:42–45, 11:56–61. Perego also discloses that "two channels 415c and 415d may transfer information simultaneously and the memory devices on the other two channels 415a and 415b remain in a ready or standby state until called upon to perform memory access operations." Ex. 1071, 21:16–20.

Apart from its arguments about "ranks," discussed above in § II.E.2.g, Patent Owner does not dispute Petitioner's contentions for this limitation.

On this record, we are sufficiently persuaded by Petitioner's contentions and evidence that are summarized above, and we need not address Petitioner's additional arguments based on alternative claim constructions. *See* Pet. 81–84.

### *j)  Circuitry*

Claim 1 recites

circuitry coupled between the data signal lines in the N-bit wide memory bus and corresponding data pins of memory devices in each of the plurality of N-bit wide ranks, the circuitry being configurable to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module;

wherein data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices.

Petitioner argues that Perego discloses circuitry in the buffer devices of Figures 5A and 5B that is coupled between the data signal lines in the memory bus and corresponding data pins of memory devices in each of the ranks. Pet. 85–88 (citing Ex. 1071, 4:38–42, 6:12–15, 7:30–34, 10:59–67, 11:1–7, 13:6–10, 13:18–24, 14:65–15:2, 17:61–63, 18:65–19:3, Figs. 5A, 5B, 5C; Ex. 1003 ¶¶ 324–333). Petitioner argues that Perego's data bursts are routed through the buffer device between the targeted rank of memory and the memory controller and that a person of ordinary skill in the art would have understood that buffer control signals are used "to activate only the channel transferring the data burst between the memory controller and the targeted rank" and "to selectively activate those circuit elements of the buffer according to the targeted rank and direction of the read and write

operations." Pet. 90–91 (citing Ex. 1071, 6:15–25, 11:56–61, 12:9–12, 13:54–59, 14:62–15:6, 15:34–40, 17:41–44, 17:61–62, 21:16–20, Figs. 5A, 5B; Ex. 1003 ¶¶ 338–342).

As to the "CAS latency" recitations, Petitioner argues that the data are transferred according to an overall CAS latency of the memory module, citing Perego's disclosure of "access latency values" and JESD79-2's disclosure of CAS latency values. Pet. 92–94 (citing Ex. 1071, 12:20–34, Fig. 5B; Ex. 1064, 12, 14, 26, 28, Fig. 26; Ex. 1062, 68 n.1; Ex. 1003 ¶¶ 344–353). Petitioner argues that the data transfers in Perego are registered using latches 597f–m in Figure 5C. Pet. 95–96 (citing Ex. 1071, 12:65–13:5, 17:61–63, 18:65–19:3, Figs. 5B–5C; Ex. 1003 ¶¶ 359–362). Petitioner also argues that, "[u]nder the JEDEC standards, 'an additional clock cycle' is added to the 'CAS latency' of the memory devices to leave enough time for the register on the memory module to perform its functions." Pet. 95 (citing Ex. 1062, 68 n.1; Ex. 1064, 12, 14; Ex. 1003 ¶¶ 359–362). Petitioner argues that it would have been obvious to a person of ordinary skill in the art to add an additional clock cycle in Perego "so that the memory module complies with the timing of the JEDEC standards, and so the '*circuitry*' has enough time to perform its functions (including '*register[ing]*' the data signals for interfaces 520a/b with latches 597f-m . . .) using 'internal' clock circuit 570a-b." Pet. 95 (brackets by Petitioner; citing Ex. 1071, 12:65–13:5, 17:61–63, 18:65–19:3, Figs. 5B–5C; Ex. 1003 ¶¶ 359–362).

Patent Owner disputes Petitioner's contentions for the CAS latency recitations. Prelim. Resp. 42–45. As an initial matter, for the reasons explained above in § II.E.2, we disagree with Patent Owner's argument that

a person of ordinary skill in the art would not have combined the teachings of Perego and JESD79-2. *See* Prelim. Resp. 42.

Patent Owner argues that "Perego does not state that the 'access latency values' relate to the 'overall CAS latency of the memory module,' as opposed to a latency value of the memory device itself." Prelim. Resp. 43. The relied-upon portion of Perego discloses that "serial interface 574 may be employed to couple signals utilized in initialization of *module or memory device* identification values, test function, set/reset, access latency values." Ex. 1071, 12:20–24 (emphasis added). Thus, this disclosure suggests that the access latency values may pertain to the module and memory devices on the module. *See* Ex. 1003 ¶ 346 ("Perego discloses a serial interface 574 and operation circuit 572 including a ROM . . . that, during initialization of the module, provide identification information about the module, including 'access latency values,' that are used by the controller 'to properly configure the memory devices upon boot of the system.'" (citing Ex. 1071, 12:20–34)). Based on this evidence, we are sufficiently persuaded that Perego teaches access latency values for the memory module.

Patent Owner also argues that "Petitioner has also not provided competent evidence" to show that "the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices," as recited in claim 1. Prelim. Resp. 44. We disagree. Petitioner presents detailed testimony from Dr. Wolfe explaining how Perego's registered data transfers would have introduced delay. In particular, Dr. Wolfe, citing Perego's disclosures of data latches and an internal clock to generate synchronizing clock signals (Ex. 1071, 12:65–13:5, 17:61–63, Fig. C), provides the following testimony:

> A Skilled Artisan would have understood from these disclosures that Perego's latching of the data signals and the use of internal synchronizing clock signals adds a predetermined amount of time delay for each data transfer through the buffer because the output of the latch needs to be in synchronization with an internal clock. A Skilled Artisan would have understood that such registering of the data signals would require the addition of a fixed time delay, such as one clock cycle, for each registered data transfer through the circuitry with respect to the actual operational CAS latency of each of the plurality of memory integrated circuits.

Ex. 1003 ¶ 360. Dr. Wolfe further explains how Perego's "latching delays in the buffer device of Perego increase the overall CAS latency of the memory module compared to the CAS latency of the memory devices." Ex. 1003 ¶ 362 (citing Ex. 1071, 12:65–13:5, 18:65–19:3, Figs. 5B, 5C). On this record, we find Petitioner's evidence sufficiently persuasive to show that Perego teaches that "data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices," as recited in claim 1.

We are sufficiently persuaded by Petitioner's contentions for the remainder of the "circuitry" limitation, which we summarize above and which Patent Owner does not dispute at this stage. Having determined that Petitioner presents sufficiently persuasive evidence for this subject matter, we address Patent Owner's remaining arguments regarding this subject matter.

Patent Owner argues that "Petitioner ignores that Perego's buffer device includes caches that speed up data access." Prelim. Resp. 44 (citing Ex. 1071, 12:4–9). Perego, however, indicates that such a cache is optional ("may be incorporated"). Ex. 1071, 12:4–5. Even if a cache were

34

incorporated, its purpose is to store the "most frequently referenced data" so that they do not have to be retrieved from memory devices, which can speed up the memory module because the cache has "lower access latency characteristics than those of the memory devices." Ex. 1071, 12:5–9. This disclosure does not speak to the latched data that are otherwise retrieved from the memory devices when such data are not present in the cache.

Patent Owner also argues that Petitioner's reliance on Additive Latency (AL) in JESD79-2 falls short because "the actual operational CAS latency of a memory device would include the AL as well as specified" CAS latency. Prelim. Resp. 45 (citing Ex. 1064, 24; Ex. 1075, 15:52–57). Thus, according to Patent Owner, the CAS latency of the memory module would equal the actual operational CAS latency of the memory device, rather than being greater than the actual operational CAS latency, as recited in claim 1. Prelim. Resp. 45. We encourage the parties to address this argument further during trial because, to the extent the JESD79-2's disclosure of AL is specific to the memory devices themselves, it would appear that this AL would impact the actual operational CAS latency of the memory device. In any case, Petitioner presents evidence that a person of ordinary skill in the art would have taken into account the latency of the entire module, including latency of the memory devices combined with latency of the buffer device. Pet. 94 (citing Ex. 1003 ¶¶ 350–351; Ex. 1062, 68 n.1). This evidence sufficiently supports Petitioner's contentions.

Patent Owner also argues that Petitioner's reliance on the DDR RDIMM specification's disclosure of adding an extra clock cycle on the memory module is misplaced because (1) "Perego expressly distinguishes its data buffer to that on a traditional RDIMM" and (2) "no similar language is found in JEDEC's DDR2 RDIMM specification." Prelim. Resp. 43 (citing

35

Ex. 1071, 6:27–33; Ex. 1066, 94–96; Ex. 1062, 68). As to Patent Owner's first argument, we disagree for the reasons given above in § II.E.2.d based on Perego's disclosure of wanting to maintain backward compatibility. Ex. 1071, 2:4–6, 6:27–33, 6:37–39. As to Patent Owner's second argument, some additional development of the record would be helpful during trial.

We further note that claim 1's recitation that "data transfers through the circuitry are registered for an amount of time delay such that the overall CAS latency of the memory module is greater than an actual operational CAS latency of each of the memory devices" appears to pertain to the recited "circuitry," which is "*configurable* to transfer the burst of N-bit wide data signals between the N-bit wide memory bus and the memory devices in the one of the plurality of N-bit wide ranks in response to the data buffer control signals and in accordance with an overall CAS latency of the memory module" (emphasis added). The claim, therefore, appears to require a device that is configur*able* to perform data transfers in a certain way, rather than a device that is necessarily configur*ed* to do so. Based on the evidence presented, it appears that Perego's device has such configurability. In particular, Perego discloses the following:

> According to an embodiment of the present invention, clock circuit 570a–b includes one or more clock alignment circuits for phase or delay adjusting internal clock signals with respect to an external clock (not shown). Clock alignment circuit may utilize an external clock from an existing clock generator, or an internal clock generator to provide an internal clock, to generate internal synchronizing clock signals having a predetermined temporal relationship.

Ex. 1071, 12:65–13:5. Dr. Wolfe's testimony indicates that this allows Perego to "add[] a predetermined amount of time delay for each data

36

transfer." Ex. 1003 ¶ 360. Thus, it appears on this record that Perego discloses the configurability recited in claim 1.

For the reasons discussed above and based on the evidence presented with the Petition, on this record, we are sufficiently persuaded by Petitioner's contentions for the circuitry limitation.

### k)    Determination for Claim 1

For the reasons discussed above and based on Petitioner's contentions and evidence, summarized above, we are persuaded, on this record, that Petitioner shows a reasonable likelihood of prevailing in demonstrating that claim 1 is unpatentable as obvious over the combined teachings of Perego and JESD79-2. We note that Petitioner presents a short discussion of alleged secondary considerations of obviousness. Pet. 126–27. At this stage, Patent Owner does not present evidence of secondary considerations as to any of the challenged claims. Because we are sufficiently persuaded by Petitioner's showing, we need not rely on Petitioner's assertions of secondary considerations.

### 3.    Claims 2–15

Petitioner also asserts that dependent claims 2–15 are unpatentable as obvious over the combined teachings of Perego and JESD79-2. Pet. 97–111. Patent Owner relies on the arguments addressed above in § II.E.2 and does not set forth additional arguments for claims 2–15 at this stage of the proceeding. *See* Prelim. Resp. 13–46. We have reviewed Petitioner's contentions, and we are sufficiently persuaded, on this record, that Petitioner shows a reasonable likelihood of prevailing in demonstrating that claims 2–15 are unpatentable as obvious over the combined teachings of Perego and JESD79-2.

*F. Additional Grounds*

As noted above, Petitioner asserts two additional grounds, each adding either Ellsberry or Halbert to the combination of Perego and JESD79-2 discussed above. Pet. 5, 111–26. Patent Owner opposes. Prelim. Resp. 45–59. Having determined that the Petition meets the threshold for institution (reasonable likelihood of prevailing as to at least one of the challenged claims) based on the Perego and JESD79-2 obviousness ground, the remainder of this Decision focuses on the parties' disputes to provide guidance to the parties for the trial.

*1. Prior Art Status of Ellsberry*

In an *inter partes* review, a petitioner "may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). Patent Owner argues that "patent applications are 'printed publication' prior art only as of the date they became published and available to the public." Prelim. Resp. 48. Patent Owner argues, therefore, that Ellsberry is not a prior art printed publication under 35 U.S.C. § 311(b) because it was published in December 2006, which is after the effective filing date of July 1, 2005, that Petitioner asserts applies to the '417 patent. Prelim. Resp. 46; *see* Pet. 5–6 (asserting that the claims of the '417 patent are not entitled to the benefit of a filing date before July 1, 2005).

We disagree with Patent Owner's statutory interpretation. Ellsberry is a printed publication, having been published in December 2006, as Patent Owner acknowledges. *See* Ex. 1073, code (43) (publication date of Dec. 7, 2006); *see also* Prelim. Resp. 47 (acknowledging publication date). On this record, we are persuaded by Petitioner's contentions that Ellsberry is prior

art under 35 U.S.C. § 102(e), having been filed "by another . . . in the United States before the invention by the applicant for patent." *See* Pet. 5–8 (asserting a priority date of no earlier than July 1, 2005, for the '417 patent); *see also* Ex. 1073, code (22) (filing date of June 1, 2005). Thus, Petitioner asserts a permissible ground of unpatentability under 35 U.S.C. § 311(b) by arguing that claims 1–15 are unpatentable under 35 U.S.C. § 103(a) on the basis of Ellsberry, which is a prior art printed publication, in combination with other prior art.

### 2. *Combination of Perego, JESD79-2, and Ellsberry*

Patent Owner also argues that "Ellsberry does not cure the deficiency of Perego," disputing various assertions of Petitioner as to Ellsberry's disclosure. Prelim. Resp. 48–54 (emphasis omitted). For the reasons discussed in § II.E.2, we are sufficiently persuaded that the combination of Perego and JESD79-2 teaches the subject matter of claim 1, and, therefore, on this record we do not agree with Patent Owner that there are deficiencies in the asserted combination.

With respect to Petitioner's reasoning to combine based on Ellsberry's disclosure of JEDEC compliance and DDR2 memories (Pet. 113–114), Patent Owner argues that "Petitioner does not explain why a [person of ordinary skill in the art] would modify Perego to make it comply with JEDEC." Prelim. Resp. 54. For the reasons explained above in § II.E.2, we disagree with Patent Owner.

### 3. *Combination of Perego, JESD79-2, and Halbert*

Patent Owner argues that "Halbert does not cure the deficiencies of Perego," disputing various assertions of Petitioner as to Halbert's disclosure. Prelim. Resp. 55–57. For the reasons discussed in § II.E.2, we are sufficiently persuaded that the combination of Perego and JESD79-2 teaches

the subject matter of claim 1, and, therefore, on this record we do not agree

with Patent Owner that there are deficiencies in the asserted combination.

With respect to the CAS latency recitations of claim 1, Patent Owner

argues the following:

> Petitioner has not pointed to any evidence that Halbert's data buffer is configured to transfer data in accordance with the overall CAS latency of the memory module, as opposed to the latency of the device after the device receives the read/write commands. Pet. 125–126. What the Petition at most shows is that due to the one-cycle delay between when the command is issued by the memory controller and when the device receives the command, the time interval between when the memory controller issues a read command and when data appears on memory bus is greater than the time interval between when the memory device receives the command and when data appears on memory bus. But that result does not evidence how the result is achieved: that is, the timing could simply result when the data buffer just transports data without reference to the overall CAS latency of memory module at all, but in reference to some other signals or parameters (e.g., the relevant data data strobe signals).

Prelim. Resp. 56–57 (citing Ex. 1078, 6:19–28).

As an initial matter, Patent Owner's argument does not appear to be

commensurate in scope with the claim, which recites circuitry that is

"configurable" to transfer data in a certain manner, not "configured" to do

so. *See* § II.E.2.j above. Furthermore, it is unclear why Halbert's disclosure

would not teach the CAS latency subject matter even if "some other signals

or parameters" (Prelim. Resp. 57) cause the recited latency. In any event,

we need not rely on Halbert at this stage because, for the reasons discussed

above in § II.E.2.j, we are sufficiently persuaded by Petitioner's contentions

based on Perego in combination with JESD79-2 for this subject matter.

Patent Owner also argues that Petitioner has not provided sufficient

reasoning to combine Halbert with Perego and JESD79-2 and that Petitioner

"provides no detail whatsoever on how it suggests a [person of ordinary skill in the art] should incorporate Halbert's design in Perego." Prelim. Resp. 57–59. For claim 1, we understand Petitioner to be relying on "Halbert's disclosure of m-bit wide ranks . . . where 'm' can be 64 bits" to bolster its contention that having multiple ranks would have been obvious. Pet. 123–24. We also understand Petitioner to be relying on Halbert's disclosure of a memory module CAS latency that exceeds the CAS latency of a memory device on the module. Pet. 124–26. This latter teaching appears particularly relevant given the Examiner's reasons for allowance, which we discuss above in § II.A.2. *See* Ex. 1002, 229–30 (Examiner's reasons for allowance stating that the "closest prior art of record" does not teach the "circuitry" limitation, including the CAS latency recitations). On this record, we are sufficiently persuaded by Petitioner's reasoning that a person of ordinary skill in the art "would have recognized that the combination would have resulted in a predictable variation, which would improve similar devices like Perego in the same way and not yield unexpected results or challenges." *See* Pet. 122 (citing Ex. 1003 ¶ 198).

## III. CONCLUSION

For the foregoing reasons, we determine that the information presented in the Petition establishes that there is a reasonable likelihood that Petitioner would prevail in challenging at least one claim of the '417 patent, and we institute *inter partes* review of all challenged claims on all grounds raised in the Petition. *See* 37 C.F.R. 42.108(a) ("When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim."). At this stage of the proceeding, we have not made a final

41

determination with respect to the patentability of any of the challenged claims or the construction of any claim term.

## IV. ORDER

Accordingly, it is

ORDERED that, pursuant to 35 U.S.C. § 314(a) and 37 C.F.R. § 42.4, an *inter partes* review is hereby instituted as to claims 1–15 of the '417 patent on all challenges raised in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial, which will commence on the entry date of this decision.

Appx5080

FOR PETITIONER:

Eliot Williams
Theodore Chandler
Ferenc Pazmandi
John Gaustad
Brianna Potter
BAKER BOTTS LLP
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
john.gaustad@bakerbotts.com
brianna.potter@bakerbotts.com


FOR PATENT OWNER:

Hong Zhong
Jonathan Lindsay
IRELL & MANELLA LLP
hzhong@irell.com
jlindsay@irell.com

Appx5081

Trials@uspto.gov
571-272-7822

Paper: 20
Entered: October 19, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

SAMSUNG ELECTRONICS CO., LTD.,
Petitioner,

v.

NETLIST, INC.,
Patent Owner.

————————

IPR2022-00615
Patent 7,619,912 B2

————————

Before JON M. JURGOVAN, DANIEL R. GALLIGAN, and
NABEEL U. KHAN, *Administrative Patent Judges.*

JURGOVAN, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

# I. INTRODUCTION

Samsung Electronics Co., Ltd. ("Petitioner") filed a Petition requesting *inter partes* review of claim 16 of U.S. Patent No. 7,619,912 [1] (Ex. 1001, "the '912 patent"). Paper 1 ("Pet."), 4. Netlist, Inc. ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). Petitioner filed an authorized Preliminary Reply (Paper 14), and Patent Owner filed an authorized Preliminary Sur-Reply (Paper 15).

We have jurisdiction and authority to institute trial pursuant to 35 U.S.C. §§ 6 and 314(a), and 37 C.F.R. § 42.4(a). Upon consideration of the Petition, Preliminary Response, Reply, and Sur-Reply, we exercise our discretion to institute *inter partes* review under § 314(a).

# II. BACKGROUND

## A. Real Parties-in-Interest

Petitioner identifies itself and Samsung Semiconductor, Inc. as the real parties-in-interest involved in this case. Pet. 1. Patent Owner identifies itself as the real party-in-interest in this case. Paper 4, 1.

## B. Related Matters

Petitioner and Patent Owner identify the following as matters that can affect or be affected by this proceeding. *See* Pet. 1–2; Paper 4, 1.

- *Netlist, Inc. v. Google LLC*, 4:09-cv-05718 (N.D. Cal. Dec. 4, 2009)

- *Samsung Electronics Co., Ltd. et al. v. Netlist, Inc.*, 1:21-cv-01453 (D. Del. Oct. 15, 2021)

---

[1] Challenged claim 16 was amended as part of an *inter partes* reexamination, as set forth in the reexamination certification (appended at the end of Ex. 1001).

- *Netlist, Inc. v. Inphi Corp.*, No. 2:09-cv-06900 (C.D. Cal. Sept. 22, 2009) (terminated)

- U.S. Application No. 17/403,832

- *Inter partes* Reexamination Nos. 95/000,578, 95/000,579, and 95/001,339 of the '912 patent (concluded)

- *Inter partes* Reexamination Nos. 95/000,546 and 95/000,577 of U.S. Patent No. 7,289,386 (concluded)

- *Inter partes* Reexamination No. 95/001,337 of U.S. Patent No. 7,636,274 (concluded)

- IPR2014-00882 of U.S. Patent No. 7,881,150 (concluded)

- IPR2014-00883 of U.S. Patent No. 8,081,536 (concluded)

- IPR2015-01021 of U.S. Patent No. 8,081,536 (concluded)

- IPR2017-00549 of U.S. Patent No. 8,756,364 (concluded)

- IPR2017-00667 of U.S. Patent No. 7,532,537 (concluded)

- IPR2017-00668 of U.S. Patent No. 7,532,537 (concluded)

*C. Overview of the '912 Patent*

The '912 patent is titled "Memory Module Decoder" and is directed to a memory module that is connectable to a computer system. Ex. 1001, codes (54), (57). Figure 1A of the '912 patent is reproduced below.

3



Figure 1A:

Figure 1A shows a memory module 10 with printed circuit board 20 and memory devices 30 connected to the printed circuit board. *Id.* at 5:9–11. Memory devices 30 are arranged in ranks 32, 34, 36, 38. *Id.* at 22:35–37. The memory devices 39 may be double-data rate (DDR) dynamic random-access memory (DRAM) devices. *Id.* at 6:12–16. The memory module 10 further comprises logic element 40 coupled to the printed circuit board 20. *Id.* at 5:13–14. Logic element 40 receives a set of input control signals and generates output control signals for select memory devices 30. *Id.* at 5:14–21. Phase-lock loop device 50 and register 60 are also mounted on printed circuit board 20. *Id.* at 5:25–27. The phase-lock loop device 50 generates clock signals to memory devices 30, logic element 40, and register 60.

4

Register 60 receives and buffers control signals including address signals, and transmits corresponding signals to appropriate memory devices 30. *Id.* at 5:31–36.

In Figure 1A, logic element 40 receives a set of input control signals from the computer system that include chip-select signals $CS_0$–$CS_1$, address signal $A_{n+1}$, and bank address signals $BA_0$–$BA_m$. *Id.* at 7:35–53. To the computer system, the memory module has only two ranks selectable with either $CS_0$ or $CS_1$. *Id.* at 6:55–7:19. However, logic element 40 generates a set of output control signals $CS_{0A}$, $CS_{0B}$, $CS_{1A}$, $CS_{1B}$ corresponding to the four ranks 32, 34, 36, 38 of memory devices 30. *Id.* at 6:61–63. Logic element 40 also receives command signals (e.g., read or write) from the computer system and transmits the command signal to memory devices on the selected rank of the memory module. *Id.* at 6:55–61, 7:43–53. In some embodiments, logic element 40 transmits command signals to only a single memory device on a multi-device rank at a time. *Id.* at 8:49–54.

### D. Claim 16 of the '912 Patent

Claim 16 of the '912 patent is an independent claim, and the only claim that is challenged in this proceeding. Claim 16 is reproduced below.

> [16.pre] A memory module connectable to a computer system, the memory module comprising:
>
> [16.a] a printed circuit board;
>
> [16.b] a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board, [16.b.i] the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks;
>
> [16.c] a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register, [16.c.i] the logic element receiving a set of input signals from the computer

5

system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal, [16.c.ii] the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks, [16.c.iii] the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks, [16.c.iv] wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks; and

[16.d] a phase-lock loop device coupled to the printed circuit board, [16.d.i] the phase-lock loop device operatively coupled to the plurality of DDR memory devices, the logic element, and the register,

[16.e] wherein the command signal is transmitted to only one DDR memory device at a time.

*Id.* at *Inter Partes* Reexamination Certificate, 3:9–43.

E.  *Asserted References*[2]

| Reference | | Date | Exhibit No. |
|---|---|---|---|
| Perego-422 [3,] | US 7,363,422 B2 | Apr. 22, 2008 | 1035 |

---

[2]  Petitioner also relies upon the Declaration of Dr. Andrew Wolfe (Ex. 1003).

[3]  Although the Petition refers to this reference as "Perego," we refer to it as "Perego-422" to distinguish it from another reference of record by the same

| Reference [4] | | Date | Exhibit No. |
|---|---|---|---|
| Amidi [5] | US 2006/0117152 A1 | Jun. 1, 2006 | 1036 |
| Ellsberry [6] | US 2006/0277355 A1 | Dec. 7, 2006 | 1037 |

Pet. 4, 14–22.

### F. Asserted Challenges to Patentability

| Claim Challenged | Basis | Reference(s)/Basis |
|---|---|---|
| 16 | § 103(a) | Perego-422 |
| 16 | § 103(a) | Perego-422, Amidi |
| 16 | § 103(a) | Ellsberry |

Pet. 4.

### G. Procedural History

The '912 patent was filed on September 7, 2007, as U.S. Application No. 11/862,931 ("the '931 application"), and issued November 17, 2009. Ex. 1001, codes (21), (22). The '912 patent indicates that it is a continuation of U.S. Application No. 11/173,175, filed on July 1, 2005, which issued as

---

inventor, U.S. Patent No. 7,356,639 ("Perego-639") (Ex. 1061).

[4] Petitioner contends Perego-422 is prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 14.

[5] Petitioner contends Amidi is prior art under 35 U.S.C. §§ 102(a) and (e). Pet. 18.

[6] Petitioner contends Ellsberry is prior art under under 35 U.S.C. §§ 102(a) and (e). Pet. 20.

U.S. Patent No. 7,289,386 ("the '386 patent"). *Id.* at code (63). The '912 patent further indicates that this continuation is in turn a continuation-in-part of U.S. Application No. 11/075,395, filed March 7, 2005, now U.S. Patent No. 7,286,436 ("the '436 patent"). *Id.* The '912 patent also claims priority to U.S. Provisional No. 60/588,244 ("the '244 provisional") filed July 15, 2004, U.S. Provisional No. 60/550,668 ("the '668 provisional") filed March 5, 2004, and U.S. Provisional No. 60/575,595 ("the '595 provisional") filed May 28, 2004. *Id.* at code (60).

Perego-422 was not considered by the Examiner during examination of the '912 patent. However, a related patent with similar disclosure, Perego-639, was considered and is listed on the patent. Ex. 1002, 125; Ex. 1001, 2.

Amidi was considered and discussed by the Examiner during examination and is listed on the patent. Ex. 1002, 91, 509–510, 536; Ex. 1001, 2. Amidi was further considered in the reexamination of the '912 patent. Ex. 1010, 1, 2947, 3865–67.

During examination, the Examiner acknowledged Ellsberry's substance at a high level as including a memory module and phase-locked loop (PLL). Ex. 1002, 509–510, 516. However, the Examiner noted that Ellsberry was filed after the earliest effective filing date of the '931 application on which the '912 patent issued. *Id.* Consequently, the Examiner did not consider Ellsberry to be prior art to the '931 application. Ellsberry is listed on the '912 patent as having been considered by the Examiner. Ex. 1001, 2.

On September 22, 2009, Patent Owner served Inphi Corp. with a complaint for infringement of U.S. Patent No. 7,532,537 in the Central District of California. Exs. 2002, 2017.

On December 4, 2009, Patent Owner served Google, Inc. with a complaint for infringement of the '912 patent in the Northern District of California. Ex. 2001. On May 18, 2010, the District Court for the Northern District of California stayed the litigation to await the outcome of reexamination of the '912 patent.

Thereafter, Inphi Corporation (Requester 1), Smart Modular Technologies, Inc. (Requester 2), and Google, Inc. (Requester 3) filed *inter partes* reexaminations as Control Nos. 95/001,339, 95/000,578, and 95/000,579 on June 8, 2010, October 20, 2010 and October 21, 2010, respectively, against the '912 patent. Ex. 1011, 5. On February 28, 2011, these proceedings were merged into a single proceeding under Control No. 95/000,578. *Id.*

During the reexamination, Amidi was cited in a Form PTO 1449. Ex. 1010, 1. Amidi was considered in combination with references called "Micron DDR2," "Dell2," and "Dell '184" in proposed § 103 rejections against claim 16 of the '912 patent. Ex. 1010, 2456–2457, 4442–4443, 5300–5303. The Examiner confirmed patentability of claim 16 and Patent Owner amended the claim into independent form. Ex. 1010, 3145, 3844, 3945–3946, 4569–4570, 4722, 5326. Requesters appealed to the Board, which affirmed the Examiner's decision confirming claim 16 as patentable. *Id.* at 7259–7260; Ex. 1011, 78–80*; Inphi Corp. Requester 1, Smart Modular Tech. (WWH), Inc. Requester 2, and Google, Inc. Requester 3 v. Patent of Netlist, Inc., Patent Owner*, 2016 WL 3088604 (Patent Tr. & App. Bd.)

9

(May 31, 2016). Requesters sought reconsideration of the Board's decision, arguing that claim 16 would have been obvious in view of Amidi alone and combined with Dell 2. Ex. 1010, 7258–7264. The Board denied rehearing. Thereafter, Requesters appealed to the Court of Appeals for the Federal Circuit, which affirmed the Board's decision on June 15, 2020. *Id.* at 7905. The *Inter Partes* Reexamination Certificate confirming claim 16 issued on February 8, 2021. Ex. 1011, 7966.

From 2015 to 2020, Patent Owner licensed Petitioner under the '912 patent until Patent Owner terminated the license for "material breach." Prelim. Resp. 24 (citing Ex. 2023, 18–20).

On October 15, 2021, Petitioner filed a complaint for non-infringement and unenforceability, as well as breach of contract, against Patent Owner regarding the '912 patent and two other patents in the District Court for the District of Delaware. Ex. 1049. Patent Owner sought to dismiss the Delaware case for lack of subject matter jurisdiction and failure to state a claim upon which relief could be granted. Ex. 1052. The Northern District of California stayed Google's case in favor of the Delaware litigation. Ex. 1054. Thereafter, Patent Owner filed a complaint, and then an amended complaint, against Petitioner for infringement of the '912 patent and others in the Eastern District of Texas. Ex. 1056; Ex. 1057. Petitioner sought transfer of the Texas case to the Northern District of California, and alternatively requested the Texas court to either stay the Texas case pending resolution of a Ninth Circuit Appeal or consolidate this case with "the First Texas Case" (No. 2:21-cv-463). Ex. 1062.

10

The record also includes an Order from the Northern District of California granting intervening rights to the claims asserted by Patent Owner against Google except for claim 16 of the '912 patent. Ex. 1053.

## III. ANALYSIS

### A. *Statutory Time-Bar under 35 U.S.C. § 315(b)*

Patent Owner argues that Google is an unnamed real party in interest and privy of Petitioner. Prelim. Resp. 6–16. Patent Owner contends that the Petition is time-barred under § 315(b) because Google was sued on the '912 patent in 2009, and thus more than one year before filing of the Petition.

For the following reasons, we do not agree that Google is a real party in interest or privy or that the Petition is time-barred under § 315(b) due to the 2009 complaint against Google.

### 1. *Whether Google is a Real Party in Interest*

"Whether a party who is not a named participant in a given proceeding nonetheless constitutes a 'real party-in-interest' . . . to that proceeding is a highly fact-dependent question." Consolidated Trial Practice Guide, 13 (Nov. 2019), available at https://www.uspto.gov/sites/default/files/documents/tpgnov.pdf ("TPG"). "[A]t a general level, the 'real party-in-interest' is the party that desires review of the patent," and, thus, "may be the petitioner itself, and/or it may be the party or parties at whose behest the petition has been filed." *Id.* at 14. "For example, a party that funds and directs and controls an IPR or PGR petition or proceeding constitutes a 'real party-in-interest.'" *Id.* at 17. Several relevant factors for determining whether an unnamed party to an *inter partes* proceeding is a real party-in-interest include the party's relationship with the petitioner, the party's

11

relationship to the petition, and the nature of the entity filing the petition. *Id.* at 17–18. Determining whether an unnamed party is a real party-in-interest "demands a flexible approach that takes into account both equitable and practical considerations, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner." *Applications in Internet Time, LLC v. RPX Corp.* ("*AIT*"), 897 F.3d 1336, 1351 (Fed. Cir. 2018).

Petitioner's initial identification of the real party-in-interest is accepted unless and until Patent Owner produces some evidence to support its argument that a particular third party should be named as a real party-in-interest. *Worlds Inc. v. Bungie, Inc.*, 903 F.3d 1237, 1242 (Fed. Cir. 2018). Petitioner bears the ultimate burden of persuasion to show that its Petition is not time-barred under § 315(b). *Id.*

Patent Owner focuses on three factors in contending that Google is a real party-in-interest: (1) Google's alleged interest and benefit from this proceeding; (2) Petitioner's alleged representation of Google's interest; and (3) Petitioner's business model, including its preexisting relationship with Google. Prelim. Resp. 8–14.

Turning to the first of these factors, Patent Owner contends Google's alleged infringement has been willful; that Google is the only entity with legal exposure to damages in the United States; that Google is time-barred under § 315(b) by the 2009 complaint served on it; and that Google's participation in the reexamination bars it from challenging the same claim in District Court. *Id.* at 8–9.

Petitioner, on the other hand, contends that Patent Owner lost its case against Google. Prelim. Reply 1. Specifically, Petitioner contends that

12

intervening rights precluded infringement before 2021 because all asserted claims were either amended or canceled during reexamination, and because the accused products from 2009 were no longer in use. *Id.* (citing Ex. 1053, 44:5–10; Ex. 1054, 10:4–10). Petitioner's assertion is supported by an order from the Northern District of California granting Google's motion for summary judgement on the issue of intervening rights for all but claim 16 of the '912 patent for which summary judgement was denied. Ex. 1053, 44. In addressing Google's motion to strike Patent Owner's assertion of claim 16 against Google, the Northern District of California stated in its order that "[c]onsistent with Google's assertion, it appears from this evidence that DDR4 DIMMs operating in PDA mode transmit a command signal to all DRAM in a given rank at the same time" and that "this evidence is largely unrebutted by [Patent Owner]." Reply 1–2 (citing Ex. 1053, 11:3–12). In contrast, claim 16 recites that "the command signal is transmitted to only one DDR memory device at a time." Ex. 1001, 3:42–43 (reexamination certificate). Consequently, the present record shows that Google may have little if anything to gain by this proceeding.

To specifically address Patent Owner's arguments concerning Google's alleged interest and benefit in this proceeding, Patent Owner does not explain why any alleged willful infringement on the part of Google would matter in the real party-in-interest analysis, let alone how its infringement case is sound in view of the Northern District of California's observations. *See* Prelim. Resp. 8–9. Patent Owner also does not explain why, if Google is the only party with legal exposure to damages, it also sued Petitioner for damages in the Eastern District of Texas for infringing the '912 patent. *See id.* at 9; Prelim. Reply 1; Ex. 1056; Ex. 1058. And

13

although Google's participation in the *inter partes* reexamination of the '912 patent may preclude it from asserting certain invalidity defenses in District Court, as Patent Owner contends (*see* Prelim. Resp. 9), Patent Owner does not address the possibility that Google achieved all it sought in the reexamination such that it has no interest in this proceeding.

Consequently, on the existing record, Petitioner has shown sufficiently that Google has little, if any, interest or benefit accruing to it in this proceeding.

Patent Owner contends that Petitioner is representing Google's interest because Petitioner admitted in filings in the District of Delaware that it was challenging the '912 patent at the behest of Google due to indemnification requests it received from Google and its subcontractor Lenovo. Prelim. Resp. 9–11 (citing Ex. 1049 ¶ 11; Ex. 1051 ¶ 14).

The record developed thus far does not show the language of Google's indemnification request or demand, nor does it show what the relevant agreements were between Google and Petitioner. Whatever their terms, Google's indemnification request (*see* Ex. 1051 ¶¶ 43–44) makes it unlikely that Google is funding or controlling this proceeding. *See* Prelim. Reply 2 (explaining that Google did not pay Petitioner to reduce its exposure and that Petitioner is the party with the apparent risk of infringement liability).

Patent Owner further contends that Google benefited by using the Petition and declaratory judgement sought by Petitioner in the District of Delaware as a reason to request a stay of the Northern District of California litigation. Prelim. Sur-Reply 12. Although Google may have derived a minor ancillary benefit in this respect, we find it unlikely that Petitioner's

14

purpose in filing the Petition was to provide Google with a basis to request a stay, particularly when, at the time the Petition was filed, Patent Owner had effectively "lost" its case due to intervening rights and the accused products no longer being in use. *See* Prelim. Reply 1. Any benefit that accrued to Google regarding the request for stay was marginal. If anything, the fact that Google and Patent Owner filed a joint motion to stay their litigation pending resolution of the district court litigation between Petitioner and Patent Owner tends to demonstrate that Google is not a real party-in-interest to this proceeding. Ex. 1064, 1–2.

The record shows that Patent Owner's threats against Petitioner and Petitioner's recognition that the '912 patent related to its products are what caused Petitioner to file its Petition, not any interest or benefit that would accrue to Google. Prelim. Reply 1. As Petitioner explains, Petitioner is the party with the apparent risk of infringement liability, not Google. *Id.* at 2.

Petitioner also cites the case of *Glenayre Electronics, Inc. v. Jackson*, 443 F.3d 851, 864 (Fed. Cir. 2006). Prelim. Reply 2. Under this case, "[a] party [Patent Owner] is precluded from suing to collect damages for direct infringement by a buyer and user of a product [Google] when actual damages covering that very use have already been collected from the maker and seller of that product [Petitioner]." *Glenayre*, 443 F.3d at 864. Thus, under the *Glenayre* case, Patent Owner can collect damages for direct infringements from either the manufacturer (Petitioner) or the buyer-user (Google), not both. Patent Owner's suit against Petitioner in the Eastern District of Texas, if successful, would preclude Patent Owner from collecting damages for the same acts of direct infringement from Google in the Northern District of California. And Google has represented to the

15

Northern District of California District Court that "the only products remaining at issue are 4-Rank DDR4 RDIMMS and 4- Rank DDR4 LRDIMMs that Google has purchased from Samsung."  Ex. 2004, 14, *cited in* Prelim. Sur-Reply 4.  Petitioner acknowledges that Patent Owner has asserted claim 16 of the '912 patent against its newly released products incorporating DDR4 technology.  Prelim. Reply 1.

Consequently, on this record, Petitioner has shown sufficiently that Petitioner is not representing Google's interest, but solely its own interest, in this proceeding.

Although Patent Owner overstates Petitioner's and Google's relationship as "permeating all aspects of their businesses" (Prelim. Resp. 12), Patent Owner is correct to the extent it contends that the nature of Petitioner's and Google's businesses, and their preexisting relationship, is relevant to the real party-in-interest analysis.  *See RPX Corp. v. Applications in Internet Time, LLC*, IPR2015-01750, Paper 128, 10 (Oct. 2, 2020) (considering the nature and relationship of petitioner and party); *Ventex Co., Ltd. v. Columbia Sportswear North America*, IPR2017-00651, Paper 148, 7 (Jan. 24, 2019) (precedential) (considering agreements between petitioner and an unnamed party).

As Patent Owner states, Google's business primarily pertains to its search engine from which it derives revenue for advertisements.  Prelim. Resp. 12.  Google also has a cloud business hosting data and applications. *Id.*  These businesses utilize memory modules in servers and smartphones, although they are generally agnostic to what type of memory modules are used in these devices.  *Id.* (acknowledging there is a "highly competitive market" for DIMMs).  In addition, Google sells Pixel smartphones and other

16

devices. Ex. 2010.

Petitioner, on the other hand, manufactures electronic devices and components thereof, including memory modules. *Id.* Although, as Patent Owner contends (*id.* at 13–14), Samsung and Google have a close relationship by virtue of Google's Android operating system running on some of Petitioner's smartphones, Chromebook computers, and other products and services, these businesses are not directly connected to the memory modules produced by Petitioner or its competitors, let alone those described and claimed in the '912 patent. Ex. 2008; Ex. 2014. As Petitioner notes, Patent Owner's Exhibits pertain to arms-length transactions between the two conglomerates concerning Android smartphones, Chromebook computers, and smart watches, among other products and services. Prelim. Reply 3. Android smartphones and Chromebook computers are not the only phones and computers produced by Petitioner, and Petitioner is not the only manufacturer of Android smartphones and Chromebook computers. *See* Ex. 2009, 1. Petitioner's Tizen operating system competes directly against Android, and Petitioner's smartphones compete directly against Google's Pixel phones. Prelim. Resp. 14; Ex. 2010; Ex. 2027, 1 ("It's hard to know whether the two companies [Petitioner and Google] quietly hate each other while remaining diplomatic in public as they wrestle over a variety of mobile initiatives in the spirit of 'competing while cooperating.'").

The record does not show that any exclusive relationship exists between Petitioner and Google, such as Petitioner being the only supplier of memory modules, phones, or computers used in Google's businesses or Petitioner's devices using only Google's software to the exclusion of competitive offerings. *Cf. Ventex*, Paper 148, 9 (exclusive business

17

relationship found to be a factor in deciding that non-party was a real party-in-interest).

Petitioner and Google have aligned interests in the success of each other's businesses in some respects, but, as noted, in others they are competitive or disinterested. For example, the greater the number of Android smartphones and Chromebook computers that Petitioner sells to its customers, the greater the opportunity is for Google to offer its advertising and services on those devices. But, as noted, Google's Android operating system competes directly with Petitioner's Tizen operating system, just as Google's Pixel phone competes against Petitioner's phone offerings. Whatever aligned interest Petitioner and Google may have is not tied in any significant way to the particular type of memory modules claimed in the '912 patent. *Cf. Ventex*, Paper 148, 8 (unnamed and named parties had mutual interest tied to subject of infringement allegations).

We are also persuaded by Petitioner's contention that there was no overlap between this proceeding and the '912 patent claims asserted in the 2009 complaint until Patent Owner recently amended its complaints to assert claim 16 against Petitioner's newly released products. Prelim. Reply 1; Ex. 1056; Ex. 1059; *cf. Ventex*, Paper 148, 9 (overlap between claims in litigation and *inter partes* review considered in analysis of unnamed real party-in-interest). Claim 16 of the '912 patent was not included in the complaint against Google as originally filed in 2009 in the Northern District of California. Reply 1. Petitioner is correct that "it would be deeply unfair to allow [Patent Owner] to manufacture a time bar against [Petitioner]" merely by amending its complaints after the Petition was filed to assert claim 16 against Petitioner's DDR4 products that did not exist when the

18

2009 complaint was filed against Google. *See* Prelim. Reply 4; *AIT*, 897 F.3d at 1351 ("Determining whether a non-party is a 'real party in interest' demands a flexible approach that takes into account both *equitable and practical considerations*, with an eye toward determining whether the non-party is a clear beneficiary that has a preexisting, established relationship with the petitioner" (emphasis added)).

On this record, Petitioner has carried its burden to show that Petitioner is the sole real party-in-interest, i.e., that Google is not an unnamed real party in interest.

### 2. Privity

In *Taylor v. Sturgell*, 553 U.S. 880, 894–95 (2008), the Supreme Court provided a non-exhaustive list for examining whether the legal relationship between two parties establishes that one is the privy of the other: "(1) an agreement between the parties to be bound; (2) pre-existing substantive legal relationships between the parties; (3) adequate representation by the named party; (4) the non-party's control of the prior litigation; (5) where the non-party acts as a proxy for the named party to relitigate the same issues; and (6) where special statutory schemes foreclose successive litigation by the non-party (e.g., bankruptcy and probate)." Analysis under any one of the factors can support a finding of privity. *AIT*, 897 F.3d at 1363.

Patent Owner contends that it presented evidence of "pre-existing substantive legal relationships between the parties," which is the second *Taylor* category. Prelim. Sur-Reply 4. Examples of "[q]ualifying relationships include, but are not limited to, preceding and succeeding

19

owners of property, bailee and bailor, and assignee and assignor." *Taylor*, 553 U.S. at 894.

Patent Owner contends that *AIT* establishes that a privy is a party that has a direct relationship to the petitioner with respect to the allegedly infringing product or service. Prelim. Resp. 15 (citing *AIT* at 1350). Patent Owner contends that Google uses memory products supplied by Petitioner. *Id.* at 16. Patent Owner, however, has not provided persuasive authority to show that a supplier-integrator relationship alone would be sufficient to establish privity. On the contrary, Petitioner provides compelling authority that a customer relationship alone does not trigger privity. Prelim. Reply 3 (citing *Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1340–41 (Fed. Cir. 2018); *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1319–20 (Fed. Cir. 2018)).

Patent Owner argues that Petitioner represents Google's interest in this proceeding. Prelim. Resp. 9–12. To the extent Patent Owner argues that Petitioner is a proxy under the fifth *Taylor* factor, we have already discussed above that Petitioner is representing its own interests in this proceeding, not Google's. *See* Section III.A.1.

Accordingly, Petitioner has shown that it is the sole real party-in-interest in this proceeding, and that Google is not a real party-in-interest or privy of Petitioner. Consequently, the Petition is not time-barred under § 315(b) contrary to Patent Owner's assertions.

### B. Discretionary Denial under § 314(a) – General Plastics

Patent Owner contends that we should deny the Petition as an improper serial challenge under *General Plastic Industrial Co., Ltd. v.*

*Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017) (precedential) and *In re Vivint, Inc.*, 14 F.4th 1342, 1353 (Fed. Cir. 2021). Prelim. Resp. 16–25.

In *General Plastic*, a petitioner filed a first set of petitions that the Board denied on the merits. *General Plastic*, at 2. Several months later, the same petitioner filed follow-on petitions against the same patents. *Id.* at 3. Considering what are commonly now referred to as "the *General Plastic* factors" (*id.* at 16), the Board exercised its discretion to deny institution of the follow-on petitions. *Id.* at 22.

Patent Owner asks us to extend the *General Plastic* framework to discretionarily deny the Petition due to the prior *inter partes* reexamination of the '912 patent requested by Google and others. Although Patent Owner rightly asserts that *Valve Corp. v. Elec. Scripting Prods., Inc.*, IPR2019-00062, Paper 11, at 8–15 (PTAB Apr. 2, 2019) (precedential) applied *General Plastic* when a previous challenge was brought by a different petitioner (Prelim. Resp. 18), Patent Owner points to no authority that *General Plastic* has ever been applied to deny institution of a petition based on a prior reexamination. We decline to extend *General Plastic* to discretionarily deny the Petition on this basis.

In addition to *General Plastic*, Patent Owner relies on *Vivint* as supporting its contention that the Petition should be discretionarily denied due to the *inter partes* reexamination of the '912 patent. Prelim. Resp. 17. The facts in *Vivint*, however, are distinguishable from this proceeding. In *Vivint*, a petition for *inter partes* review was denied as "undesirable, incremental petitioning" and then the Office granted *ex parte* reexamination based on substantial new grounds of patentability, some of which were the

same grounds raised in the *inter partes* review, while others were different. *Vivint*, 14 F.4th at 1353–54. In contrast, the arguments raised here are not the same as in the previous *inter partes* reexamination.

Consequently, we determine that *General Plastics* under § 314(a) is not applicable to the facts of this proceeding.

*C. Discretionary Denial Under 35 U.S.C. § 325(d)*

Under § 325(d), in determining whether to institute an *inter partes* review, "the Director may take into account whether, and reject the petition or request because, the same or substantially the same prior art or arguments previously were presented to the Office." In evaluating arguments under § 325(d), we use a two-part framework: (1) whether the same or substantially the same art previously was presented to the Office or whether the same or substantially the same arguments previously were presented to the Office; and (2) if either condition of the first part of the framework is satisfied, whether the petitioner has demonstrated that the Office erred in a manner material to the patentability of challenged claims. *Advanced Bionics, LLC v. MED-EL Elektromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 8 (PTAB Feb. 13, 2020) (precedential) ("*Advanced Bionics*"). We also consider the non-exclusive factors set forth in *Becton, Dickinson and Co. v. B. Braun Melsungen AG*, IPR2017-01586, Paper 8 (PTAB Dec. 15, 2017) (precedential in relevant part) ("*Becton, Dickinson*"), which "provide useful insight into how to apply the framework" under § 325(d). *Advanced Bionics* at 9. Those non-exclusive factors are the following:

> (a) the similarities and material differences between the asserted art and the prior art involved during examination;

22

(b) the cumulative nature of the asserted art and the prior art evaluated during examination;

(c) the extent to which the asserted art was evaluated during examination, including whether the prior art was the basis for rejection;

(d) the extent of the overlap between the arguments made during examination and the manner in which Petitioner relies on the prior art or Patent Owner distinguishes the prior art;

(e) whether Petitioner has pointed out sufficiently how the Examiner erred in its evaluation of the asserted prior art; and

(f) the extent to which additional evidence and facts presented in the Petition warrant reconsideration of the prior art or arguments.

*Becton, Dickinson* at 17–18. "If, after review of factors (a), (b), and (d), it is determined that the same or substantially the same art or arguments previously were presented to the Office, then factors (c), (e), and (f) relate to whether the petitioner has demonstrated a material error by the Office." *Advanced Bionics* at 10.

### 1. *Advanced Bionics Part 1*

Turning to the first part of the *Advanced Bionics* framework, we consider whether the same or substantially the same art or arguments previously were presented to the Office. We find it necessary to address only Ellsberry in our analysis.

The record shows that the Examiner considered Ellsberry during examination of the '912 patent. Ex. 1001, 2; Ex. 1002, 509–510, 516, 548. Specifically, the Examiner commented that "Ellsberry et al., filed after the instant application's earliest effective filing date, show a memory module with controller and PLL." Ex. 1002, 510. Ellsberry was also considered in the reexamination of the '912 patent. Ex. 1010, 2032, 2465.

23

Thus, under the first part of *Advanced Bionics*, we find that same or substantially the same art or arguments previously were presented to the Office regarding Ellsberry.

### 2. *Advanced Bionics Part 2*

Under the second part of the *Advanced Bionics* framework, we consider whether Petitioner has demonstrated that the Office erred in a manner material to the patentability of the challenged claims.

Petitioner contends "the Examiner clearly erred in allowing claim 16" because the Examiner assumed that Ellsberry was not prior art to the '912 patent based on its earliest effective filing date. Prelim. Reply 8; Ex. 1002, 510. Petitioner contends that the '912 patent is not entitled to the priority benefit of its provisional applications. Pet. 63–69. Specifically, Petitioner contends the '668 and '595 provisionals did not disclose a "logic element" let alone one that receives "at least one row/column address signal, bank address signals, and at least one chip-select signal," as required by claim 16. *Id.* at 63. Petitioner contends that the '244 provisional discloses an ASIC decoder which could be a "logic element," but does not disclose "bank address" signals as required by claim 16. *Id.* (citing Ex. 1005, 10, Fig. 1; Ex. 1003 ¶ 189).

Petitioner further contends the '436 patent, which is in the priority chain of the '912 patent, fails to provide support for "a circuit" comprising "a logic element" and a "register" as required in claim 16 and shown in Figure 1A of the '912 patent, and by lacking Verilog code showing use of "row" and "bank address signals." *Id.* at 64 (citing Ex. 1003 ¶ 190).

Petitioner contends that Patent Owner did not recognize the problem of "back-to-back read commands which cross memory device boundaries"

24

causing collisions until the '386 patent, which is late in the priority chain of the '912 patent. Pet. 65 (citing Ex. 1001, 23:65–24:12, Fig. 5; Ex. 1008, 24:16–30, Fig. 5; Ex. 1003 ¶ 192). According to Petitioner, the earlier applications would have suffered signal errors, and those errors could have destroyed drivers. *Id.* at 65–66 (citing Ex. 1043, 89–90; Ex. 1003 ¶ 193).

Petitioner further contends it is not until the '912 patent that a solution to this problem is described involving electrical isolation of the DQS data strobe signal lines of the memory devices using FET switches. Pet. 67–68 (citing Ex. 1001, 24:23–28, 24:45–49, 25:58–60; Ex. 1008, 24:41–56, 26:9–12; Ex. ¶ 194). By this time, Petitioner contends that Ellsberry had already disclosed the solution to back-to-back read operations by using separate ports for memory devices along with bidirectional drivers instead of the '912 patent's FET switches. *Id.* (citing Ex. 1037 ¶¶ 9, 31, 40, 45, 57, Fig. 4; Ex. 1043, 89–90; Ex. 1001, 24:45–49, 25:6–25, Fig. 6D; Ex. 1003 ¶ 195). Petitioner further contends that Ellsberry describes FET switches as too slow and imprecise to comply with then current JEDEC standards. Pet. 68 (Ex. 1037 ¶¶ 9, 57; Ex. 1003 ¶ 195).

Petitioner thus contends the inventors of the '912 patent were not in possession of, and did not provide an enabling disclosure for, the full scope of claim 16 of the '912 patent, making Ellsberry prior art. *Id.* at 68–69 (citing Ex. 1003 ¶¶ 188, 196).

Patent Owner argues that during reexamination of the '912 patent, Inphi (Requester 1) similarly argued that claims reciting a "logic element [that] generates a first number of chip-select signals . . . in response at least in part to clock signals received from the [PLL]" were unsupported by the 912 patent because a person of ordinary skill in the art "would not have

25

known for certain how the signals from PLL 50 were used by logic element 40." Prelim. Resp. 74 (citing Ex. 1011, 88–89). Patent Owner states that the Board was unpersuaded by Inphi's argument. *Id.* (citing Ex. 1011, 89). But Inphi's arguments pertained to clock signals, not the features Petitioner contends are missing from the priority applications. And the disclosure of "control signals" in Figure 1 of the '244 provisional is not explicit enough to disclose the row/column address, bank address, and chip-select signals that Petitioner asserts are missing. *Id.* at 75 (citing Ex. 1005, Fig. 1). Although Figure 11A of the '436 patent may disclose some of these features, it does not disclose a register separate from a logic element, nor FET switches to achieve electrical isolation. *Id.* (citing Ex. 1009, Fig. 11a).

Consequently, we find that Petitioner carried its initial burden to show that Ellsberry is prior art. The burden of production thus shifts to Patent Owner to show that the subject matter of claim 16 of the '912 patent is supported by its priority applications such that Ellsberry is not prior art. Patent Owner has not presented evidence at this preliminary stage in support of that burden. *See Dynamic Drinkware, LLC v. National Graphics, Inc.*, 800 F.3d 1375, 1379 (Fed. Cir. 2021).

Petitioner has shown sufficiently that the Examiner erred in a manner material to the patentability of the challenged claims under the second part of the *Advanced Bionics* framework. The Examiner assumed that Ellsberry was not prior art based on the '912 patent's earliest priority date without considering whether the features claimed in the '912 patent were supported by the earlier priority applications.

Accordingly, we proceed to the merits of Petitioner's obviousness contentions.

26

*D. Obviousness Challenges*

*1. Principles of the Law of Obviousness*

A claim is unpatentable under 35 U.S.C. § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious to a person having ordinary skill in the art to which said subject matter pertains. *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) where in evidence, so-called secondary considerations, including commercial success, long-felt but unsolved needs, failure of others, and unexpected results. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). "[T]here must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988.

*2. Level of Ordinary Skill in the Art*

Factors pertinent to a determination of the level of ordinary skill in the art include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing

*Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1381–1382 (Fed. Cir. 1983)). "Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case." *Id.*

Petitioner contends that a person of ordinary skill in the art in the field of memory module design in 2004 or 2005 would have an advanced degree in electrical or computer engineering and at least two years working in the field, or a bachelor's degree in such engineering disciplines and at least three years working in the field. Pet. 5. Petitioner contends such person would have been familiar with various standards of the day including JEDEC industry standards, knowledgeable about the design and operation of standardized DRAM and SDRAM memory devices and memory modules and how they interacted with the memory controller of a computer system. *Id.* at 6.

For purposes of its Preliminary Response only, Patent Owner applies the skill level of a POSITA proposed by Petitioner. Prelim. Resp. 28.

On this record, we accept Petitioner's statement of the level of ordinary skill in the art except that we omit the qualifiers "at least" before years of education and experience because they render the level ambiguous and encompass levels that are beyond ordinary. Otherwise, we find Petitioner's statement of the level of ordinary skill in the art consistent with the '912 patent and the applied prior art references. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill).

### 3. *Claim Construction*

We construe claim terms "using the same claim construction standard

28

that would be used to construe the claim in a civil action under 35 U.S.C. 282(b)." 37 C.F.R. § 42.100(b) (2019). There is a presumption that claim terms are given their ordinary and customary meaning, as would be understood by a person of ordinary skill in the art in the context of the specification. *See In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). Nonetheless, if the specification "reveal[s] a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess[,] ... the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc) (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing Phillips, 415 F.3d at 1312–17). Only disputed claim terms must be construed, and then only to the extent necessary to resolve the controversy. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

Petitioner contends that "rank" refers to "an independent set of one or more memory devices on a memory module that act together in response to command signals, including chip select signals, to read or write the full bit-width of the memory module." Pet. 12 (citing Ex. 1003 ¶ 74).

Patent Owner contends the Board correctly construed the term in the reexamination as "a group of memory devices enabled to receive and transmit data by a common chip-select signal." Prelim. Resp. 29–30 (citing Ex. 1011, 79–80; Ex. 2026, 7). Patent Owner contends this definition of

"rank" is consistent with all embodiments of the '912 patent which show multiple memory devices per rank. *Id.* at 30–32 (citing Ex. 1001, Figs. 1A, 1B, 2A, 3A, 6:31–38, 7:9–13, 7:55–8:43, 8:64–9:18, 10:31–35, 12:13–25).

Thus, the dispute to be resolved between the parties is whether the term "rank" may refer to only one memory device, as Petitioner contends, or requires multiple devices, as Patent Owner contends.

Both Petitioner and Patent Owner rely on the following textbook definition of "rank" as supporting their views:

### 10.2.2   Rank

Figure 10.5 shows a memory system populated with 2 ranks of DRAM devices. Essentially, a *rank* of memory is a *"bank"* of one or more DRAM devices that operate in lockstep in response to a given command. However, the word *bank* has already been used to describe the number of independent DRAM arrays within a DRAM device. To lessen the confusion associated with overloading the nomenclature, the word *rank* is now used to denote a set of DRAM devices that operate in lockstep to respond to a given command in a memory system.

Ex. 1033, 413; Pet. 13; Prelim. Resp. 34.  This text sets forth two definitions for "rank": (1) a "bank" of one or more DRAM devices that operate in lockstep in response to a given command"; and (2) "a set of DRAM devices that operate in lockstep to respond to a given command in a memory system." Ex. 1033, 413.  The textbook definition of "rank" does not resolve the dispute between the parties since one can read it to mean that a "rank" includes "one or more devices," or that a "rank" must include multiple memory devices operating "in lockstep." *Id.*  Petitioner's and Patent

30

Owner's declarants are similarly at odds over the definition of "rank."

Ex. 1003 ¶ 74; Ex. 2007 ¶ 65.

> "Rank" is further distinguished from "bank" as follows:

> The number of banks within a rank is usually equal to the number of banks within a single DRAM device.  In the case of SDRAM, for example, there are two banks in a DRAM device, and so a bank identifier is a single bit sent over the address bus at the time of a command.

Ex. 1034, 4 n.3.  Hence, "bank" refers to arrays within a single memory device of a rank.

> Petitioner contends the meaning of "rank" can be gleaned from the '912 patent itself.  Pet. 13–14.  Specifically, the '912 patent states the following:

> In certain embodiments, the command signal is passed through to the **selected rank only** (e.g., state 4 of Table 1). In such embodiments, the command signal (e.g., read) is sent to **only one memory device** or the other memory device so that data is supplied from one memory device at a time.  In other embodiments, the command signal is passed through to both associated ranks (e.g., state 6 of Table 1).  In such embodiments, the command signal (e.g., refresh) is sent to both memory devices.

Pet. 13–14 (citing Ex. 1001, 8:50–58) (emphasis Petitioner's).  Petitioner contends that this excerpt from the '912 patent implies that a rank can be composed of only one memory device.  *Id.*  Patent Owner does not adequately address Petitioner's contention.  *See* Prelim. Resp. 32–34.

Patent Owner contends that, during reexamination, the Examiner allowed claim 16 because Amidi failed to teach "transmit[ting] a command signal to only one DDR memory device at a time **when there is a plurality of memory devices in a rank**."  Prelim. Resp. 29 (citing Ex. 1010, 3865–

31

67, 3904) (emphasis Patent Owner's). The Examiner's point was merely that the Requester did not provide a reasonable explanation why one would transmit a command signal to only one DDR memory device at a time when Amidi teaches there are a plurality of memory devices in a rank. Contrary to Patent Owner's assertion, this is not the same as stating that claim 16 requires a plurality of memory devices in a rank. *Id.*

We find no illumination of the meaning of "rank" in the file history of the examination of the '912 patent. *See* Ex. 1002.

Patent Owner further contends that the Board's supposed construction during reexamination is consistent with the stipulated construction for "rank" in the Google litigation in the Northern District of California that "rank" is "a group of memory devices enabled to receive and transmit data by a common chip-select signal." Prelim. Resp. 30 (citing Ex. 2026, 7). Although the Northern District of California's view of the meaning of "rank" carries weight here, Petitioner notes that claim 16 was not at issue in that litigation until recently. Prelim. Reply 6–7. Furthermore, Petitioner was not a party to that litigation, so it is not precluded here from providing its own interpretation of what the term "rank" means.

Petitioner contends that U.S. Patent 9,858,215 B1 ("the '215 patent") is related to the '912 patent, and that it refers to "rank" as "at least one memory integrated circuit." Ex. 1058, 152, 187 (3:33–35), 204 (37:35–38). Although Patent Owner characterizes Petitioner's observation as a "trick" because Patent Owner added disclosure to the '215 patent that is not present in the '912 patent (Prelim. Sur-Reply 6–7), Patent Owner does not deny that the '215 patent defines "rank" in this way. Claim terms must be interpreted consistently across related patents. *See SightSound Techs., LLC v. Apple*

32

*Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015); *NTP, Inc. v. Research In Motion, Ltd.*, 418 F.3d 1282, 1293 (Fed. Cir. 2005); *Jonsson v. The Stanley Works*, 903 F.2d 812, 818 (Fed. Cir. 1990).

For purposes of this decision, we determine that "rank" refers to "one or more memory devices." We do not construe the term further at this time. *See Nidec, supra.* We do not view this issue as closed and will continue to consider any additional argument and evidence on this issue at trial.

### 4. *Perego-422 (Ex. 1035)*

Perego-422 is titled "Configurable Width Buffered Module." Ex. 1035, code (54). Perego-422 discloses a memory system architecture/interconnect topology that includes a configurable width buffer device coupled to at least one memory device on the configurable width memory module. *Id.*, code (57).

Perego-422's Figure 3B is shown below.



**FIG. 3B**

Figure 3B shows a system including memory controller 310 connected to multiple buffered memory modules 330a–330n. Each memory module 330a–330n may be configured like memory module 340 shown in the upper part of Figure 3B, to include a buffer device 350 and a plurality of memory devices 360. *Id.* at code (57), 4:63–5:15. The memory modules 330a–330n are connected in a dynamic point-to-point configuration. *Id.* at 6:57–62.

Perego-422's Figure 5B is shown below.

34



Fig. 5B

Perego-422's Figure 5B shows a configurable width buffer device 391 with programmable in interfaces 520a, 520b, which accommodate different numbers and types of memory devices. *Id.* at 13:60–14:15. Configurable width interface 590 communicates with the memory controller. *Id.* Serial interface 574 and operations circuit 572 provide information to the system memory controller for proper configuration and operation of the system. *Id.* at 12:20–34.

35

### 5. *Amidi (Ex. 1036)*

Amidi is titled "Transparent Four Rank Memory Module for Standard Two Rank Sub-Systems." Ex. 1036, code (54). The memory module has stacked memory ranks on its front and back sides. *Id.* at code (57). An emulator coupled to the memory module controls one memory rank based on signals from the memory controller. *Id.*

Amidi's Figure 3 is shown below.



Transparent Four Rank DDR Module Block Diagram
FIG. 3

Amidi's Figure 3 shows that each rank of the memory module has a corresponding chip select signal cs0–cs3.

Amidi's Figure 6A is shown below.

36



Row Address Decoding
FIG.6A

Figure 6A shows a Complex Programmable Logic Device CPLD 604 that uses command signals, chip select signals, and address signals to generate chip select signals (one for each rank). *Id.* ¶¶ 43, 50, 52. Figure 6A also shows a register 608 to store signals received from the module connector and provide them to the memory devices, as well as a phase-locked loop 606 to provide clock signals.

### 6. Ellsberry (Ex. 1037)

Ellsberry is titled "Capacity-Expanding Memory Device." Ex. 1037, code (54). "A control unit and memory bank switch are mounted on a memory module to selectively control write and/or read operations to/from memory devices communicatively coupled to the memory bank switch." *Id.* at code (57). "By selectively routing data to and from the memory devices, a plurality of memory devices may appear as a single memory device to the operating system." *Id.*

37

Figure 2 of Ellsberry is shown below.



Fig. 2

Figure 2 "illustrates a block diagram of a capacity-expanding memory
system 200 according to one embodiment." *Id.* ¶ 28. In Figure 2, system
200 has a DIMM interface 202 that couples to a "memory socket and
communication bus over which data, memory addresses, commands, and
control information are transmitted." *Id.* "The capacity-expanding feature
of the invention is accomplished by a combination of control unit 204 and
one or more memory bank switches 206 & 208." *Id.* Figure 2 of Ellsberry
illustrates system 200 with control ASIC 204 that receives addresses and
commands from DIMM interface 202 and generates corresponding control
signals on bus 210 and addresses on bus 220 to selectively connect memory
banks 212–228 to DIMM interface 202 via switch ASICs 206, 208. *Id.*
¶¶ 28–29.

38

Figure 12 of Ellsberry is shown below.



Fig. 12

Figure 12 of Ellsberry shows another configuration of the control unit and bank switch. *Id.* ¶ 52. In Figure 12, a single chip-select memory configuration includes one control unit 1202 and one bank switch 1204 which are used to control two memory banks 1206, 1208, each memory bank having one memory device 1210. *Id.* ¶ 55.

### 7. *Secondary Considerations of Obviousness*

Petitioner contends that the '912 patent is remarkably similar to Ellsberry and that both were filed within a month of each other. Pet. 111. Petitioner contends Amidi and Perego-422 also recognized and solved the same problem in the 18 months before the '912 patent. *Id.* Petitioner

39

contends this is evidence of "simultaneous invention" which is a secondary consideration of obviousness. *Id.* Patent Owner does not refute Petitioner's contentions. We give weight to Petitioner's evidence of "simultaneous invention" in our obviousness analysis.

### 8. *Obviousness Challenge to Claim 16 based on Perego-422*

Petitioner contends that claim 16 would have been obvious over Perego-422. Pet. 22–63. The preamble limitation [16.pre] of claim 16 recites "memory module connectable to a computer system." Ex. 1001, 3:9–11 (reexamination certificate). Petitioner contends the claimed "memory module" corresponds to Perego-422's memory module 340 with buffer device 350 and memory devices 360. Pet. 25 (citing Ex. 1035, Fig. 3B). Petitioner further contends the claimed "computer system" corresponds to Perego-422's memory system 305, including a controller 310 coupled to memory modules 330a–330c. *Id.* at 25–26 (citing Ex. 1035, 5:56–6:11, 7:39–41. 4:19–22, Fig. 3B; Ex. 1003 ¶¶ 108–109).

Petitioner sufficiently shows that the preamble of claim 16 is taught by Perego-422. It is thus unnecessary for us to determine whether the preamble is limiting.

Claim 16 further recites limitation [16.a] as "a printed circuit board." Ex. 1001, 3:12 (reexamination certificate). Petitioner contends that Perego-422 teaches that memory modules 340 "are incorporated onto individual substrates (e.g., PCBs)," noting that PCB stands for "printed circuit board." *Id.* at 26–27 (citing Ex. 1035, 5:60–62, 5:59–60, Fig. 3B; Ex. 1003 ¶¶ 111–113).

Petitioner sufficiently shows that limitation [16.a] of claim 16 is taught by Perego-422.

40

Claim 16 further recites limitation [16.b] as "a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board." Ex. 1001, 3:13–16 (reexamination certificate). Petitioner contends that Perego-422 teaches "memory devices 360 are discretely packaged synchronous type DRAM integrated circuits (ICs), for example, DDR memory devices." *Id.* at 27 (citing Ex. 1035, 8:1–9, 3:62–4:3, 10:56–59, Fig. 3B; Ex. 1003 ¶ 115). Petitioner further contends that Perego-422 teaches that the memory devices are coupled to the printed circuit board. *Id.* at 27–28 (citing Ex. 1035, 5:4–6, 5:60–62, 5:59–60, 6:12–15, Fig. 3B; Ex. 1003 ¶¶111–113, 116).

Claim 16 further recites limitation [16.b.i] as "the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks." Ex. 1001, 3:14–16 (reexamination certificate). Petitioner contends that Perego-422 teaches "grouping memory devices into multiple independent target subsets (i.e. more independent banks)." Pet. 28 (citing Ex. 1035, 15:37–45; Ex. 1003 ¶¶ 73–77, 118). Petitioner's declarant indicates that the term "rank" of memory is a bank of one or more DRAM devices that operate in lockstep in response to a given command. Ex. 1003 ¶ 75 (citing Ex. 1029, 6). Specifically, Petitioner contends that Perego-422 teaches a module with four memory devices arranged in four single device ranks. Pet. 30 (citing Ex. 1035, 10:17–20, 6:15–24, 9:58–60, 14:4–10, 10:56–67, 10:5–13, Fig. 4B; Ex. 1029, 6; Ex. 1003 ¶ 124).

Patent Owner contends that limitation [16.b.i] of claim 16 requires multiple-device ranks. Prelim. Resp. 40–41. However, Petitioner pointed out that Patent Owner's support for claim 16 relies on a passage of the '912 patent that may be construed as disclosing single device ranks. *See* Section

III.D.4 (claim construction); Pet. 13–14 (citing Ex. 1001, 8:50–56). As discussed above in Section III.D.4, we preliminarily determine that "rank" refers to "one or more memory devices." Thus, on this record, we disagree with Patent Owner's attempted distinction over the art.

Petitioner sufficiently shows that limitations [16.b] and [16.b.i] of claim 16 are taught by Perego-422.

Limitation [16.c] of claim 16 recites "a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register." Ex. 1001, 3:17–18 (reexamination certificate). Petitioner contends that Perego-422's buffer device 405 is equivalent to the claimed "circuit," which comprises a "logic element" including request and address logic 540 that provides control and address lines (RQ) to memory interfaces 520a and 520b based on signals received from configurable interface 590. *Id.* at 33 (citing Ex. 1035, 5:56–67, 10:59–68, 9:58–60, 13:54–59, Figs. 4B, 5B, 5C; Ex. 1003 ¶¶ 111, 112, 116, 128).

Petitioner further contends that Perego-422 teaches that its buffer device includes a "register" that transceives and provides isolation for address, command, and data signals between the memory controller and memory devices on the module. *Id.* at 34 (citing Ex. 1035, 6:12–27). Petitioner contends that Perego-422's buffer device's interface 596 decodes control and address information. *Id.* (citing Ex. 1035, 13:54–59). Petitioner contends that a person of ordinary skill in the art would have understood from this disclosure that Perego-422's interface 596 includes registers (e.g., 597f–m in Fig. 5C) that latch the received address, command, and data signals to provide "isolation" and for decoding of the control and address information. *Id.* at 34–35 (citing Ex. 1035, 17:61–63).

42

Petitioner contends that Perego-422 discloses limitation [16.c.i] of claim 16 reciting "the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal." Pet. 35–38; Ex. 1001, 3:18–22 (reexamination certificate). Specifically, Petitioner contends that Perego-422 teaches that control information and address information may be decoded by request and address logic 540. *Id.* at 36 (citing Ex. 1035, 13:54–59, Figs. 4B, 5B; Ex. 1003 ¶ 133). Petitioner contends a person of ordinary skill in the art would have understood that the address lines labeled RQ in Perego-422 would have conveyed row/column and bank addresses under the JEDEC standard. *Id.* at 37 (citing Ex. 1029, 6, 49; Ex. 1035, 3:67–4:3, 6:15–19, 8:1–9, 9:58–60, 10:56–59; Ex. 1032, 4.20–4.6; Ex. 1036 ¶¶ 30, 31; Ex. 1003 ¶ 134). Petitioner further contends that one of ordinary skill in the art would have understood that the logic element would need the claimed row/column, bank address, and chip-select signals to translate protocols so that the memory module can use DDR memory devices that are different than those the memory controller expected. *Id.* at 38 (citing Ex. 1035, 10:63–68; Ex. 1003 ¶¶ 135, 137–168).

Petitioner contends that Perego-422 discloses limitation [16.c.ii] reciting "the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks." Pet. 38–51 (citing Ex. 1003 ¶¶ 137–164); Ex. 1001, 3:22–28 (reexamination certificate). Specifically, Petitioner contends that Perego-

43

422 discloses that the "second number of memory devices" is two memory devices arranged in "a second number of ranks" which is one rank. *Id.* at 38–39 (citing Ex. 1035, Fig. 4B). The "second number of memory devices" (two) is smaller than the "first number of memory devices" (four), and the "second number of ranks" (one) is smaller than the "first number of ranks" (two), as claim 16 requires.

Petitioner contends that Perego-422 teaches the limitation [16.c.iii] reciting "the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks." Pet. 51–52 (citing Ex. 1003 ¶¶ 166–188); Ex. 1001, 3:28–31 (reexamination certificate). Petitioner contends that Perego-422 states that "[i]n a normal read operation, buffer device 350 receives control, and address information from controller 310 via point-to-point link 320a and in response, transmits corresponding signals to one or more, or all of memory devices 360." *Id.* at 51–52 (citing Ex. 1035, 6:15–19). According to Petitioner, Perego-422 further teaches that different types of memory devices may be used by utilizing the buffer to "translate protocols." *Id.* at 52 (citing Ex. 1035, 10:63–67).

Patent Owner contends that limitation [16.c.iii] of claim 16 requires multiple-device ranks. Prelim. Resp. 40–41. However, as noted above, we preliminarily disagree with this interpretation.

Petitioner contends that Perego-422 teaches the limitation [16.c.iv] reciting "wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least

44

one DDR memory device of the selected one or two ranks of the first number of ranks." Pet. 53–57 (citing Ex. 1003 ¶¶ 169–172); Ex. 1001, 3:32–37 (reexamination certificate). Petitioner contends that Perego-422 discloses selecting "one" memory device and transmitting the corresponding signals to the selected memory device. *Id.* at 53 (citing Ex. 1035, 6:15–19; Ex. 1003 ¶¶ 166–188). Petitioner contends that a person of ordinary skill in the art would have understood that a single memory device can form one rank. *Id.* (citing Ex. 1035, Fig. 4B; Ex. 1003 ¶ 170).

Petitioner has sufficiently shown that Perego-422 teaches limitations [16.c], [16.c.i]. [16.c.ii], [16.c.iii], and [16.c.iv] of claim 16.

Claim 16 recites a limitation [16.d] as "a phase-lock loop device coupled to the printed circuit board." Petitioner contends Perego-422 discloses limitation [16.d]. Pet. 57–58 (citing Ex. 1003 ¶¶ 176–179); Ex. 1001, 3:38–39 (reexamination certificate). Specifically, Petitioner contends that Perego-422 describes that buffer device 405 includes a clock circuit 570a–b which includes one or more clock alignment circuits for phase or delay adjusting internal clock signals with respect to an external clock. Pet. 57–58 (citing Ex. 1035, 12:65–13:5). Perego-422 further explains that the function of a "phase lock loop (PLL) generator device [is] to generate phase aligned clock signals for each memory device disposed on the module. *Id.* at 58 (citing Ex. 1035, 12:61–64). Petitioner contends a person of ordinary skill in the art would have understood that Perego-422's clock circuit 570a–b is a "phase-lock loop device." *Id.* (citing Ex. 1003 ¶ 177).

Claim 16 recites the limitation [16.d.i] as "the phase-lock loop device is operatively coupled to the plurality of DDR memory devices, the logic

element, and the register." Ex. 1001, 3:39–41 (reexamination certificate).

Petitioner contends that Perego-422 discloses limitation [16.d.i]. Pet. 58–61

(citing Ex. 1003 ¶¶ 180–183). Specifically, Petitioner contends that the

buffer device includes interfaces 520a and 520b which receive and transmit

to memory devices disposed on the module. *Id.* at 59 (citing Ex. 1035,

11:48–51, Fig. 5B; Ex. 1003 ¶ 181). Petitioner further contends clock circuit

570a–b includes a "phase-lock loop device" that provides internal clock

synchronizing signals to the circuit within the buffer device. *Id.* at 59–60

(citing Ex. 1035, 12:65–13:5; Ex. 1003 ¶ 181). Petitioner contends that,

therefore, clock circuit 570a–b ("phase-locked loop device") is operatively

coupled to the configurable width interface 590 (including the claimed

"register"), request and address logic 540 (in the claimed "logic element"),

and the interfaces 520 which are operatively coupled to "the DDR memory

devices." *Id.* at 60 (citing Ex. 1035, Fig. 4B; Ex. 1003 ¶ 182).

Petitioner has sufficiently shown that Perego-422 teaches limitations

[16.d] and [16.d.i] of claim 16.

Petitioner contends that Perego-422 discloses limitation [16.e] of

claim 16 reciting "wherein the command signal is transmitted to only one

DDR memory device at a time." Ex. 1001, 3:42–43 (reexamination

certificate). Petitioner notes that Perego-422 discloses "[i]n a normal

memory read operation, buffer device 350 receives control, and address

information from controller 310 via point-to-point link 320a and in response,

transmits corresponding signals to one or more, or all of memory devices

360 via channels 370." Pet. 62 (citing Ex. 1035, 6:15–19). Petitioner

contends that Perego-422 directly teaches selecting "one" memory device

and transmitting the corresponding signals to the selected memory device.

*Id.* Petitioner further contends that Perego-422 benefits from "multiple independent target subsets (i.e. more independent banks)" through reduced power and higher performance and that one of ordinary skill in the art would have understood that the command signal is not transmitted to memory devices that do not participate in the read or write transaction, consistent with the JEDEC standard. *Id.* (citing Ex. 1035, 15:31–45; Ex. 1029, 6, 49; Ex. 1003 ¶ 186).

Patent Owner argues that Petitioner has not provided any competent evidence that Perego-422 discloses limitation [16.e] of claim 16. Prelim. Resp. 41–42. Specifically, Patent Owner argues that claim 16 requires sending a command to a single device at a time even though there are multiple devices in each rank. *Id.* at 41. As discussed above in Section III.D.4, we preliminarily determine that a rank can have one device, and, therefore, we disagree with Patent Owner's argument.

Patent Owner further contends that Petitioner assumes each channel of Perego-422's Figure 4B corresponds to a rank when that is not supported by Perego-422. *Id.* at 42. Specifically, Patent Owner contends that the channels may operate in pairs or simultaneously so that a single device rank is not possible. *Id.* at 42–43 (citing Ex. 1035, 9:24–33, 10:22–36). However, Patent Owner does not address that Perego-422 states that a single channel is feasible or that more than two channels may be incorporated into the module. Ex. 1035, 10:14–17. Furthermore, Patent Owner does not address Petitioner's reliance on Perego-422 explaining that "[i]n a normal memory read operation, buffer device 350 receives control, and address information from controller 310 via point-to-point link 320a and in response, transmits corresponding signals to one or more, or all of memory devices

47

360 via channels 370." Pet. 62 (citing Ex. 1035, 6:15–19).

We determine that Petitioner has presented a reasonable likelihood that claim 16 of the '912 patent is unpatentable as obvious over Perego-422.

        *9. Obviousness Challenge to Claim 16 based on the Combination of Perego-422 and Amidi*

Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Perego-422 and Amidi for several reasons. Pet. 23–25. Specifically, Petitioner contends that Perego-422 and Amidi are analogous art to the '912 patent because they relate to the same field of memory modules and seek to improve performance and upgrade flexibility of memory modules. *Id.* at 23 (citing Ex. 1035, 3:13-28; Ex. 1036 ¶¶ 2, 18; Ex. 1001, 1:21–24, 5:1–5; Ex. 1003 ¶ 97). Petitioner further contends a person of ordinary skill in the art would have been motivated to implement rank multiplication functionality taught by Amidi in the memory module of Perego-422 to lower cost and increase upgrade flexibility of the memory modules. *Id.* (citing Ex. 1036 ¶ 18). Petitioner contends Perego-422 teaches that its buffer device is likewise designed for flexibility as well as backward compatibility. *Id.* (citing Ex. 1035, 6:34–43,2:26–30; Ex. 1003 ¶¶ 99, 101). Petitioner contends that Amidi's teachings on cost-effectiveness and practicality of using memory devices with low densities would have motivated a person of ordinary skill in the art to use lower-capacity memory devices in memory systems configured for higher-capacity memory devices. *Id.* at 23–24 (citing Ex. 1036 ¶ 18; Ex. 1003 ¶¶ 101, 106). Petitioner further contends a person of ordinary skill in the art would have been motivated to configure Perego-422's buffer to respond to control signals for a different type of memory device than the one implemented on its module, such as a

48

higher-capacity memory device, as taught by Amidi, to upgrade a system configured to handle those higher-capacity memory devices. *Id.* at 24 (citing Ex. 1035, 3:23–28; Ex. 1036 ¶ 71; Ex. 1003 ¶¶102–103).

Petitioner further contends that the combination of Perego-422 and Amidi would have been well within the skill of a person of ordinary skill in the art. Pet. 24. Specifically, Petitioner contends the two references disclose how to make a module with one type of memory device and add an interface to communicate with a memory controller configured for a different type of memory device according to relevant standards at the time. *Id.* (citing Ex. 1035, 10:17–20, 14:4–10, 17:34–35, Fig. 5D, 18:65–66; Ex. 1003 ¶ 105). Petitioner further contends that a person of ordinary skill in the art would have recognized that the combination would avoid problems like back-to-back read operations across device boundaries given Perego-422's teaching of a dedicated channel for each memory device. *Id.* (citing Ex. 1035, 10:17–20, 14:4–10, 17:34–35, Fig. 5D, 18:65–66; Ex. 1003 ¶ 105). Petitioner contends the combination "would have provided nothing more than what was expected at the time, a memory module that is built with one type of memory devices, e.g., lower-capacity memory devices, and operates in a system where the memory controller issues commands for another type of memory devices, such as higher-capacity memory devices." *Id.* at 24–25 (citing Ex. 1003 ¶ 106).

Patent Owner does not refute Petitioner's evidence of motivation to combine Perego-422 and Amidi at this time. *See* Prelim. Resp.

We determine Petitioner has sufficiently shown that a person of ordinary skill in the art would have been motivated to combine Perego-422 and Amidi with a reasonable expectation of success.

49

Petitioner relies on Amidi for several limitations, in the alternative, to the extent one might argue that Perego-422 alone does not disclose those limitations. *See, e.g.*, Pet. 29. For example, Petitioner further relies on Amidi as disclosing DDR memory devices in multiple ranks on a memory module (Pet. 29); a register (Pet. 35); and a phase-lock loop device (Pet. 58) among other features. Patent Owner does not dispute that Amidi teaches these features at this time. *See* Prelim. Resp.

Because we determine that Petitioner has presented a reasonable likelihood that claims 16 of the '912 patent is unpatentable over Perego-422 alone, we likewise determine that Petitioner has presented a reasonable likelihood that claim 16 is unpatentable as obvious over the combination of Perego-422 and Amidi. *See* Section III.D.8. In addition, we determine that Petitioner has presented a reasonable likelihood that claim 16 is unpatentable as obvious over the combination of Perego-422 and Amidi due to Amidi's additional teaching of claimed features together with sufficient evidence of motivation to combine with reasonable expectation of success in producing the memory module of claim 16.

*10.Obviousness Challenge to Claim 16 based on Ellsberry*

Petitioner further contends that Ellsberry teaches or suggests all limitations of claim 16. *Id.* at 69–111.

The preamble limitation [16.pre] of claim 16 recites "memory module connectable to a computer system." Ex. 1001, 3:9–11 (reexamination certificate). Petitioner contends that Ellsberry describes a memory module 106 with a capacity expanding device 108, connected to a computer system 100 that includes a processing unit 102 and I/O controller 104. Pet. 69 (citing Ex. 1037 ¶¶ 23, 27, Fig. 1; Ex. 1003 ¶¶ 198-199).

Petitioner sufficiently shows that the preamble limitation [16.pre] of claim 16 is taught by Ellsberry. It is thus unnecessary for us to determine whether the preamble is limiting.

Claim 16 further recites limitation [16.a] as "a printed circuit board." Ex. 1001, 3:12 (reexamination certificate). Petitioner contends that Ellsberry teaches a memory module with a printed circuit board. Pet. 72–73 (citing Ex. 1037 ¶ 2. Fig. 5).

Petitioner sufficiently shows that limitation [16.a] of claim 16 is taught by Ellsberry.

Claim 16 further recites limitation [16.b] as "a plurality of double-data-rate (DDR) memory devices coupled to the printed circuit board." Ex. 1001, 3:13–16 (reexamination certificate). Petitioner contends that Ellsberry teaches DDR and DDR 2 memory devices mounted on a circuit board. Pet. 73–74 (citing Ex. 1037 ¶¶ 3, 23, 26, 46; Ex. 1038, 4, 23; Ex. 1003 ¶¶ 209–213).

Claim 16 further recites limitation [16.b.i] as "the plurality of DDR memory devices having a first number of DDR memory devices arranged in a first number of ranks." Ex. 1001, 3:14–16 (reexamination certificate). Petitioner contends that Ellsberry teaches a memory module with two memory devices arranged in two single device ranks controlled by separate chip select signals (CS0A, CS0B). Pet. 74–76 (citing Ex. 1037 ¶¶ 3, 26, 30, 32, Fig. 12; Ex. 1003 ¶¶ 215, 218–221). Petitioner thus contends "a first number of DDR memory devices" is two and the "first number of ranks" is two. *Id.* Alternatively, Petitioner contends "a first number of DDR memory devices" is four and the "first number of ranks" is four. *Id.* at 76 (citing Ex. 1037, Fig. 13; Ex. 1003 ¶ 216).

51

Patent Owner contends that limitation [16.b.i] of claim 16 requires multiple-device ranks. Prelim. Resp. 40–41. As discussed above in Section III.D.4, we preliminarily determine that "rank" refers to "one or more memory devices." Thus, on this record, we disagree with Patent Owner's attempted distinction over the art.

Petitioner sufficiently shows that limitations [16.b] and [16.b.i] of claim 16 are taught by Ellsberry.

Limitation [16.c] of claim 16 recites "a circuit coupled to the printed circuit board, the circuit comprising a logic element and a register." Ex. 1001, 3:17–18 (reexamination certificate). Petitioner contends that Ellsberry teaches this limitation. Pet. 77–80 (citing Ex. 1003 ¶¶ 224–225). Specifically, Petitioner contends that Ellsberry teaches that the "circuit" is a control unit ASIC, that the "logic element" is a control block, and that the "register" corresponds to register 302. *Id.* at 77.

Petitioner contends that Ellsberry discloses limitation [16.c.i] of claim 16 reciting "the logic element receiving a set of input signals from the computer system, the set of input signals comprising at least one row/column address signal, bank address signals, and at least one chip-select signal." Pet. 75–78; Ex. 1001, 3:18–22 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches a command processing system 300 with a control block possessing address/command decode logic 306, configuration decode logic 308, and bank switch state machine 308. *Id.* at 78–79 (citing Ex. 1037, Fig. 3). Petitioner notes that Ellsberry describes memory addresses and command information are received from DIMM interface 202, buffered in register 302, decoded in logic 304, and that a bank switch state machine 308 determines which

52

memory bank should be activated or accessed. *Id.* at 79 (citing Ex. 1037 ¶ 39). Petitioner contends that a person of ordinary skill in the art would have understood that Ellsberry's control block includes a "logic element" and "register" receiving row/column address signal, bank address signals, and chip-select signals. *Id.* (citing Ex. 1003 ¶ 224).

Petitioner contends that Ellsberry teaches limitation [16.c.ii] of claim 16 reciting "the set of input signals configured to control a second number of DDR memory devices arranged in a second number of ranks, the second number of DDR memory devices smaller than the first number of DDR memory devices and the second number of ranks less than the first number of ranks." Pet. 86–95 (citing Ex. 1003 ¶¶ 232–243); Ex. 1001, 3:22–28 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches that the "set of input signals" corresponding to a single DDR2 memory device and the memory module uses two DDR2 memory devices to simulate a larger memory device. Pet. 87–88 (citing Ex. 1037, Figs. 7D, 12 [signals AC, C0]; Ex. 1003 ¶ 233). Petitioner contends that Ellsberry teaches that the "set of input signals" includes bank address, row address, and column address signals consistent with the JEDEC standard. *Id.* at 87–95 (citing Ex. 1037, Figs. 7D, 8A).

Petitioner further contends the "second number of DDR memory devices" is one, which is less than the "first number of DDR memory devices" which is two, and that the "second number of ranks" is one which is less than the "first number of ranks" which is two. *See* Ex. 1037, Fig. 12. These relations would also be satisfied for the alternative when the "first number of DDR memory devices" is four and the "first number of ranks" is four. *See* Pet. 76 (citing Ex. 1037, Fig. 13).

Petitioner contends that Ellsberry teaches the limitation [16.c.iii] of claim 16 reciting "the circuit generating a set of output signals in response to the set of input signals, the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks." Pet. 95–99 (citing Ex. 1037, Figs. 12, 13; 1003 ¶¶ 244–246); Ex. 1001, 3:28–31 (reexamination certificate). Petitioner contends that Ellsberry teaches that "the circuit" corresponds to the Control Unit ASIC and that the "set of output signals" corresponds to Ellsberry's signals ACA, CS0A, ACB, CS0B that are responsive to the "set of input signals" corresponding to Ellsberry's signals AC, CS0. Pet. 95–96 (citing Ex. 1037, Fig. 12). Petitioner contends that Ellsberry teaches that the "circuit generat[es] the set of output signals in response to the set of input signals" because the relationship between the input signals and output signals is described in Ellsberry. *Id.* at 97–99 (citing Ex. 1037 ¶¶ 37, 42, 40, Figs. 7D, 8A; Ex. 1003 ¶¶ 232–243, 246). Petitioner further contends that "the set of output signals configured to control the first number of DDR memory devices arranged in the first number of ranks" corresponds to single device ranks 1206, 1208 corresponding to chip-select signals CS0A, CS0B. *Id.* at 95–96 (citing Ex. 1037, Fig. 12). In addition to this embodiment with two single-device ranks, Petitioner contends similar mappings apply to Ellsberry's embodiment with four-single device ranks. *Id.* (citing Ex. 1037, Fig. 13).

Patent Owner contends that limitation [16.c.iii] of claim 16 requires multiple-device ranks. Prelim. Resp. 40–41. However, as noted above, we preliminarily disagree with this interpretation.

Petitioner contends that Ellsberry teaches the limitation [16.c.iv] of

54

claim 16 reciting "wherein the circuit further responds to a command signal and the set of input signals from the computer system by selecting one or two ranks of the first number of ranks and transmitting the command signal to at least one DDR memory device of the selected one or two ranks of the first number of ranks."  Pet. 99–103 (citing Ex. 1003 ¶¶ 248–254); Ex. 1001, 3:32–37 (reexamination certificate).  Petitioner contends that the "command signal" corresponds to a read or write command under the JEDEC standard. Pet. 99 (citing Ex. 1029, 6, 49).  Petitioner further contends that Ellsberry selects "one" rank and transmits the command signal to the selected "one" rank.  *Id.*

Furthermore, Petitioner notes that Ellsberry states as follows:

[t]he control unit maps a received logical address to a physical address corresponding to the particular memory bank configuration employed.  It also directs commands to the memory banks to indicate which memory bank should be operational and which one should be passive (do nothing).

*Id.* at 100 (citing Ex. 1037 ¶ 11).  Petitioner further notes that Ellsberry states that the control unit may send either the same command to both memory banks or different commands to each memory bank with a "no operation" command to the other memory bank.  *Id.* at 100–101(citing Ex. 1037 ¶ 42, Fig. 8A; Ex. 1029, 48, 49; Ex. 1003 ¶¶ 229, 233–235, 249, 250). Petitioner contends this Ellsberry disclosure is similar to Example 1 of the Verilog code in the '912 patent.  *Id.* at 102 (citing Ex. 1003 ¶ 251). Petitioner contends another embodiment of Ellsberry selects a target rank based on a row address bit that is bank specific, like Example 2 of the Verilog code in the '912 patent.  *Id.* (citing Ex. 1003 ¶ 252).

Petitioner has sufficiently shown that Ellsberry teaches limitations

55

[16.c], [16.c.i]. [16.c.ii], [16.c.iii], and [16.c.iv] of claim 16.

Claim 16 recites a limitation [16.d] as "a phase-lock loop device coupled to the printed circuit board." Petitioner contends that Ellsberry teaches limitation [16.d]. Pet. 103–106 (citing Ex. 1037 ¶ 2, Figs. 12, 13; Ex. 1003 ¶¶ 255–257). Specifically, Petitioner contends that Ellsberry teaches a "phase lock loop (PLL) 238 [(yellow)] regenerates a clock signal that can be used by the components on the memory system 200." *Id.* at 104 (citing Ex. 1037 ¶ 30, Fig. 2; Ex. 1003 ¶ 256). Petitioner further contends that Ellsberry's PLL is coupled to the circuit board. Id. at 105 (citing Ex. 1037, ¶ 48, Fig. 5). Specifically, Petitioner contends that Ellsberry teaches that external phase lock loop (PLL) 514 receives a clock signal from the edge interface 506 and provides a clock signal to the memory module components. *Id.* (citing Ex. 1037, ¶¶ 39, 45, 48, 49, Figs. 2–4, 12; Ex. 1003 ¶ 257).

Claim 16 recites the limitation [16.d.i] as "the phase-lock loop device is operatively coupled to the plurality of DDR memory devices, the logic element, and the register." Ex. 1001, 3:39–41 (reexamination certificate). Petitioner contends that Ellsberry discloses limitation [16.d.i]. Pet. 106–109 (citing Ex. 1003 ¶¶ 259–263). Specifically, Petitioner contends Ellsberry's PLL receives a clock signal PCLK and generates a clock signal NCLK that is provided to the Control Unit ASIC and Switch ASIC. *Id.* at 106 (citing Ex. 1037 ¶ 30, Figs. 2–5, 12, 13; Ex. 1003 ¶¶ 255–257). Petitioner contends the Switch ASIC then uses the clock NCLK to derive the clock ECLK provided to the memory devices. *Id.* Petitioner thus contends Ellsberry's PLL is also operatively coupled to the plurality of DDR memory devices. *Id.* at 106–07 (citing Ex. 1037, Fig. 12; Ex. 1003 ¶ 260).

56

Petitioner contends Control Unit ASIC uses the clock signal NCLK from the PLL to derive its own local clocks that are provided to both the Control Block and register 302 in the Control Unit ASIC. Pet. 108 (citing Ex. 1037, Figs. 3, 12, 13; Ex. 1003 ¶ 261).

Petitioner contends that, to the extent Ellsberry does not sufficiently disclose a local clock of the Control Unit ASIC is provided to the register 302, a person of ordinary skill in the art would have understood that register 302 is clocked by a local clock signal as indicated by the small triangle at the bottom of the register 302. *Id.* at 108–09 (citing Ex. 1003 ¶ 262). Petitioner notes that Ellsberry states that the PLL "regenerates a clock signal that can be used by the components on the memory system 200." *Id.* at 109 (citing Ex. 1037 ¶ 30). Thus, Petitioner contends that Ellsberry's PLL provides a clock to the Control Unit ASIC, which can be used to operate its components, including the register 302, and that a person of ordinary skill in the art "would have understood and been motivated to use the local clock in the Control Unit ASIC to operate the register 302." *Id.* (citing Ex. 1003 ¶ 262).

Petitioner has sufficiently shown that Ellsberry teaches limitations [16.d] and [16.d.i] of claim 16.

Petitioner contends that Ellsberry discloses limitation [16.e] of claim 16 reciting "wherein the command signal is transmitted to only one DDR memory device at a time." Pet. 109–11 (citing Ex. 1003 ¶¶ 264–265); Ex. 1001, 3:42–43 (reexamination certificate). Specifically, Petitioner contends that Ellsberry teaches that an Activate, Write or Read command signal is transmitted to only the selected memory device and the other memory device receives a no-operation command. *Id.* at 109–11 (citing

57

Ex. 1037 ¶¶ 10, 33, 42, Figs. 8A, 12; Ex. 1003 ¶ 264).

Patent Owner argues that Petitioner has not provided any competent evidence that Ellsberry discloses limitation [16.e] of claim 16. Prelim. Resp. 41–42. Specifically, Patent Owner argues that claim 16 requires sending a command to a single device at a time even though there are multiple devices in each rank. *Id.* at 41. As discussed above in Section III.D.4, we preliminarily determine that a rank can have one device, and, therefore, we disagree with Patent Owner's argument.

We determine that Petitioner has shown a reasonable likelihood that claim 16 of the '912 patent is unpatentable as obvious over Ellsberry.

## IV.   CONCLUSION

Petitioner has carried its burden to show that it is the sole real party-in-interest in this proceeding, and that Petition is not time-barred under § 315(b) due to service of a complaint on an unnamed real party-in-interest more than one year before the filing of the Petition.

We do not deny this Petition based on an earlier *inter partes* reexamination under § 314(a) under *General Plastics*. No authority has been provided to support application of *General Plastics* in the context presented here.

We determine under the *Advanced Bionics* framework that, although Ellsberry was considered during examination of the '912 patent, Petitioner has shown that the Examiner erred by concluding that Ellsberry is not prior art to the '912 patent. Petitioner carried its initial burden to show that Ellsberry is prior art, and Patent Owner did not carry its burden of production to show that the subject matter of claim 16 of the '912 patent is

58

supported by its priority applications such that Ellsberry is not prior art. Accordingly, we decline to exercise our discretion to deny institution under § 325(d).

Petitioner has shown a reasonable likelihood that claim 16 would have been obvious over Perego-422, the combination of Perego-422 and Amidi, and Ellsberry. Accordingly, we institute inter partes review for claim 16 on all asserted challenges. *See SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348 (2018).

## V. ORDER

For the foregoing reasons, it is

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claim 16 of the '912 patent is hereby instituted on the grounds of unpatentability set forth in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial; the trial will commence on the entry date of this decision.

59

IPR2022-00615
Patent 7,619,912 B2

PETITIONER:

Eliot D. Williams
Theodore W. Chandler
Ferenc Pazmandi
Eric J. Faragi
Brianna L. Porter
BAKER BOTTS LLP
DLSamsungNetlistIPRs@bakerbotts.com
eliot.williams@bakerbotts.com
ted.chandler@bakerbotts.com
ferenc.pazmandi@bakerbotts.com
eric.faragi@bakerbotts.com
brianna.potter@bakerbotts.com


PATENT OWNER:

Hong Annita Zhong
Jason Sheasby
IRELL & MANELLA LLP
hzhong@irell.com
jsheasby@irell.com
netlistIPR@irell.com

60

████████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC., <br><br> Plaintiff, <br><br> v. <br><br> SAMSUNG ELECTRONICS CO, LTD; SAMSUNG ELECTRONICS AMERICA, INC.; SAMSUNG SEMICONDUCTOR INC., <br><br> Defendants. | Civil Action No. 2:22-cv-00293-JRG <br> (LEAD CASE) <br><br> **JURY TRIAL DEMANDED** |
| NETLIST, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICRON TECHNOLOGY, INC., MICRON SEMICONDUCTOR PRODUCTS, INC., AND MICRON TECHNOLOGY TEXAS LLC, <br><br> Defendants. | Civil Action No. 2:22-cv-00294-JRG <br><br> **JURY TRIAL DEMANDED** |

**MICRON'S DAUBERT MOTION AND MOTION TO STRIKE
EXPERT TESTIMONY OF MR. DAVID KENNEDY**

Appx5143

CONFIDENTIAL MATERIAL OMITTED

outweighed by a risk of unfair prejudice." *Id.* Moreover, Mr. Kennedy's forward-looking "book of wisdom" analysis also completely ignores the subsequent invalidation of the patents on which that verdict rests.

Thus, the Court should strike Mr. Kennedy's opinions because Mr. Kennedy attempts to anchor or base a royalty on a jury verdict in another case against another defendant based on different patents that has no probative value whatsoever and is highly prejudicial.

**B.      The Court Should Strike Mr. Kennedy's Opinion That the ███████  ███████ Is Relevant to the Hypothetical Negotiation.**

Mr. Kennedy relies on an unsupported and conclusory opinion of Dr. Mangione-Smith to assert that the ███████ is a comparable license for a hypothetical negotiation. Ex. 1. ¶ 502. But the ███████ could only be relevant if technology comparability exists between the Asserted Patents and the patents licensed by Rambus. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). Dr. Mangione-Smith did not compare the specific Asserted Patents to the patents in the ███████ to establish any discernible link to the claimed technology at issue. Ex. 2, Ex. E, ¶¶ 153-163. Thus, Mr. Kennedy's corresponding opinions are completely untethered to the facts of the case. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283 (Fed. Cir. 2015); *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010) (finding district court erred in considering damages opinions when expert "used licenses with no relationship to the claimed invention to drive the royalty rate up to unjustified [] levels.").

Dr. Mangione-Smith provided no analysis that the Asserted Patents share any technical comparability to ███████ that he analyzed. Ex. 2, Ex. E, ¶¶ 156-63. Dr. Mangione-Smith provides only vague, "loose" and unsupported opinions that "a person of skill in the art would understand that this is technically comparable to the Asserted Patents." Ex. 2, ¶¶ 159,163; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed.

6

CONFIDENTIAL MATERIAL OMITTED

Cir. 2012). By failing to compare the ████████████ to the asserted patents, Dr. Mangione-Smith has not reliably determined whether the ████████████ is technically comparable to the '912 and '417 Patents.

Additionally, Dr. Mangione-Smith copies, almost verbatim, his opinion on the comparability of the ████████████ from his Netlist -203 report. *See* Ex. 3 Ex. C, ¶¶ 153-163. In Netlist -203, Dr. Mangione-Smith defined the subject of the '506 and '339 Patents—the different patents in the Netlist -203 case directed toward DDR4. *Id*., ¶ 2. Specifically, in Netlist -203, Dr. Mangione-Smith opined that "the '506 and '339 Patents are directed towards ████████████ ████████████████████ *Id*. In the current proceeding, Dr. Mangione-Smith opines that ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ Ex. 2, Ex. E, ¶ 2. He also opines that ████████ ████████████████████████████████████ ████████████████████████████████████ ████████████ *Id*.

Despite conceding that the subject matter of the DDR4 patents at issue in the other Netlist -203 litigation is **different**, Dr. Mangione-Smith reuses his report and opinion almost verbatim from that case in the current proceeding. *Compare* Ex. 3, Ex. C ¶¶153-163, *with* Ex. 2, Ex. E ¶¶ 153-163. The only difference is that in Netlist -203, Dr. Mangione-Smith compared the technology of the '506 patent to the ████████████ patents with the required level of specificity. *See* Ex. 3, Ex. C ¶¶ 159, 163. In the current proceeding, Dr. Mangione-Smith does not provide this analysis and only provides vague, "loose" and unsupported opinions that "a person of skill in the art would understand that this is technically comparable to the Asserted Patents," without any explanation of

7

Appx5154

CONFIDENTIAL MATERIAL OMITTED

how the ▮▮▮▮▮▮▮▮ is technically comparable to the '912 or '417 Patents. Ex. 2, Ex. E ¶¶, 159, 163.

Congress amended Fed. R. Evid. 702 in December 2023 to "emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. This amendment clarified that critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of admissibility and not weight. *Id*. By copying his report from Netlist -203—despite conceding that the technology of the asserted patents is different between the two litigations—and by only providing vague, loose, and unsupported opinions that a person of skill in the art would understand that this is technically comparable to the Asserted Patents, Netlist has not demonstrated that it is more likely than not that Mr. Kennedy's "opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. Thus, the Court should exclude Mr. Kennedy's opinions tied to the ▮▮▮▮▮▮▮▮

### C. The Court Should Strike Mr. Kennedy's Opinions Regarding DDR4 LRDIMMs Damages Because He Does Not Reliably Apportion Damages.

The Court should strike Mr. Kennedy's opinions regarding DDR4 LRDIMMs because he does not reliably apportion the value of the asserted patents. Mr. Kennedy has twice claimed the *same damages* arising from Micron's sales of DDR4 LRDIMMs, once for infringement of the Patents-in-Suit in this matter, and once for the technology of two other Netlist patents that were at issue in a *different litigation* (and subsequently dropped by Netlist after the Patent Office found all claims to be unpatentable).

A proper damages analysis must apportion the value of the accused technology in the accused products. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1327 (Fed. Cir. 2014). "[T]he

8

Appx5155

CONFIDENTIAL MATERIAL OMITTED

ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). When multiple patents are asserted on the same accused products, an expert must apportion the value of multiple patents that allegedly covered the same feature. *See Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197-WHO, 2016 WL 4268659, at *4 (N.D. Cal. Aug. 15, 2016) ("This method assumes that both patents add the full value of that feature to the SAV Engine. As discussed, this is not possible under patent law; therefore, this apportionment calculation is not a reliable methodology for calculating a reasonable royalty."). Specifically, it is "improper[] [to] inflate[] the royalty base by double or triple counting revenue attributable to certain features of the accused products." *Id*. at *3.

Mr. Kennedy concludes that Micron has realized gains from the sale of DDR4 LRDIMM products that infringe the '912 and '417 Patents. Ex. 1, ¶¶ 193–195, 202–204. Mr. Kennedy opines that Micron would ████████████████████████████████████████ ████████████████████████████████. *Id*. However, in Netlist -203, Mr. Kennedy made exactly the same claim, arguing that the ████████████████ ███████████████████████████████████████████ ████████████████████████████████████████. Ex. 4, ¶¶ 322–324, 332–334. Mr. Kennedy even admits—in an attempt to improperly use the Samsung verdict—that the asserted patents "████████████████ ███████████████████████████████████████████ ███████████████████████████████ Ex. 1, ¶ 365. Mr. Kennedy has *twice* claimed these different patents are each solely responsible for the exact same technical benefit and same damages that arise from Micron's

9

Appx5156

CONFIDENTIAL MATERIAL OMITTED

sales of DDR4 LRDIMMs, once for infringement of the Patents-in-Suit in this matter, and once for technology of the '339 and '506 Patents (now invalid).

Mr. Kennedy does not apportion the value of multiple patents that allegedly cover the same DDR4 LRDIMM features. Ex. 1, ¶ 211 ███████████████████████████████████████████████████████████████ *See Finjan, Inc.*, 2016 WL 4268659, at *4. Mr. Kennedy provides no explanation for why he can double count the revenue attributable to the exact same alleged incremental technology advance for DDR4 LRDIMM features. For these reasons, Micron respectfully asks the Court to strike Mr. Kennedy's opinions regarding DDR4 LRDIMM products.

**D.    The Court Should Strike Mr. Kennedy's Opinions Regarding Willfulness and Netlist's February 2015 Slide Deck and April 2015 Slide Deck.**

The Court should strike Mr. Kennedy's opinions regarding willfulness and notice, wherein Mr. Kennedy—an accountant—just characterizes certain internal Netlist documents provided to him by Netlist's counsel to opine about Micron's alleged knowledge of patents in suit. Ex. 1, ¶¶ 49-52, 54-63, 593-594. If documents Mr. Kennedy summarizes are relevant and admissible, the jury is perfectly capable of assessing them without "expert" testimony, which utilizes none of Mr. Kennedy's expertise.

Mr. Kennedy improperly speculates about alleged meetings he did not attend to exclusively opine on Micron's alleged state of mind. "An expert witness's credentials put him in no better position to opine as to Defendant's state of mind than the jury." *Thomas v. PFG Transco, Inc.*, 501 F. Supp. 3d 437, 443 (E.D. Tex. 2020). Indeed, these types of opinions are "matters which a jury is capable of understanding without an expert's help." *Retractable Techs. Inc. v. Abbott Lab'ys, Inc.*, Case No. 5:05-CV-157, 2010 WL 11531436, at *6 (E.D. Tex. June 18, 2010).

10

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

_____

| | | |
|---|---|---|
| Netlist, Inc. | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| V. | : | 2:22-cv-294-JRG |
| | : | |
| Micron Technology, Inc., | : | |
| Micron Semiconductor Products, Inc., | : | |
| Micron Technology Texas, LLC | : | |
| | : | |
| Defendants. | : | |

_____

Expert Report of Mr. David Kennedy

November 20, 2023

███████████████████████████

*Expert Report of Mr. David Kennedy*

████████████████████████████

█

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████

█████████████████████████████████████████████

████████

██ ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████

██ █████ ██ ████████████ █████ ████ ██ ████

██ ██████████████████████████████████████████

███████████████████████████████████████

██████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████

---

██ ████████████████████████████████████████████

██ ████████████████████████████████████████

██ ████████████████████████████████████████

██████████████████████

*Expert Report of Mr. David Kennedy*

███████████████████████

*Expert Report of Mr. David Kennedy*

████████████████████████████████████████████████
████████████████████████████████████████████████
████

- ██ ████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████████████████████████

  - ██ ████████████████████████
    - ██ █████████████████████████████████████████
      █████████████████████████████████████████████
      ████████████████████████████████████████████████
      ████████████████████████████████████████████████
      ████████████████████████████████████████████████
      ███████████████████████████████████████████
      ████████████████████████████████████████████████
      ██████████████████████████

    - ██ ████████████████████████████████████████
      ████████████████████████████████████████████████
      ██████████████████

  - ██ ████████████████████████████████
    - ██ █████████████████████████████████████████
      ████████████████████████████████████████████████
      ████████████████████████████████████
      ██████████████████████████████████

  - ██ ███████████████████████████
    - ██ █████████████████████████████████████████
      ████████████████████████████████████████████████
      ███████████████████████████████████████
      ██████████████████████████████████

---

██ ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

██████████████████████████

*Expert Report of Mr. David Kennedy*

- ██ ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████

- ██ ████████████████████████████████████████████████
  ██████████████████████████████████████████████
  ████████████████████████████████████
  ██████████████████████████████████████████████████
  ██████████████████

- ██ ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ████████████████████████████████████████████████
  ██████████████████████████████████████████
  ██████████████████████████████████████████
  ████████████

  - ██ ██████████████████████

    - ██ ████████████████████████████████████████████
      ████████████████████████████████████████████
      ████████████████████████████████████████████
      ██████████████████████████████████████
      ██████████████████████████████████████
      ████████████████████████████████████████████

    - ██ ████████████████████████████████████████████
      ████████████████████████████████████████████
      ██████████████████████████████████

- ██ ██████████████████████████████████

  - ██ ████████████████████████████████████████████
    ████████████████████████████████████████

─────────────────────

██████████████████████████████████████████████████████
██████████



*Expert Report of Mr. David Kennedy*





*Expert Report of Mr. David Kennedy*



*Expert Report of Mr. David Kennedy*

███████████████████████

*Expert Report of Mr. David Kennedy*

- ████████████████████████████████
  ████████████████████████████████
  █████████████████████████████
  ████████████████████████████████
  █████████████████████████████
  ████████████████████████████████
  ███████████████████████████████
  ███████████████████████████████
  ███████████████████████████████
  ███████████████████████████████
  ███████████████████████████████
- ███████████████████████████████
  ███████████████████████████████
  ███████████████████████

- ████████

  - ███████████████████████
    - ███████████████████████████████
      ██████
  - █████████████████████
    - ███████████████████████████████
      ████████████████████████
      ███████████████████████████████
      ██████████████████████████
      ███████████████████████████████
      ███████████████████████████████
      ██████████████████████████
      ███████████████████
    - ██████████████████████████
      ██████████████████████████
      ███████████████████████████████
      ███████████████████████████████
      ███████████████████████████████



*Expert Report of Mr. David Kennedy*



*Expert Report of Mr. David Kennedy*



Exhibits to Expert Report of David Kennedy



Exhibits to Expert Report of David Kennedy

███████████████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

NETLIST, INC.,

       Plaintiff,

   vs.

MICRON TECHNOLOGY, INC.; MICRON
SEMICONDUCTOR PRODUCTS, INC.;
MICRON TECHNOLOGY TEXAS LLC,

Defendants.

Civil Action No. 2:22-cv-00294-JRG

JURY TRIAL DEMANDED

---

**OPENING EXPERT REPORT OF DR. WILLIAM HENRY MANGIONE-SMITH**

---

_Dr. William Henry Mangione-Smith_

Dr. William Henry Mangione-Smith

November 20, 2023



# CONFIDENTIAL MATERIAL OMITTED













CONFIDENTIAL MATERIAL OMITTED



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

_____

|  |  |
|---|---|
| Netlist, Inc. | : |
|  | : |
| Plaintiff, | : Civil Action No. |
| V. | : 2:22-cv-00203-JRG-RSP |
|  | : |
| Micron Technology, Inc., | : |
| Micron Semiconductor Products, Inc., | : |
| Micron Technology Texas, LLC | : |
|  | : |
| Defendants. | : |

_____

Expert Report of Mr. David Kennedy

October 4, 2023

████████████████████████████

*Expert Report of Mr. David Kennedy*

██████████████████████

*Expert Report of Mr. David Kennedy*

████████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████

■■ ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
█████████████████████████████████████

■■ ████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
██████████████████████████████████████████████
█████████████████████████████████

■■ ████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████

■■ ███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████

■■  ████████████████████████

■■ ██████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████

_____

■■  ████████████████████████████████████████████████
████████████████████████████████████████████

██████████████████████████

*Expert Report of Mr. David Kennedy*

█████████████████████

*Expert Report of Mr. David Kennedy*

██████████

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>        Plaintiff,<br><br>  vs.<br><br>SAMSUNG ELECTRONICS CO., LTD.<br>ET AL.,<br><br>        Defendants. | Case No. 2:22-cv-293-JRG (Lead Case)<br><br>JURY TRIAL DEMANDED |
| NETLIST, INC.,<br><br>        Plaintiff,<br><br>  vs.<br><br>MICRON TECHNOLOGY, INC.;<br>MICRON SEMICONDUCTOR<br>PRODUCTS, INC.; MICRON<br>TECHNOLOGY TEXAS LLC,<br><br>        Defendants. | Case No. 2:22-cv-294-JRG<br><br>JURY TRIAL DEMANDED |

## MICRON DEFENDANTS' OMNIBUS MOTIONS *IN LIMINE*

██████████









██████████████████████████████████

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| NETLIST, INC.,<br><br>    Plaintiff,<br><br>  vs.<br><br>MICRON TECHNOLOGY, INC.; MICRON SEMICONDUCTOR PRODUCTS, INC.; MICRON TECHNOLOGY TEXAS LLC,<br><br>Defendants. | Civil Action No. 2:22-cv-203-JRG<br><br>JURY TRIAL DEMANDED |

## OPENING EXPERT REPORT OF DR. WILLIAM HENRY MANGIONE-SMITH

Dr. William Henry Mangione-Smith

October 4, 2023



NETLIST, INC.,

      Plaintiff,

    vs.

MICRON TECHNOLOGY, INC.; MICRON
SEMICONDUCTOR PRODUCTS, INC.;
MICRON TECHNOLOGY TEXAS LLC,

Defendants.

Civil Action No. 2:22-cv-00294-JRG

JURY TRIAL DEMANDED

---

**OPENING EXPERT REPORT OF DR. WILLIAM HENRY MANGIONE-SMITH**

---

Dr. William Henry Mangione-Smith

November 20, 2023



Exhibit A to Opening Report

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| NETLIST, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO, LTD;<br>SAMSUNG ELECTRONICS AMERICA,<br>INC.; SAMSUNG SEMICONDUCTOR INC.,<br><br>        Defendants. | Civil Action No. 2:22-cv-00293-JRG<br>(LEAD CASE)<br><br>**JURY TRIAL DEMANDED** |
| NETLIST, INC.,<br><br>        Plaintiff,<br><br>v.<br><br>MICRON TECHNOLOGY, INC., MICRON<br>SEMICONDUCTOR PRODUCTS, INC., AND<br>MICRON TECHNOLOGY TEXAS LLC,<br><br>        Defendants. | Civil Action No. 2:22-cv-00294-JRG<br><br>**JURY TRIAL DEMANDED** |

**MICRON'S REPLY TO NETLIST'S OPPOSITION TO MOTION TO STRIKE EXPERT
TESTIMONY OF MR. DAVID KENNEDY**

## I. Mr. Kennedy's Opinions Regarding the *Samsung* Jury Verdict Are Unreliable

Mr. Kennedy's opinions regarding the *Samsung* litigation jury verdict are unreliable and extremely prejudicial. *See* Dkt. 360 ("Motion") at 3-6. As this Court held in granting Micron's similar motion to strike in *Netlist, Inc., v. Micron Technologies, Inc. et. al.*, No. 2:22-cv-203-JRG (E.D. Tex.) ("Netlist -203"), Ex. 1 at 4, "the subsequent date of the verdict and its lessened reliability due to not being final, cause the risk of unfair prejudice to outweigh the probative value." *Id.* Netlist raises the same rejected arguments here, Dkt. 468 at 1-3, which the Court should reject again. Nor does the existence of different patents in this case mandate a different result. Dkt. 456 at 2 n.1. Rather, this only lowers the *Samsung* verdict's probative value because there is no overlap between the patents at issue here and those at issue in the *Samsung* litigation.

## II. Mr. Kennedy's Opinion That the ███████████████ Is Relevant to the Hypothetical Negotiation Is Untethered to the Facts of the Case

Mr. Kennedy's opinions regarding the ███████████████ are untethered to the facts of the case because Netlist's expert, Dr. Mangione-Smith, provided no analysis that the patents-in-suit share *any* comparability to ██████████ patents. Mot. at 6-8. *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). As a result, Mr. Kennedy's opinions lack *any* factual predicate for technical comparability and are unreliable. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283 (Fed. Cir. 2015). While this Court denied Micron's motion to strike in Netlist -203, Dr. Mangione-Smith's current analysis is more deficient and mandates a different result. Here, Dr. Mangione-Smith does not compare the ██████████████ to *any* of the patents-in-suit. Instead, he simply recycles his Netlist -203 report and opinions despite conceding that the subject matter of the patents in the Netlist -203 litigation is different. Mot. at 7-8.

## III. Mr. Kennedy's Opinions Regarding DDR4 LRDIMMs Do Not Apportion Damages

Mr. Kennedy has improperly double counted *the same claimed damages* arising from

1

CONFIDENTIAL MATERIAL OMITTED

Micron's sales of DDR4 LRDIMMs: once for infringement of the two Patents-in-Suit in this matter, and once again for the technology of two other Netlist patents at issue in Netlist -203. Mot. at 8-10. Despite Netlist's assertions regarding non-infringing alternatives, Opp. at 5, Mr. Kennedy must still "isolate the incremental value that [the Defendant] would ascribe to the patented features, and not more." *Metaswitch Networks Ltd. v. Genband US LLC*, 2016 WL 874737, at *3 (E.D. Tex. Mar. 5, 2016). When comparing Mr. Kennedy's report from this litigation with his report from the -203 litigation, Mr. Kennedy assigns **all** of the value of two features of DDR4 LRDIMM products to the two patents-in-suit—but Mr. Kennedy had already assigned all of the value of those same two features to **two separate** patents in the -203 case.[1] His ultimate conclusions only differ because his, and Dr. Groehn's, analysis begins at an earlier date in this case.

Netlist's reliance on *Intel Corp. v. Tela Innovations, Inc*. is unpersuasive because, unlike here, the expert there made "relative changes in value to [various] measures, such as royalty rate and base …" 2021 WL 1222622, at *33 (N.D. Cal. Feb. 11, 2021). Similarly, the court in *PersonalWeb Techs. LLC v. Int'l Bus. Machines Corp.* determined that the expert considered the "'incremental value' of the [] patent." 2017 WL 3476082, at *1 (N.D. Cal. Aug. 14, 2017). Lastly, *Finjan* made clear that Mr. Kennedy's "assum[ptions] that both [sets of] patents add the full value" of the same feature to DDR4 products "is not possible under patent law." *Finjan, Inc. v. Sophos, Inc.*, 2016 WL 4268659, at *4 (N.D. Cal. Aug. 15, 2016). As a matter of law and logic, Mr. Kennedy cannot properly conclude that two groups of patents each contribute the full value of the same feature to the DDR4 LRDIMMs at issue.

That Netlist is no longer proceeding with the '506 and '339 patents in Netlist -203 supports

---

[1] Mr. Kennedy assigned **all** of the value of ▮▮▮▮▮▮▮▮▮▮▮▮▮ both to the '912 patent in this case and the '506 patent in the -203 case. Similarly, Mr. Kennedy assigns all of the value of ▮▮▮▮▮ ▮▮▮▮▮ both to the '417 patent in this case, as well as to the '339 patent in the -203 case. Mot. at 9-10.

2

CONFIDENTIAL MATERIAL OMITTED

striking Mr. Kennedy's methodology. Mr. Kennedy already assigned 100% of the value of the ██████████ for DDR4 products to the technology originally claimed in the '339 and '506 patents asserted in -203; the contribution of that technology must be apportioned out from damages in this case, leaving 0% available if the only benefit of the patents asserted in this litigation is the same benefit claimed in the previous -203 litigation. *Finjan*, 2016 WL 4268659, at *4.

**IV.    Mr. Kennedy's Opinions Regarding Willfulness and Netlist's February 2015 and April 2015 Slide Decks Have Already Been Found Inadequate**

Netlist fails to mention that this Court granted Micron's similar motion to strike Mr. Kennedy's opinions regarding the February 2015 and April 2015 slide decks in Netlist -203, holding that the "February 2015 and April 2015 Slide Decks are not sufficient for pre-suit damages notice." Ex. 1 at 8. This Court also held that "Mr. Kennedy shall not be permitted to testify to 'Micron's awareness of Netlist's patented technology" in any other context.'" *Id*.  The slide decks are not sufficient for pre-suit damages notice; as this Court previously determined, "the presentations do not attempt to identify infringement in Micron's products but rather provide offers for partnership and incorporation of the patent portfolio through licensing." Ex. 2 at 8. For the same reasons, the Court should strike Mr. Kennedy's opinions regarding Netlist's 2015 slide decks.

**V.    Mr. Kennedy is Not Qualified to Provide Economic Opinions**

As a Certified Public Accountant (CPA), Mr. Kennedy lacks the credentials to deliver antitrust economic opinions. Mot. at 12. Netlist's response is significant for what it does *not* cite:

- Any case, from any jurisdiction, when a non-economist was permitted to opine on issues of ███████████████████████████████████████████;
- Any case when Mr. Kennedy was qualified to opine as an expert on these issues;
- Any economics course Mr. Kennedy has ever taken or taught; and
- Any peer reviewed economic article Mr. Kennedy has ever written.

3

Appx5555